IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA A. MORRING and )
DESHAUNIA Q. SNOWDEN, as )
Parents and Next Friends of )
Q.E.S., a minor, )
                       ) Civil Action No. 06CV2036
            Plaintiffs, )
                       ) Judge Rosemary M. Collyer
    v. )
                       ) Next Event: Status Conference
CHILDREN'S NATIONAL MEDICAL ) 02/08/08, 2:30 p.m.
CENTER, )
            Defendant. )

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## WITH RESPECT TO COUNTS II THROUGH XI OF THE COMPLAINT

Defendant Children's National Medical Center ("Children's"), through

undersigned counsel and pursuant to Fed. R. Civ. P. 56(b), hereby respectfully moves

the Court for summary judgment as to Counts II through X and a substantial part of

Count XI of Plaintiffs' Complaint because there is no genuine issue of material fact, and

Defendant is entitled to judgment as a matter of law.

The Complaint purports to set forth the following claims:

- Count I.  Medical Negligence—Child's Claims

- Count II.  Lack of Informed Consent

- Count III.  Strict Products Liability

- Count IV.  Breach of Implied Warranty of Fitness for a Particular Purpose

- Count V.  Breach of Express Warranties

- Count VI.  Fraud

- Count VII.  Negligence Per Se—Violation of 21 U.S.C. § 360c(a)(II) and 21 C.F.R. Ch. 1 § 812.20(a)(2)

- Count VIII.  Negligence Per Se—Violation of 21 U.S.C. § 331(a), (b), (c), (g) and (k)

- Count IX.  Negligence Per Se—Violation of 21C.F.R. § Ch. 1 812.20(a)(2)

- Count X.  Punitive Damages

- Count XI.  Parents' Claim

This matter is, at its core, a medical negligence or malpractice suit.  Plaintiffs have attempted to layer on top of this negligence claim wholly irrelevant claims unsubstantiated by law and unsupported by material facts.  Accordingly, dismissal of Counts II through XI is appropriate.

In further support of this Motion, Defendant would respectfully refer the Court to the accompanying Statement of Material Facts as to Which There Is No Genuine Dispute, Memorandum of Points and Authorities, and attached Exhibits A through O.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

By: _____
   Nicholas S. McConnell (#167742)
   Krista A. Maizel (#503597)
   Lydia A. Auzoux (#477054)
   1120 – 20th Street, NW (South Tower)
   Washington, DC  20036-3437
   (P)(202) 457-1600
   (F)(202) 457-1678
   nmcconnell@jackscamp.com
   kmaizel@jackscamp.com
   lauzoux@jackscamp.com

*Counsel for Defendant*
*Children's National Medical Center*

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of February, 2008, I caused the foregoing

Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56(b) with Respect to

Counts II Through XI of the Complaint, the accompanying Statement of Material Facts

as to Which There is No Genuine Dispute, Memorandum of Points and Authorities,

Exhibits A through O, and proposed form of Order, to be electronically served upon the

following:

Ira Sherman, Esq.
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth St., NW
Washington, DC 20036

Anthony Newman, Esq.
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave.
Suite 700E
Bethesda, MD 20814

*Counsel for Plaintiffs*

Nicholas S. McConnell

563657v.2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA A. MORRING and          )
DESHAUNIA Q. SNOWDEN, as        )
Parents and Next Friends of     )
Q.E.S., a minor,                )
                                )    Civil Action No. 06CV2036
          Plaintiffs,           )
                                )    Judge Rosemary M. Collyer
     v.                         )
                                )    Next Event: Status Conference
CHILDREN'S NATIONAL MEDICAL     )    02/08/08, 2:30 p.m.
CENTER,                         )
          Defendant.            )

## DEFENDANT'S STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE DISPUTE

1.      On September 6, 2005, in the 38th week of her second pregnancy which
was high-risk and complicated by gestational diabetes, Teresa Morring gave birth to
Q.E.S., the infant on whose behalf this suit is brought, at Sentara Norfolk General
Hospital ("Sentara") in Norfolk, Virginia by emergency C-section necessitated by
nonreassuring fetal heart tones and late decelerations.  Q.E.S. was given oxygen
almost immediately for persistent cyanosis and was briefly bag-masked.  His oxygen
saturation levels remained under 80% and, as a result, he was quickly transferred from
Sentara to the Neonatal Intensive Care Unit ("NICU") at Children's Hospital of the King's
Daughters ("CHKD") in Norfolk, Virginia for suspected cardiac anomaly and/or
persistent pulmonary hypertension.  [See Transfer Summary of Children's Hospital of
the King's Daughters for Q.E.S., attached as Exhibit A hereto, produced as CHKD 009-
010.]

2.    While at CHKD, Q.E.S. was diagnosed with severe ventricular septal hypertrophy[1]/cardiomegaly with outflow obstruction, tricuspid regurgitation, small to moderate patent ductus arteriosis, and persistent pulmonary hypertension.  To assist with oxygenation, Q.E.S. was placed on a ventilator shortly after his admission and was subsequently treated with nitric oxide.[2]  Even on jet ventilation, Q.E.S.'s oxygen levels dropped without provocation.  Also at CHKD, Q.E.S. was discovered to be very sensitive to blood pressure.  [See Exhibit A.]

3.    Despite the efforts of the NICU team at CHKD, Q.E.S. could not be stabilized sufficiently on their available therapeutic interventions and, on September 11, 2005, a CHKD neonatologist, Dr. Jamil Khan, determined that Q.E.S. might need extracorporeal membrane oxygenation ("ECMO") therapy.  [See Dr. Khan's Note explaining Q.E.S.'s status on September 11, 2005, attached hereto as Exhibit B, produced as CHKD 062.]

4.    ECMO is a heart/lung bypass system by which equipment connected to the patient acts as an extension of the patient's own cardiopulmonary system; blood is circulated through the ECMO circuit, where it is stripped of carbon dioxide and loaded with oxygen, warmed, and then pumped into the patient.[3]  While the ECMO circuit acts as the patient's heart and lungs, and although there are no assurances that the therapy

---

[1] In layman's terms, the walls of Q.E.S.'s heart's ventricles, which pump blood from the heart into the body, were too large.  See Stedman's Medical Dictionary (28th ed. 2005).

[2] Nitric oxide assists with the relaxation of muscle fibers, resulting in dilation and increased blood flow.

[3] A schematic of the ECMO circuit used for Q.E.S. is attached hereto as Exhibit C.  The schematic in included in Children's National Medical Center's internal ECMO training manual, produced as CNMC 02327.

will be successful, the therapy does create an opportunity for the patient's organs to rest and heal.

5.    Dr. Khan could not secure an ECMO bed for Q.E.S. at the University of Virginia, but he found a bed for Q.E.S. at Children's National Medical Center ("Children's").  See Exhibit B.  Dr. Khan discussed the transport and ECMO with Ms. Morring, Mr. Snowden, and Ms. Morring's family members prior to Q.E.S.'s transport. [See Deposition Transcript of Teresa A. Morring (hereinafter "Morring Depo."), taken September 4, 2007, excerpts of which are attached hereto as Exhibit D, at 36:8-16.] Additionally, Ms. Morring had Q.E.S. baptized before he was flown to Children's; it was the chaplain's suggestion, but Ms. Morring understood Q.E.S.'s condition was "critical." [See Morring Depo., 37:11-14.]  Q.E.S.'s transfer to Children's took place on the evening of September 11, 2005.

6.    Q.E.S. was not placed immediately on ECMO upon his arrival at Children's.  By the late afternoon of September 13, 2005, however, the Children's neonatologists recommended that Q.E.S. be placed on ECMO, which was done at approximately 4:30 p.m.  [See Children's ECMO Cannulation Note, produced as CNMC 00373 and attached hereto as Exhibit E]

7.    In this lawsuit, filed against Children's National Medical Center on November 29, 2006, Plaintiffs, as the Guardians and Next Friends of their son, Q.E.S., in addition to claims of medical negligence or malpractice as set forth in Count I of the Complaint, attempt to allege in Counts II through XI multiple product liability, warranty, and lack of informed consent claims as well as claims for fraud and damages related to the alleged improper use of "the ECMO device and/or its smaller component devices."

- 3 -

This Motion addresses only the claims attempted to be alleged in Counts II through XI of the Complaint. [See Plaintiffs' Complaint, filed herein.[4]]

8.     The pump used in the ECMO circuit at Children's was approved by the FDA pursuant to the 510(k) premarket approval process for cardiopulmonary bypass procedures lasting six hours or less.[5]

9.     The average length neonatal patients are on ECMO, if necessary, is in the range of a week to ten days. [See Deposition Transcript of Melvin H. Van Woert, M.D., (hereinafter "Van Woert Depo."), taken January 4, 2008, excerpts of which are attached hereto as Exhibit G, at 15:11-15.]

10.     At the time the physicians at Children's recommended ECMO therapy to Plaintiffs, they hoped Q.E.S. would be on ECMO for less than a month. [See Deposition Transcript of Khodayar Rais-Bahrami, M.D. (hereinafter "Rais-Bahrami Depo."), taken October 24, 2007, excerpts of which are attached as Exhibit H, at 37:6-12.]

---

[4] The claims set forth in Plaintiffs' Complaint are as follows:
   Count I – Medical Negligence;
   Count II – Lack of informed consent;
   Count III – Strict products liability;
   Count IV – Breach of implied warranty of fitness for a
   particular purpose;
   Count V – Breach of express warranties;
   Count VI – Fraud;
   Count VII – Count IX - Negligence *per se* for violation of
   various federal laws and regulations;
   Count X – Punitive damages; and
   Count XI – Parents' claim for economic loss.

[5] This process is explained at 21 C.F.R. § 807.81. In short, a medical device carrying 510(k) premarket approval has shown to the FDA that the device is "substantially equivalent" to a fully-approved predicate device. For the sake of this Motion only, Children's accepts Plaintiffs' allegations regarding the FDA-approval status of the ECMO circuit and/or its component parts as true. [See Plaintiff Teresa A. Morring's Answers to Interrogatories, relevant portions of which are attached hereto as Exhibit F.]

11.    The physicians and other caregivers at Children's did not at any time discuss with Plaintiffs the FDA status of the ECMO equipment, including, specifically, the Maquet/Jostra HL20 Roller Pump in the ECMO circuit used to deliver the medical care received by their son, Q.E.S., at Children's. [See Rais-Bahrami Depo. at 148:22 – 150:17, 151:5-17, and 163:10-15.

12.    The physicians and other caregivers at Children's did not at any time discuss with Plaintiffs the incidence of unscheduled or inadvertent decannulations of neonatal patients from ECMO.  [See Rais-Bahrami Depo., supra.]

13.    The incidence of inadvertent decannulations for Children's NICU patients on ECMO is 0.004%.  [See Deposition Transcript of Gerald Thomas Mikesell (hereinafter "Mikesell Depo."), taken August 24, 2007, excerpts of which are attached hereto as Exhibit I, at 11:1-16 (recalling a total of three unscheduled decannulations in over 700 ECMO patients at Children's); Deposition Transcript of David M. Powell, M.D. (hereinafter "Powell Depo."), taken October 24, 2007, excerpts of which are attached hereto as Exhibit J, at 11:9-11 (performing a total of two unscheduled recannulations in 17 years of surgical practice); Rais-Bahrami Depo. at 104:6-22 (recalling a total of three unscheduled decannulations at Children's since 1991); Deposition Transcript of Billie Lou Short, M.D. (hereinafter "Short Depo."), taken January 22, 2008, excerpts of which are attached hereto as Exhibit K, at 38:5 - 39:16 (describing the incidence of unscheduled decannulation as "very rare").]

14.    There is no evidence that the ECMO pump used in the circuit for Q.E.S. was in any way implicated in the alleged injury-producing event in that there is no evidence of any defect in the pump or that there was any failure of the pump, itself.

- 5 -

[See Deposition Transcript of Carolyn S. Crawford, M.D. (hereinafter "Crawford Depo."),

taken December 10, 2007, excerpts of which are attached hereto as Exhibit L, at 125:3-

8; Deposition Transcript of Samuel M. Rosenberg, M.D., (hereinafter "Rosenberg

Depo."), taken December 13, 2007, excerpts of which are attached hereto as Exhibit M,

at 34:7 – 36:7; Mikesell Depo. at 19:10-12.]

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

By: _____
Nicholas S. McConnell (#167742)
Krista A. Maizel (#503597)
Lydia A. Auzoux (#477054)
1120 – 20th Street, NW (South Tower)
Washington, DC  20036-3437
(P)(202) 457-1600
(F)(202) 457-1678
nmcconnell@jackscamp.com
kmaizel@jackscamp.com
lauzoux@jackscamp.com

*Counsel for Defendant*
*Children's National Medical Center*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA A. MORRING and )
DESHAUNIA Q. SNOWDEN, as )
Parents and Next Friends of )
Q.E.S., a minor )
) Civil Action No. 06CV2036
                 Plaintiffs, )
) Judge Rosemary M. Collyer
        v. )
) Next Event: Status Conference
CHILDREN'S NATIONAL MEDICAL ) 02/08/08, 2:30 p.m.
CENTER, )
                 Defendant. )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
<u>WITH RESPECT TO COUNTS II THROUGH XI OF THE COMPLAINT</u>**

## <u>TABLE OF CONTENTS</u>

I.  Argument Supporting Summary Judgment as to Counts II through XI............................ 1

    A.  Legal Standard for Summary Judgment .................................................... 1

    B.  Analysis of Counts ................................................................................. 2

        1.  Count II—Lack of Informed Consent—cannot withstand summary judgment. .... 2

        2.  Counts III through V—Product Liability counts—cannot withstand summary
            judgment. ............................................................................................ 8

        3.  Count VI—Fraud—cannot withstand summary judgment................................ 15

        4.  Summary judgment should be granted as to Counts VII through IX—Negligence
            *Per Se* Counts.................................................................................... 17

        5.  Count X—Punitive Damages—cannot withstand summary judgment. .............. 20

        6.  Summary judgment must be granted as to the majority of Count XI—Parents'
            Claim. ................................................................................................ 22

II.  Conclusion .................................................................................................. 25

## TABLE OF AUTHORITIES

\* indicates authority chiefly relied upon

### Federal Statutes

21 U.S.C. §§ 301 *et seq.* ........................................................................... 17

21 U.S.C. § 331(a) ...................................................................................... 18

\*21 U.S.C. § 337 .................................................................................. 17, 18

21 U.S.C. § 351(f)(1) .................................................................................. 18

21 U.S.C. § 360(c) ........................................................................................ 9

21 U.S.C. § 360e(a) ................................................................................. 9, 18

\*21 U.S.C. § 396 ........................................................................................... 4

### Federal Regulations

21 C.F.R. §§ 812.1 *et seq.* ....................................................................... 17

### Federal Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ................................. 1

\*Bailey v. Johnson, 48 F.3d 965 (6th Cir. 1995) ........................................ 18

\*Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001) ........ 5, 6

\*Calvetti v. Antcliff, 346 F. Supp. 2d 92 (D.D.C. 2004) ......................... 16, 17

\*Canterbury v. Spence, 464 F.2d 772, 780 (D.C. Cir. 1972) ............. 2, 3, 7, 8

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................ 1

\*Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938) .................................. 20

\*Iacangelo v. Georgetown University 2006 U.S. Dist. LEXIS 95848
    at 15 (D.D.C. 2006) ......................................................... 11, 13, 14

In re Orthopedic Bone Screw Prods. Liability Litig., 159 F.3d 817
    (3rd Cir. 1998) ............................................................................. 18

\*Kozup v. Georgetown University, 663 F. Supp. 1048 (D.D.C. 1987) ....... 12

Laningham v. U.S. Navy, 813 F.2d 1236 (D.C. Cir. 1987) .......................... 2

*Lasley v. Georgetown University, 842 F. Supp. 593 (D.D.C. 1994)...................22, 23

Lester v. Dunn, 475 F.2d 983 (D.C. Cir. 1973).........................................................22

Mylan Labs., Inc. v. Matkari, 7 F.3d 1130 (4th Cir. 1993) ........................................18

PDK Labs, Inc.v. Friedlander, 103 F.3d 1105 (2d Cir. 1997) ..................................18

*Perry v. Frederick Investment Corp., 2007 U.S. Dist. LEXIS 66933
     (D.D.C. 2007) ...............................................................................................24

*Pleasant v. Dow Corning Corp., 1993 U.S. Dist. LEXIS 21488, 6
     (D.S.C. 1993)................................................................................................12

*Robinson v. District of Columbia, 403 F. Supp. 2d 39, 47 (D.D.C. 2005) .................1

*Synergistic Technologies, Inc. v. IDB Mobile Communications, Inc.,
     871 F. Supp 24 (D.D.C. 1994) .....................................................................14

*Talley v. Danek Medical Inc., 179 F.3d 154 (4th Cir. 1999)..............................18, 19

Webster v. Pacesetter, 259 F. Supp. 2d 27 (D.D.C. 2003) ....................................11

## State Statutes

*D.C. Code § 28:2-103..............................................................................................14

*D.C. Code § 28:2-313..............................................................................................15

*D.C. Code § 46-101.................................................................................................23

## State Cases

*Bennett v. Kiggins, 377 A.2d 57 (D.C. 1977)...........................................................16

Burch v. Amsterdam Corp., 366 A.2d 1079, 1086 (D.C. 1976) ...............................13

*Cafazzo v. Central Medical Health Services, Inc., 635 A.2d 151
     (Pa. Super. Ct. 1993).....................................................................................12

*District of Columbia v. Hawkins, 782 A.2d 293 (D.C. 2001)....................................23

*District of Columbia v. Howell, 607 A.2d 501 (D.C. 1992) ......................................23

District of Columbia v. Jackson, 810 A.2d 388 (D.C. 2002) .....................................21

*Fisher v. Sibley Memorial Hospital, 403 A.2d 1130 (D.C. 1979).............................11

Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916
  (D.C. 1992) ..................................................................................... 16

Jonathan Woodner Co. v. Breeden, 665 A.2d 929 (D.C. 1995) ................................ 21

*Morton v. George Washington University, Superior Court of the
  District of Columbia, Docket No. 99ca4599 ........................................ 19

*North Miami General Hospital v. Goldberg, 520 So. 2d 650
  (Fla. Dist. Ct. App. 1988) ................................................................. 12

Parker v. Martin, 905 A.2d 765 (D.C. 2006) ............................................................. 24

*Robinson v. Sarisky, 535 A.2d 901 (D.C. 1988) ..................................................... 21

*Russell v. G.A.F. Corporation, 422 A.2d 989 (D.C. 1980) ...................................... 13

Scarzella v. Saxon, 436 A.2d 358 (D.C. 1981)......................................................... 13

Snow v. Capitol Terrace Inc., 602 A.2d 121 (D.C. 1992) .......................................... 21

*Southard v. Temple University Hospital, 781 A.2d 101 (Pa. 2001)........................... 5

Vassilades v. Garfinckel's, 492 A.2d 580 (D.C. 1985) ............................................. 22

*Wagman v. Lee, 457 A.2d 401 (D.C. 1983)............................................................. 21

*Warner Fruehauf Trailer Company, Inc. v. Boston, 654 A. 2d 1272
  (D.C. 1995) ..................................................................................... 12

**Restatement**

*Restatement 2d of Torts § 402A........................................................ 10, 11, 12, 13

Defendant Children's National Medical Center ("Children's") hereby submits that it is entitled to summary judgment as to Counts II through X and a substantial part of Count XI of Plaintiffs' Complaint because there is no issue of material fact and Defendant is entitled to judgment as a matter of law.

## I.  Argument Supporting Summary Judgment as to Counts II through XI

### A.  Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56 permits consideration of facts in the record subsequent to the pleadings.  "A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law." Robinson v. District of Columbia, 403 F. Supp. 2d 39, 47 (D.D.C. 2005).  The moving party carries the initial burden of showing the district court the basis for its motion through identifying portions of the pleadings and discovery "which it believe[s] demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The non-moving party must respond by going "beyond the pleadings" and use discovery material to "designate specific facts showing that there is a genuine issue for trial." Id. at 324.

Although the non-moving party is entitled to the benefit of all inferences from its support, "the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment." Robinson, supra, at 48, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  "To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the

nonmoving party." Id. at 48., citing Laningham v. U.S. Navy, 813 F.2d 1236 (D.C. Cir. 1987). Therefore, Children's is entitled to judgment on a particular count if the pleadings combined with facts on the record show that the non-moving party cannot support its claim.

### B.    Analysis of Counts

#### 1.    Count II—Lack of Informed Consent—cannot withstand summary judgment.

Physicians carry the responsibility to obtain a patient's informed consent because patients (or their substitute decision-makers, such as a parent or guardian) have the right to determine what shall happen to their own body before beginning therapy. See Canterbury v. Spence, 464 F.2d 772, 780 (D.C. Cir. 1972).

The content and nature of the information that must be disclosed to a patient to obtain an "informed consent" is not unlimited: "[I]t seems obviously prohibitive and unrealistic to expect physicians to discuss with their patients every risk of a proposed treatment—no matter how small or remote—and generally unnecessary from the patient's viewpoint as well." Id. at 786. The scope of a physician's disclosure is stated affirmatively as "information material to the decision." Id. This includes "the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." Id. at 787-8. A risk or hazard is material "when a reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." Id. at 787.

Although a physician must disclose information *material* to the decision the patient will make, there is no duty to disclose all risks, and, even if there has been a

2

failure to disclose a material risk, the patient/plaintiff does not automatically prevail on the claim of lack of informed consent. The final test of a successful informed consent claim is that an "unrevealed risk that should have been made known must materialize" and that a "causal relationship between the physician's failure to adequately divulge" and damage is shown. Id. at 790. The causal relationship "exists when, but only when, disclosure of the significant risks incidental to treatment would have resulted in a decision against it." Id. But that determination is measured by an *objective* standard, not a personal standard which a patient/plaintiff creates with the assistance of hindsight. The patient/plaintiff must show that a "*prudent person in the patient's position*" would have decided differently than the plaintiff did "if suitably informed of all perils bearing significance." Id. at 791 (emphasis added). Thus, a claim for lack of informed consent must overcome two hurdles *after showing that the physician had a duty to disclose information*: first, that there was a reasonable requirement to disclose the previously withheld information and second, that there is a causal connection between the withheld information and the decision which was actually made.

Plaintiffs essentially allege two issues regarding informed consent: first, that had they been informed of the fact that the ECMO equipment was being put to off-label use,[1] they would not have consented to the therapy, and second, if they had been informed of the "high failure rates for decannulations,"[2] they would not have consented

_____

[1] "Off-label" use describes use of a medical device or drug in ways other than those approved by the FDA.
[2] From a medical standpoint, this demand for information as a makes little sense. "Decannulation" is the removal of a cannula from a patient. Claiming that there is a high failure rate for removal of a cannula ("decannulation") implies that, in fewer than 100% of the cases in which the removal of cannulae is attempted the removal is successful. That issue has never been raised in Plaintiffs' discovery; therefore, there is no evidence

3

to the therapy. <u>See</u> Complaint ¶¶ 14, 15, and 17. Plaintiffs cannot show that either the FDA-approval status of the medical devices used in the ECMO circuit or the "decannulation risk" related to ECMO is within the scope of reasonable disclosure. Indeed, the testimony of Plaintiffs' own expert witnesses as well as governing law establishes the contrary. Moreover, there is no evidence that the pump used in the ECMO circuit was in any way implicated in the alleged injury-provoking event. Therefore, the necessary causal connection between the alleged non-disclosure and the patient's injury does not exist and for that reason as well the informed consent claim must fail. Therefore, Children's is entitled to summary judgment with respect to Count II.

According to 21 U.S.C. § 396, "[n]othing in this [Federal Food, Drug, and Cosmetic] Act[3] shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally-marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship." In short, *any* FDA-approved drug or device can be used within the confines of a legitimate physician-patient relationship for *any* condition or disease—even those not specifically "targeted" by the drug or device. Plaintiffs do not—and cannot—contend that the relationship between Q.E.S. and his Children's caregivers was not a legitimate physician-patient relationship.

---

in the record that, at any point, removal of a cannula actually fails. Giving Plaintiffs the benefit of the doubt with respect to their unclear drafting, Children's assumes that Plaintiffs meant to allege that, had they been informed of a "high rate of unscheduled decannulation" of a patient from ECMO, they would not have given their consent to have Q.E.S. placed on ECMO.

[3] The Federal Food and Cosmetic Act is referred to herein as the "FDCA."

4

Courts at the highest level protect the legitimate physician-patient relationship, even in light of possible off-label use of medical devices. See, e.g., Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341, 350 (2001) ("'off-label' usage of medical devices . . . is an accepted and necessary corollary to the FDA's mission to regulate in this area without directly interfering with the practice of medicine"). In fact, Pennsylvania—which requires that physicians inform patients of material facts, risks, complications, and alternatives to a medical procedure which a reasonable person in the patient's situation would consider significant[4]–has specifically refused to expand its understanding of "material" risks to include the FDA status of medical devices. Southard v. Temple University Hospital, 781 A.2d 101 (Pa. 2001). As the court stated in Southard, a case involving a patient's informed consent allegation for lack of information regarding the FDA-approval status of bone screws,

> We see no reason to expand the information that surgeons traditionally impart to their patients to encompass a device's FDA regulatory status . . .. The category into which the FDA places the device for marketing and labeling purposes simply does not enlighten the patient as to the nature of seriousness of the proposed operation, the organs of the body involved, the disease sought to be cured, or the possible results. The FDA administrative label does not constitute a material fact, risk, complication or alternative to a surgical procedure. It follows that a physician need not disclose a device's FDA classification to the patient in order to ensure that the patient has been fully informed regarding the procedure.

Southard at 107.

---

[4] Pennsylvania's informed consent requirements of materials facts, risks, complications, and alternatives is similar to the District of Columbia's requirement to discuss hazards or risks, alternatives, and results without treatment, although, importantly, Pennsylvania reviews the disclosure from a patient-centered, subjective (rather than an objective) standard.

Even Plaintiffs' expert, Dr. Melvin Van Woert, designated for alleged expertise in "human research," testified on deposition that "ECMO has been approved by the FDA for use . . .." Deposition Transcript of Melvin H. Van Woert, M.D. (hereinafter "Van Woert Depo."), taken January 4, 2008, excerpts of which are attached hereto as Exhibit K, at 13:6-9. More significantly, Dr. Van Woert conceded that the specific pump used by Children's in this ECMO circuit was FDA approved. Van Woert Depo., 13:7-9, 14:6-8. While Dr. Van Woert added that the FDA marketing approval for the pump was limited to procedures of six hours or less, that is wholly irrelevant to the use of a medical device by physicians in a legitimate physician-patient relationship for clinical purposes. Buckman, supra. And in any event, Dr. Van Woert further conceded that the average amount of time "kids are on ECMO" was "somewhere about a week, ten days, something in that range." Van Woert Depo., 15:11-15. He also testified that a physician "can use [a medical] device according to the need of the patient and the physician's decision, rational decision as to its use," so long as the device has been given some FDA approval. "Within reason, [physicians] can use [a device] different than the approval process," and he understands "reason" as "the clinical consensus reached by responsible physicians addressing a particular medical condition which needs to be treated by the use of a particular device." Van Woert Depo., 15:24 – 16:25.

Federal statute, common law, and the testimony of Plaintiffs' own expert in consent and research issues establish that the FDA status of the ECMO circuit is beyond the required disclosures in order to obtain informed consent.

As for the risk of unscheduled decannulation, by all accounts, it is so low as to be immaterial. See Mikesell Depo. at 11:1-16 (recalling a total of three unscheduled

6

decannulations in over 700 ECMO patients at Children's); Powell Depo. at 11:9-11

(performing a total of two unscheduled recannulations in 17 years of surgical practice);

Rais-Bahrami Depo. at 104:6-22 (recalling a total of three unscheduled decannulations

at Children's since 1991; Short Depo. at 38:5 - 39:16 (describing the incidence of

unscheduled decannulation as "very rare"). Even Plaintiffs' expert in ECMO cannulation

issues, Albert C. Beatty, Jr., M.D., a general surgeon, agrees that unscheduled

decannulation is "very uncommon," (Deposition Transcript of Albert C. Beatty, Jr., M.D.

(hereinafter "Beatty Depo."), taken January 14, 2008, excerpts of which are attached

hereto as Exhibit N, at 94:23 – 95:9) in that the surgeon involved in this procedure,

having worked in a major children's hospital for ten to 15 years and having done several

hundred of the ECMO procedures recalled only one other decannulation the whole of

that time. Beatty Depo., 94:11 – 96:6. See also Canterbury, 464 F.2d at n86 (collecting

cases in which incidence rates of medical complications warrant disclosure by a

physician, reflecting that 1% to 3% chance of death, paralysis, or loss of hearing—

where a full physiological system is destroyed—requires disclosure, but a 2% chance or

less of injury which is not life- or system-threatening need not be disclosed); Henderson

v. Milobsky, 595 F.2d 654, 659 (D.C. Cir. 1978) (finding no duty to disclose permanent

paralysis of the face if incidence is 0.001%). Plaintiffs have not challenged the reported

unscheduled decannulation rate from ECMO at Children's; the evidence in the record

reflects that such an event occurs in 0.004% of cases. Therefore, arguing that

unscheduled decannulation from ECMO is a risk of the procedure which must have

been disclosed in order to obtain informed consent is nonsensical, particularly when "[i]t

is such a rare event and we have more significant issues to discuss with parents that they need to be aware of." Short Depo., 38:11-13.

Because Plaintiffs cannot show that there is a reasonable requirement that the FDA approval status of the ECMO circuit (or its component parts) and the risk of decannulation from the ECMO circuit must have been disclosed to Plaintiffs in order to obtain their informed consent, Defendant is entitled to summary judgment on Count II. Finally, there is no evidence in this record that the pump used in this ECMO circuit was defective or failed in any way such as to have caused the injury to the patient. An undisclosed risk that fails to materialize cannot serve as the basis for an informed consent claim. Canterbury, supra, at 790. For this additional reason, Plaintiffs' informed consent claim must fail.

### 2. Counts III through V—Product Liability counts— cannot withstand summary judgment.

Counts III through V—all product liability counts—attempt to circumvent the fundamental fact that provision of ECMO to Q.E.S. was a legitimate medical therapy, not a sale or promise regarding a medical device. That fact cannot be ignored; therefore, all three product liability counts fail.

### a) Count III: Strict Product Liability

As pled in the Complaint, Count III relies on no statutory authority reflecting the standard in the District of Columbia for holding a party accountable for strict product liability. Instead, Count III creates an argument as follows:

The ECMO device, or some of its component parts, is a Class III device according to the FDA classification schedule. Class III devices are described by Plaintiffs as devices for which the FDA does not have reasonable assurance of the

8

device's safety and effectiveness.  Complaint ¶ 20.[5]  Because Class III devices are

dangerous, they may only be marketed with particular FDA approval.  The ECMO

device, or some of its component parts, was not marketed with that FDA approval.

Without that approval, hospitals and/or physicians must obtain an investigational device

exemption ("IDE") before using a Class III unapproved device.  Children's did not have

an IDE for ECMO or its component parts.  Therefore, Children's was using a medical

device which was unregulated, unapproved, and dangerous.  Plaintiffs further claim

entitlement to relief because Children's also failed to warn Plaintiffs of these conditions

---

[5]  Complaint ¶ 20 cites to 21 U.S.C. § 360e(a) for this description of Class III devices.
This citation is incorrect and misleading.  The correct citation for "classification of
devices intended for human use" is 21 U.S.C. § 360(c)(a)(1)(C).  A Class III device is

> [a] device which because--
>    (i) it (I) cannot be classified as a class I device because
> insufficient information exists to determine that the
> application of general controls are sufficient to provide
> reasonable assurance of the safety and effectiveness of the
> device, and (II) cannot be classified as a class II device
> because insufficient information exists to determine that the
> special controls described in subparagraph (B) would
> provide reasonable assurance of its safety and
> effectiveness, and
>    (ii) (I) is purported or represented to be for a use in
> supporting or sustaining human life or for a use which is of
> substantial importance in preventing impairment of human
> health, or
>       (II) presents a potential unreasonable risk of illness
> or injury,
>    is to be subject, in accordance with section 515 [21
> USCS § 360e], to premarket approval to provide reasonable
> assurance of its safety and effectiveness. If there is not
> sufficient information to establish a performance standard for
> a device to provide reasonable assurance of its safety and
> effectiveness, the Secretary may conduct such activities as
> may be necessary to develop or obtain such information.

and, therefore, should be held strictly liable for its promotion, use, and/or sale of this medical device to Plaintiffs.

This argument fails for a significant reason: it relies upon an unstated (and untenable) premise. Inherent in Count III is the assumption that Children's and its practitioners were engaged in an ordinary commercial transaction involving the sale of a product to a consumer. Under District of Columbia law, this is not the case. Children's and its practitioners provided Plaintiffs' son with medical *services*, not goods; therefore, it cannot be liable under a strict product liability theory.

Although the Complaint does not reference Restatement 2d of Torts § 402A, the language of Count III makes it clear that this claim is grounded upon this theory of tort liability. Complaint ¶¶ 30 and 32 allege that Children's manufactured a medical device which was "defectively designed" and "unreasonably dangerous." Complaint ¶ 33 also alleges that Children's "failed to warn *purchasers* and users, including the Plaintiffs, of the unreasonably dangerous, defective and/or adulterated condition of the ECMO device it created for use on minor Plaintiff." (Emphasis added.)

According to Restatement 2d of Torts § 402A, which states a cause of action recognized by the District of Columbia, "one who sells any product in a defective condition unreasonably dangerous to the user or consumer . . . is subject to liability for physical harm caused thereby . . .." Under Restatement 2d of Torts § 402A, the three ways in which a product might be found defective are (1) by defective design; (2) by defective manufacture; or (3) by failure of the producer or assembler to warn adequately of a risk related to the way the product was designed. See Iacangelo v. Georgetown

10

University, 2006 U.S. Dist. LEXIS 95848 at 15 (D.D.C. 2006).[6] See also Webster v.

Pacesetter, 259 F. Supp. 2d 27, 30 (D.D.C. 2003).

The language in Plaintiff's Complaint regarding "defective design," "unreasonable

danger," and "failure to warn" represents Plaintiffs' effort to state a cause of action

predicated upon Restatement 2d of Torts § 402A.  In the context of this medical

malpractice case, however, that effort is unavailing.  Under longstanding District of

Columbia case law, Restatement 2d of Torts § 402A is inapplicable to hospitals or

practitioners providing care to patients.  As explained in Iacangelo, "the weight of

uncontradicted legal authority suggests that courts do not apply this doctrine to a

hospital or medical practitioner for injuries caused by medical instruments, drugs or

other substances used in treatment," Iacangelo at 18, because even when hospitals or

their practitioners use drugs or devices, the primary "product" offered by the hospital or

its practitioners is patient care, of which drugs and devices may be a beneficial part.

See, e.g., Fisher v. Sibley Memorial Hospital, 403 A.2d 1130, 1133 (D.C. 1979) (blood

transfusion, even when "itemized" on a hospital bill, is a service rendered as part of the

overall treatment provided by hospital; "treating blood transfusions as an incidental

service performed by hospitals comports with reality, and with the policies underlying

merchantability liability"); Kozup v. Georgetown University, 663 F. Supp. 1048 (D.D.C.

---

[6] Iacangelo is a substantially similar lawsuit to the one filed by Plaintiffs herein.   In
Iacangelo, the parents and guardians of Karyn Kerris, as Plaintiffs, alleged that their
daughter, as a result of treatment for her arteriovenous malformation, was left
permanently neurologically impaired.  The treatment at issue consisted of an
embolization procedure utilizing Histoacryl and Lipiodol, which plaintiffs alleged were
both Class III medical devices and not approved for medical use in the United States.
Numerous counts in the Iacangelo Amended Complaint, a copy of which is attached
hereto as Exhibit O, are nearly identical to the counts contained in the Complaint at
issue herein.

1987) (blood banks, like hospitals, are not merchants of products); North Miami General

Hospital v. Goldberg, 520 So. 2d 650, 652 (Fla. Dist. Ct. App. 1988) ("the hospital is

properly regarded as itself a consumer of the product which merely employs it in

performing its actual function of providing medical services"); Pleasant v. Dow Corning

Corp., 1993 U.S. Dist. LEXIS 21488, 6 (D.S.C. 1993) ("[B]ecause hospitals are primarily

engaged in the business of providing medical services, rather than selling products,

strict liability should not be imposed if the medical services involve the use of a

product"); Cafazzo v. Central Medical Health Services, Inc., 635 A.2d 151, 153 (Pa.

Super. Ct. 1993) ("[a] hospital is not a purveyor of products or goods; it is a provider or

services, an intermediary in the distribution chain of a product such as the implant

device in this case").

Because Restatement 2d of Torts § 402A has not been made applicable to

hospitals and their practitioners, it does not matter that Plaintiffs seem to allege both a

defective device claim and a failure to warn claim; the claim fails in either event.  In an

abundance of caution, however, both theories are discussed—and debunked—briefly.

First, "[t]o establish strict liability in tort, a plaintiff must establish that the

defendant *sold the product in question* in a defective and unreasonably dangerous

condition.  In design defect cases, most jurisdictions[7] decide this issue by applying

some form of a risk-utility balancing test." Warner Fruehauf Trailer Company, Inc. v.

Boston, 654 A. 2d 1272, 1276 (D.C. 1995) (emphasis added).  As discussed above,

Children's did not sell the ECMO equipment to the minor Plaintiff or his parents;

therefore, Children's cannot be liable under a strict liability/design defect claim.

---

[7] The District of Columbia is included among these jurisdictions.  See Warner Fruehauf,
supra.

12

As for a failure to warn theory, "the *seller or manufacturer* of a product whose use could result in foreseeable harm has a duty to give a warning which adequately advises the user of attendant risks and which provides specific directions for safe use." Russell v. G.A.F. Corporation, 422 A.2d 989, 991 (D.C. 1980) (emphasis added), citing Burch v. Amsterdam Corp., 366 A.2d 1079, 1086 (D.C. 1976). Again, on its face, this cannot apply to Children's because District of Columbia law holds that Children's is not the seller or manufacturer of a product.

Because District of Columbia law does not make hospitals and medical practitioners liable as merchants of medical drugs and devices as contemplated by Restatement 2d of Torts § 402A, Children's is entitled to summary judgment on Count III.

### b) Count IV: Breach of Implied Warranty of Fitness for a Particular Purpose

According to Count IV, Children's, acting through its practitioners, impliedly warranted, or warranted by operation of law, that the ECMO equipment was reasonably fit and suitable for cardiopulmonary support, and Children's, acting through its practitioners, breached that warranty by "designing, producing, assembling, and/or selling the medical device" in an unreasonably dangerous, defective, or adulterated condition. Complaint ¶ 38. An applicable provision of the D.C. Code was not cited.

In the District of Columbia, in order to state a breach of warranty claim against a physician, a plaintiff must demonstrate that the physician clearly and unmistakably gave a positive assurance that he/she would produce or avoid a particular result in treating the patient. Iacangelo at 23, citing Scarzella v. Saxon, 436 A.2d 358 (D.C. 1981). A breach of warranty claim is not cognizable against a physician where the claim is based

on a physician's use of an allegedly defective device in the course of clinical treatment. Iacangelo at 23-4 ("the weight of the authority suggests that because doctors and hospitals primarily provide medical services as opposed to medical supplies or devices, the theories of strict liability and breach of warranty are inapplicable"). This is consistent with Pleasant, supra, at 15 (if a transaction is dominated by a service rather than a sale of goods, the transaction falls outside the scope of the U.C.C.).

The District of Columbia has adopted the provisions of the U.C.C. in which "seller" is defined as "a person who sells or contracts to sell goods." D.C. Code § 28:2-103. In addition, the District of Columbia, like South Carolina, holds that "[i]n a contract providing for both goods and services . . . the Court must look to which aspect of the contract predominates." Synergistic Technologies, Inc. v. IDB Mobile Communications, Inc., 871 F. Supp 24, 29 (D.D.C. 1994). When read in conjunction with Iacangelo, the prevailing approach to hospital care is that hospitals and practitioners provide *medical services* which may include use of medical devices, rather than involving a sale of goods to patients.

Therefore, Children's is entitled to summary judgment on Count IV.

### c) Count V: Breach of Express Warranties

In Count V, Plaintiffs allege that Children's, through its practitioners, expressly warranted that the ECMO device was reasonably fit for cardiopulmonary support and that Plaintiffs relied on this warranty as the basis for their decision to place Q.E.S. on ECMO. Complaint ¶ 41. Allegedly, the breach of the express warranty was Children's designing, producing, assembling, selling, or otherwise distributing ECMO equipment that was unreasonably dangerous, defective, or adulterated. Complaint ¶ 43.

14

The Complaint does not cite to the D.C. Code, but, according to the applicable

D.C. Code provision:

> Express warranties *by the seller* are created as follows:
> (a) Any affirmation of fact or promise made by the seller to
> the buyer which relates to the goods and becomes part of
> the basis of the bargain creates an express warranty that the
> goods shall conform to the affirmation or promise.  (b) Any
> description of the goods which is made part of the basis of
> the bargain creates an express warranty that the goods shall
> conform to the description.  (c) Any sample or model which
> is made part of the basis of the bargain creates an express
> warranty that the whole of the goods shall conform to the
> sample or model.

D.C. Code § 28:2-313 (emphasis added).

Again, in order to plead a viable claim for breach of express warranty, Plaintiffs

would have to overcome the statutory and common law predicate that hospitals provide

medical services—not the "sale" of "goods"—to their patients.  Children's is not a "seller"

within the context of either the D.C. Code § 28:2-313 or the overwhelming weight of

legal authority, and ECMO therapy is not a "good."  Therefore, Children's is entitled to

summary judgment as to Count V.

### 3.    Count VI—Fraud—cannot withstand summary judgment.

The District of Columbia follows general common law as to the elements of fraud:

> Fraud is never presumed and must be particularly pleaded.
> It must be established by clear and convincing evidence,
> which is not equally consistent with either honesty or deceit .
> . ..   The essential elements of common law fraud are: (1) a
> false representation (2) in reference to material fact, (3)
> made with knowledge of its falsity, (4) with the intent to
> deceive, and (5) action is taken in reliance upon the
> representation.

Bennett v. Kiggins, 377 A.2d 57, 59 (D.C. 1977) (internal citations omitted).  See also

Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992);

Calvetti v. Antcliff, 346 F. Supp. 2d 92, 100 (D.D.C. 2004).

According to Plaintiffs, Children's made or fraudulently withheld representations

of material facts which were false.  Complaint ¶ 44.  The "material facts" in this Count

pertain solely to the "legal status" of the ECMO circuit.  Complaint ¶ 45.  Plaintiffs also

claim that Children's made these representations and/or omissions "for the purpose of

defrauding each of the Plaintiffs into agreeing to the ECMO procedure to further the

advances [sic] of the ECMO practice . . .."  Complaint ¶ 46.  Plaintiffs then allege that

Children's knew or should have known that Plaintiffs would rely on their representations

and/or omissions.  Complaint ¶ 47.

Count VI fails essentially for the same reasons discussed in I.B.1, above, that is:

Children's practitioners were not obligated—either ethically or legally—to disclose

information about the FDA status of a device or devices used by the physicians in the

course of clinical treatment of a patient within a legitimate physician-patient relationship.

If there is no legal or ethical requirement for such disclosure, the "non-disclosure" of the

information cannot be deemed "material," much less the imposition of fraud upon a

patient.  Count VI, then, fails to meet the second element of a fraud claim:

representation regarding a *material* fact.  For this reason alone, Count VI should be

dismissed.

Alternatively, to paraphrase from Calvetti, the *record* is devoid of any evidence to

support a finding that, even assuming the physicians or other providers at Children's

were under an obligation not to make any false disclosures concerning the status of the

ECMO circuit, Children's intended to make fraudulent statements to Plaintiffs regarding the FDA status of the ECMO pump. See Calvetti at 100.

Because Plaintiffs have failed to show that Children's made fraudulent statements to them as to any "material" fact, let alone made those statements with any intent to deceive, Defendant is entitled to summary judgment as to Count VI.

### 4.    Summary judgment should be granted as to Counts VII through IX—Negligence *Per Se* Counts.

Counts VII, VIII, and IX all attempt to impose liability on Children's under a negligence *per se* theory. According to Plaintiffs, Children's off-label use of a medical device (the ECMO circuit) violates federal statutes and regulations designed, *inter alia*, to promote the health and safety of the public, which presumably includes Q.E.S.[8] Complaint ¶¶ 62, 71, and 77. According to this theory, Children's alleged violation of the federal statutes and regulations is negligence *per se*, the injuries to Q.E.S. would not have occurred but for these violations, and, therefore, Plaintiffs are entitled to recover.

These Counts are grounded upon Plaintiffs' citation to 21 C.F.R. §§ 812.1 *et seq.* and 21 U.S.C. §§ 301 *et seq.*[9] What Plaintiffs must have overlooked in formulating this theory, however, is 21 U.S.C. § 337, which states, in pertinent part, that "all such proceedings for the enforcement, or to restrain violations, of this Act [21 U.S.C. §§ 301 *et seq.*] shall be by and in the name of the United States." In light of this statutory language, the courts have uniformly held that the FDCA does not create a private right

---

[8] The connection between the person(s) or class of person(s) whom the statutes were intended to protect and Q.E.S. was not made clear; Children's reads onto the Complaint the interpretation which Plaintiffs must have intended.

[9] This portion of the U.S. Code is the FDCA.

17

of action. See Bailey v. Johnson, 48 F.3d 965, 967 (6th Cir. 1995) ("[n]o federal court

has ever resolved this question in favor of the plaintiff's claim"). See also PDK Labs,

Inc.v. Friedlander, 103 F.3d 1105 (2d Cir. 1997); In re Orthopedic Bone Screw Prods.

Liability Litig., 159 F.3d 817 (3rd Cir. 1998); Mylan Labs., Inc. v. Matkari, 7 F.3d 1130

(4th Cir. 1993). Without a private right of action to enforce the FDCA, Plaintiffs cannot

use the FDCA as basis for their claims in Counts VII through IX.

Although the language and the interpretation of 21 U.S.C. § 337 is clear,

Plaintiffs attempt to circumvent this bar to their claims by asserting that the regulations

and statutes set a standard of care which Children's violated, making the alleged

violation negligence *per se*. For this approach to succeed, however, Plaintiffs must

prove that the statutes on which they rely provide a relevant standard of care, and they

then must show the requisite elements of duty, proximate cause, and injury. Talley v.

Danek Medical Inc., 179 F.3d 154, 159 (4th Cir. 1999). In Talley, the plaintiff alleged

that the manufacturer of a medical device (specifically, an orthopedic screw) should be

liable for pain and injury affiliated with repeated surgeries on her back in which

defendant's screw was used. Plaintiff sued the device manufacturer claiming, *inter alia*,

that violation of the FDCA is negligence *per se*.[10]  In analyzing these claims, the court

stated:

> Where a statutory provision does not define a standard of
> care but merely imposes an administrative requirement,
> such as the requirement to obtain a license or file a report
> to support a regulatory scheme, violation of such requirement
> will not support a negligence per se claim.  Even if the
> regulatory scheme as a whole is designed to protect the
> public or to promote safety, the licensing duty itself is not a

---

[10] Plaintiff Talley relied on 21 U.S.C. §§ 360e(a), 331(a), and 351(f)(1), all of which
Plaintiffs' rely upon in their negligence *per se* claims, among others.

> standard of care, but an administrative requirement. [. . .]
> [W]here a particular statutory requirement does not itself
> articulate a standard of care but rather requires only
> regulatory approval, or a license, or a report for the
> administration of a more general underlying standard,
> violation of that administrative requirement itself is not a
> breach of a standard of care.

Id.

Based on this analysis, the <u>Talley</u> court held:

> The administrative requirement that a given device be
> approved by the FDA before being marketed—as opposed
> to a specific substantive requirement that a device be safe
> and effective—is only a tool to facilitate administration of the
> underlying regulatory scheme. *Because it lacks any*
> *independent substantive content, it does not impose a*
> *standard of care, the breach of which could form the basis of*
> *a negligence per se claim.* Its breach is analogous to the
> failure to have a drivers license.

<u>Id.</u> at 161 (emphasis added).

Since the District of Columbia has adopted the <u>Talley</u> analysis, Plaintiffs'

negligence *per se* claims fail at this threshold. Thus, in <u>Morton v. George Washington</u>

<u>University</u>, Superior Court of the District of Columbia, Docket No. 99ca4599, Judge

Jackson, by Order dated November 30, 2001, a copy of which is attached as Exhibit P

hereto, applied the <u>Talley</u> holding to a case similar to the instant case. In short, Ms.

Morton, a high school student, became unexpectedly ill and was taken to Alexandria

Hospital and then to George Washington University Medical Center ("GW") for

treatment of an arteriovenous malformation. After diagnostic tests, GW, through its

practitioners, decided that it was in Ms. Morton's best interest to undergo an

embolization procedure with a combination of two substances, Histocryl and Lipiodol,

which Plaintiff later alleged were Class III devices according to the FDCA and used

outside the scope of those laws and regulations.

After reviewing the law and facts related to the negligence *per se* claims in

Plaintiff's Amended Complaint, Judge Jackson concluded:

> The FDCA provisions and regulations proffered by Plaintiffs
> in support of their negligence *per se* claims are devoid of an
> appropriate standard of care.   Rather, the statute and
> regulations relied upon by Plaintiffs are administrative in
> nature and do not set forth a standard of conduct, the breach
> of which would constitute negligence *per se*.

See Exhibit P.

In this diversity jurisdiction case, the Court should apply the substantive law of

the District of Columbia, Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), and rule

that the FDCA negligence *per se* claims must be dismissed as failing to meet the

threshold requirement of establishing an essential element of a negligence *per se* claim:

a standard of care.  Accordingly, Children's is entitled to summary judgment as to

Counts VII through IX.

### 5.    Count X—Punitive Damages—cannot withstand summary judgment.

In Count X, Plaintiffs allege that Children's willfully and maliciously allowed the

use of "unapproved . . . Class III devices *to wit*: ECMO device . . .."  Complaint ¶ 78.

Plaintiffs also allege that Children's "recklessly and wantonly obtained and combined

the component parts necessary to manufacture the ECMO device . . .."  Complaint ¶ 79.

Finally, Plaintiffs allege that Children's repeatedly ratified this conduct, intentionally

acted without any provision for review of its own "manufacturing process," and failed to

20

provide necessary information to the Extracorporeal Life Support Organization.[11]

Complaint ¶¶ 81-83. By the allegations of Count X, Plaintiffs contend that Children's

acted intentionally and maliciously, through the actions of its agents and the ratification

of the organization, by using an unapproved medical device on Q.E.S. There is no legal

or factual basis for this claim.

In the District of Columbia, there is no independent cause of action denominated

"punitive damages." Punitive damages are only available in conjunction with intentional

torts. See, e.g., Robinson v. Sarisky 535 A.2d 901 (D.C. 1988). Punitive damages are

available "where the act of the defendant is accompanied with fraud, ill will,

recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or

other circumstances tending to aggravate the injury." Wagman v. Lee, 457 A.2d 401,

405 (D.C. 1983). See also Jonathan Woodner Co. v. Breeden, 665 A.2d 929 (D.C.

1995); District of Columbia v. Jackson, 810 A.2d 388, 396 (D.C. 2002) (describing the

necessary state of mind as evincing malice). "Punitive damages may be assessed

against a corporation if (1) the act of the corporate employee was intentional, malicious

or willful, and (2) the corporation through its officers or directors participated in the doing

of the wrongful act or authorized or subsequently ratified the offending conduct with full

knowledge of the facts." Snow v. Capitol Terrace Inc., 602 A.2d 121, 127 (D.C. 1992).

The actor's state of mind need not be shown directly, but rather may be inferred by the

---

[11] The Extracorporeal Life Support Organization ("ELSO"), as described on its website, is "an international consortium of health care professionals and scientists who are dedicated to the development and evaluation of novel therapies for support of failing organ systems." See http://www.elso.med.umich.edu. It maintains a registry of use of ECMO around the world at member-centers. Children's is a member of ELSO.

circumstances.  Jackson, supra, at 396; see also Vassilades v. Garfinckel's, 492 A.2d 580 (D.C. 1985).

The only intentional tort pled by Plaintiffs is Fraud (Count VI).  As discussed above in Section I.B.3., Count VI must be dismissed.  Plaintiffs have failed to show fraud on its face by their failure to understand that Children's made no false representations to Plaintiffs and that the FDA-approval status of the ECMO equipment was not a material fact, the disclosure of which was required under the circumstances of this case.  Without a viable claim for fraud, Count X fails in its entirety Children's is entitled to summary judgment thereon.

### 6.    Summary judgment must be granted as to the majority of Count XI—Parents' Claim.

In Count XI, the adult Plaintiffs ask for recovery in their own right based on two theories with respect to two periods of Q.E.S.'s life.  They demand recovery for damages stemming from Q.E.S.'s injury, accrued both during his minority and "throughout Plaintiff's majority," and also demand recovery for "a loss of financial support" which otherwise would have accumulated during Q.E.S.'s minority and "throughout Plaintiff's majority."  Complaint ¶ 84.  Of these four demands, Plaintiffs may only recover under one theory: damages incurred to Plaintiffs while Q.E.S. is a minor.

It is settled law in the District of Columbia that "parents can recover expenses when a child is injured."  Lasley v. Georgetown University, 842 F. Supp. 593, 595 (D.D.C. 1994).  See also Lester v. Dunn, 475 F.2d 983 (D.C. Cir. 1973) (the generally accepted view regarding recovery of damages is that a parent may recover the reasonable expenses of medical care and services rendered to a minor child, even if the

parent provides them). Children's does not dispute the validity of Count XI to the extent that it demands recovery for damages incurred while Q.E.S. is a minor.

Plaintiffs cannot, however, recover damages related to Q.E.S.'s injury which accrue after he reaches the age of majority.[12] In Lasley, the court specifically addressed the issue of "postmajority parental recovery of expenses" and held that "[a]ny expenses incurred in caring for [the injured child[13]] can be recovered through an action in his own name." Lasley at 596. Count XI is not an action in Q.E.S.'s own name; rather, Plaintiffs bring Count XI as Parents and Next Friends of their child. Plaintiffs are not the proper individuals to seek recovery for damages which Q.E.S. may incur if he reaches the age of majority; therefore, this aspect of Count XI must be dismissed.

Plaintiffs then make a demand for compensation based on "loss of financial support," both during Q.E.S.'s minority and throughout his majority. Presumably this is intended to be a demand for "loss of financial support provided by the minor Plaintiff, Q.E.S.," either through a loss of his financial contribution to the household which he would have made as he grew, or a claim for loss of Q.E.S.'s household labor/services, which he would have provided if he were not injured. By invoking the phrase "loss of financial support," Plaintiffs may be attempting to avoid the fact that this is, in reality, a claim for damages not cognizable in the District of Columbia, a jurisdiction which does not permit a claim for loss of parent-child consortium. See, e.g., District of Columbia v. Howell, 607 A.2d 501 (D.C. 1992) (refusing to recognize loss of parent-child consortium as a basis for damages without *en banc* determination); District of Columbia v. Hawkins,

---

[12] The age of majority in the District of Columbia is 18. D.C. Code § 46-101.
[13] The injured child in Lasley was not a minor according to applicable law at the time of his injury.

782 A.2d 293, 303 (D.C. 2001) (supporting Howell rule that a child's parents could not recover for the loss of parent-child consortium in an action for damages arising out of an accident in which the child was injured, but distinguishing claims brought pursuant to the D.C. Wrongful Death Act); Parker v. Martin, 905 A.2d 765 (D.C. 2006) (refusing, in the absence of case law, to allow parents to recover for the loss of services of a minor child); Perry v. Frederick Investment Corp. , 2007 U.S. Dist. LEXIS 66933 (D.D.C. 2007) (noting that Parker suggests that District of Columbia law does not recognize a claim for loss of services of a minor child).  Therefore, the demand due to loss of financial support is wholly unsubstantiated by the law.

Even if Plaintiffs were entitled to claim a loss of financial support from Q.E.S. while he was a minor and, presumably, still living in the family home—a claim which Children's disputes—Plaintiffs' designated expert in economics, Dr. Richard Lurito, predicts that Q.E.S.'s earning power would not begin until Q.E.S. graduated from high school, which is roughly around age 18, the age of majority.[14]  At that point, damages, if any, no longer flow to Q.E.S.'s parents, but rather flow to Q.E.S., who has not made a claim for either damages or "loss of financial support."  This is yet another reason why Children's is entitled to summary judgment at least as to the "loss of financial support" claim.

Plaintiffs may have attempted to avoid summary judgment on most of Count XI by labeling it "Parents' Claim," but their attempt at an end-run around the clear law in the District of Columbia with respect to damages after the age of majority and loss of

---

[14] Relevant portions of Dr. Lurito's report, dated September 2007, are attached hereto as Exhibit Q.

parent/child consortium cannot succeed.  Therefore, Children's is entitled to summary judgment on Count XI as to these three of four demands.

## II.    Conclusion

Neither the relevant law nor the record in this case support the claims Plaintiffs' have attempted to set forth in Counts II through XI.  For the reasons noted above, Defendant Children's National Medical Center is entitled to summary judgment on Counts II through X of the Complaint herein, and should be granted summary judgment on Count XI as to all demands but those involving damages which accrue during Q.E.S.'s minority.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

/s/ Nicholas S. McConnell

By: _____
   Nicholas S. McConnell (#167742)
   Krista A. Maizel (#503597)
   Lydia A. Auzoux (#477054)
   1120 – 20th Street, NW (South Tower)
   Washington, DC  20036-3437
   (P)(202) 457-1600
   (F)(202) 457-1678
   nmcconnell@jackscamp.com
   kmaizel@jackscamp.com
   lauzoux@jackscamp.com

*Counsel for Defendant*
*Children's National Medical Center*

564180v.2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

TERESA A. MORRING and          )
DESHAUNIA Q. SNOWDEN, as       )
Parents and Next Friends of    )
Q.E.S., a minor                )
                               )    Civil Action No. 06CV2036
                Plaintiffs,    )
                               )    Judge Rosemary M. Collyer
        v.                     )
                               )
CHILDREN'S NATIONAL MEDICAL    )
CENTER,                        )
                Defendant.     )

## ORDER

Upon consideration of the Motion of Defendant Children's National Medical

Center for Summary Judgment pursuant to Fed. R. Civ. P. 56(b) with Respect to Counts

II through XI of the Complaint, its accompanying Memorandum of Points and

Authorities, Exhibits A through Q thereto, any opposition thereto, and the entire record

herein, it is by this Court, this _____ day of _____, 2008, hereby

ORDERED, that the Motion be, and the same hereby is, GRANTED for the

reasons stated therein; and it is further

ORDERED, that summary judgment be, and the same hereby is, ENTERED in

favor of Defendant Children's National Medical Center with respect to Counts II through

X of the Complaint, and it is further

ORDERED, that Counts II through X of the Complaint be, and the same hereby are, DISMISSED; and it is further

ORDERED, that summary judgment be, and the same hereby is, ENTERED in favor of Defendant Children's National Medical Center with respect to Plaintiffs' claims for damages incurred throughout the minor child's majority and loss of financial support

SO ORDERED.

_____
Rosemary M. Collyer
Judge, United States District Court
District of Columbia


Copies to:

Ira Sherman, Esq.
CHAIKEN & SHERMAN, P.C.
1232 Seventeenth St., NW
Washington, DC 20036

Anthony Newman, Esq.
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave.
Suite 700E
Bethesda, MD 20814

Nicholas S. McConnell, Esq.
Krista A. Maizel, Esq.
JACKSON & CAMPBELL, P.C.
1120 – 20th Street, NW (South Tower)
Washington, DC  20036-3437

632224v.1

# EXHIBIT A

CHILDREN'S HOSPITAL OF THE KING'S DAUGHTERS, INC.
601 Children's Lane Norfolk, VA 23507-1910

**TRANSFER SUMMARY**

| | |
|---|---|
| MR #: | 0057-44-31 |
| NAME: | : |
| ACCT: | 03025045 |
| ADM: | 09/06/2005 |
| DOT: | 09/11/2005 |
| LOC: | NI |

ATTENDING: David G. Oelberg, M.D.

HISTORY OF PRESENT ILLNESS: ____ is the 4720-gram male LGA 38-week product of a 26-year-old, G2 P1-0-0-1, B positive Mom with unremarkable serologies and pregnancy complicated by gestational diabetes mellitus and positive group B strep culture. Labor was complicated by nonreassuring fetal heart tones and late decelerations, for which a C-section was performed. Apgars were 5 and 8, for which oxygen was provided for persistent cyanosis, accompanied by brief bag-mask ventilation. Saturations remained in the 70-80% range and the infant was transferred to the NICU at CHKD by Dr. Green for suspected cardiac anomaly and/or persistent pulmonary hypertension. Echocardiogram is in progress and initial findings suggest ventricular hypertrophy associated with the infant of a diabetic mother. Initial CBG is 7.13, 90, 28 and +1 by capillary gas. Intubation is pending. Umbilical line placement, sepsis workup and antibiotic coverage are planned. $O_2$ saturations are currently 91% in 100% oxygen.

PHYSICAL EXAMINATION: Weight 4720 grams, length 57 cm, FOC 35 cm, admitting temperature 36.4 degrees centigrade, heart rate 179, respiratory 80 and blood pressure 84/58 with a mean of 67. Head is normocephalic, atraumatic. Soft anterior fontanel. Intact palate. Bilateral red reflexes. Normal facies. Breath sounds are equal and clear, but slightly diminished. Occasional retractions are noted. No grunting or flaring is present. Normal sinus rhythm is present without murmur. Pulses are equal with three-second capillary refill. Abdomen is soft and flat without palpable masses or organomegaly. Bowel sounds are diminished. A three-vessel cord is present. Normal male genitalia are present with bilaterally descended testes. Anus is patent. Sacrum is intact. No hip clicks are present. Skin is clear, except for acrocyanosis in 100% oxygen. Tone, activity and deep tendon reflexes are appropriate for gestational age without focal signs or seizure activity.

IMPRESSION: Male, large for gestational age, infant of a diabetic mother with probable septal hypertrophy of the heart secondary to maternal diabetes. Persistent pulmonary hypertension cannot be ruled out. Likewise, transient tachypnea of the newborn and/or early respiratory distress syndrome also cannot be ruled out at this time. The infant is at risk for group B strep and sepsis cannot be ruled out; although, membranes did not rupture until delivery. Initial dextrostick was 23 mg percent and hypoglycemia secondary to maternal diabetes is present.

HOSPITAL COURSE:
1) HEALTH MAINTENANCE: An umbilical artery catheter was inserted on admission and a triple-lumen venous catheter was also inserted on admission. Total fluids were begun at 100 and advanced to 150 cc/kg/day based on serum electrolytes, urine output and clinical course. Initial hypoglycemia was treated with 2 cc/kg boluses x2 with blood sugars stabilizing on a glucose infusion rate of 10 mg/kg/hr. This has since been increased to 12 mg with TPN and intralipid therapy beginning on 09/06. Urine out has been 2.5 to 6 cc/kg/day and the infant has had several meconium stools. Most recent laboratories, on the day of transfer, reveal a sodium 141, potassium 4.7, chloride 108, $CO_2$ 22, BUN 19, creatinine 0.8, glucose 101, hematocrit 44 and calcium 8.8. Of note, most recent nutritional labs revealed phosphorus 5.9, magnesium 1.8, triglyceride 112 and alkaline phosphatase 69. A Foley catheter is in place and draining well. Maternal blood type is B positive, infant blood type is B positive, DAT negative.

2) RESPIRATORY: The infant was brought from Sentara Norfolk General's delivery room using bag-mask CPAP with labored breathing and tachypnea. Capillary blood gas on admission revealed a pH 7.13, PCO2 90 and PaO2 20. An initial chest x-ray was consistent with cardiomegaly, left upper lobe atelectasis with right lung fields clear. The infant was intubated shortly after admission and placed on an IMV of 60, PIP 30, PEEP 6 and 100% oxygen. Initial post intubation blood gas revealed a pH 7.32, PCO2 52, Pa02 arterially of 31. Nitric oxide was begun at 20 parts/million, yielding a blood gas of 7.48, PCO2 25, PaO2 246. Approximately 12 hours after initiating nitric oxide, methemoglobin was noted to be 1.4 and the infusion was decreased to 5 parts/million. Six hours later the methemoglobin was 0.9. The infant has been sedated with a fentanyl drip beginning at 3 mcg/kg/hr; currently, increased to 10 mcg/kg/hr. Pavulon and Ativan q.4h. On 09/07, the infant was noted to be exquisitely sensitive to blood pressure, which was being treated with volume support. On 09/08, the IMV was increased to 80, subsequently to 60, PIP 35, PEEP 6 and 100% oxygen. PaO2's ranged between 41 and 60. Stress hydrocortisone, which had been decreased to 50% stress, was increased to hydrocortisone 1.5 mg/kg/dose q.6h. Ventilatory rates have ranged between an IMV of 47 to 60, PIP from 30 to 45, always 100% oxygen. We have attempted to wean stress hydrocortisone by 50% three times and within an hour to six hours, the infant has demonstrated hypotension and desaturations. On the day of transfer, the

**ORIGINAL(TranS)-CONFIDENTIAL**

CHKD 00009

TRANSFER SUMMARY                                          MR #: 0057-44-31
Page 2 of 2                                               NAME:

infant was noted to be on an IMV of 60, PIP of 45/5, 100% oxygen with mean airway pressures of 19. Oxygen index calculations have been between 20 and 46. An attempt to decrease mean airway pressure by utilizing Jet ventilation transiently was successful with PaO2's of 517; however, PaO2's without provocation have dropped to 42 and 31, requiring positive pressure ventilation with the Ambu bag. A chest x-ray today was hazy with cardiomegaly. The ET tube was advanced 1 cm. Chest x-rays will be enclosed.

3) **CARDIOVASCULAR:** An echocardiogram performed on day one of life revealed severe ventricular septal hypertrophy. This was performed to rule out cyanotic heart disease. Echocardiograms have been performed every day and results are enclosed. An echocardiogram on the day of transfer, 09/11, demonstrated tricuspid regurgitation, small to moderate patent ductus arteriosus, persistent pulmonary hypertension of the newborn and severe ventricular septal hypertrophy without outflow tract obstruction. Volume support to treat blood pressure, in addition to hydrocortisone, have ranged between 25 and 128 cc/kg/day normal saline. This infant has received no packed red blood cell transfusions. Because of massive volume support, the infant has pitting edema.

4) **SEPSIS:** Maternal history is positive for GBS positive with no treatment provided. Initial CBC revealed a white count of 12.8, platelet count 281,000, 24 polys and 11 bands at 12 hours of age. A CBC revealed a white count of 4.7, 9 polys, 34 bands, 2 metas for an I:T ratio of 0.8. Blood culture has remained negative; however, ampicillin and gentamicin have been provided with a goal of seven days. Gentamicin peak was 7.3 and gentamicin trough was 1.

5) **MISCELLANEOUS:**
   a.   Newborn screen was obtained on admission with the results pending.
   b.   Cerebral sector scan performed on 09/07 is noted to be normal.

**DISPOSITION:** Transfer to D.C. Children's Hospital for evaluation for ECMO therapy.

**CONDITION:** Critical.

**TRANSFER DIAGNOSES:**
1)   38-week large for gestational age infant, now 6 days old.
2)   Persistent pulmonary hypertension of the newborn.
3)   Rule out sepsis.
4)   Severe ventricular septal hypertrophy.
5)   Patent ductus arteriosus.

Kathleen Johnson, N.N.P.                         FOR              David G. Oelberg, M.D.

kjh      09/11/2005:09/11/2005  9:28 P    000047541/648390
kjh      09/06/2005:09/06/2005  3:45 P    000045026/646494

cc:      Kathleen Johnson, N.N.P.
         David G. Oelberg, M.D.

ORIGINAL(TranS)-CONFIDENTIAL

# EXHIBIT B

574431        3025045
CELBERG, DAVID
09/06/2005  M  09  NE
09/06/2005             CHKD

**Children's Hospital Of The King's Daughters, Inc.**
601 Children's Lane, Norfolk, Virginia 23507-1910

## PROGRESS NOTES

Addressograph

| PATIENT NAME: | ROOM: | MED REC#: |
|---|---|---|

| DATE | |
|---|---|
| 9/11 1710 | Neonatal Med |

Pt remains critical & unstable. As noted in chart, have had extreme variability in Oxygenation and now on very high support.

Attempts at jet ventilation did not eliminate instability.

Although at time pO₂'s have been quite good, I feel that pt's instability as well as inability to use vasopressors — because of hypertrophic Cardiomyopathy — would make referral to an ECMO center optimal.

I have spoken with Major in state referral center at U Va — they refused pt as they do not have an available bd — all in use — therefore I called Childrens Hosp National Med ctr in adjoining Wash DC They (Dr Scoba) will accept, and as they are a nationally recognized leader in both clinical & research aspects of ECMO, this seems in the child's best interest, and given emergent nature of situation, I am arranging this now

KHAN

# EXHIBIT C



CNMC 02327

# EXHIBIT D

**1**

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3  - - - - - - - - - - - - - - +
4  TERESA MORRING, et al.,        |
5      Plaintiffs,        |
6  v.        | Case No.
7  CHILDREN'S NATIONAL MEDICAL    | 06-2036 (RMC)
8  CENTER, INC.,        |
9      Defendant.        |
10  - - - - - - - - - - - - - - +
11
12
13  Videotaped Deposition of TERESA  A. MORRING
14  Washington, D.C.
15  Tuesday, September 4, 2007
16  11:27 a.m.
17
18
19
20  Job No. 1-110272
21  Pages 1 - 126
22  Reported by: Cathy Jardim

**2**

1      Deposition of TERESA A. MORRING, held at the
2  offices of:
3
4  CHAIKIN & SHERMAN, PC
5  1232 17th Street, Northwest
6  Washington, D.C.  20036
7
8
9
10
11
12
13
14
15      Pursuant to notice, before Cathy Jardim,
16  Registered Professional Reporter and Notary Public of
17  the District of Columbia.
18
19
20
21
22

**3**

1  A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3  IRA SHERMAN, ESQUIRE
4  Chaikin & Sherman, PC
5  1232 17th Street, Northwest
6  Washington, D.C.  20036
7  (202)659-8600
8
9  ORIGINAL
10
11
12  ON BEHALF OF THE DEFENDANT:
13  NICHOLAS S. MCCONNELL, ESQUIRE
14  KRISTA A. MAIZEL, ESQUIRE
15  Jackson & Campbell, PC
16  1120 20th Street, Northwest
17  Washington, D.C.  20036
18  (202)457-1600
19
20
21  VIDEOGRAPHER:  Alfred Gomes
22

**4**

## C O N T E N T S

1
2  EXAMINATION OF TERESA MORRING        PAGE
3  By Mr. McConnell        6
4
5
6
7
8
9
10
11
12
13  E X H I B I T S
14  (Attached to transcript)
15  MORRING DEPOSITION EXHIBITS        PAGE
16  No. 1--Plaintiff's Answers to Interrogatories    10
17  No. 2--Collection of photographs and calendars    63
18
19
20
21
22

**5**

1    PROCEEDINGS
2        VIDEOGRAPHER:  Here begins videotape number
3    1 in the deposition of Teresa Morring in the matter of
4    Teresa Morring et al. versus Children's National
5    Medical Center, Inc., in the United States District
6    Court for the District of Columbia, case number
7    2006-2036 (RMC).  Today's date is September 4, 2007.
8    The time on the video monitor is 11:27.  The video
9    operator today is Alfred Gomes.  This video deposition
10   is taking place at 1232 17th Street Northwest,
11   Washington, D.C.  Counsel, please voice identify
12   yourselves and state whom you represent.
13       MR. SHERMAN:  Ira Sherman representing the
14   plaintiffs.
15       MR. MCCONNELL:  Nick McConnell, and with me
16   is Krista Maizel, representing Children's Hospital.
17       MS. MAIZEL:  Krista Maizel, Children's
18   National Medical Center.
19       VIDEOGRAPHER:  The court reporter today is
20   Cathy Jardim of L.A.D. Reporting.
21       Whereupon,
22       TERESA A. MORRING

**6**

1    was called for examination by counsel for Defendant
2    and, having been first duly sworn by the notary
3    public, was examined and testified as follows:
4        EXAMINATION BY COUNSEL FOR DEFENDANT
5        BY MR. MCCONNELL:
6        Q   Ms. Morring, would you tell us your full
7    name, please.
8        A   Teresa Ann Morring.
9        Q   Have you ever given a deposition before?
10       A   No.
11       Q   I am sure Mr. Sherman has had a chance to
12   speak with you briefly about what the process will be.
13   The purpose of the deposition is primarily to give me
14   a chance to ask you questions about events as to which
15   you have knowledge related to the lawsuit you have
16   filed against Children's Hospital.
17       If at any time today I ask you a question
18   that you don't understand, that confuses you or that I
19   have phrased poorly, please let me know.  If you
20   respond to my questions, I will assume you have
21   understood the question and have testified fully and
22   truthfully.  All right?

**7**

1        A   Yes.
2        Q   If at any time you need to take a recess,
3    let me know.  This is not a physical contest at all.
4    It is my chance to put questions to you, and I don't
5    mean for you to be uncomfortable in any way at any
6    time.  All right?
7        Where do you presently live?
8        A   5861 Poplar Hall Drive, apartment 23B, as
9    in boy, Norfolk, Virginia, 23502.
10       Q   How long have you lived at that address?
11       A   I have lived there since February of 2004.
12       Q   Who lives there with you at this time?
13       A           my son                , and
14   (             my daughter.
15       Q   Since 2004, has anyone else resided at that
16   address with you?
17       A   Yes.
18       Q   Who else?
19       A   DeShaunia Snowden.
20       Q   And he is            father and (
21   father?
22       A   Yes.

**8**

1        Q   Where does Mr. Snowden reside at this time?
2        A   5744 East Hastings Arch, Virginia Beach,
3    Virginia, 23462.
4        Q   When did he last live with you at the
5    Poplar Hall address?
6        A   November of 2004.
7        Q   I see from the answers to interrogatories
8    that you filed in this case that there were court
9    custody proceedings concerning custody of         and
10           Were they contested proceedings?
11       A   No.
12       Q   So that was done mutually by consent?
13       A   Yes.
14       Q   And as I understand it, Mr. Snowden has the
15   children on weekends.
16       A   He has        on the weekends.
17       Q   What about        does he ever physically
18   take custody of      and take him to his residence?
19       A   On Tuesdays and Thursdays, he comes over to
20   the house to see
21       Q   Does he actually ever take        back
22   with him to his residence?

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007
Case 1:06-cv-02036-RMC   Document 16   Filed 09/28/2008   Page 4 of 4

-10 (Pages 37 to 40)

**Page 37**

1    Q  Was          baptized before he left
2  Children's Hospital for the King's Daughters?
3    A  Yes.
4    Q  Why?
5    A  The chaplain suggested it as soon as
6  DeShaunia and I got there.
7    Q  Was there a statement to you that it would
8  be important to have          baptized because he was
9  at severe risk?
10    A  No.
11    Q  Did you understand at any time that
12  was really sort of in a life-or-death struggle at this
13  point in terms of being able to survive?
14    A  At that time, yes, I knew he was critical.
15    Q  During this meeting with Dr. Khan that you
16  have been describing for us, did any of the other
17  family members ask any questions of Dr. Khan or the
18  nurse or any other of the providers who may have been
19  there?
20    A  Yes.
21    Q  What were the questions that were asked?
22    A  How would          be transported.

**Page 38**

1    Q  What were they told about that?
2    A  He would be flown out, and I asked if I
3  would be able to accompany him for the flight.
4    Q  What were you told?
5    A  No, because there was only enough room for
6  the transport team.
7    Q  Were there any other questions asked by
8  family members about the transfer,
9  condition, what would be done and so forth?
10    A  No.
11    Q  Do you know why          was being flown up
12  to Children's rather than simply transported by an
13  ambulance?
14    A  No, I don't know why.
15    Q  Was there anything else that was said
16  during this meeting that you recall that you haven't
17  told us about?
18    A  No.
19    Q  About what time of day did the meeting end?
20    A  I don't recall.  It was in the afternoon,
21  but I don't know the exact time.
22    Q  Was          then flown up to Children's

**Page 39**

1  Hospital here?
2    A  Yes, but where is here?
3    Q  Washington, D.C.?
4    A  Yes.
5    Q  And he was flown up here that same day,
6  September 11?
7    A  Yes.
8    Q  Other than Dr. Khan, did you have
9  conversations with any other physicians at Children's
10  Hospital of the King's Daughters concerning
11  condition, its severity and the need for ECMO
12  treatment?
13    A  No.
14    Q  Before          was put on a plane to be
15  flown up to Children's, did you speak with anyone at
16  Children's Hospital?
17    A  Which Children's Hospital?
18    Q  Up here in Washington, D.C.
19    A  Before
20    Q  Yes.
21    A  No, I did not speak to anyone.
22    Q  After the meeting, tell me what happened

**Page 40**

1  next?
2    A  The transport team came and transferred
3          from his bed that was in the NICU at King's
4  Daughters to one of the isolettes for the helicopter
5  and --
6    Q  Did you speak with any members -- I am
7  sorry.  Did I cut you off?
8    A  We said our goodbyes to          , we kissed
9  him, we prayed over him, and we baptized him, and they
10  left.
11    Q  Did you speak with any of the members of
12  the transport team from Children's National Medical
13  Center here in Washington, D.C., while they were down
14  at Children's Hospital of the King's Daughters in
15  Norfolk preparing for the transfer and actually taking
16          out to be flown up here, did you have any
17  conversations with anybody from Children's Hospital up
18  here?
19    A  The question was kind of two-part.  What
20  was the first part of the question?
21    Q  Did you have any conversations with any of
22  the members of the transport team from Children's

# EXHIBIT E



**PROGRESS NOTES**



PCP    NO,PRIMARY CARE
MR#:   020567916
AccU#: 0525400132
NIC    NIU-3606-A
Sex    M
Exp:
Adm:   09/11/05
DOB:   09/06/05
DR.    SHORT,BILLIE LOU
Ins.Plan
       VA MEDICAID OPTIMA

LABEL

Patient's Name: _____

| DATE/TIME | Education Plan: Reviewed: ☐    Updated: ☐    Continue as planned: ☐  N/A: ☐ | INITIALS |
|---|---|---|

9/11/05
1700 pm — Ecmo Consultation note.

Infant had frequent D-sats requiring hand bag ventilation
Bolus of albumin. Vent settings were ? so 50/6 x 50 x10
on Nitric oxid @ 20 ppm

Consulted for V-A Ecmo 8mg/id 21 00 failure 00
Maximum conventional vent support

10Fr Biomedicus arteral and 12 Fr Biomedicus venous cannula were
Placed by Dr Newman

CXR to confirm The cannula position done

Ecmo flow ? 00 500cc/min Vent settings weaned.

meds Fentyl 40 Mcrg/m x 2 doses, and
heparin bolus of 100 u/kg given

Plan: Keep Ecmo Flow fixed Wean Bband 02, F102

Dc Vecuronium drip
IVfluid @ 100 cc/kg/d.
Lasix BID  ↓ Hydrocortison 00 BID.
↑Ventilation 8° MAP's ≤ 80
√ CXR s head u/s tomorrow.

(Please write on back of this page if information is to be continued)

CNMC 00373

# EXHIBIT F

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **TERESA MORRING,** *et al.*, | : |
| | : |
| **Plaintiffs,** | : |
| | : |
| **v.** | : **Civil Action No. 06-2036 (RMC)** |
| | : **Next Event:** |
| **CHILDREN'S NATIONAL MEDICAL** | :     Status Conference 9/5/07 |
| **CENTER, INC.,** | : |
| | : |
| **Defendant.** | : |
| | : |

## PLAINTIFFS' ANSWERS TO INTERROGATORIES

**TO:**      **Children's National Medical Center, Inc., Defendant**
         c/o Nicholas McConnell, Esquire

**FROM:**   **Teresa Morring, Plaintiff**
         c/o Ira Sherman, Esquire

The above-named party, represented by Ira Sherman, Esquire, and the law firm of Chaikin & Sherman, P.C., and Anthony Newman, Esquire, and the law firm of Newman, McIntosh, & Hennessy, L.L.P., answers the Interrogatories propounded herein and states as follows:

(a)  The information contained in these Answers is being provided in accordance with the provisions and intent of the applicable Rules of Procedure, which require the disclosure of all facts, which may be relevant or may lead to the discovery of relevant information.  Accordingly, the party answering these Interrogatories, by providing the information requested, does not waive objections to its admission in evidence on grounds of materiality or relevancy or other proper grounds for objection.

(b)    The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, his agents, representatives and attorneys unless privileged.

(c)    The word usage, sentence structure, and syntax may be that of the attorney assisting in the preparation of these Answers, and thus, does not necessarily purport to be the precise language of the executing party.

\* \* \* \* \*

13. Do you contend that CNMC violated any statute, ordinance, regulation, or codified standards regarding the standard of care provided to Quinton Snowden? If so, please identify the same and state in detail all facts upon which you rely to support your contention.

**ANSWER:**    Based on the discovery to date, Plaintiffs are aware of the fact that the duration of time that Quinton Snowden was placed on ECMO exceeded the manufacturer's time limit for the device and exceeded the time limit placed on the device by the FDA in its 510(k) submission. Thus, defendants used the product in violation of Maquet's own indications, and for a period of time in excess of the FDA's approved time limits for use. Specifically:

"The Jostra Heart Lung Machine HL 20 is indicated for use as an extra corporeal circulation device for perfusion appropriate to cadiopulmaonary bypass procedures of six hours or less." (Jostra-HL Heart-Lung Machine User's Manual 1-1)

This is consistent with the FDA's 510(k) Number K984338 for the device, i.e., "the Jostra HL-20 Twin Pump and the Jostra Hl-20 Single Head Roller Pump have the same intended use which is for use as an extra corporeal circulation device for perfusion appropriate to cardiopulmonary bypass procedures of six hours or less" (FDA 510(k) Substantial Equivalence Summary for the Jostra Hl-20 Twin Pump.

Furthermore, since the device was being used in excess of the manufacturer's recommendation and the FDA 510(k) submission, the matter should have been reviewed by the

11

IRB and a proper IRB approved consent form generated.

In addition, Plaintiffs are aware that the Jostra HL-20 Twin Pump at issue, was recalled, FDA recall #Z-0159-2007, and thus was defective.

## VERIFICATION

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTY OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

TERESA MORRING

Respectfully submitted,

Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 659-8600

Anthony Newman, Esquire
NEWMAN, McINTOSH & HENESSEY, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Plaintiff Teresa Morring's Answers to Defendant's Interrogatories was ~~mailed postage pre-paid~~ this 31 day of August, 2007 to:

hand delivered

Nicholas McConnell, Esquire
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
Washington, DC 20036

_____
Ira Sherman

30

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - - - -x
TERESA A. MORRING and
DESHAUNIA Q. SNOWDEN, as
Parents and Next Friends of
Q.E.S., a Minor,

     Plaintiffs,

            Index No.
  -against-
            06CV02036

CHILDREN'S NATIONAL MEDICAL
CENTER,

     Defendant.
- - - - - - - - - - - - - - - - - - - -x


   DEPOSITION of MELVIN H. VAN WOERT, M.D., taken

by Defendant, held at the offices of Fink & Carney

Reporting and Video Services, 39 West 37th Street, New

York, New York 10018, on Friday, January 4, 2008,

commencing at 10:56 a.m., before Jean Wilm, a

Registered Professional Reporter, Certified LiveNote

Reporter and Notary Public within and for the State of

New York.

Page 2

```
 1
 2   A P P E A R A N C E S:
 3
 4         NEWMAN, McINTOSH & HENNESSEY, LLP
              Attorneys for Plaintiff
 5            7315 Wisconsin Avenue
              Suite 700 East Tower
 6            Bethesda, Maryland 20814
 7         BY:  ANTHONY G. NEWMAN, Esq.
 8
 9         JACKSON & CAMPBELL, PC
              Attorneys for Defendant
10            1120 - 20th Street, NW
              South Tower
11            Washington, DC 20036-3437
12         BY:  NICHOLAS S. McCONNELL, Esq.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    Van Woert
 2     A    Not now.
 3     Q    Where have you previously been
 4   licensed?
 5     A    In Illinois.
 6     Q    When did that license last -- when
 7   was it last in effect?
 8     A    I had that from my residency at
 9   University of Chicago, and then after that, I
10   didn't renew it.
11     Q    Your residency ended when?
12     A    '60.  1960, I believe.
13          MR. McCONNELL:  You are
14     reaching for a piece of paper to help
15     remind us of some details.
16          Can we have this marked as
17     Deposition Exhibit 1?
18          (Curriculum Vitae was marked
19     as Deposition Exhibit 1 for
20     identification, as of this date.)
21   BY MR. McCONNELL:
22     Q    The court reporter has now marked as
23   your Deposition Exhibit 1, a document you just
24   handed to me entitled "Curriculum Vitae,
25   Melvin H. Van Woert, MD."
```

Page 3

```
 1                    Van Woert
 2
 3   D R.   M E L V I N   H.   V A N   W O E R T,
 4         called as a witness, having been first duly
 5         sworn/affirmed by Jean Wilm, a Notary Public
 6         within and for the State of New York, was
 7         examined and testified as follows:
 8   EXAMINATION
 9   BY MR. McCONNELL:
10     Q    Doctor, would you tell us your full
11   name, please?
12     A    Melvin H. Van Woert.
13     Q    Your residence address?
14     A    752 Ridgewood Road in Millburn, New
15   Jersey.
16     Q    How long have you lived there?
17     A    About four years.
18     Q    And your current professional
19   address?
20     A    Mount Sinai Medical Center, Fifth
21   Avenue, 100 Street, New York New York.
22     Q    You are a physician licensed to
23   practice in the State of New York?
24     A    That's correct.
25     Q    Are you licensed anywhere else?
```

Page 5

```
 1                    Van Woert
 2          Is this a complete, current,
 3   accurate copy of your CV?
 4     A    Yes, I believe I can say that's -- I
 5   haven't changed it in a lot of years, but as far
 6   as I know, it's fairly current.  I mean, it has
 7   most everything in it.
 8     Q    Does this include all of your
 9   publications and research projects?
10     A    All of the publications, yes.  Not
11   all the grants.  I didn't put that in.  And that's
12   not totally complete, the last page.
13     Q    Are you currently in clinical
14   practice of any kind?
15     A    Yes.  Outpatient clinic, medical.
16     Q    Outpatient medical clinic?
17     A    Yes.
18     Q    Here at Sinai Hospital?
19     A    Mt. Sinai, uh-huh.
20     Q    You need to say yes or no.
21     A    I'm sorry.
22     Q    You need to say yes or no.
23     A    I'm sorry.  Thank you.  Yes.
24     Q    What type of patients do you see at
25   this clinic?
```

Page 10

Van Woert

1  papers and applications submitted to the FDA were
2  reviewed by counsel?
4      A    I assumed on the IRB that the
5  counsel or lawyer would have reviewed it, but I
6  don't know for sure.
7      Q    Did you ever directly submit papers
8  to the FDA in an investigational study of any kind
9  without having first submitted them to counsel for
10 approval?
11     A    Yes, I have submitted INDs to the
12 FDA.
13     Q    Have you done that without first
14 having them reviewed by counsel?
15     A    Yes.
16     Q    When you say you have submitted
17 INDs, what does IND stand for?
18     A    Investigation of a new drug.
19     Q    Have you ever followed through that
20 process with respect to a medication that was
21 specifically being reviewed by the FDA for
22 purposes of use as a pediatric drug?
23     A    Not specifically, no, for use of
24 pediatrics.
25     Q    Are you in any way familiar with the

Page 11

Van Woert

1  FDA review and approval process with respect to
2  medications specifically designed for use in the
3  neonatal or pediatric population?
4      A    No, not specifically.  No experience
5  with that.
6      Q    Have you ever had any experience, or
7  do you have any knowledge regarding FDA processes
8  and requirements for approval of a medical device
9  for specific use in a pediatric or neonatal
10 population?
11     A    I'm familiar with the FDA documents
12 relating to both the medications and devices, but
13 I have not been personally involved with the
14 pediatric devices or pediatric medications.
15     Q    So you have knowledge of the general
16 rules, but do you know whether there are rules
17 specific to pediatric and neonatal devices within
18 the FDA?
19     A    Well, I read the rules.  I know
20 there is in terms of informed consent information
21 provided by the FDA on that issue.
22     Q    Do you know how the FDA defines the
23 terms and circumstances that would apply to a,
24 quote, clinical investigation, close quote?

Page 12

Van Woert

1      A    I'm sorry.  Could you repeat that?
3      Q    Sure.
4          Do you know how the FDA defines the
5  terms or circumstances that would apply to a,
6  quote, clinical investigation, close quote?
7      A    If I understand your question, yes,
8  I believe I do.
9      Q    What are the requirements applicable
10 to a clinical investigation?
11     A    Well, certain information has to be
12 provided in terms of the toxicity of a
13 compound or the risk in terms of device, some
14 information about pharmacokinetics, whatever
15 preliminary work has been done either in other
16 countries or here about -- concerning that
17 medication or device.  These have to be provided
18 before an IND can be approved.
19          In addition, of course, there has to
20 be a protocol, information about the informed
21 consent, information on the quality control of
22 the -- in terms of a medication, the medication
23 being used, what was the quality control, what
24 testing has been done.
25     Q    With respect to devices used in ECMO

Page 13

Van Woert

1  therapy in neonates, have you done any research
2  within the FDA to determine whether there are any
3  devices that have been approved by FDA for
4  neonatal pediatric use on ECMO circuits?
5      A    I understand the ECMO has been
6  approved by the FDA for use.  I think I was made
7  aware that the actual pump was approved by FDA for
8  six hours' use in an ECMO apparatus.
9      Q    Do you know if it has ever been
10 approved specifically for use in the neonatal or
11 pediatric population?
12     A    From my understanding, it has been,
13 yes.
14     Q    Do you know if the devices used in
15 ECMO circuits have been approved by the FDA for
16 treatment specifically of infants with meconium
17 aspiration syndrome?
18     A    I don't know those specifics.  I do
19 not know that.
20     Q    Do you know whether the devices used
21 in ECMO circuits has been FDA approved for use in
22 patients such as _____, the neonate in
23 this case, who required, or going into ECMO looked
24 as if he would require long-term ECMO therapy;

Van Woert

1
2  that is, therapy greater than six hours?
3        Do you know if there was ever any
4  ECMO equipment that has been approved for that
5  purpose?
6        A    No, I think what I know is what I
7  said, and that was that the pump was approved for
8  only six hours' use by the FDA.  In terms of the
9  other part of the ECMO apparatus, I don't know the
10  details.
11       Q    Do you know how many different pumps
12  have been produced that have been used in ECMO
13  circuits?
14       A    No, I don't.
15       Q    You are familiar with only the one
16  pump in this case, the Jostra pump?
17       A    That's correct.
18       Q    But you have no idea how many other
19  manufacturers may have -- how many other different
20  types of pumps that have been produced and used in
21  ECMO circuits?
22       A    I don't know that.
23       Q    And I would be correct in assuming
24  that you don't know whether any of those pumps
25  have been approved by the FDA for use for periods

Van Woert

1
2  of longer than six hours, correct?
3        A    I don't know that, no.
4        Q    Do you know what the average run
5  time is for neonates who are referred to tertiary
6  care centers for ECMO therapy?
7        A    Are you referring to the time that
8  they will be on ECMO?
9        Q    Yes.  That is what I mean by average
10  ECMO run time.
11       Do you know on average how long ECMO
12  kids are on ECMO?
13       A    I think I've seen it.  I think it's
14  somewhere about a week, ten days, something in
15  that range.  I don't recall the exact number.
16       Q    Is it your contention that if the
17  manufacturer has not obtained FDA clearance or
18  approval for the use of its mechanical device, a
19  medical device in a specific -- for a specific
20  purpose or within specific parameters, that in a
21  clinical setting a physician may not use the
22  device in ways other than those specifically
23  approved by the FDA?
24       A    The physician can use the device
25  according to the need of the patient and the

Van Woert

1
2  physician's decision, rational decision as to its
3  use.
4        Q    There is a substantial use of
5  medical devices in the clinical setting in the
6  United States beyond those specifically approved
7  by the FDA for the device, true?
8        A    Beyond the approval, yes, the
9  specifics of the approval, yes.  It has to be
10  approved, of course.
11       Q    But the parameters of the specific
12  FDA approval related to a particular or specific
13  device do not dictate to a physician in a clinical
14  setting how that device is to be used; does it?
15       A    Within reason.  I mean, you are
16  making it a very general statement.  No, within
17  reason, yes, they can use it different than the
18  approval process.
19       Q    And the reason that you speak to is
20  the clinical consensus reached by responsible
21  physicians addressing a particular medical
22  condition which needs to be treated by the use of
23  a particular device, true?
24       A    The consensus is very important,
25  yes.

Van Woert

1
2        Q    How long has ECMO in neonates been
3  in widespread use in the United States?
4        A    I don't recall the exact date.  I
5  would say, and, again, I don't recollect, recall
6  exactly, but I would say in the -- fairly common
7  in 1970s and 1980s, of course, it was being used
8  fairly widespread.
9        Q    Since the 1970s on up until the
10  current time, can you tell me approximately how
11  many patients have been placed on ECMO units in
12  the United States -- neonates been placed on ECMO?
13       A    I don't know that number.
14       Q    If it were somewhere in excess of
15  30,000, would that seem about right to you?
16       A    I don't know.
17       Q    Or do you know?
18       A    I don't.
19       Q    You have no idea as you sit here
20  today how many neonates have been treated with
21  this therapy in the United States since 1970?
22       A    I don't know the number on that.  I
23  know it has been a large number.
24       Q    Would you agree with me that there
25  has been a widespread consensus that this therapy

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
--------------------------x
                          :
TERESA A. MORRING,        :
et al.                    :
                          :
        Plaintiffs        :
                          : Civil Action
    vs.                   : No. 06cv0206
                          :
CHILDREN'S NATIONAL       :
MEDICAL CENTER            :
                          :
        Defendant         :
                          :
--------------------------x
```

Washington, D.C.
October 24, 2007

Deposition of:

KHODAYAR RAIS-BAHRAMI, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 12:30 p.m., before Lynell C.S.

Abbott, a Notary Public in and for the

District of Columbia, when were present on

Page 2

1
2  behalf of the respective parties:
3
4  On behalf of the Plaintiffs:
5  Chaikin & Sherman
      By:  ANTHONY G. NEWMAN, ESQ.
6       1232 17th Street, N.W.
         Washington, D.C. 20036
7       (202) 659-8600
8
   On behalf of the Defendant:
9
   Jackson & Campbell
10 By:  NICHOLAS S. McCONNELL, ESQ.
   By:  KRISTA MAIZEL, Esq.
11      1120 20th Street, N.W., 300 South Tower
         Washington, D.C. 20036
12      (202) 457-1600
13           + + +
14     C O N T E N T S
15 WITNESS:  KHODAYAR RAIS-BAHRAMI, M.D.
16 EXAMINATION BY:              PAGE
17 MR. NEWMAN              3, 137, 163
18 MR. McCONNELL              129, 160
19
20           EXHIBITS
21 None.
22

Page 3

1
2  Whereupon,
3        KHODAYAR RAIS-BAHRAMI, M.D.
4  was called for examination by counsel and,
5  having been duly sworn by the Notary, was
6  examined and testified as follows:
7        EXAMINATION BY COUNSEL FOR PLAINTIFFS
8        BY MR. NEWMAN:
9     Q.   Good afternoon, Doctor.
10    **A.   Good afternoon.**
11    Q.   I have been provided a document
12 which is 14 pages long, apparently.  I think
13 only the first two or three pages -- for the
14 record, it's Pages 2538 to actually just 2540.
15 It's a three-page document which doesn't say
16 it's your CV but it looks like it came off the
17 Internet.
18        Is that the only curriculum vitae
19 you have?  It says, also, "Punch here for
20 map."  I'm assuming it comes off the Internet.
21 Do you have another document like that or is
22 that it?

Page 4

1     A.   **You are asking me to verify these**
2  **informations are correct?**
3     Q.   Well, I'm first asking you is that
4  your curriculum vitae?
5     A.   **No.**
6     Q.   Okay.  It seems to be a printout
7  from the Internet.  Do you have a curriculum
8  vitae printed up somewhere?
9        MR. McCONNELL:  Do we have one?
10       MR. NEWMAN:  That's the one you
11 gave to me, actually.
12       THE WITNESS:  I do.
13       MR. McCONNELL:  Let's see if we
14 have something better than that.
15       BY MR. NEWMAN:
16    Q.   But you could look through it just
17 to say -- does it appear to be incomplete, in
18 other words, between your publications and
19 other works, or is it relatively complete?
20    A.   **The information is correct.  This**
21 **is part of my -- I mean it's a part of my CV.**
22    Q.   All right.  Meaning there is a

Page 5

1  document that has more entries than that that
2  is your actual CV.
3     A.   **Yes.**
4     Q.   If you can provide that to counsel
5  to provide to me, that will be fine.  Is this
6  a CV that is kept at Children's on the
7  Internet?
8     A.   **Correct.**
9     Q.   The last publication on this
10 document is in Perfusion 2004.  Have you
11 written anything since then that's been
12 published?
13    A.   **Yes.**
14    Q.   Is there any other research or
15 funding that you've been involved with besides
16 what's on here?
17    A.   **May I see that.  No.**
18    Q.   When did you first come to
19 Children's, what year?
20    A.   **July of 1991.**
21    Q.   While it does not give me the
22 years of what's called Past Research

Page 34

1      Q.   Do you believe there was an acute
2  event that occurred to this child following
3  the decannulation before the brain damage was
4  found on the films?
5          MR. McCONNELL: Again, I object as
6  to the form and foundation as assuming that
7  the brain damage is found only on the films.
8          BY MR. NEWMAN:
9      Q.   Doctor, let me ask you first of
10  all: Is it your opinion to a reasonable
11  degree of medical certainty that this child
12  did suffer brain damage and it was diagnosed
13  sometime after the decannulation?
14          MR. McCONNELL: Objection as to
15  the form and foundation, again.
16          BY MR. NEWMAN:
17      Q.   Is that your determination, that
18  it was brain damaged and it was diagnosed
19  after the decannulation, sometime after?
20      A.   Yes.
21      Q.   And if I understand also, you do
22  not have an opinion based on your review to a

Page 35

1  reasonable degree of medical certainty as to
2  what the cause of that brain damage was.
3      A.   Correct.
4      Q.   My next question is, besides the
5  decannulation and the code, were there any
6  other acute events that you believe occurred
7  with this child from the point of the
8  decannulation up to the point of where the
9  diagnosis was made?
10      A.   No.
11      Q.   Did you come to any conclusion
12  that any of the brain damage was a result of
13  the birth? I'm not asking you to do that now,
14  but when you reviewed it did you believe that
15  is what the case was?
16      A.   No.
17      Q.   Does that mean that your opinion
18  as far as the brain damage is that it occurred
19  sometime afterward?
20      A.   Yes.
21      Q.   Is that an opinion you hold to a
22  reasonable degree of medical certainty as

Page 36

1  opposed to just a guess?
2      A.   Yes.
3      Q.   And am I correct that as far as
4  when that occurred or why, you don't know?
5      A.   I don't know.
6      Q.   Did you also make inquiry as far
7  as, let's say, metabolic conditions or genetic
8  conditions causing that, potentially causing
9  any kind of trouble in the brain or did you
10  not review that?
11      A.   I did not review that.
12      Q.   We went through the beginnings of
13  what you first saw on the patient. And did
14  you make the determination that ECMO should
15  begin or who made the determination?
16      A.   I did.
17      Q.   Was the reason, as I understand
18  it, for ECMO that other mechanical maintenance
19  was not adequate and you wanted to go to, if
20  you will, the full bypass?
21      A.   Correct.
22      Q.   Did you have an opinion at that

Page 37

1  time of how long the patient would be on ECMO?
2      A.   No.
3      Q.   And I understand that it depends
4  on how the values are looking.
5      A.   Correct.
6      Q.   But no end point; in other words,
7  you wouldn't put the patient on for, let's
8  say, a month or more or it could have been any
9  length of time?
10      A.   I hoped it to be less than that.
11      Q.   Less than a month.
12      A.   Yes.
13      Q.   Now, there was a, what I
14  understand is there was a study being
15  performed called "Evaluation of Serum Iron and
16  Iron Storage Levels in Neonates Undergoing
17  Extracorporeal Membrane Oxygenation (ACMO)."
18  At that time was that correct, there was that
19  protocol?
20      A.   Correct.
21      Q.   Were you the investigator of that
22  protocol?

Page 102

1    A.   The catheter is sutured to the
2  vessels, artery to artery, vein to vein, and
3  secured in the neck and closed.  I mean a
4  surgeon can answer that question by far better
5  than I can.  I watch.  I don't do.
6      Q.   In this case, though, you don't
7  know what happened to the sutures that allowed
8  the catheter to get free.
9      A.   No, I don't.
10        MR. McCONNELL:  Objection as to
11 the form and foundation of the question.  But
12 you may answer, and you have.
13        THE WITNESS:  Yes.
14        BY MR. NEWMAN:
15     Q.   Am I correct that if a catheter is
16 not anchored by the sutures around the vessel,
17 that hyperextending the neck would move the
18 catheter further out?
19     A.   It would extend and straighten the
20 catheter, not necessarily pull it out.  That's
21 my understanding.
22     Q.   Well, when you were told that this

Page 103

1  nurse placed the roll under the shoulders and
2  then noticed the blood, if the catheter had
3  been sutured correctly onto the artery and was
4  anchored, why would that cause it to bleed?
5        MR. McCONNELL:  Objection as to
6  the form and foundation.  It's assuming
7  relationships of observations are related to
8  underlying events.  Subject to my objection,
9  you may answer.
10        THE WITNESS:  Is this a general
11 question?
12        BY MR. NEWMAN:
13     Q.   No.  In this case where someone
14 said, "Look, I put a roll under and then I
15 noticed the bleed," which I think you've
16 already testified was from the catheter
17 moving, why would it move if it was sutured
18 onto the artery?  Why would it cause a bleed?
19        MR. McCONNELL:  Objection as to
20 the assumption of the relationship of those
21 events in time.  But you may answer.
22        THE WITNESS:  Bleeding around the

Page 104

1  ECMO catheters is a common occurrence that we
2  deal with day in/day out.  And I cannot tell
3  you exactly what causes it and what starts it
4  and what happens.
5        BY MR. NEWMAN:
6      Q.   But am I correct that as far as
7  inadvertent decannulation, that doesn't happen
8  a lot?
9      A.   It does not happen a lot.
10     Q.   How many times do you know it to
11 have happened at Children's besides this
12 episode?
13     A.   In my --
14     Q.   In your tenure here.
15     A.   That I have been involved, three.
16     Q.   Did any of those occur before this
17 decannulation?
18     A.   Yes.
19     Q.   Is this the third one, by the way,
20 or are you talking about four in total?
21     A.   This is the third that I have
22 seen.

Page 105

1      Q.   The other two happened before.
2      A.   Yes.
3      Q.   And how long before this case?  In
4  other words, years before this?
5      A.   Years.
6      Q.   What was the outcome of those
7  patients?  Did any of them have any kind of
8  permanent neurologic impairment or die?
9        MR. McCONNELL:  Objection as to
10 the form and foundation.
11        THE WITNESS:  Am I at liberty to
12 discuss other patients in this forum?
13        BY MR. NEWMAN:
14     Q.   Not the names, I'm not asking.
15 You can give me whether they died or whether
16 they had permanent impairment.  I'm not asking
17 for the name of the patient.
18        MR. McCONNELL:  Objection as to
19 form, foundation and relevance.  Without
20 knowing everything there is to know about
21 those patients, you know, what happened to a
22 patient who was on ECMO is a pretty far

Page 146

1  things, and I don't want to keep going back
2  over other things.  So my point is if you want
3  to stick with what you said to me earlier as
4  what you would definitely have said to a
5  patient like this and what Mr. McConnell's
6  answers are if someone asked you and if you
7  did this you might say that, we'll leave it at
8  that.
9          But I just need to know what your
10  general core information is and what you
11  believe you said in this case, if you had any
12  recollection beyond that.  So if you want to
13  stick to your old testimony before Mr.
14  McConnell's questions, fine.  And then you can
15  say that if a patient asks as Mr. McConnell
16  asked --
17          MR. McCONNELL:  I didn't ask that.
18  You are misstating the record.
19          MR. NEWMAN:  We'll see.  The
20  record is the record.  I'm just trying to give
21  this man an opportunity to rely on his prior
22  testimony.

Page 147

1          MR. McCONNELL:  He specifically
2  mentioned, for example, the risk of heparin,
3  and what's the explanation of that, what does
4  it mean, what does he discuss.  That was the
5  context.
6          MR. NEWMAN:  Right, you asked.  He
7  didn't say he discussed those issues, and
8  especially intraventricular hemorrhage.  Very
9  amusing he didn't mention that.  He did when
10  you asked him.  You can ask him something
11  about whether there's blood in the urine but
12  that doesn't mean unless the patient asked
13  that that he would say that.
14          So if you understand, Doctor, I
15  see no other way to do it.  Either you adopt
16  your prior testimony or continue again.
17          MR. McCONNELL:  Please take your
18  time.  Just do it.  Go through an
19  explanation--
20          BY MR. NEWMAN:
21      Q.    What the minimum you would tell a
22  patient is unless they ask further questions

Page 148

1  or unless you felt that there was some
2  specific reason.
3      A.    I do start with providing them the
4  information of what the infant's condition is.
5  "At the present time in spite of maximum
6  respiratory, cardiorespiratory and
7  pharmacologic support, the infant's condition
8  is not improving and getting worse.  His or
9  her chances of dying while failing to respond
10  to maximum level of conventional therapy is
11  extremely high and we have opportunity to
12  provide extracorporeal life support to
13  temporarily take over the heart and lung
14  function."  And then I go to the specific
15  discussion of what extracorporeal life support
16  entails.
17          MR. McCONNELL:  Tell us about it.
18  That's the question.  Tell us the whole thing.
19          BY MR. NEWMAN:
20      Q.    Don't give me a summary.  Tell me
21  what you said.
22      A.    I clearly tell them they're

Page 149

1  consenting to do a surgical cut-down on the
2  right side of the neck to access the major
3  blood vessels, to cannulate or insert a
4  cannula for connecting the patient's or the
5  baby's heart to the extracorporeal life
6  support machine and that entails circulating
7  the blood into the circuit that is pre-primed
8  with donor blood.
9          So they are consenting to blood
10  transfusion.  And in order to run that blood
11  into that circuit without constant clot
12  formation is to maintain a certain level of
13  anticoagulation which includes continuous
14  heparinization or blood thinner.
15          The side effect of that may
16  include or does include risk of bleeding from
17  the baby which by far involves, and I said
18  before, involves intraventricular or
19  intracranial hemorrhage.  And I usually
20  summarize at the end that there are risk of
21  surgery, there are risk of anesthesia, there
22  are risk of large quantity of blood

Page 150

1   transfusion, there are risk of blood thinner
2   and heparinization and the subsequent risks of
3   spontaneous bleeding or hemorrhage in the
4   patient, and almost always ask them if they
5   understood what I said.
6           Very often I ask them to repeat
7   what I told them. And at the end I always
8   give them opportunity to ask questions or if
9   they have heard this from other colleagues of
10  mine who actually referred the patients to us,
11  what they told them and what they understood
12  and if any of those was covered in my
13  discussion or if they have further questions
14  that I need to respond to.
15          And that is what I exactly did, as
16  you asked me and as Mr. McConnell asked me. I
17  answered very, very precisely.
18      Q.   Now, is that it? I don't want to
19  hear anything else you talked about or
20  anything else you would generally say to
21  patients in informed consent. Have we now
22  completed the list of what you would talk

Page 151

1   about with regard to everything, from why to
2   the risks to the issues that could happen and
3   of course to asking them to repeat it, does
4   that complete it now?
5       A.   I do mention to them that this is
6   a very, very critical and risky procedure and
7   there are very known major side effects and
8   major complications that could potentially be
9   life-threatening. Very often they ask me,
10  "Can my baby die on ECMO?" And I say, "Yes.
11  This does not guarantee survival, does not
12  guarantee recovery, does not guarantee
13  lifelong well being. But this is what we have
14  to offer at the moment to see what happens
15  next." And I'm very much up front and forward
16  with them. I mean there is nothing I have to
17  hide.
18      Q.   Anything else?
19      A.   No.
20      Q.   In this particular case you would
21  have also told the mother, would you not, as
22  far as condition is concerned, not necessarily

Page 152

1   with informed consent, but that the hope is
2   that the hypertrophic condition of the heart
3   would improve when the patient is placed on
4   bypass for a period of time.
5       A.   Without that hope, why would I
6   even do this?
7       Q.   And that's what you are getting
8   the consent for and that's what the purpose
9   was in this case.
10      A.   Yes.
11      Q.   Now, the record will reflect that
12  earlier I asked you if this patient had
13  suffered a cardiac arrest. And you said, "I
14  do not know." Is that still your testimony?
15  You went through the respiratory, went through
16  cardiac. Do you know if this patient suffered
17  a cardiac arrest?
18          MR. McCONNELL: Again, objection
19  as to the form of the question, because it may
20  mean several different things. Subject to
21  that, you may answer.
22          BY MR. NEWMAN:

Page 153

1       Q.   Or do you still not know?
2       A.   May I rephrase your question or
3   answer to your question?
4           MR. McCONNELL: It's your
5   testimony.
6           BY MR. NEWMAN:
7       Q.   That means you can't answer it as
8   I stated it, did this patient suffer a cardiac
9   arrest. Is that to say you can't answer that
10  question? That is my question.
11          MR. McCONNELL: There is an
12  ambiguity in it. But subject to my form
13  objection, you may answer. You may answer in
14  whatever way under oath you feel comfortable.
15  That's what a witness needs to do.
16          THE WITNESS: The patient required
17  cardiac compression but not at any given time
18  had cardiac arrest, i.e., asystole.
19          BY MR. NEWMAN:
20      Q.   And how are you aware during the
21  time when there are no recordations of pulse,
22  blood pressure, and only bagging, that this

Page 162

1  you listen or feel as a pulse.  And during
2  emergency code situation we often rely on a
3  monitoring system or a tracing which often may
4  not be exact situation.
5      Q.   But here if the number zero had
6  ever appeared on the monitor, is that
7  something that would be documented on the
8  chart?
9      A.   Yes, yes.
10     Q.   Mr. Newman put it to you a little
11 crudely, "Did you tell the mother in effect
12 that if the infant didn't go on ECMO he'd be
13 dead in two days," and you said, "Well, not in
14 those words."  How do you explain to mothers
15 like Ms. Snowden the gravity of their child's
16 situation and the need for ECMO?  How is it
17 put to them?
18         MR. NEWMAN:  I'm going to object.
19 You asked the same question before.  Mine was
20 a follow-up of yours.
21         MR. McCONNELL:  I don't want to
22 leave the impression that parents aren't aware

Page 163

1  of --
2          THE WITNESS:  No.
3          MR. NEWMAN:  Go ahead.  You've
4  asked your question again.  I noted my
5  objection.  Don't speak.
6          BY MR. McCONNELL:
7      Q.   How do you convey that to the
8  parents?
9      A.   As I mentioned in my explanation
10 of consent form, I do mention that in spite of
11 all efforts with conventional support the
12 child is failing to respond and most likely
13 if, most like I is going to die under the
14 current circumstances unless we do this thing
15 that I discussed later.
16         MR. McCONNELL:  No other questions
17 at this time.
18     EXAMINATION BY COUNSEL FOR PLAINTIFFS
19         BY MR. NEWMAN:
20     Q.   Are you saying just, so I
21 understand, that the patient would likely die
22 on other conventional support mechanisms or

Page 164

1  would likely die if not placed on a support
2  mechanism?
3      A.   Which support mechanism?
4      Q.   That's what I'm saying.  In this
5  case involving ECMO, are you saying that the
6  patient will die if left on a regular
7  respirator and also some other type of devices
8  or are you saying obviously if the patient did
9  not have mechanical support the patient would
10 die?
11     A.   The first thing you said, in spite
12 of maximum mechanical and pharmacological
13 support, the patient would die.
14     Q.   And the issue you always tell the
15 patient, is it not, that ECMO is a temporary
16 procedure?
17     A.   Absolutely.
18     Q.   And it's a procedure designed to
19 improve the status of the patient so that they
20 no longer need the ECMO.
21     A.   Actually, I tell them it's the
22 procedure to support the patients, to allow

Page 165

1  them to improve their condition.
2      Q.   ECMO is not used, am I correct, on
3  patients that are moribund, in other words,
4  that there are no chances for particular
5  survival?  Or is that also used in extremis
6  patients, in other words, where the end is
7  obviously happening from, let's say, cancer or
8  so on, but this is the last step?
9      A.   Well, that's not my field of
10 specialty and I should not be discussing.
11     Q.   I'm just asking if in fact when
12 you use ECMO it is to get a child through a
13 particular critical phase?
14     A.   Correct.
15     Q.   For a temporary, short period of
16 time, be it as long as a month.
17     A.   Correct.
18         MR. NEWMAN:  Hopefully that's it.
19         MR. McCONNELL:  No other questions
20 at this time.
21         MR. NEWMAN:  Then that's it.
22         (Whereupon, signature not having

# EXHIBIT I

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------------------x
                            :
TERESA A. MORRING,          :
et al.                      :
                            :
            Plaintiffs      :
                            : Civil Action
      vs.                   : No. 06cv0206
                            :
CHILDREN'S NATIONAL         :
MEDICAL CENTER              :
                            :
            Defendant       :
                            :
----------------------------x

                    Washington, D.C.
                    August 24, 2007

Deposition of:

    GERALD THOMAS MIKESELL, CCP,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Office, 111 Michigan Avenue, N.W.,

Washington, D.C., beginning at 11:51 a.m.,

before Zev V. Feder, CSR, a Notary Public in

and for the District of Columbia, when were

present on behalf of the respective parties:

Page 2

1
2    On behalf of the Plaintiffs:
3    Chaikin & Sherman
     By: ANTHONY G. NEWMAN, ESQ.
4         1232 17th Street, N.W.
          Washington, D.C. 20036
5         (202) 659-8600
6
     On behalf of the Defendant:
7
     Jackson & Campbell
8    By: NICHOLAS S. McCONNELL, ESQ.
     By: KRISTA MAIZEL, Esq.
9         1120 20th Street, N.W., 300 South Tower
          Washington, D.C. 20036
10        (202) 457-1628
11            + + +
12
13           C O N T E N T S
14   WITNESS: GERALD THOMAS MIKESELL, CCP
15   EXAMINATION BY:                    PAGE
16   MR. NEWMAN                         3, 66
17   MR. McCONNELL                      64
18
19           EXHIBITS
20   None.
21
22

Feder Reporting Company
(202) 863-0000

Page 4

1    beginning.  When did you first become involved
2    with that patient?
3        A.   In terms of when the patient came
4    into the hospital?
5        Q.   Yes.  First time you saw the
6    patient is fine.  Then we will go into the
7    specifics of the occasion.
8        A.   I think I may have been involved
9    with the original cannulation.  I think.  I
10   can't remember.  I would have to look back on
11   her chart to see who set up and primed the
12   circuit, entry into the hospital, when she
13   first went on ECMO.  I think I may have been.
14           MR. NEWMAN: I don't have that
15   particular one.  Does counsel have --
16           MR. McCONNELL: I may.
17           THE WITNESS: The ECMO record is
18   what it would be.
19           MR. McCONNELL: It is called the
20   ECMO record?
21           THE WITNESS: Yes.  Or ECMO flow
22   sheet.

Feder Reporting Company
(202) 863-0000

Page 3

1
2    Whereupon,
3        GERALD THOMAS MIKESELL, CCP
4    was called for examination by counsel and,
5    having been duly sworn by the Notary, was
6    examined and testified as follows:
7    EXAMINATION BY COUNSEL FOR PLAINTIFFS
8        BY MR. NEWMAN:
9        Q.   Hello, again.
10       A.   Hello.
11       Q.   What I would like to do, first of
12   all, is ask you if there have been any changes
13   to your CV that we had before.  Anything that
14   you have published or done in the meantime?
15       A.   Nothing this summer, no.
16       Q.   Now that you are in a different
17   capacity for this deposition, I am basically
18   going to start with questions about what you
19   remember about the particulars of the
20   case, or Morring, depending on how you refer
21   to it.
22       Why don't we start from the

Feder Reporting Company
(202) 863-0000

Page 5

1        (Discussion off the record.)
2        THE WITNESS: Yes.  I did.  I set
3    up and put her on ECMO.
4        BY MR. NEWMAN:
5        Q.   I don't have that in front of me.
6    What page --
7        A.   1625?  Is that your page?
8        Q.   That's the Children's Hospital
9    page.  Also, for identification purposes, it
10   is the --
11       A.   It is essentially the back sheet
12   of the ECMO flow sheet.
13       Q.   For 9/13?
14       A.   For the 9/13, the time of the
15   original cannulation, initiation of ECMO.
16       Q.   When patients first come to
17   Children's are you the one that usually is the
18   perfusionist involved with first setting them
19   up on ECMO?
20       A.   Correct.  At this institution we
21   get called by the attending physician and told
22   that we have a patient we want to put on ECMO.

Feder Reporting Company
(202) 863-0000

Page 10

1  adjustment of the neck roll? Can a nurse do
2  that?
3      A.    The ECMO specialist would do that.
4      Q.    Does that mean a nurse can't do
5  it?
6      A.    The ECMO specialist may be a
7  nurse. They may be one and the same.
8      Q.    If the ECMO specialist is not a
9  nurse?
10     A.    It would be a respiratory
11 therapist and they also are trained to be able
12 to handle the patient, move the patient.
13     Q.    But they have to be an ECMO
14 specialist, whatever their other training is,
15 in order to move the patient with the cannulas
16 in?
17     A.    That is our procedure to do things
18 at this institution, yes.
19     Q.    Did you implement that particular
20 part of the procedures?
21     A.    It was just part of what has grown
22 over time with the program.

Feder Reporting Company
(202) 863-0000

Page 11

1      Q.    In the time since you first began
2  to be involved with Children's in ECMO up to
3  the time of 2000, September of 2005 in this
4  case, how many patients do you think had been
5  on ECMO?
6      A.    I came in 1987. And at that time
7  they had done a little over a hundred
8  patients. And I think that                  is
9  717, so that would be about 600 patients. And
10 that doesn't count pediatric patients or
11 cardiac patients, which have a different
12 numbering. So I would say probably about 700.
13     Q.    Outside of              on one
14 of the decannulation, any other patients
15 decannulized?
16     A.    I can remember two others.
17     Q.    When were they?
18     A.    That I don't remember.
19     Q.    Before
20     A.    Oh, yes. Actually, one was when
21 Kathy Anderson was here. That would have been
22 before -- because she left in 1992 or 1993.

Feder Reporting Company
(202) 863-0000

Page 12

1  So it would have been in that time. And one
2  would have been in the mid '90s sometime.
3      Q.    The policies involving having an
4  ECMO specialist adjust the neck roll, did they
5  come into effect after those cases?
6      A.    They pretty much --
7      MR. McCONNELL: The question is
8  did they come into effect after those cases.
9  Yes or no?
10     THE WITNESS: No. Before.
11     BY MR. NEWMAN:
12     Q.    Any difference in the policies or
13 procedures for adjusting the neck roll after
14 those other two cases in the '90s?
15     A.    No.
16     Q.    Did either of those patients die?
17     A.    I don't remember.
18     Q.    Do you recall if either of those
19 patients suffered an anoxic event?
20     A.    I do not remember.
21     Q.    Back to this particular case, do I
22 understand from what you said that while you

Feder Reporting Company
(202) 863-0000

Page 13

1  read your note to us, you don't have any
2  particular recollection of
3  getting started on ECMO?
4      A.    No. I did a number of patients
5  that...
6      Q.    As far as the protocols and
7  procedures for suturing the catheters, who
8  came up with those?
9      A.    That would be general surgery.
10     Q.    But if I understand correctly, you
11 were involved with editing the manuals and
12 incorporating general surgery procedures into
13 them?
14     A.    That is correct.
15     Q.    From your understanding, how are,
16 according to the policies and procedures, the
17 venous and arterial catheter and ECMO unit
18 supposed to be secured suture-wise?
19     A.    In terms of -- I am not sure I
20 understand completely what you are --
21     Q.    There are procedures within both
22 the ECMO program, policies and procedures in

Feder Reporting Company
(202) 863-0000

Page 18

```
1      A.   All of the above, yes.  And can
2  simply be, many times, if the patient's own
3  pressure is increasing, that becomes part of
4  the total resistance to the circuit and to
5  flow which is reflected on our arterial line
6  pressure.
7      Q.   Also a kink in the line?
8      A.   A kink in the line.  Somebody
9  standing on a line.  Any sort of physical
10  obstruction or physiologic obstruction can
11  cause an increased pressure.
12      Q.   So Ms. Bird mentioned that.  And
13  what was said?
14      A.   I mean, I do not remember exactly
15  what was said other than we were, you know, at
16  that point would troubleshoot a circuit and
17  look at a circuit, and it was my feeling that
18  there was no circuit involvement in terms of
19  problems with the arterial line.  Because that
20  pressure reflects the pressure from the outlet
21  at the oxygenator to the tip of the cannula on
22  the patient.
```

Page 19

```
1      So just in looking at the circuit,
2  through our heat exchanger and everything
3  else, there was no, there were no clots, no
4  obvious physical obstruction for the circuit.
5      Q.   So, literally, you went over and
6  looked between the heat exchanger and the
7  patient and said there is nothing here --
8      A.   Between the oxygenator and the
9  patient, yes.
10      Q.   And there was nothing there?
11      A.   Everything there looked normal and
12  looked fine.
13      Q.   So what happened next?
14      A.   Dr. Bahrami, I think, was the one
15  that made the suggestion that we reposition
16  the patient.  And during the course of putting
17  a neck roll in to help reposition the patient,
18  why, then I noticed blood at the site of the
19  cannula insertion and knew right away that we
20  had inadvertently decannulated the patient.
21  Had become inadvertently decannulated.
22      Q.   First of all, was there
```

Page 20

```
1  actually -- was there always a neck roll under
2  a patient in ECMO?
3      A.   Not necessarily.  During
4  cannulation, yes.  Then most of the time that
5  is removed.
6      Q.   In this case there wasn't the neck
7  roll under the patient?
8      A.   I don't remember whether there was
9  or whether we just were readjusting position
10  of the neck roll.  I don't recall.
11      Q.   So when you said you were putting
12  a neck roll in, do you mean, do I understand
13  that means either adjusting the one that was
14  there or putting a new one in?
15      A.   Correct.
16      Q.   But you don't have any
17  recollection?
18      A.   Of which, no.
19      Q.   Tell me what you saw from --
20  Bahrami made the order to whom?
21      A.   To Kristen Bird.
22      Q.   And told her to readjust the neck?
```

Page 21

```
1      A.   Because that's generally our first
2  thing that we do, is either put in a neck roll
3  or readjust the neck roll if it is felt it is
4  a cannula positioning problem.
5      Q.   Tell me what the benefit would be
6  of the neck roll or readjusting the neck.
7  What are you looking to do?
8      A.   What you are looking to do is to
9  take an area that may be compacted and the
10  cannula at this point, if your neck is in this
11  position --
12      Q.   Squished towards your shoulder?
13      A.   Squished towards your shoulder.
14  Then the cannula, the tip of the cannula could
15  be directing flow into the side of a vessel.
16  And by putting in a neck roll, you essentially
17  stretch out the neck and you straighten the
18  vessel and, by doing that, straighten the
19  cannula and allowing a more free flow of blood
20  from the cannula back.
21      Q.   The process of either putting in
22  the neck roll or moving the child for the
```

# EXHIBIT J

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
--------------------------x
                          :
TERESA A. MORRING,        :
et al.                    :
                          :
        Plaintiffs        :
                          : Civil Action
    vs.                   : No. 06cv0206
                          :
CHILDREN'S NATIONAL       :
MEDICAL CENTER            :
                          :
        Defendant         :
                          :
--------------------------x
```

Washington, D.C.
October 24, 2007

Deposition of:

DAVID MANN POWELL, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 9:35 a.m., before Zev V. Feder,

CSR, a Notary Public in and for the District

of Columbia, when were present on behalf of

Page 2

1
2  the respective parties:
3
4  On behalf of the Plaintiffs:
5  Chaikin & Sherman
     By:  ANTHONY G. NEWMAN, ESQ.
6        1232 17th Street, N.W.
           Washington, D.C. 20036
7        (202) 659-8600
8
     On behalf of the Defendant:
9
     Jackson & Campbell
10  By:  NICHOLAS S. McCONNELL, ESQ.
     By:  KRISTA MAIZEL, Esq.
11        1120 20th Street, N.W., 300 South Tower
           Washington, D.C. 20036
12        (202) 457-1600
13              + + +
14          C O N T E N T S
15  WITNESS: DAVID MANN POWELL, M.D.
16  EXAMINATION BY:                        PAGE
17  MR. NEWMAN                             3
18  MR. McCONNELL                          -
19
20          EXHIBITS
21  DEPOSITION NO.    MARKED FOR IDENTIFICATION
22  1. Curriculum vitae                    4

Page 3

1
2  Whereupon,
3        DAVID MANN POWELL, M.D.
4  was called for examination by counsel and,
5  having been duly sworn by the Notary, was
6  examined and testified as follows:
7  EXAMINATION BY COUNSEL FOR PLAINTIFFS
8        BY MR. NEWMAN:
9        Q.   Please state your full name for
10  the record.
11       A.   David Mann Powell.
12       Q.   Dr. Powell, you are a physician.
13  Correct?
14       A.   Yes.
15       Q.   Prior to the deposition I was
16  given a document which is 14 pages long which
17  purports to be your CV.  Is that your most
18  recent, up to date version?
19       A.   This is current as of February,
20  2007 as dated at the bottom.
21       Q.   Any additions?
22       A.   There may be one or two additional

Page 4

1  publications but otherwise it is the same.
2        Q.   The publications, what are their
3  titles or what do they involve?
4        A.   I don't know.
5        Q.   If you can just provide the names
6  of it to counsel, or provide me with a newer
7  version of the CV.  Is that agreeable?
8        A.   Certainly.
9        Q.   Right now we will just attach that
10  as Exhibit 1.
11            (Document referred to marked
12  Deposition Exhibit No. 1 for identification
13  and subsequently attached to the deposition.)
14            BY MR. NEWMAN:
15       Q.   Let's begin by a simple question,
16  I suspect.  That is, when did you first get
17  involved with the care and treatment of this
18  patient?
19       A.   I believe on the morning, on the
20  morning rounds I was told that a patient who
21  had previously been cannulated for ECMO needed
22  repositioning of one of the cannulas.

Page 5

1        Q.   I have no problem you looking at
2  any records but what time are you talking
3  about when you think that occurred?
4        A.   5:00 o'clock in the morning.
5        Q.   Do you have a recollection of this
6  case in particular or only a recollection
7  based on reviewing the records?
8        A.   I have a very limited recollection
9  of this case in particular.  I have reviewed
10  the records.
11       Q.   As far as your limited
12  recollection as to the particulars of this
13  patient, tell me what you remember without the
14  benefit of looking at records.  Then we will
15  go through the specifics.  If you need to see
16  a record, that's what I am trying to get to.
17            MR. McCONNELL:  Let me object to
18  the form of the question, because I think what
19  people remember varies greatly with the
20  specific questions that may be put to them.
21            Subject to the objection, however,
22  to the extent you have a general recollection,

Page 10

1. Discard after use.
2. Do you recall that as being the
3. indication for the cannula?
4. **A.   I am sorry, I don't understand the**
5. **question.**
6. Q.   You said earlier that you
7. understood the manufacturer said it was for
8. single use only.
9. **A.   Correct.**
10. Q.   Does that comport with your
11. recollection of what the nature of the use of
12. the cannula was, that I just read to you?
13. **A.   Yes.**
14. Q.   Do I understand, whether or not it
15. was, in fact, a Bio-Medicus cannula as stated
16. on page 2246, you don't know?
17. **A.   I don't know.**
18. Q.   Any particular size catheter, do
19. you remember?  Whether it was a particular
20. French or another type of size?
21. **A.   No, I am sorry.**
22. Q.   We got to the point of remembering

Page 11

1. that you were there.  You called in.  This was
2. your recollection.  And then involved with,
3. you said, putting it back in.
4. You went through the issue of
5. recollection of blood loss.
6. Do you recall who else was present
7. besides the one individual that you mentioned?
8. **A.   No.**
9. Q.   On how many occasions prior to .
10. this had you been called for recannulations?
11. **A.   Once.**
12. Q.   Just so we understand, over what
13. period of time had you been doing this type of
14. work?
15. **A.   17 years.**
16. Q.   You actually -- I looked at your
17. CV but are you certified in ECMO?  Is there a
18. training course you took specifically?
19. **A.   No.**
20. Q.   Do you understand there is such a
21. course?
22. **A.   Yes.**

Page 12

1. Q.   You predated it when you were
2. doing these type of procedures?
3. **A.   I have participated in the course.**
4. **On occasion I have helped as an instructor in**
5. **the course.  But I have not been certified in**
6. **the course.**
7. Q.   Is there any requirement presently
8. that surgeons involved in ECMO have to be
9. certified at the Children's Hospital?
10. **A.   Surgeons at this children's**
11. **hospital have certain requirements.  There is**
12. **not a surgical course for ECMO.  As part of**
13. **any board eligible or board certified**
14. **pediatric surgeon who goes through this**
15. **training program or comes here, they would**
16. **have gotten adequate experience in ECMO as**
17. **part of their pediatric surgery training.**
18. Q.   The other case you recall in the
19. 17 years that you have been performing, been
20. involved with ECMO, that involved a
21. decannulation, when did that occur?
22. **A.   I don't remember.**

Page 13

1. Q.   Before this case?
2. **A.   Before.**
3. Q.   Do you remember the result of
4. that?
5. **A.   The patient was recannulated.  I**
6. **don't remember the outcome.**
7. Q.   In this particular case do you
8. recall that, one way or the other, whether the
9. patient suffered intracranial hemorrhage
10. during the recannulation and resuscitation?
11. **A.   No.**
12. Q.   Is it safe to say that you don't
13. recall anything, whether one way or the other,
14. about an intracranial hemorrhage in that prior
15. case?
16. **A.   No.**
17. Q.   When you arrived -- again, looking
18. at your recollection in your mind's eye, when
19. you arrived and applied pressure and began the
20. process of recannulating, can you describe
21. what the field looked like?  In other words,
22. we understand, if I am correct, that there was

# EXHIBIT K

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-------------------------x
                         :
TERESA A. MORRING,       :
et al.                   :
                         :
         Plaintiffs      :
                         : Civil Action
    vs.                  : No. 06cv0206
                         :
CHILDREN'S NATIONAL      :
MEDICAL CENTER           :
                         :
         Defendant       :
                         :
-------------------------x
```

RECEIVED

JAN 25 2008

JACKSON & CAMPBELL, PC

Washington, D.C.

Tuesday, January 22, 2008

Deposition of:

BILLIE LOU SHORT, M.D.

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 2:17 p.m., before Renee A. Feder,

CSR, a Notary Public in and for the District

of Columbia, when were present on behalf of

the respective parties:

Page 2

1
2  On behalf of the Plaintiffs:
3  Chaikin & Sherman
3  By: ANTHONY G. NEWMAN, ESQ.
4      1232 17th Street, N.W.
4      Washington, D.C. 20036
5      (202) 659-8600
5
6
6  On behalf of the Defendant:
7
7  Jackson & Campbell
8  By: NICHOLAS S. McCONNELL, ESQ.
8      1120 20th Street, N.W., 300 South Tower
9      Washington, D.C. 20036
9      (202) 457-1600
10
10          + + +
11      C O N T E N T S
12  WITNESS: BILLIE LOU SHORT, M.D.
13  EXAMINATION BY:                    PAGE
14  MR. NEWMAN                          3
15  MR. McCONNELL                       -
16
17          EXHIBITS
18  DEPOSITION NO.    MARKED FOR IDENTIFICATION
19  1 (DVD)                10
20  2 (Description of DVD on the Internet) 21
21
22      *  ***  *

Page 3

1  Thereupon,
2          BILLIE LOU SHORT, M.D.
3  was called for examination by counsel and,
4  after having been duly sworn by the Notary,
5  was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFFS
7      BY MR. NEWMAN:
8      Q.    State your full name for the
9  record.
10     A.    Billy Lou Short.
11     Q.    Dr. Short, do you have a current
12  CV?
13     A.    Not here.
14     Q.    In any event, you do have one and
15  you can get a hold of one for me?
16     A.    Yes.
17     Q.    Just so I understand, when did you
18  first start working at Children's?
19     A.    I started in 1977 doing a neonatal
20  fellowship.  And joined the faculty in 1980.
21     Q.    Before that, where were you?
22     A.    I did my residency at the

Page 4

1  University of Oklahoma.
2      Q.    As far as your involvement with
3  Dr. Bartlett, when did all that begin?  I know it
4  began with ECMO, but did it begin before that
5  time?
6      A.    Yes -- actually, no, I am sorry.
7  It began with training for ECMO in 1983, I
8  believe is when we first started our training.
9      Q.    Did you actually, from what I
10 understand, go to Dr. Bartlett so you could
11 set up an ECMO program at Children's?
12     A.    Yes.
13     Q.    Was that in 1983?
14     A.    1982, '83.
15     Q.    As far as your contacts with
16 Dr. Bartlett, have they been pretty much all
17 the way up to the present?
18     A.    Yes.
19     Q.    With regard to the training
20 manual, et cetera, that there is at Children's
21 Hospital for ECMO, is any of this under a
22 similar prototype as the manuals that

Page 5

1  Dr. Bartlett has?  Did you use it as any kind
2  of a guide?
3      A.    He had a training manual and we
4  actually used his as a guide to create ours.
5  In fact, in 1983, '84.
6      Q.    Looking at one aspect of it, as
7  far as the ECMO inclusion criteria, where did
8  that come from initially?
9      A.    The original criteria was designed
10 here and it was based on our retrospective
11 analysis of patients at Children's and had to
12 take into account all of our different
13 therapies that we do here.
14     Q.    In other words, it was not taking
15 from another institution, but more or less
16 actually from the results you were having at
17 Children's and what would be the best protocol
18 to follow?
19     A.    Yes.
20     Q.    So would it be safe to say, since
21 it began -- by the way, when did the ECMO
22 program begin at Children's?

Page 38

1    A.    This document is reviewed with all
2    of the ECMO staff and comments are taken into
3    account and revisions made.  So it is
4    reviewed.
5        Q.    As far as the potential for
6    decannulation, am I correct that that is not
7    something that was told to patients as a
8    discussion during the informed consent
9    process?
10        A.    That is not a common discussion.
11    It is such a rare event and we have more
12    significant issues to discuss with parents
13    that they need to be aware of.
14        Q.    Fair enough.  Does that mean it is
15    not discussed?
16        A.    Yes.  By myself.  I cannot comment
17    for my colleagues.
18        Q.    Well, within your position,
19    though, am I correct that I don't appear to
20    find anything within any document that lays
21    out the decannulation potential and you didn't
22    discuss with any colleague of yours that they

Page 39

1    should discuss decannulation and informed
2    consent?
3        A.    No.
4        Q.    As far as a general premise, how
5    often -- do you have any idea in the
6    literature how common decannulations are in
7    ECMO?
8        A.    They are very rare.  I don't know
9    the incidence.
10        Q.    By very rare, do you mean less
11    than 5 percent?
12        A.    I don't have -- there is not a
13    published number as far as I know.
14        Q.    So at least, as far as your
15    testimony, it is not a common event?
16        A.    Correct.
17        Q.    Did you have anything to do with
18    the criteria for the surgical placement or
19    cut-down of the catheters and their suturing?
20        A.    What criteria are you talking
21    about?
22        Q.    There is reference how a cannula

Page 40

1    is to be placed during the initial cannulation
2    or recannulation.
3        A.    No, that is written by the
4    surgeons.
5        Q.    And the surgeons who wrote those
6    sections, are they actually ECMO certified
7    individuals?
8        A.    All of the pediatric surgeons are
9    ECMO surgeons.
10        Q.    Am I correct that within the ECMO
11    unit the surgeons who are to perform
12    cannulations on the patients in the NICU who
13    are on ECMO must be ECMO certified?
14        A.    Yes.
15        Q.    While there is a general criteria
16    discussed in your DVD, do you have a
17    discussion with the patients as to the general
18    criteria for what children are on or are not
19    on ECMO or can be a candidate for ECMO?
20        A.    During -- at what phase?
21        Q.    Before.
22        A.    Yes, we do.

Page 41

1        Q.    And what I want to know is if
2    there is a speech that you give or a usual
3    statement, can you tell me what that is as far
4    as a general criteria?
5        MR. McCONNELL:  Objection as to
6    the form of the question.  Overly broad.
7        But subject to that, to the extent
8    you can, you may answer.
9        MR. NEWMAN:  Let me do it even
10    easier.
11        BY MR. NEWMAN:
12        Q.    That is, was there a statement
13    made by the neonatologist at Children's to the
14    family as to the general criteria for ECMO
15    when talking to a patient's family before the
16    child is placed on ECMO?
17        A.    When you are discussing with the
18    family, you are going over how critically ill
19    the patient is, and usually you are going
20    through the therapies that they are on and
21    their degree of support and the fact that the
22    baby is not responding to that support.

# EXHIBIT L

1 (Pages 1 to 4)

**1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2          FOR THE DISTRICT OF COLUMBIA
 3                    - - -
 4   TERESA A. MORRING    : CIVIL ACTION
 5   and DESHAUNIA Q.     :
 6   SNOWDEN, as Parents  :
 7   and Next Friends of  :
 8   (                    :
 9        Plaintiffs,  : JUDGE ROSEMARY M. COLLYER
10   VS.               :
11                     :
12   CHILDREN'S NATIONAL  :
13   MEDICAL CENTER,      :
14       Defendant.  : NO. 06-CV-02036
15
16                    - - -
17
18   DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
19       Philadelphia, Pennsylvania
20       MONDAY, DECEMBER 10, 2007
21            4:30 p.m.
22                    - - -
```

**2**

```
 1   Job No.:  118081
 2   Pages 1-
 3   Reported By:  Robin Frattali
 4
 5
 6              I-N-D-E-X
 7
 8   CAROLYN S. CRAWFORD, M.D.              PAGE
 9
10       Mr. McConnell...........................6
11
12              Documents received and
13   EXHIBITS            marked for identification
14
15   Notice of Expert Witness Deposition, consisting
16   of four pages, received and marked for
17   identification Defendant's Exhibit 1.......Page 5
18
19   Plaintiff's Preliminary 26(B)(4) Statement,
20   consisting of six pages, received and marked for
21   identification Defendant's Exhibit 2.......Page 6
22
```

**3**

```
 1   Curriculum Vitae of Carolyn Stocker Crawford,
 2   M.D., consisting of seventeen pages, received
 3   and marked for identification Defendant's
 4   Exhibit 3................................Page 38
 5
 6   EXHIBITS (Continued)
 7
 8   Letters to Dr. Carolyn S. Crawford from Newman,
 9   McIntosh & Hennessey, LLP dated April 26, 2006,
10   December 5, 2007, December 3, 2007 and November
11   27, 2007, consisting of four pages, received
12   and marked for identification Defendant's
13   Exhibit 4................................Page 41
14
15   Operative Report, consisting of one page,
16   received and marked for identification
17   Defendant's Exhibit 5...................Page 149
18
19
20
21
22
```

**4**

```
 1            Deposition of CAROLYN S.
 2   CRAWFORD, M.D., Witness, on behalf of the
 3   Defendant, pursuant to the Federal Rules of Civil
 4   Procedure, taken at Philadelphia International
 5   Airport, U.S. Airways Club, Conference Room A,
 6   Terminal B, 8000 Essington Avenue, Philadelphia,
 7   Pennsylvania, December 10, 2007, commencing at or
 8   about four-thirty o'clock p.m., Eastern Standard
 9   Time, before Robin Frattali, Registered
10   Professional Reporter - Notary Public.
11            - - -
12   APPEARANCES:
13
14       NEWMAN, McINTOSH & HENNESSEY, LLP
15       BY:  ANTHONY G. NEWMAN, ESQUIRE
16       7315 Wisconsin Avenue
17       Suite 700 East Tower
18       Bethesda, Maryland  20814
19       (301)654-3400
20       Attorneys for Plaintiffs
21
22
```

Case 1:06-cv-02036-RMC    DEPOSITION OF CAROLYN S. CRAWFORD    Filed 02/08/2008    Page 3 of 4
CONDUCTED ON MONDAY, DECEMBER 10, 2007

2 (Pages 5 to 8)

**5**

1  APPEARANCES (Continued):

2

3  JACKSON & CAMPBELL, P.C.

4  BY: NICHOLAS S. McCONNELL, ESQUIRE

5  1120 20th Street, Northwest

6  Suite 300

7  Washington, DC  20036

8  (202)457-1600

9  Attorneys for Defendant

10

11  - - -

12

13

14

15

16

17

18

19

20

21

22

**6**

1  CAROLYN S. CRAWFORD, M.D.,

2  having been duly sworn, was examined and

3  testified as follows:

4  - - -

5  MR. McCONNELL:  You can mark

6  this as Exhibit 1 and this Exhibit 2.

7  - - -

8  (Notice of Expert Witness

9  Deposition, consisting of four pages,

10  received and marked for identification

11  Defendant's Exhibit 1.)

12  (Plaintiff's Preliminary

13  26(B)(4) Statement, consisting of six pages,

14  received and marked for identification

15  Defendant's Exhibit 2.)

16  - - -

17  BY MR. McCONNELL:

18  Q.  Tell us your full name, if you would,

19  please.

20  A.  Carolyn S. Crawford --

21  Q.  You're a medical --

22  A.  -- M.D.

**7**

1  Q.  You're a medical doctor, licensed to

2  practice in New Jersey?

3  A.  New Jersey, that's correct.

4  Q.  Licensed anywhere else at this time?

5  A.  No.  I have an inactive license in

6  Pennsylvania.

7  Q.  Where are you presently practicing

8  medicine, if at all?

9  A.  Our Lady of Lourdes Medical Center,

10  based in Camden, New Jersey.

11  Q.  And what are you doing there in terms

12  of clinical practice at this time?

13  A.  The same thing I was the last time you

14  deposed me, but for the record, well, this past

15  week, I worked eighty hours, but I'm taking off

16  the next week, so it averages out to somewhere

17  between twenty and thirty-four hours clinically in

18  the nursery a week and then I work every third

19  night and every third weekend.

20  Q.  You're with a group called Lourdes

21  Neonatologists?

22  A.  Neonatal Associates.

**8**

1  Q.  Neonatal Associates.

2  How many members of Neonatal

3  Associates are on staff at Lourdes?

4  A.  Well, probably twenty, twenty-two,

5  twenty-three.

6  Q.  Is that distinct from a group called On

7  Site Neonatal Partners, Inc.?

8  A.  Well, On Site Neonatal Partners, Inc.

9  was an old name for the group that worked at

10  Rancocas Valley Hospital and when that hospital

11  was bought out or taken over by Lourdes, it became

12  known as Lourdes Medical Center of Burlington

13  County and On Site Medical Consultants, or

14  whatever their name was, ceased to exist and that

15  facility is covered by -- by the group now.

16  Q.  At this time, do you still estimate

17  that you earn approximately two hundred and fifty

18  thousand dollars a year from your total forensic

19  related activities, including review of medical

20  records, consulting with attorneys, testifying at

21  deposition, testifying at trial and so forth?

22  A.  Somewhere around there.

Case 1:06-cv-02036-RMC    Document 19-14    Filed 02/08/2008    Page 4 of 4
DEPOSITION OF CAROLAN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

32 (Pages 125 to 128)

**125**

1  running situation on the 15th. That was the
2  impression I got from Bird, mainly.
3      Q.  All right.  But you don't know -- if
4  there were problems with the circuit, you have no
5  way of knowing what those problems could be.
6      A.  No.
7      Q.  True?
8      A.  I wasn't there.
9      Q.  Well, without being there, what are the
10  types of problems that you could have with an ECMO
11  circuit that would cause fluctuations in blood
12  pressure?
13      A.  I don't know.  It's -- it was a generic
14  kind of explanation that she -- or -- explanation
15  that she gave.
16      Q.  But do you know enough about the ECMO
17  equipment and the mechanics of the system to tell
18  me what the problems would be?
19      A.  You can potentially have clots.
20      Q.  Okay.  So let's --
21      A.  That might be one reason why you'd have
22  to change the -- why you might need to change the

**126**

1  circuit.
2      Q.  Was there any evidence that there were
3  clots at this time in the circuit?
4      A.  I didn't see any evidence that there
5  were -- I didn't see anything written down that
6  there was.
7      Q.  How would someone running an ECMO
8  circuit determine whether there was a problem at
9  this point with clots in the circuit?
10      A.  Well, I guess they'd look.
11      Q.  Any other method you would use to
12  determine whether clots -- and I take it by that
13  you mean blood clots?
14      A.  Blood clots.
15      Q.  Other than looking at the circuit,
16  would there be any other method used to determine
17  whether clots at this point were a problem with
18  the circuit causing fluctuation of blood pressure?
19      A.  They frequently measure ACT, keep it in
20  a normal -- in a particular range.
21      Q.  Other than measuring ACT, would there
22  be any other method of determining whether there

**127**

1  was a problem with clots in the circuit?
2      A.  No.  Other than observation, no.
3      Q.  Okay.  And you say these fluctuations
4  could have been caused by problems with the
5  infant's blood pressure, including episodes of
6  SVTs?
7      A.  He was having SVT.
8      Q.  But --
9      A.  He had to get Adenosine several times.
10      Q.  Was he having SVTs at this time, that
11  is, during the morning of September 15?
12      A.  Yes.
13      Q.  Was he getting sufficient Adenosine to
14  be therapeutic?
15      A.  I don't know.  I know he was getting
16  Adenosine and I don't think he had too many
17  episodes after the 15th.
18      Q.  What is it you contend, if anything,
19  that should have been done in light of the
20  fluctuating blood pressure of this infant?
21      A.  I think if she was going to adjust the
22  neck, she probably should have had the surgeons

**128**

1  right by the bedside in this particular case,
2  because they had been adjusting the venous
3  catheter, and just the possibility that this
4  catheter could be further out of the -- could be
5  not in the vessel as far as they thought it was in
6  the vessel and that certainly seems to be the
7  case, because you just basically lifted the head a
8  little bit and the catheter's out.
9          So either it wasn't tied in
10  tightly or it had migrated out.
11          They could have taken an x-ray
12  to verify the position as part of the evaluation
13  for why there were fluctuating pressures, some of
14  them high.
15      Q.  Do you know how often infants are
16  repositioned in response to -- infants who are on
17  ECMO are repositioned in response to increases in
18  arterial pressure?
19      A.  It's frequent, I think.  My
20  understanding is that's one of the first things
21  that's done.
22      Q.  When you say it's your understanding,

# EXHIBIT M

DEPOSITION OF SAMUEL M. ROSENBERG, M.D.
CONDUCTED ON THURSDAY, DECEMBER 13, 2007

1 (Pages 1 to 4)

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - +

TERESA A. MORRING and      :
DESHAUNIA G. SNOWDEN, as
Parents and Next Friends   :
of
                           :
        Plaintiffs,       Civil Action No.
                    :   06CV02036
v.
                           :
CHILDREN'S NATIONAL MEDICAL
CENTER,                    :
        Defendant.
- - - - - - - - - - - - - +

Deposition of SAMUEL M. ROSENBERG, M.D.
        Rockville, Maryland
        Thursday, December 13, 2007
                4:35 p.m.

Job No.: 1-118162
Pages: 1 - 74
Reported by:  Toni R. Thompson, RMR

**2**

Deposition of SAMUEL M. ROSENBERG, M.D.,
held at the office of:

    Pediatric Pulmonary & Asthma Center
    9711 Medical Center Drive, Suite 212
    Rockville, Maryland  20850
    (301) 738-7011

    Pursuant to agreement, before Toni R.
Thompson, RMR, Court Reporter and Notary Public in and
for the State of Maryland.

**3**

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS
    ANTHONY NEWMAN, ESQUIRE
    Newman, McIntosh & Hennessey, LLP
    7315 Wisconsin Avenue, Suite 700E
    Bethesda, Maryland  20814
    (301) 654-3400

ON BEHALF OF THE DEFENDANT
    NICHOLAS S. McCONNELL, ESQUIRE
    KRISTA A. MAIZEL, ESQUIRE
    Jackson & Campbell, P.C.
    1120 20th Street, Northwest, South Tower
    Washington, D.C.  20036
    (202) 457-1600

**4**

C O N T E N T S

EXAMINATION OF SAMUEL M. ROSENBERG, M.D.      PAGE
  By Mr. McConnell                    5


        E X H I B I T S

1 CV                                6
2 Patient Selection for ECMO          61

(Exhibits attached to the transcript.)

DEPOSITION OF SAMUEL M. ROSENBERG, M.D.
CONDUCTED ON THURSDAY, DECEMBER 13, 2007

2 (Pages 5 to 8)

5

1          P R O C E E D I N G S
2          SAMUEL M. ROSENBERG, M.D.,
3  having been duly sworn, testified as follows:
4      EXAMINATION BY COUNSEL FOR DEFENDANT
5  BY MR. McCONNELL:
6      Q.  Would you tell us your full name, please.
7      A.  It's Samuel M. Rosenberg.
8      Q.  You're a physician licensed to practice
9  in Maryland, specializing in pediatric pulmonology?
10     A.  Yes.
11     Q.  Are you licensed in any other
12 jurisdictions?
13     A.  Virginia and District of Columbia.
14     Q.  Both still active?
15     A.  Yes.
16     Q.  We're here today at your office.  What's
17 the address of this office building?
18     A.  9711 Medical Center Drive, Rockville,
19 Maryland.
20     Q.  Do you have any other offices for the
21 practice of medicine?
22     A.  Yes, I have an office in Frederick.

6

1      Q.  And what's the address there?
2      A.  610 Solarex, S-o-l-a-r-e-x, Court,
3  Frederick, Maryland.
4      Q.  Your office has provided us with a
5  document I'll ask the Court Reporter to mark as
6  Deposition Exhibit No. 1, if we may.
7          (Deposition Exhibit No. 1 was marked for
8  identification and attached to the transcript.)
9  BY MR. McCONNELL:
10     Q.  Let me hand you what we have marked as
11 Deposition Exhibit No. 1.  Is that a complete,
12 correct and accurate copy of your curriculum vitae?
13     A.  Yes.
14     Q.  Could you describe for me, if you would,
15 the nature of your clinical practice at this time,
16 what you do?
17     A.  I'm a pediatric pulmonologist in private
18 practice, which includes seeing all types of
19 youngsters with lung problems from zero to 18 years
20 of age.  I consult at two different hospitals, Shady
21 Grove Hospital and Holy Cross Hospital, for
22 inpatients who request consultations in pediatrics

7

1  and in the neonatal intensive care unit.
2      Q.  And you're in a sole practice?
3      A.  Yes.
4      Q.  How long have you been practicing as a
5  pediatric pulmonologist here in the Rockville area as
6  a sole practice?
7      A.  Well, my first four years of practice was
8  at Fairfax Hospital where I was a staff pediatric
9  pulmonologist, and I've been in Rockville for 13
10 years, coming on 13 years.
11     Q.  And your practice has remained
12 essentially the same during that 13-year period?
13     A.  Yes.
14         MR. McCONNELL:  These may be your kids.
15         THE WITNESS:  I need to take two minutes,
16 I'm sorry.
17         MR. McCONNELL:  No problem.
18         THE WITNESS:  It's just one of those
19 days.
20         (Recess 4:36-4:42 p.m.)
21 BY MR. McCONNELL:
22     Q.  Have you had any formal training in ECMO

8

1  therapy?
2      A.  No.
3      Q.  Have you ever been the attending
4  physician for a patient while the patient was on
5  therapy, that is the physician directing ECMO therapy
6  for a patient?
7      A.  No.
8      Q.  Does Shady Grove Hospital provide ECMO
9  therapy?
10     A.  No.
11     Q.  Does Holy Cross Hospital provide ECMO
12 therapy?
13     A.  No.
14     Q.  Where does Shady Grove Hospital send its
15 infants who may be born there but have conditions
16 that do require ECMO therapy?
17     A.  I don't know.
18     Q.  Where does Holy Cross send its patients
19 who may be born there who need ECMO?
20     A.  I don't know.
21     Q.  In the last, I believe you told us 13
22 years you've been in practice here?

DEPOSITION OF SAMUEL M. ROSENBERG, M.D.
CONDUCTED ON THURSDAY, DECEMBER 13, 2007

9 (Pages 33 to 36)

---

33

1    MR. McCONNELL: Yeah, because my question
2 was so general I don't think it yet got to a point
3 where the doctor needed the numbers.
4    THE WITNESS: Okay. On 9/15/05 there was
5 several blood gases, obviously, and there was a blood
6 gas at 11:11. This is on page, I don't know, 406.
7 BY MR. McCONNELL:
8    Q. This is Mr. Newman's 406, okay.
9    A. There's a blood gas that has an oxygen
10 level at 11:11 of 451, a pO2 of 451, and a carbon
11 dioxide level, PcO2, of 41. Then eight minutes
12 later -- and the pH was 7.51. And then eight minutes
13 later there's a blood gas that has a pO2 of 33, which
14 is obviously dramatically different, a PcO2 of 59,
15 which is much higher than it was, and a pH which has
16 gotten lower, down to 7.38. So that's a pretty
17 dramatic change.
18    Q. And what do you believe in this infant
19 would be the potential causes of that dramatic
20 change?
21    A. Well, there could be a few different
22 causes --

---

34

1    Q. All right.
2    A. -- obviously. But clearly there's a
3 problem in oxygenating the baby, so his oxygen pO2,
4 which is partial pressure of oxygen in the blood,
5 goes from 451 to 33. So obviously there could be
6 several reasons why that is occurring.
7    Q. All right. Let's go through the reasons
8 why a baby like          at this time would
9 show this change in blood gases from -- I take it the
10 first blood gas you read was timed at 11:11?
11    A. Right.
12    Q. And the next one at 11:19?
13    A. Right.
14    Q. What are the things going on either in
15 the circuit or in the baby that could explain those
16 changes?
17    A. Well, first of all, when a baby is on
18 ECMO, and I know you already know this, but basically
19 his lungs are -- lung function is being taken over by
20 the machine. So your lung -- the purpose of your
21 lungs is to exchange oxygen and carbon dioxide. If
22 you're on the ECMO machine, the machine is doing that

---

35

1 for you.
2    Q. All right. So --
3    A. So there's really no other explanation
4 that I could come up with, because you're basically
5 on bypass and the machine is doing it for you, for
6 such a dramatic change other than the ECMO is not
7 working for some reason.
8    Q. What part of the ECMO is not working?
9    A. All of it. Clearly the oxygen and the
10 carbon dioxide are not being exchanged properly, so
11 that means there's a problem in blood flow through
12 the circuit or an obstruction or something, but the
13 child's oxygen is going very low and obviously the
14 system is not working properly.
15    Q. Can you tell me what part of the system?
16 Is it in the lung membrane, is it in the pump?
17    A. I couldn't tell you specifically.
18    Q. Do you know with the setup of the ECMO
19 equipment what readouts are available at bedside
20 concerning the various functions performed by the
21 various pieces of the equipment?
22    A. I don't know specifically.

---

36

1    Q. So in terms of -- assuming a clinician at
2 bedside has these blood gases in front of him, do you
3 know what information is available right there on
4 readouts on the equipment that would assist the
5 physician at bedside in assessing what may be going
6 on with the system that could explain these changes?
7    A. I don't know the particulars.
8    Q. Are these changes potentially consistent
9 with a change in the perfusion of an infant like
10          caused by something such as a
11 shifting of the position of one of the catheters
12 within a blood vessel lumen, such as the catheter is
13 up against a wall of a lumen and therefore occluding?
14    A. Anything that would impede the flow in or
15 out of the ECMO circuit from the baby certainly could
16 cause a problem.
17    Q. Would you agree that          was
18 a very, very sick infant?
19    A. Yes.
20    Q. Would you agree that he was subject to
21 dramatic shifts in his perfusion status in response
22 to relatively minor events?

---

# EXHIBIT N

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


------

TERESA A. MORRING and        :   CIVIL ACTION
DESHAUNIA Q. SNOWDEN, as     :
Parents and Next Friends of  :
Q.E.S., a Minor              :
          Plaintiffs,        :
                             :
     vs.                     :
                             :
CHILDREN'S NATIONAL MEDICAL  :
CENTER,                      :
          Defendant.         :   NO. 06CV02036
          ------
          Philadelphia, Pennsylvania
          Monday, January 14, 2008
          ------

          Deposition of ALBERT C. BEATTY, JR.,

M.D., taken pursuant to notice, at the offices

of Varallo, Inc., 1835 Market Street, Suite

600, on the above date, beginning at

approximately 11:05 a.m., before Janet E.

Fabian, an Approved Reporter of the United

States District Court and Notary Public of the

Commonwealth of Pennsylvania.

          ------

          V A R A L L O  Incorporated
          Litigation Support Services
          1835 Market Street, Suite 600
          Philadelphia, PA 19103
          215.561.2220  215.567.2670

2

1
2  APPEARANCES:
3    ANTHONY NEWMAN, ESQUIRE
     Newman, McIntosh & Hennessey, LLP
4      7315 Wisconsin Avenue, Suite 700E
       Bethesda, MD 20814
5
       Counsel for Plaintiffs
6
7    NICHOLAS S. McCONNELL, ESQUIRE
     Jackson & Campbell, P.C.
8      1120 20th Street, N.W. South Tower
       Washington, DC 20036
9
       Counsel for Defendant
10
          ------
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25        (Index at end of transcript.)

3

1
2        ... ALBERT C. BEATTY, JR., M.D.,
3  after having been duly sworn, was examined and
4  testified as follows:
5  BY MR. McCONNELL:
6     Q.  Would you tell us your full name,
7  please?
8     A.  Albert C. Beatty, Jr.
9     Q.  You're a medical doctor licensed to
10  practice in the --
11    A.  Yes, M.D.
12    Q.  I know you've done this before,
13  Doctor.  As a courtesy to the reporter, please
14  let me finish the question before you shout out
15  the answer.  It will just make the day much
16  easier for our stenographer.
17       You are a physician licensed to
18  practice medicine in the State of Pennsylvania?
19    A.  Yes.
20    Q.  Are you currently licensed anywhere
21  else?
22    A.  New Jersey.
23    Q.  Are you still in an active clinical
24  practice?
25    A.  Yes.  But right now I'm on a

4

1        Dr. Albert C. Beatty, Jr.
2  sabbatical.
3     Q.  We'll get there.  Dr. Beatty, I think
4  the first order of business is I need to hand
5  you, as I understand it from counsel for
6  plaintiff, a check for your time today.  I have
7  a check for $1,800.  I understand your hourly
8  fee for a deposition is what?
9     A.  My hourly -- it's not an hourly.
10  It's a standard fee.  $3,000, whether it's 10
11  hours, 20 hours or two hours.  I put that whole
12  day out.
13    Q.  And what constraints, if any, are
14  there on your time today, assuming we're --
15    A.  None whatsoever.  I'm here for the
16  day.
17    Q.  I've been led to understand that you
18  had to leave no later than 1 o'clock, but
19  that's no longer a consideration?
20       MR. NEWMAN:  I emailed your
21  office.
22       THE WITNESS:  That's changed.
23       MR. McCONNELL:  We have a
24  document that's been presented to us today
25  which I'll ask the court reporter to mark as

5

1        Dr. Albert C. Beatty, Jr.
2  your deposition Exhibit 1.
3        (Document marked Exhibit Beatty 1 for
4  identification.)
5  BY MR. McCONNELL:
6     Q.  That document's been placed in front
7  of you.  Is that a complete, current, accurate
8  copy of your curriculum vitae?
9     A.  I want to make sure she sent you the
10  latest.  No, it's not accurate.  There's some
11  additions to this.
12    Q.  What additions need to be made to
13  have this document be a complete, accurate --
14    A.  Oh, I'm sorry.  Excuse me; she does
15  have it down here.  There's one other addition
16  I don't see that she has here that I have --
17  I'm professor of clinical medicine in the
18  Medical University of the Americas also.
19    Q.  Professor of clinical medicine where?
20    A.  At the Medical University of the
21  Americas.
22    Q.  Where is that located?
23    A.  That's in Nevis, N-E-V-I-S, West
24  Indies.
25    Q.  How long have you held an appointment

94

Dr. Albert C. Beatty, Jr.

1      Dr. Albert C. Beatty, Jr.
2 infants on ECMO.
3      A. It could, sure.
4      Q. And do you know how often in 2005
5 healthcare teams attending patients like
6       on ECMO would need to attempt
7 to address rising arterial pressure by
8 repositioning the patient, how frequently that
9 happened?
10      A. I don't have those statistics.
11      Q. Do you have any information on the
12 rate of inadvertent decannulations, say, during
13 the period --
14      A. I can, yes.
15      Q. Hold a second; during the period,
16 say, 1995 through 2005 for infants on ECMO
17 circuits?
18      A. Sure. I can tell you from the
19 surgeon who -- just working there what, for 10
20 or 15 years doing several hundred of them, as
21 he said, he only saw one, one decannulation in
22 the whole time.
23      Q. Do you know is that the sole source
24 of information you have on the rate of
25 inadvertent decannulations of infants on ECMO

95

Dr. Albert C. Beatty, Jr.

1      Dr. Albert C. Beatty, Jr.
2 circuits?
3      A. That's enough information for me to
4 know it's very uncommon. In a major children's
5 hospital that does all those echos and only
6 seeing one in 15 years? That's very, very --
7 to me that's an important point, that it
8 shouldn't happen and it doesn't happen. But it
9 happened in this case.
10      Q. Does that type of a report or that
11 type of testimony with respect to a particular
12 surgeon's experience in a particular
13 institution rise to the level of what is
14 considered to be statistically significant in
15 terms of incidence?
16      A. More likely than not -- no, we don't
17 have a statistical survey. But the survey that
18 he gave me was enough for me to know that it's
19 very uncommon; that it didn't -- that it
20 hadn't happened in a major children's hospital
21 only once before. So that was -- I'm not
22 worrying about statistics because to me
23 statistics are -- as you know, we're not
24 looking at statistics. We're looking at a
25 fact. And I'm looking at measuring the facts

96

Dr. Albert C. Beatty, Jr.

1      Dr. Albert C. Beatty, Jr.
2 and coming up with the facts that it shouldn't
3 have happened and it happened, and he admits
4 that he's only seen it once before. That's
5 good enough for me. I don't need any other
6 information.
7      Q. Here's my next question, that's good
8 enough for you: Do you have any other source
9 of information as to the incidence of
10 inadvertent decannulation in neonatal patients
11 on ECMO circuits?
12       MR. NEWMAN: Elsewhere I
13 gather.
14 BY MR. McCONNELL:
15      Q. From any other source.
16      A. No.
17      Q. We were talking about any opinions
18 you have as to departures from standard of care
19 by any healthcare providers, and they should
20 have taken an xray before attempting to address
21 the increasing arterial pressure by
22 repositioning the patient. Any other
23 departures from the standard of care in this
24 case in your opinion?
25      A. Yes. My departure is more likely

97

Dr. Albert C. Beatty, Jr.

1      Dr. Albert C. Beatty, Jr.
2 than not to a reasonable degree, as you would
3 say, of medical probability that the catheter
4 was never properly put in to begin with. In
5 other words, if it was -- let's put it this
6 way, if the catheter had been properly affixed
7 in the tissues, by tissues I mean in the
8 artery, if it had been placed properly, done
9 exactly the way it should have been done, that
10 the catheter would not have come out. And so I
11 say that it's a failure of technique.
12      Q. Let me ask you this: Do arterial
13 catheters placed in neonates who are on ECMO
14 circuits even when properly affixed change
15 position from time to time?
16      A. As you said before, if you remember,
17 you said to me quite often these kids are on
18 here for days at a time, maybe a week, maybe 10
19 days and they can change position. But,
20 Counselor, remember in this particular case,
21 and I go over backwards to try to figure a
22 defense for these cases, this baby had only had
23 the catheter -- the catheter was readjusted, as
24 you know, around 7 o'clock and this thing
25 occurred within a few hours. And so,

# EXHIBIT O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FELICE I. IACANGELO and  :
CICILY A. IACANGELO, as   :
GUARDIAN OF THE PERSON  :
AND PROPERTY of     :
KARYN A. KERRIS     :
2109 Edgeware Street    :
Silver Spring, MD 20905   :
            :
and          :
            :
PAUL KERRIS      :
8938 Footed Ridge     :
Columbia, MD 21045    :

    Plaintiffs,    :  Case No.  1:05CV02086
            :
   v.       :  Judge Paul L. Friedman
            :
GEORGETOWN UNIVERSITY, t/a :
Georgetown University Hospital :
serve:         :
            :
 4000 Reservoir Road, NW  :
 Washington, DC 20007  :
            :
and          :
            :
VANCE E. WATSON, M.D.   :
4000 Reservoir Road, NW   :
Washington, DC 20007   :
            :
    Defendants.   :

## AMENDED COMPLAINT

   COMES NOW the Plaintiffs, Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of

the Person and Property of Karyn A. Kerris and Karyn A. Kerris' husband Paul Kerris, by and

through her attorneys, Anthony G. Newman, Esq., and Andrew Greenwald, Esq., respectfully

represents as follows:

### COUNT I
*(Medical Negligence - Personal Injury)*

1.     Jurisdiction of this Court is founded on diversity of citizenship.

2.     Felice I. Iacangelo and Cicily A. Iacangelo were duly appointed as Guardians of the Person and Property of Karyn A. Kerris by the Circuit Court of Montgomery County (28221-FL) being so appointed on August 11, 2005 .

3.     Plaintiff Paul Kerris is husband of Karyn Kerris, an adult, and a resident of the State of Maryland.

4.     Upon information and belief, at all relevant times herein, the Defendants, Georgetown University, owned, leased, operated, managed, maintained, supervised, and/or did business as, Georgetown University Hospital, which is a hospital located in and doing business in the District of Columbia.

5.     At all relevant times herein, Georgetown University Hospital was a duly licensed and accredited health care facility, which held itself out to the public as an institution providing legally and ethically approved treatments to its patients, and was competent to provide legally and ethically approved health care services within the District of Columbia.

6.     At all relevant times herein, Defendant Vance E. Watson, M.D., was a licensed physician in the District of Columbia who held himself out to the public as a specialist in the field of interventional neuro-radiology.

7.     Defendant Vance E. Watson, M.D., is a resident of the District of Columbia.

8.     At all relevant times herein, Defendant Georgetown University rendered care to

-2-

Karyn A. Kerris through its employees, agents and/or servants acting within the scope of their employment, including Defendant Vance E. Watson, M.D.

9.      On or about the dates of November 4, 1998, January 13, 1999, and March 3, 1999, Defendant Vance E. Watson, M.D., performed multiple embolizations on Karyn A. Kerris' arteriovenous malformations at the Georgetown University Hospital using a combination of two devices, Histoacryl and Lipiodol.

10.     Histoacryl is chemically a n-butyl-cyanoacrylate, a polymer glue that is chemically identical to "Super Glue"™; Lipiodol is a mixture of poppy seed oil mixed with a radio-opaque material.

11.     Defendant Georgetown University, through their servants, agents and employees, including Defendant Vance E. Watson, M.D., were negligent in their management, care and treatment of Karyn A. Kerris on November 4, 1998 and continuing thereafter, including but not limited to the following particulars:

a.      negligent performance of examinations and evaluations;

b.      negligent decision to perform multiple embolizations on Karyn A. Kerris' vascular anomaly;

c.      negligent decision to perform embolizations utilizing a Class III, medical device that had not been approved and was thus illegal;

d.      negligent performance of embolizations without obtaining an investigational device exemption (IDE), without any other exemption or waiver from the Federal Government or its agencies and without providing notice to said entities of their intent to use such a device;

-3-

e.    negligent performance of embolizations on a AVM where the risk of failure outweighed any potential benefit;

f.    negligent technique in compounding a new device using two unapproved illegal Class III devices employed in the performance of the multiple embolizations;

g.    negligent failure to follow the express warnings and/or contraindications found on the manufacturer's package insert regarding the use of Histoacryl;

h.    negligent failure by Defendant Vance Watson, M.D., to submit his use of an "investigational" Class III device to Defendants Georgetown University's research body governing human experimentation and/or Institutional Review Board (IRB) prior to its usage;

i.    negligent supervision and/or monitoring by Defendant Georgetown University of the ordering, invoicing and use of illegal Class III devices by their employees, agents and/or servants, including Vance E. Watson, M.D., on patients within Georgetown University Hospital;

j.    negligent failure by Vance E. Watson, M.D. to follow Georgetown University's human experimentation and/or IRB rules and regulations;

k.    negligent failure to disclose patients in general, and Karyn A. Kerris in particular, that Defendants intended on using a device that had been the subject of a trade alert and had been seized by the FDA prior to its use on Karyn A. Kerris;

l.    negligent failure to record the embolizations of Karyn A. Kerris by video tape or otherwise, since it was an experiment using human subjects with an unapproved and illegal Class III device;

m.    negligent failure to document the precise combination and/or strength of

-4-

Histoacryl and its diluent Lipiodol;

      n.      Defendants were otherwise negligent; and,

      o.      Plaintiffs may also rely on *res ipsa loquitur*.

12.     As a direct and proximate result of the aforesaid negligence of the Defendants, Karyn A. Kerris, suffered serious permanent and disabling damage to her body, including but not limited to: glue particles escaping into eloquent portions of her brain causing: ischemia, brain damage, seizures, hydrocephalus, psychological damages and other neurological and physical impairments leaving her brain damaged and dysfunctional for the remainder of her life. She has suffered, and will in the future suffer, she will endure expenses for medical services and supplies, physical and occupational therapy and testing, careful and frequent psychological and psychiatric evaluation and treatment, as well as for specialized devices required for the activities of daily living. She has suffered and forevermore will suffer a total loss of future earnings, earning capacity, and the ability to lead a normal life. She has endured in the past, and will endure in the future, pain, suffering, disability, humiliation, embarrassment, mental anguish and emotional distress. She presently requires and will require around-the-clock care and supervision for the remainder of her life.

13.     Karyn A. Kerris was adjudicated incompetent by the Circuit Court for Montgomery County, MD. As a result of her incompetence, the Circuit Court for Montgomery County, MD appointed Felice I. Iacangelo and Cicily A. Iacangelo, as Guardians of the Person and Property of Karyn A. Kerris. Thus, Karyn A. Kerris did not have and does not have the mental capacity to discover any of the negligent acts and/or omissions contained in this Complaint because after the negligent and illegal embolizations were performed, she became

-5-

brain damaged, and will forevermore remain so, unable to comprehend or otherwise be cognizant of what had occurred, or what is presently occurring, nor can she express any understanding of said, assuming *arguendo* she had any such understanding, given her inability to communicate.

14.    Defendants' failure to provide proper informed consent as stated below in Count II and Defendants' fraud as set forth below in Count VI, also precluded Karyn A. Kerris from discovering that the device(s) which was/were implanted into the vessels of her brain was/were unapproved and illegal and/or that the Defendants' physician was not authorized to perform embolizations with Histoacryl, thus she could not have discovered, even if she had been mentally competent to discover, the exact nature and extent of the negligent and/or illegal conduct of the Defendants.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT II
*(Lack of Informed Consent)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

15.    Defendants never disclosed before any of the embolizations had occurred, *inter alia*, their intent to use the unapproved Class III devices, Histoacryl and/or Lipiodol, during the embolizations, in a combination manufactured at the time of the procedure which had never been

-6-

tested previously and could never be tested and could never again be duplicated, since the concoction and combination of Histoacryl and Lipiodol had neither been precisely measured nor recorded.

16.    Defendants never disclosed that the Histoacryl and Lipiodol which were to be injected into the vessels of Karyn A. Kerris' brain had to be smuggled into the United States since the two devices were not approved by the FDA and had been the subject of an FDA trade alert.

17.    Defendants never described the high failure rates for embolizations utilizing Histoacryl and/or Lipiodol and/or its combination to treat vascular anomalies.

18.    Defendants never disclosed to Karyn A. Kerris the fact that the Histoacryl was to be employed in the vessels of her brain in a manner specifically forbidden by the manufacturer's labeling.

19.    Defendants never disclosed to Karyn A. Kerris the fact that any attempted embolization would have an extremely high risk of failure with catastrophic results.

20.    Defendants never disclosed to Karyn A. Kerris that the use of unapproved and untested devices, such as Histoacryl and Lipiodol and/or their combination was experimental, never disclosed that their use had not been approved by Georgetown University Hospital's IRB, and never disclosed that approval was required before any experimental procedure could be conducted at the Hospital.

21.    Had Karyn A. Kerris been informed of the aforesaid facts in paragraphs 16 - 21, she would not have consented to the embolizations, because she would have knowledge that: a)the treatments had not received FDA approval; b) the risks and dangers inherent with the use of

-7-

Histoacryl, and/or Lipiodol, and/or a combination thereof were extremely high; c) the concocted embolization device made up of unknown quantities and strengths of Histoacryl and/or Lipiodol was never previously tested, could not be duplicated, so its efficacy was unknown; d) defendants intended on utilizing unapproved medical devices without IRB oversight; e) defendants were unauthorized to use these devices; f) the illegal devices had unacceptable failure rates; g) their use was contrary to warnings by the manufacturer; and h) any attempted embolization with these devices could have catastrophic results.

22.    Defendant had not authorized and/or created a proper IRB-approved  informed consent form for human experimentation that set forth: a) the purpose of the treatment; b) the fact that the decision to use the experimental device was purely voluntary; c) the availability of alternative devices and/or treatments; d) that the use of the experimental device would not be charged to the patient; e) a full description of the risks and benefits of the proposed treatment; f) the number of persons in the study; and g) the failures during present and prior usage; without said information,  Karyn A. Kerris could not provide proper consent and the Defendants were thus not authorized to provide said treatments.

WHEREFORE, Plaintiff Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants, Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT III
*(Strict Products Liability)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

-8-

23.    A Class III device is one for which the Food and Drug Administration ("FDA") does not have "reasonable assurance" of its "safety and effectiveness." See 21 U.S.C. § 360e(a).

24.    A Class III device is unreasonably dangerous requiring restrictions on its use and those that are authorized to use it.

25.    At all relevant times herein, Histoacryl and Lipiodol were Class III artificial embolization devices as defined by 21 CFR Ch.1 § 882.5950.

26.    The only acceptable process by which Class III devices can be marketed in the United States is by an approved application to the FDA, known as an application to obtain Pre-Market Approval (PMA) or pursuant to a §510(k)(substantial equivalence) application. See 21 U.S.C. § 360c(a)(II).

27.    No application for PMA was filed with the FDA, and no PMA was obtained at anytime prior to the date of Defendants' attempted embolization of Karyn A. Kerris.

28.    The only exemption which allows a physician and/or a hospital to treat a patient with a Class III device is an investigational device exemption (IDE). See 21 U.S.C. § 360j(g)(1).

29.    An application to obtain an IDE was never submitted by any Defendant.

30.    The application for IDE which was submitted by other practioners prior to the embolizations at issue had been denied and/or withdrawn.

31.    21 U.S.C. § 351(f)(1)(B)(I) defines a Class III device that does not have an approved, "application for Pre-Market Approval," as adulterated.

32.    21 U.S.C. § 352(q) defines a Class III device that is "used in violation of regulations," as misbranded.

33.    At all relevant times herein, Defendants Georgetown University, acting by and

-9-

through its agents, servants and/or employees, including but not limited to Defendant Vance E.

Watson, M.D., combined two devices, Histoacryl (a Class III device) and Lipiodol or some other

diluent, Class III devices, thereby compounding, creating and manufacturing a new "medical device"

which Plaintiffs will hereafter refer to as "Histadol". This "medical device" was defectively

designed and unreasonably dangerous, in that, *inter alia*:

        a.     "Histadol" was manufactured without any specifications, controls and/or safe

manufacturing procedures;

        b.     "Histadol" was manufactured without any record keeping to permit

reconstruction of its components and the percentage of each component;

        c.     "Histadol" was designed for use contrary to the instructions provided by the

manufacturer of the Histoacryl, one of its component parts;

        d.     "Histadol" was never submitted for approval to the Food and Drug

Administration (FDA);

        e.     none of the component parts of "Histadol" were approved by the FDA for

internal use; and,

        f.     injecting "Histadol" into the brain, in the combination used at the time at

issue, had never been formally tested.

     34.     The defect in "Histadol" - the combined compound of Histoacryl and Lipiodol -

existed when on or about November 4, 1998, and on each occasion it was used thereafter by

Defendant Vance E. Watson, M.D., when he attempted to embolize an arteriovenous malformation

(AVM) found in the Karyn A. Kerris.

     35.     "Histadol" - the combination of Histoacryl and Lipiodol, or another diluent - was

dangerous to an extent beyond that which would be contemplated by the ordinary consumer who

-10-

purchases it or by a member of the general public who uses it with ordinary knowledge common to the community as to its characteristics.

36.     Defendants Georgetown University and Vance E. Watson, M.D., failed to warn purchasers and users, including the named Plaintiffs, of the unreasonably dangerous, defective and/or unadulterated  condition of "Histadol" the device it created for injection into the human body.

37.     At no time herein did Karyn A. Kerris have the ability to use the "Histadol" compound in a manner other than what was intended by Defendants since she had no control over, or knowledge of, the device prior to its being injected into her brain.

38.     As a direct and proximate result of the Defendants' use of the aforesaid device,  the Estate of Karyn A. Kerris, suffered injuries and damages as set forth above.

WHEREFORE, Plaintiff Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University, and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT IV
*(Breach of Implied Warranty of Fitness for a Particular Purpose)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

39.     At all relevant times herein, Defendants were aware of the particular purpose for which Karyn A. Kerris would receive "Histadol" and its component parts, Histoacryl with Lipiodol, and/or some other diluent namely for the purpose of attempting to embolize Karyn A. Kerris' arteriovenous malformations (AVM).

40.     At all relevant times herein, Defendants, acting by and through their agents, servants,

-11-

and/or employees, impliedly and/or by operation of law warranted that the medical device, "Histadol", was reasonably fit and suitable for the particular purpose for which Karyn A. Kerris was receiving it.

41.    Defendants, acting by and through their agents, servants, and/or employees, breached the implied warranty of fitness for a particular purpose by designing, producing, assembling, selling, and/or otherwise distributing the medical device, "Histadol", at issue in an unreasonably dangerous, defective and/or adulterated condition, as set forth above.

42.    As a direct and proximate result of the Defendants' use of the aforesaid product, Plaintiffs  Felice I. Iacangelo and Cicily A. Iacangelo, as Guardians of the Person and Property of Karyn A. Kerris and Paul Kerris, suffered injuries and damages as set forth above.

WHEREFORE, Plaintiff Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT V
### (Breach of Express Warranties)

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

43.    At all relevant times herein, Defendants, acting by and through their agents, servants, and/or employees, expressly warranted to the Karyn A. Kerris and Paul Kerris that the "medical device" at issue was reasonably fit and safe for the intended, ordinary, foreseeable, and particular purpose of being injected and embolizing Karyn A. Kerris' arteriovenous malformation (AVM).

-12-

44.     At all relevant times herein, Defendants' express representation to Karyn A. Kerris was the basis of the bargain between the Defendants, and Karyn A. Kerris, in that, *inter alia*, Karyn A. Kerris would not have agreed, that the medical device be injected into her body, but for Defendant's representation that it was reasonably safe and effective.

45.     Defendants, acting by and through their agents, servants, and/or employees, breached the express warranty of fitness for a particular purpose by designing, producing, assembling, selling, and/or otherwise distributing the medical device at issue in an unreasonably dangerous, defective and/or adulterated condition, as set forth above.

46.     As a direct and proximate result of the Defendants aforesaid product, Karyn A. Kerris and Paul Kerris, suffered injuries and damages as set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

### COUNT VI
*(Fraud)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

47.     Defendant Vance E. Watson, M.D., acting individually and/or as the agent, servant and/or employee of Defendant Georgetown University, made and/or fraudulently withheld representations of material facts which were false and/or the falsity of what was known or should have been known to Defendants at the time the representations were made.

-13-

48.     Defendants' fraud included, but was not limited to, failing to advise the Karyn A. Kerris that:

a.     Defendants intentionally did not seek and/or obtain approval from the FDA to use the experimental devices, Histoacryl and Lipiodol or provide the FDA with notice of its use; Defendant did not advise Karyn A. Kerris of that fact;

b.     Defendant Vance E. Watson, M.D. did not seek and/or obtain an IDE for use of these experimental devices;

c.     the illegal status of Histoacryl and/or Lipiodol;

d.     that an untested illegal product would be injected into the vessels of her brain;

e.     the device intended to be inserted into the Karyn A. Kerris was to be extemporaneously manufactured by Defendant Vance E. Watson, M.D. in the operating room, by combining Histoacryl with a diluent such as Lipiodol, and that the precise combination of diluent and Histoacryl had not been determined, and had never been tested at the time of, or at any time before, the manufacture and/or use of the product manufactured during the procedure.

f.     the treatments were not curative and were at best paliative.

49.     The representations and/or omissions were made by Defendants for the purpose of defrauding Karyn A. Kerris and Paul Kerris.

50.     Defendants knew or should have known that the Karyn A. Kerris and Paul Kerris would rely upon said representations and/or omissions and that said representations and/or omissions were material to a knowing and intelligent decision.

51.     Based on the special relationship which exists between Karyn A. Kerris and Paul Kerris and each Defendant, Defendants had a duty to disclose the information concealed from Karyn A. Kerris

-14-

and Paul Kerris.

52.    Defendants' deceptive practices concealed, *inter alia:*  the truth about the legal status of the components and the combination of components of the device Defendants intended to manufacture and insert into Karyn A. Kerris;  how they were being unlawfully acquired, combined, and injected into her as well as the truth about the  potential for "success" of the procedures.

53.    As a direct and proximate result of the Defendants' fraud, Karyn A. Kerris and Paul Kerris, suffered injuries and damages as set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris and Paul Kerris, demand judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT VII
*(Consortium Claim of Paul Kerris)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

54.    Karyn A. Kerris and Plaintiff Paul Kerris, were at all relevant times, and remain to this day, husband and wife.

55.    As a result of the severe injuries suffered by Karyn A. Kerris, her spouse Paul Kerris, has suffered mental anguish, and emotional pain and suffering, from the loss of services, society, companionship and consortium of his spouse, as well as other related damages.

WHEREFORE, Plaintiff Paul Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of One

Million Dollars ($1,000,000.00) plus costs and interest.

## COUNT VIII
*(Breach of Fiduciary Obligations)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

56.     At all relevant times herein, Defendant Vance E. Watson, M.D., owed a fiduciary duty to Karyn A. Kerris to, *inter alia*, use only approved medical devices and/or be authorized to use unapproved devices.

57.     Vance E. Watson, M.D. and Georgetown University, breached their fiduciary duty of loyalty and care to Karyn A. Kerris and the duty to, at all times, act in good faith and in the best interests of the Plaintiff, abide by the Hippocratic oath of loyalty, care and to do no harm to her.

58.     Defendant, Vance E. Watson, M.D., owed fiduciary duty to each individually, jointly and severally to, *inter alia*, utilize only medical devices that were approved and/or which were legally authorized to utilize and/or which had a reasonable chance for success versus its risk.

59.     Defendant, Georgetown University breached their fiduciary duty of loyalty and care and to act in good faith and in the best interests of the Karyn A. Kerris by, *inter alia*:

a)     Failing to disclose the risks associated with each embolization.

b)     Failing to disclose that the medical device utilized would include the use of cyanoacrylate, and that was a device which the manufacturer specifically warned against using internally and specifically, in the area of the brain.

c)     Failing to disclose that the cyanoacrylate and its diluent were Class III medical devices which required a physician to have sought and obtained an exemption prior to

-16-

employing its use.

        d)     Failing to reveal Defendant Vance E. Watson, M.D.'s failure rates utilizing

cyanoacrylates when he had previously attempted embolization with this medical device.

        e)     Failing to disclose that Histoacryl and Lipiodol were not approved medical

devices.

        f)     Failing to disclose the Defendant Vance E. Watson, M.D., intended to

manufacture a totally new, previously untested medical device and insert it into Karyn A. Kerris.

        g)     Failing to disclose that the medical device Defendant Vance E. Watson,

M.D., manufactured could not be duplicated and efficacy tested accuracy.

        h)     Failing to fulfill its responsibility pursuant to 21CFR Sections 50 & 56 to

establish an IRB and/or implement appropriate procedures to protect subjects in experimentation.

        i)     Failing to disclose the high risk and low benefit of the proposed

embolizations.

        60.     Defendant Vance E. Watson, M.D., breached his fiduciary duties with Co-

Defendant Georgetown University Hospital, by *inter alia*:

        a)     Failing to notify the hospital that the United States Government had issued a

trade alert regarding cyanoacrylate to stop its importation into the United States of America.

        b)     Failing to notify the Defendant hospital of his procurement of cyanoacrylate

by smuggling it into the United States from Canada despite the existence of a trade alert.

        c)     Failing to disclose that his intention was to use a cyanoacrylate in a manner

specifically prohibited by the manufacturer according to the package insert.

        d)     By failing to disclose that he intended to use a cyanoacrylate by combining it

with Lipiodol (or some other Class III diluent) at the time the procedure was to be performed,

thereby manufacturing a totally new product.

        e)     Failing to disclose that the precise combination of cyanoacrylate and

Lipiodol (or another diluent) had never previously been manufactured before and therefore could

not have been tested in advance of utilizing it during the procedures at issue nor could it be re-

created for testing subsequent to the procedure at issue.

        f)     By failing to report his failure rate and other consequences of using

cyanoacrylate as an embolization device.

        g)     Failing to disclose the high risk and low benefit of the proposed

embolizations.

      61.     Defendant Georgetown University acting by and through its actual and/or apparent

agents, servants and/or employees breached their fiduciary duty to Karyn A. Kerris in that

Defendants, *inter alia*, intentionally, recklessly and/or negligently failed to provide proper custodial

care, treatment and supervision to her to, *inter alia*, insure that only medical devices which were

approved, or for which an exemption had been provided and used by authorized personnel had been

utilized and that any and all use of cyanoacrylate was done in a completely ethical, and procedurally

and legally appropriate manner.

      62.     As a direct and proximate result of the aforesaid breaches of the fiduciary duty by

the Defendant Vance E. Watson, M.D., and/or Georgetown University Karyn A. Kerris suffered

severe and permanent injuries and great pain of body and mind, as set forth above.

      WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the

Person and Property of Karyn A. Kerris and Paul Kerris, demands judgment of and against

Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full

-18-

sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

**COUNT IX**
*(Punitive Damages)*

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

63.     Defendant Georgetown University, acting by and through their agents, servants and/or employees, including their administrators, board of directors, financial directors, purchasing department and staff physicians, including Defendant Vance E. Watson, M.D. willfully, maliciously and fraudulently injected and/or allowed the injection into patients' cerebral blood vessels, of unapproved and un-exempted Class III devices to wit: Histoacryl and the combination of Histoacryl with Lipiodol, or some other diluent, on multiple occasions, including into Plaintiff, with full knowledge that the devices' safety and/or the effectiveness had never been and could not be tested.

64.     Defendants recklessly and wantonly permitted Vance E. Watson, M.D. to obtain the component parts necessary to manufacture "Histadol" and then to manufacture and inject the product described above.

65.     Defendants when they repeatedly ratified the conduct of Defendant Vance E. Watson, M.D. by continuing to order, purchase and stock and provide the component parts of "Histadol" with the knowledge that they would be mixed in an unscientific fashion and injected into patients, including Karyn A. Kerris.

66.     Defendants intentionally performed all of the aforesaid without any provision for review of Vance E. Watson, M.D.'s manufacturing process, method of performance when utilizing the product and/or success/failure rate and/or an analysis of the reasons therefore.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo as Guardians of the Person and Property of Karyn A. Kerris, demands judgment of and against Defendants Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of One Hundred Million Dollars ($100,000,000.00) plus costs and interest.

## COUNT X
*(Negligence Per Se - Violation of 21 U.S.C. §360c (a)(II), and 21 C.F.R. Ch. 1 § 812.20(a)(2))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

67.     At all relevant times herein, Histoacryl and Lipiodol were, and continue to be, Class III artificial embolization devises as defined by 21 C.F.R. Ch. 1 § 882.5950, and as such, are unapproved for any use in the United states (Classes I and II are "approved" devices).

68.     A Class III device is one for which the Food and Drug Administration ("FDA") does not have "reasonable assurance" of "safety and effectiveness." See 21 U.S.C. §360e(a).

69.     The only acceptable process by which Class III devices can be marketed in the United States is by an approved application to the FDA, known as an application to obtain premarket approval (PMA).  See 21 U.S.C. § 360c(a) (II).

70.     No application for PMA was filed with the FDA, and no PMA was obtained at anytime prior to the date of Defendants' surgery on Karyn A. Kerris.

71.     The only exemption which allows a physician and/or a hospital to treat a patient with a Class III device is an investigational device exemption (IDE).  See 21 C.F.R. Ch. 1 § 360j(g)(1).

72.     To obtain an IDE, a physician or institution must become a "sponsor" and "submit an application to FDA." See 21 C.F.R. Ch. 1 § 812.20(a)(2).

-20-

73.    An application to obtain an IDE was never submitted by Defendants.

74.    The FDA's classification of Histoacryl and Lipiodol as Class III devices prohibited the production, distribution and medical use of those devices in the United States.

75.    In an effort to circumvent the government's regulations, Defendants ordered the devices from Yocan Medical Systems, Inc., in Ontario, Canada, through the use of documents that created the pretense that the devices were being used pursuant to a personal prescription and/or for an experiment (IDE).

76.    21 U.S.C. § 351(f)(1)(B)(I) defines a Class III device that does not have an approved, "application for premarket approval," as adulterated.

77.    21 U.S.C. § 352(q) defines a Class III device that is "used in violation of regulations," as misbranded.

78.    Defendants Georgetown University and their employees, agents and/or servants, including Defendant Vance Watson, M.D., violated the aforesaid sections by manufacturing, placing into the stream of commerce and employing the unapproved Class III devices.

79.    The aforesaid statutes were designed, *inter alia*, to promote the health and safety of the public by only allowing devices into the Unites States and into patients that have gone through the necessary regulatory process and had met the stringent requirements of the FDA.

80.    As a direct and proximate results of Defendants' violations of the aforesaid statutes, Karyn A. Kerris received the unapproved, misbranded, mislabeled devises and suffered permanent brain injury.

81.    The brain injury suffered by Karyn A. Kerris would not have occurred had the Defendants not violated the aforesaid statues.

-21-

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, and Paul Kerris, demand judgment of and against Defendants, Georgetown University and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT XI
*(Negligence Per Se - Violations of 21 U.S.C. §331 (a), (b), (c), (g) and (k))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

82.    21 U.S.C. §331 entitled "Prohibited Acts" sets forth in subparagraph (a) that it is a violation of the statute to allow, "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded."

83.    21 U.S.C. §331(b) states that it is a violation of the statute to allow, "[t]he adulteration or misbranding of any food, drug, device, or cosmetic in interstate commerce."

84.    21 U.S.C. §331(c) states that it is a violation of the statute to allow, "[t]he receipt in intestate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise."

85.    21 U.S.C. §331(g) states that it is a violation of the statute to allow, "[t]he manufacture within any Territory of any food, drug, device, or cosmetic that is adulterated or misbranded."

86.    21 U.S.C. §331(k) states that it is a violation of the statute to allow, "[t]he alteration, mutilation, destruction, obliteration, or removal of the whole or any part of the labeling of, or the doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and

results in such article being adulterated or misbranded."

87.    Defendants' violated the aforesaid "Prohibited Acts"subsections, in that they:

(a)    introduced and or caused introduction of, Histoacryl and Lipiodol, both adulterated and misbranded devices, into interstate commerce,

(b)    adulterated both Histoacryl and Lipiodol by mixing and/or compounding the two devices together,

(c)    received a misbranded and adulterated device,

(d)    manufactured a "new" Class III adulterated and misbranded device when they mixed Histoacryl with Lipiodol,

(e)    ignored the warnings and/or destroyed the labeling on the Class III device Histoacryl.

88.    The aforesaid statutes were designed, *inter alia*, to promote the health and safety of the public by only allowing devices into the Unites States and into patients that have gone through the necessary regulatory process and had met the stringent requirements of the FDA.

89.    As a direct and proximate result of Defendants' violations of the aforesaid statutes, Karyn A. Kerris received the unapproved, misbranded, mislabeled devises and suffered permanent brain injury.

90.    The brain injury suffered by Karyn A. Kerris would not have occurred had the Defendants not violated the aforesaid statues.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, and Paul Kerris demand judgment of and against Defendants, Georgetown University, and Vance E. Watson, M.D., jointly and severally, in the full

-23-

sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

## COUNT XII
*(Negligence Per Se - Violation of 21 C.F.R. § Ch. 1 812.20(a)(2))*

Plaintiffs replead and incorporate by reference herein each and every allegation set forth above and further state as follows:

91.    21 C.F.R. Ch. 1 § 812.20(a)(2), discussing investigational device exemptions, mandates that, "A sponsor shall not begin an investigation for which FDA's approval of an application is required until FDA has approved of an application is required until FDA has approved the application."

92.    21 C.F.R. Ch. 1 §812.1 states that the purpose of the development of investigational device exemptions ("IDEs") is, *inter alia*, "the protection of public health and safety."

93.    Defendants Georgetown University and , and their employees, namely their administrators, board of directors, purchasing department, and staff physicians, including Defendant Vance Watson, M.D., violated 21 C.F.R. Ch. 1 § 812.20(a)(2), by injecting Histoacryl and Lipiodol into Karyn A. Kerris without an IDE.

94.    As a direct and proximate result of Defendants' violation of 21 C.F.R. Ch. 1 § 812.20(a)(2), which was designed protect health and safety, Karyn A. Kerris suffered the injuries and damages set forth above.

WHEREFORE, Plaintiffs Felice I. Iacangelo and Cicily A. Iacangelo, as Gaurdians of the Person and Property of Karyn A. Kerris, and Paul Kerris demand judgment of and against Defendants, Georgetown University, and Vance E. Watson, M.D., jointly and severally, in the full sum of Thirty Million Dollars ($30,000,000.00) plus costs and interest.

-24-

Respectfully submitted,

_____

/s/ Anthony Newman
Anthony Newman, Esquire
NEWMAN & McINTOSH
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400

_____

/s/ Andrew Greenwald
Andrew Greenwald, Esquire
GREENWALD AND LAAKE
6404 Ivy Lane, Suite 440
Greenbelt, Maryland 20770
(301) 220-220
**Attorneys for Plaintiffs**

## <u>REQUEST FOR JURY DEMAND</u>

_____Plaintiffs request trial by jury as to all counts herein.

/s/ Anthony Newman
Anthony Newman, Esquire_____

_____

-25-

# EXHIBIT P

REPRODUCED AT THE NATIONAL ARCHIVES

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

RHONDA R. MORTON,                  :
Individually, as mother and as    :
next friend of Monique Morton     :
                                   :
        Plaintiff,                 :
                                   :
            v.                     :    Civil Action No. 99ca4599
                                   :    Calendar 2
THE GEORGE WASHINGTON              :    Judge William M. Jackson
UNIVERSITY d/b/a THE GEORGE        :
WASHINGTON UNIVERSITY              :
MEDICAL CENTER, et. al.            :
                                   :
        Defendant.                 :



FILED
CIVIL ACTIONS BRANCH

NOV 3 0 2001

Superior Court
of the District of Columbia
Washington, D.C.

## ORDER

In this medical malpractice action, Defendants have moved to dismiss Counts II, III, IV,

V and VII of Plaintiffs' Amended Complaint for failure to state a claim pursuant to Rule 12

(b)(6) of the Superior Court Rules of Civil Procedure.[1]  In their Motion, Defendants contend

that Counts III through VII, which allege violations of the Federal Food, Drug, and Cosmetic

Act (hereinafter "FDCA" or "the Act"), 21 U.S.C. §301 *et seq.*, must be dismissed because

there exists no private right of action under the FDCA.  In addition, Defendants maintain that

the claims of the mother of the minor plaintiff as set forth in Count II are not cognizable and

must also be dismissed.  Plaintiffs have filed an Opposition, and Defendants have filed a

Reply.[2]

---

[1]    Defendants William O. Bank, M.D. and District Health Partners, L.P., have also filed
Motions to Dismiss, alleging similar grounds for dismissal as those raised by Defendant
George Washington University Medical Center.

[2]    The question of whether the Amended Complaint states a claim upon which relief may be
granted is, of course, a question of law. *Duncan v. Children's Nat'l Med. Ctr.*, 702 A.2d 207,
210 (1997), *cert. denied*, 525 U.S. 912 (1998).  "The allegations in the complaint must be taken
as true and construed in the light most favorable to Plaintiff and, if these allegations are

REPRODUCED AT THE NATIONAL ARCHIVES

<u>Background</u>

On June 6, 1998, Monique Morton, the minor Plaintiff, fainted and became unresponsive while attending a junior prom at T.C. Williams High School in Alexandria, Virginia.  She was subsequently transported to Alexandria Hospital.  Tests at Alexandria Hospital revealed that she had an extensive intraventricular hemorrhage.  Following a cerebral angiogram, she was diagnosed as having a "large complex arteriovenous malformation."[3]  In view of the serious nature of Plaintiff's condition, she was transferred to George Washington University Medical Center for further evaluation and treatment.

Upon Plaintiff's arrival at George Washington University Medical Center on June 6, 1998, she was admitted to the Intensive Care Unit.  She was evaluated and underwent a second cerebral angiogram.[4]  After evaluating her condition, Defendants decided that it was in Plaintiff's best interest to undergo a procedure known as embolization.  Embolization is a procedure that is designed to shrink the arteriovenous malformation.  The procedure involves the introduction of various substances into the blood vessels to arrest or prevent hemorrhaging or to devitalize a structure or organ by occluding its blood supply.

It is this embolization procedure and more particularly the defendant's use of the substances Histocryl and Lipiodol that form the basis of Counts III through VIII and are the subject of this Motion to Dismiss.  During the embolization, a microcatheter was placed into a cerebral artery that fed into the malformation.  A combination of Histocryl and Lipiodol was injected into the arteriovenous malformation.  During the course of the procedure, the fluid, the

---

sufficient, the case must not be dismissed even if the court doubts that plaintiff will ultimately prevail." *Wallace v. Stadden Arps, Slate, Meagher and Horn*, 715 A.2d 873, 877 (D.C. 1998) (citing *Atkins v. Industrial Telecomms. Ass'n, Inc.*, 660 A.2d 885, 887 (D.C. 1995)).

[3]    An arteriovenous malformation is described as an abnormal tangle of fragile blood vessels that diverts blood leaving the brain.

2

REPRODUCED AT THE NATIONAL ARCHIVES

combination of Histocryl and Lipiodol, spilled into an adjacent artery, resulting in minor

Plaintiff suffering a stroke and ultimately brain damage.

According to Plaintiffs, the substances Histocryl or "super glue" and Lipiodol were not

approved by the FDA for embolization. Under the regulatory structure of the FDCA, the

embolization substances Histocryl and Lipiodol are considered "Class III devices." As such,

Histocryl cannot be sold or distributed without first obtaining "Premarket Approval" from the

FDA. *See* 21 U.S.C. § 360 (c). Even to use Histocryl occasionally for experimental purposes

requires the submission of an application to the FDA for what is known as an "Investigational

Device Exemption." *See* 21 U.S.C. §360 (e); *see also* 21 C.F.R. § 812.20. According to

Plaintiffs, Defendants' use of Histocryl was illegal because the FDA neither had issued a

"Premarket Approval" for Histocryl nor had the defendants sought and obtained an

Investigational Device Exemption allowing them to use these embolization substances.[5]

According to Plaintiffs, Defendants, knowing that the use of the substances was illegal,

engaged in a scheme to circumvent FDA's ban on the use of Histocryl and illegally obtained

the embolization substances from a supplier in Canada. Defendants, according to Plaintiffs,

knowingly violated the FDCA by illegally importing and then using the substances on the

minor Plaintiff.

### The Amended Complaint

Plaintiffs' claims at issue in this Motion involve claims by Rhonda Morton, the mother

of the minor child, and claims predicated on violations of the FDCA. In Count II, Plaintiff

---

[4]    A cerebral angiogram involves the radiographic visualization of the blood vessels
supplying the brain.
[5]    The FDCA's regulatory scheme is prophylactic in nature. Devices are deemed
"misbranded" or "adulterated" under the Act, not necessarily because there has been a finding
that the device is unsafe or dangerous, but because any device that has not been through the
approval process is deemed illegal. *See* 21 U.S.C. §360 (a) and (e).

REPRODUCED AT THE NATIONAL ARCHIVES

Rhonda Morton asserts a claim for damages for "lost services and affection of her minor child" and for income the minor child would have received during the time that she was a minor. Finally, Plaintiff Rhonda Morton seeks past and future medical expenses. In Counts III and IV, Plaintiffs assert claims under the doctrine of negligence *per se* for Defendants' purported violation of the FDCA and its regulations. In Count V, Plaintiffs assert a claim for battery, again predicating this claim on Defendants' alleged violation of the FDCA. Count VI contains a claim based on a product liability theory and alleges that Defendants marketed and distributed a product banned by the FDA. Finally, Count VII seeks punitive damages for Defendants' violation of the FDCA.

Analysis

Defendants contend that Plaintiffs' claims that are predicated on violations of the FDCA are not viable because no explicit private right of action exists under the FDCA. In determining whether an explicit private right of action exists, the Court must use the language of the statute: "the starting point for the interpretation of a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Kaiser Aluminum & Chemical Corp. v. Borjorno*, 447 U.S. 102, 108 (1980). Even a cursory examination of the FDCA reveals that the statute, by its terms, does not provide for a private right of action. The relevant provisions of the FDCA provide as follows: "(a) Except as provided in subsection (b), all such proceedings for the enforcement, or to restrain violations, of this Act shall be by and in the name of the United States." 21 U.S.C. §337 subd.(a).[6] The language of the statute is therefore clear and unambiguous: the FDCA does not explicitly create a private right of action. *See In re*

REPRODUCED AT THE NATIONAL ARCHIVES

*Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 788 (3rd Cir. 1999) (FDCA establishes no private right of action); *Bailey v. Johnson*, 48 F.3d 965, 968 (6th Cir. 1995) (same).

However, because the FDCA is silent as to whether a private party may bring a claim under the statute, there remains the issue of whether the FDCA creates an implied right of action. *See Cort v. Ash*, 422 U.S. 66, 78 (1995).

In determining whether if a private cause of action should be implied under the FDCA, the Court may consider the four factors set forth in *Cort*. First, is the plaintiff a member of the class for whose benefit the statute was enacted? Second, is there any indication of legislative intent to either create or deny a private remedy? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy? Finally, is the plaintiff's cause of action one that was traditionally relegated to state law such that it would be inappropriate to infer a cause of action under federal law? *Cort, supra*, 422 U.S. at 78. While each of these factors are important, the Aupreme Court recently has emphasized that the critical inquiry is "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 575 (1979); *see also Jones v. Lifespring, Inc.*, 713 F.Supp. 426, 427-28 (D.D.C. 1988).

In applying these principles to the case at bar, it is clear that there exists nothing in the legislative history of the FDCA that suggests that Congress intended to create a private right of action under the FDCA. To the contrary, the 1933 draft legislation originally included a

---

[6]    The exceptions referenced in this provision pertain to a limited number of circumstances where states, and the District of Columbia, may bring an action in their own name. *See* § 337(b). This came about as a result of the 1990 Amendment to the FDCA.

REPRODUCED AT THE NATIONAL ARCHIVES

private right of action, but that provision was eventually deleted from the final Bill.  *National Women's Health Network, Inc. v. A.H. Robbins Co.*, 545 F.Supp. 1177 (D. Mass. 1982) (citing *Hearings on S. 144 Before the Subcomm. of Comm. on Commerce*, 73rd Cong., 2nd Sess. (1933)).  Moreover, despite a number of amendments to the FDCA over the years, Congress has never altered the statutory language to authorize private rights of action.  In sum, the legislative history reveals that Congress considered and rejected a private right of action under the FDCA.  *Cf. Consumer Federation of American v. Upjohn Co.*, 346 A.2d 725, 731 (D.C. 1975) (citing legislative history in holding that there is no federal common law damages remedy under the FDCA).

Although courts in this jurisdiction have not had occasion to address the question of whether there exists an implied right of action under the FDCA, every federal court that has considered this issue has concluded that no implied private right of action exists under the FDCA.  *See e.g. Talbot v. C.R. Bard, Inc.*, 63 F.2d 25, 29 (1st Cir. 1995), cert. dismissed, 517 U.S. 1230 (1996); *PDK Labs Inc. v. Friedlander*, 103 F3d. 1105, 1113 (2nd Cir. 1997); *In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781, 788 (3rd Cir. 1999); *Mylan Labs, Inc., v. Matkar*, F.3d 1130, 1139 (4th Cir. 1993), *cert. denied,* 510 U.S. 1197 (1994); *Bailey v. Johnson*, 48 F3d 965, 968 (6th Cir. 1995); *Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 370 (7th Cir. 1997); *Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1993); *Cottrell Ltd. V. Biotrol Intern, Inc.*, 191 F.3d 1248, 1255 (10th Cir. 1999).[7]

---

[7]    The Supreme Court has never squarely addressed the issue of whether an implied right of action exists under the FDCA.  In *Merrill Dow Pharmaceuticals v. Thompson*, 487 U.S. 804 (1986), the lower court had ruled that no private right of action existed under the FDCA, and neither party challenged that ruling before the Supreme Court.  The Supreme Court, therefore, assumed, without deciding, that no private right of action, either expressed or implied, exists under the FDCA.

REPRODUCED AT THE NATIONAL ARCHIVES

Moreover, lower federal courts have reacted a similar conclusion. *See e.g. Munson v. Eli Lilly*, 1987 U.S. Dist. LEXIS 11040 (D. Minn Nov. 25, 1987); *National Women's Health Network v. A.H. Robbins Co.*, 545 F.Supp. 1177 (D. Mass. 1982); *Kerl v. Eli Lilly & Co.*, 490 F. Supp. 479 (E.D. Mich. 1980); *American Home Corp. v. Johnson and Johnson*, 436 F. Supp. 785 (S.D.N.Y. 1977).

In sum, every federal court that has examined this issue has reached the same conclusion: no private right of action, either expressed or implied, exists under the FDCA. Having examined the statute and caselaw addressing this issue, this Court is likewise satisfied that no private right of action exists under the FDCA. Accordingly, to the extent that Counts III-VII of the Amended Complaint are predicated upon the existence of a private right of action under the FDCA, those counts fail to state a claim for which relief may be granted and must, therefore, be dismissed.

### Negligence *per se*

Although the Court has concluded that Plaintiff cannot maintain a cause of action either directly or by implication, under the FDCA, the Court's conclusion does not resolve the issue of whether Plaintiffs may proceed under the negligence *per se* theory that is alleged in Counts III and IV. As the Court of Appeals noted in *Zhon v. Jennifer Mall Rest.*, 534 A.2d 1268, 1273 (1987), determining the existence of negligence *per se* "is distinct from determining that a cause of action arises, by implication, under a statute." To proceed under a negligence *per se* theory, Plaintiff must rely upon a statute or regulation as proof of the applicable standard of care. As the Court noted in *Ceco Corp. v. Coleman*, 441 A.2d 940, 945 (1982):

> The "general rule" in this jurisdiction is that "where a particular statutory or regulatory standard is enacted to protect persons in the plaintiff's position or to prevent the type of accident that occurred, and the plaintiff can establish his

REPRODUCED AT THE NATIONAL ARCHIVES

relationship to the statute, unexplained violation of that standard renders the defendant negligent as a matter of law." (citations omitted) Id.

For the doctrine of negligence *per se* to be applied, "[a]t a minimum . . . the statute or regulation relied on must promote public safety and have been 'enacted to protect persons in the plaintiff's position as to prevent the type of accident that occurred.'" *McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567, 579 (D.C. 1996) (quoting *Joy v. Bell Helicopter Textron, Inc.*, 303 U.S. App. D.C. 1, 9, 999 F.2d 549, 557 (D.C. Cir. 1993)). Moreover, the statute or regulation must "impose specific duties on the defendant." *Id.*

Relying on *Zhou, supra*, Plaintiffs maintain that the FDCA and the regulations relevant to this case were designed to promote public safety and to prevent the specific harm that occurred in the case at bar. According to Plaintiffs, these factors are sufficient for the application of negligence *pro se*. Defendants, on the other hand, advance two arguments in support of their contention that Plaintiffs' negligence *per se* claims are not cognizable. First, Defendants maintain that since the FDCA does not confer a private right of action, allowing Plaintiffs to use violations of the same federal statutes and regulations in state actions would be inconsistent with Congress' ban on private enforcement. Secondly, Defendants maintain, that even assuming that Plaintiffs may invoke the doctrine of negligence *per se* and rely on the FDCA and the regulations issued thereunder, Plaintiffs' negligence *per se* claims are not actionable because the regulations at issue do not set forth a standard of care.

Our Court of Appeals has not addressed the issue of whether the FDCA and its regulations may support a claim of negligence per se. In *McNeil Pharmaceutical v. Hawkins*, 686 A.2d 567 (D.C. 1996), *cert denied*, 522 U.S. 815 (1997), the Court of Appeals addressed the issue of whether, in a case involving claims for negligence *per se* and strict liability, it was error to admit a number of FDCA statutes and regulations without the benefit of expert

REPRODUCED AT THE NATIONAL ARCHIVES

testimony.  The court concluded that it was error to admit such statutes and regulations.  The court did not address the issue of whether the FDCA and its regulations could serve as the predicate for a negligence *per se* claim.  Thus, this too is an issue of first impression in this jurisdiction.

Given the long and well-established history in this jurisdiction of the doctrine of negligence *per se* and the absence of an explicit ban on the use of the FDCA as a predicate for negligence *per se*, the Court can discern no legal principle or sound policy for imposing a blanket prohibition on the use of the FDCA and its regulations as the standard of care for common law tort claims.

However, this is not such a case.  As Defendants point out, the FDCA provisions and regulations proffered by Plaintiffs in support of their negligence *per se* claims are devoid of an appropriate standard of care.  Rather, the statute and regulations relied upon by Plaintiffs are administrative in nature and do not set forth a standard of conduct, the breach of which would constitute negligence *per se*.  As the Court stated in *Talley v. Danek Medical, Inc.*, 179 F.3d 154, 160 (4th Cir. 1999):

> The administrative requirement that a given device be approved by the FDA before being marketed – as opposed to a specific substantive requirement that a device be safe and effective – is only a tool to facilitate administration of the underlying regulatory scheme.  Because it lacks any independent substantive content, it does not impose a standard of care, the breach of which could form the basis of a negligence *per se* claim.  Its breach is analogous to the failure to have a driver's license.

*See also Little v. Danek Medical, Inc.* 37 S.W.3d 429, 456-57 (Tenn. 2000).

Based on the foregoing, the Court concludes that statutory provisions and regulations proffered by Plaintiffs do not contain a standard of care. Accordingly, Plaintiffs' negligence *per se* claims are therefore dismissed [8]

### Rhonda Morton's Claims

In Count II of the Complaint, Plaintiff Rhonda Morton, mother of the minor Plaintiff, seeks recovery for loss of her daughter's services and affection, loss of her minor daughter's income, and for medical expenses incurred. Because the loss of parent-child consortium is not recognized in this jurisdiction, this claim is not actionable. *See District of Columbia v. Howell*, 607 A.2d 501 (D.C. 1992). In all other respects, the claims in Count II remains.

### Conclusion

Based on the foregoing, it is

**ORDERED** that Defendant George Washington University's Motion to Dismiss Amended Complaint is hereby **GRANTED**; and it is

**FURTHER ORDERED** that Defendant Universal Health Services, Inc.'s Motion to Dismiss Amended Complaint is hereby **GRANTED**; and it is

**FURTHER ORDERED** that District Hospital Partners' Motion to Dismiss Amended Complaint is hereby **GRANTED**;

**FURTHER ORDERED** that Count II is hereby **DISMISSED** for loss of parent-child consortium; and it is

---

[8]     This ruling is limited to the FDCA and regulations proffered by the Plaintiffs in this case. The Court does not, by this ruling, purport to rule that all FDCA statutory provisions and regulations cannot support a claim of negligence *per se*.

**FURTHER ORDERED** that Counts III, IV, V, VI and VII are hereby

**DISMISSED** for failure to state claim pursuant to Rule 12 (b)(6).

**SO ORDERED.**

Date: 11/30/01

William M. Jackson
Associate Judge

SIGNED IN CHAMBERS
COPIES OF ORDER TO COUNSEL
AND PARTIES DISTRIBUTED
IN OPEN COURT

DOCKETED DEC 0 4 2001

Copies to:

Anthony G. Newman, Esquire
NEWMAN & MCINTOSH
7315 Wisconsin Avenue
Suite 220E
Bethesda, MD 20814

Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, NW
Washington, DC 20036

Cynthia L. Santoni, Esquire
MILES & STOCKBRIDGE, P.C.
1751 Pinnacle Drive
Suite 500
McLean, VA 22102

Vicki L. Layman, Esquire
MCCANDLISH & LILLIARD, P.C.
11350 Random Hills Road
Suite 500
Fairfax, VA 22030

Thomas V. Monahan, Jr., Esq.
Goodell, DeVries, Leech & Dann, LLP
One South Street
20th Floor
Baltimore, MD 21202

11

REPRODUCED AT THE NATIONAL ARCHIVES

# EXHIBIT Q

PRESENT VALUE OF LOST FUTURE EARNINGS AND CARE COSTS

OF

Prepared By

Richard J. Lurito

formerly
Assistant Professor of Economics
Georgetown University

Senior Economist
Commonwealth Consulting Group, Inc.
McLean, Virginia

703-442-4528
703-893-1674 FAX

September 2007

The purpose of this study is to determine the economic value today of the projected lost earnings of                    as a result of alleged medical malpractice that occurred shortly after his birth on September 6, 2005 which, I am advised by Dr. Estelle Davis, a rehabilitation counselor, has rendered him unemployable.

Establishing the economic value today of                projected lost earnings has two important aspects. First, a projection must be made of his probable future earnings, less income taxes, absent injury. Second, a single lump-sum must be determined which would be equivalent to his lost future earnings year after year over his expected working life. This lump-sum is equal to the so-called "present value" of the individual's lost future earnings. These two problems are considered successively, culminating in a determination of a fair lump-sum payment to compensate                for the pecuniary loss he has sustained as a result of the alleged malpractice.

At the present time (early September, 2007),          is two years old, having been born on September 6, 2005. Based on the 2003 <u>Life Tables</u>, published by the U.S. Department of Health and Human Services, a black male, age 2, has a life expectancy of 68.2 more years. It is assumed that absent injury,          would have worked until age 62.


<u>Projection of Earnings, Absent Injury</u>

At any moment in time, the earnings of a worker depend on a large number of factors, some related to general economic conditions, and some to the individual. Among those factors affecting all workers are the level of economic activity, the general level of labor productivity, and the level of prices in the economy. The level of overall economic activity determines whether unemployment or underemployment is likely for workers; if unemployment or underemployment is likely, a worker's income stream will be interrupted or its flow reduced from time to time.

The level of productivity (output per worker) determines the general level of real income and thus the standard of living of the society. As we all know, output per worker was much lower thirty-six years ago than today, and the sustained rise in our standard of living is the result of the sustained rise in labor productivity that we have experienced. For example, the typical worker has enjoyed about a 100% increase in his/her standard of living (real income) over the last thirty-six years (Table 1, Column 3). This means that today a worker only has to work for about 30 minutes to produce the same output that he/she would have had to work a full hour to produce just thirty-six years ago. Thus productivity advance accrues to the benefit of us all, since incomes typically rise to reflect productivity advance, which means that workers can purchase more goods and services with the same work effort than in the past.

Finally, the long-run inflationary trend experienced in our economy results in higher money income. This means that wages rise as prices rise so that the purchasing power of our incomes is not eroded. Now this same typical worker who experienced about a 100% increase in his/her productivity also saw his/her money income increase because of inflation. Thus, in combination, productivity and inflation cause the typical worker's income to rise. Armed with an understanding of these three factors which influence all of our incomes, we can now turn to            particular situation.

With respect to the general increase in incomes due to the long-run improvement in output per worker (productivity), it is reasonable to expect that he would also have enjoyed the benefits of this source of increase in his income. The average increase in output per man-hour (productivity) was 1.98% per year for the total private economy over the 1970-2006 period (see Table 1, Column 3). For purposes of this study, a 1.5% yearly rise in productivity will be used in the calculations to project            income increase resulting from this source.

Inflation, as was mentioned, provides an additional upward source of pressure over and above increases due to the rise in the general level of productivity. Historically, the annual rate of inflation has varied rather widely. Consequently, it is difficult to predict what inflation will be each year in the future.

Faced with this fact, it could be assumed that the average experience over the 1970-2006 period will be repeated in the future. The average rate of inflation over this period was 4.68% per year (see Table 1, Column 2). Thus, we have seen that it is eminently reasonable to expect his income could have risen at an annual rate of 6.66% -- 4.68% for inflation and 1.98% for productivity increase. For purposes of this study, however, a conservative 4.5% escalation factor is used.

Given the 4.5% per year rate of increase that will be used to project         gross income into the future, the next step is to determine the appropriate level of income to which this 4.5% should be applied. Dr. Davis indicated that absent the alleged medical malpractice in this case, . had the capacity to earn what the typical male high school or two-year college graduate in the United States earns.

With regard to the income of the typical male high school and two-year college graduate in the United States, Tables 2 and 3, Column 3, show what these earnings will look like in the dollars of future years using a 4.5% per year earnings escalation factor. It can be seen that his future income in total dollars is as follows:

| Educational Level | Total Dollar Earnings |
|---|---|
| 1.  High School | $ 4,656,123 |
| 2.  Two Years Of College | $ 5,280,328 |

Present Value of Projected Earnings Stream

Given these projected earnings streams in total dollars (Tables 2 and 3, Column 3), the second part of the problem of estimating the economic value today of these potential earnings needs to be solved.

As indicated, Tables 2 and 3, Column 3, show totals of $4,656,123 and $5,280,328 in expected future earnings for            from his 19th or 21st year through his anticipated working life, as a male high school or two-year college graduate. The question then is, "what lump-sum payment today would be equal to these projected earnings?"

The answer depends on (1) how the income stream is spread over time, and (2) what sort of interest the lump-sum could earn if invested. The final answer, called the present value of the future income stream, is obtained by the technique of discounting each year of the future income stream at whatever interest rate is deemed appropriate for investing funds and then summing across all years.

The choice of an appropriate discount rate (interest rate) is to some extent a matter of opinion. One can invest funds in assets yielding various interest rates, and the differences in rates among such assets is usually related to the degree of risk associated with holding them. Over the 1970-2006 period, long-term, taxable U.S. Government bonds have yielded, on the average, 7.58% per year (see Table 4, Column 3). On the other hand, Aaa corporate bonds, being somewhat riskier, have yielded 8.55% per year over this same period (see Column 2). Other types of assets, such as common stocks or lower grade bonds, have still higher yields owing to the greater level of risk associated with holding them. In view of these differences in interest rates, which rate is appropriate?

5

One way to put the question of interest rate choice is to ask, "what sort of rate would be earned on the kind of asset a prudent person would choose if he/she were trustee of a sum of money for someone else?" Because there is no universally accepted rate for this purpose, calculations of the present value of          future income have been made on the basis of a 4.25% after-tax discount (interest) rate. This constitutes a rate of return, which a prudent trustee might aim for. Higher rates would require that higher levels of risk be taken and would seem to go beyond risk levels a prudent trustee might want to accept in current financial markets.

Tables 2 and 3, Column 4, present the discounted value of          future earnings using the 4.25% interest rate indicated for each year until his expected working life is ended. (The footnotes of these tables detail the steps necessary to derive the figures shown.) These present values are as follows:

| Educational Level | Present Values |
|---|---|
| 1. High School | $ 1,804,462 |
| 2. Two Years Of College | $ 2,190,662 |

Hence, absent injury, in my opinion,          \had the capacity to earn $1,804,462 or $2,190,662, if he had earned the income of the typical male high school or two-year college graduate in the United States.

Tax Liability, Absent Injury

The next issue concerns the likely amount of federal and Virginia income taxes that          would have paid if, absent injury, he had pursued a career typical of that of a male high school or two-year college graduate and earned the typical income associated with such careers.

The first step in the process of determining his total tax liability is to establish his average future yearly income in 2007 dollars for each career. Had _____ been able to enjoy the earnings of a typical male high school graduate, his average yearly income in 2007 dollars would have been $54,662 on average over his working life.[1] A single person, taking a 23% itemized deduction and earning $54,662 per year would pay $6,255 in federal income taxes.[2] A Virginia resident would pay $2,117 in taxes on such an income.[3] Thus, had _____ had the earnings of a typical male high school graduate, his total tax liability would likely have been 15.3% of his gross income [($6,255 + $2,117)/$54,662].

Had _____ been able to enjoy the earnings of a typical male two-year college graduate, his average yearly income over his working life in 2007 dollars would have been $68,076.[4] A single person, taking a 23% itemized deduction and earning $68,076 per year would pay $8,837 in federal income taxes.[5] A Virginia resident would pay $2,711 in taxes on such an income.[6] Thus, had _____ had the earnings of a typical male two-year college graduate, his total tax liability would likely have been 17.0% of his gross income [($8,837 + $2,711)/$68,076].


Present Value Of Net Income Absent Injury

It was previously shown that the present values of the gross incomes are $1,804,462 for the typical male high school graduate and $2,190,662 for the typical male two-year college graduate.

---

[1] The figures in Column 2 of Table 2 are escalated by 1.5% per year and summed. This is $2,119,969. This figure is multiplied by 1.035[3] and divided by 43 years.
[2] ($54,662)(1 - .23) - $3,300 is a taxable income of $38,790. The federal tax on such a taxable income is $6,255.
[3] Based on a $41,290 taxable income; tax is $720 + 5.75% over $17,000.
[4] The figures in Column 2 of Table 3 are escalated by 1.5% per year and summed. This is $2,517,412. This figure is multiplied by 1.035[3] and divided by 41 years.
[5] ($68,076)(1 - .23) - $3,300 is a taxable income of $49,119. The federal tax on such a taxable income is $8,837.
[6] Based on a $51,619 taxable income; tax is $2,711.

7

Applying the income tax percentages already discussed to these present values shows that the present values of these incomes, net of taxes, are as follows:

| Career | Present Value of Net Income |
|---|---|
| 1. High School | $1,528,379 a/ |
| 2. Two Years Of College | $1,818,249 b/ |

a/ $1,804,462 – 15.3% of $1,804,462.
b/ $2,190,662 – 17.0% of $2,190,662.

Hence, in my opinion,        has suffered a net income loss of $1,528,379 or $1,818,249 due to injury because, as mentioned earlier, he has likely been rendered unemployable as a result thereof.