**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **TERESA MORRING, *et al.*,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **Civil Action No. 06-2036 (RMC)** |
| | : | |
| **CHILDREN'S NATIONAL MEDICAL** | : | **Judge Rosemary M. Collyer** |
| **CENTER, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT WITH RESPECTS TO COUNTS II THROUGH XI OF THE**
**COMPLAINT**

Plaintiffs herein oppose defendants Motion For Summary Judgment with respect to Counts II, Count VI, Count X and Count XI, for the reasons set forth below.   As to the remaining Counts III, IV, V, VII, VIII, and IX, based on factual discovery,  plaintiffs voluntarily withdraw these Counts so the issues as to the Counts III, IV, V, VII, VIII, and IX are moot.

**ARGUMENT**

**I.    Legal Standard**

Simply put, where there are genuine issues of material fact, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "[A]ll that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id..* Discovery to date, taken in conjunction with Plaintiffs' Statement of Material Facts at Issue, as well as the arguments contained herein, establish that Plaintiffs have more than met their burden.

## II.     <u>Informed Consent</u>

Defendant uses gross oversimplification to narrow Plaintiffs' claims of lack of

informed consent.   First, Defendant fails to mention any of the major consent issues

uncovered during discovery and, instead, asks this Court to focus *only* on Plaintiffs'

allegations found in Count II of the Complaint.   Defendant myopically views Count II as

only having two relevant issues, arguing that because Plaintiffs presented "two issues

regarding informed consent: first…[the failure to inform of] the off label use…second the

[failure to inform of] "high failure rates for decannulations," and because they are

allegedly no longer valid, the entire Count must be dismissed (Def. Memorandum of

Points and Authorities, p. 3).   These attempts to misdirect the Court must fail.

As a basic point, the Federal Rules of Civil Procedure mandate that a Plaintiff

merely provide notice to a Defendant of the nature of the claims being presented.

Fed.R.Civ.P. 8.

> The rationale for this liberal notice pleading standard is that
> "when a party has a valid claim, he should recover on it
> regardless of [a] ... failure to perceive the true basis of the
> claim at the pleading stage, provided always that a late shift
> in the thrust of the case will not prejudice the other party in
> maintaining a defense upon the merits." 5 Charles Allen
> Wright & Arthur Miller, Federal Practice and Procedure §
> 1219, at 282 (3d ed.2004).

*Rahman v. Johanns*, 501 F.Supp.2d 8, 17 (D.D.C.,2007).   That rationale

demonstrates exactly why Defendant should not be granted Summary Judgment where

Defendant claims that the *exact* language contained in Plaintiffs' Informed Consent count

constitutes the only factual and legal bases for Plaintiffs' claim.   Obviously, Plaintiffs had

to draft their complaint before discovery takes place and before Plaintiffs have the

opportunity to establish the exact extent and nature of their claims.

Moreover, it is well-established in the District of Columbia that in order for informed consent to have been given by a patient, a physician must have divulged all material risks which could potentially affect a patient's decision. *Randall v. U.S.*, 859 F.Supp. 22, 31 (D.D.C.,1994)(citing *Canterbury v. Spence*, 464 F.2d 772, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (D.C.Cir.1972)).  A risk is material when a "reasonable person, in what the physician knows or should know to be the patient's position, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forgo the proposed therapy." [sic] *Id.*, at 786-787.

These requirements must be considered in the context from which they were derived.  The Court, in *Canterbury v. Spence*, detailed the history of informed consent noting that the "root premise is the concept, fundamental in American jurisprudence, that 'every human being of adult years and sound mind has a right to determine what shall be done with his own body.'" 464 F.2d at 780.  A physician has a duty to "warn the patient of any risks to his well-being which contemplated therapy may involve." *Id.* "[I]t is the prerogative of the patient, not the physician, to determine for himself the direction in which his interests seem to lie." *Id.* at 781.

Summary judgment must be precluded in this case as there are a multitude of material risks which were not disclosed to Plaintiffs.  Those material risks certainly would have led Plaintiff, or a reasonable person in Plaintiffs' position, to attach significance to the cluster of risks in deciding whether or not to forgo the proposed therapy, here a treatment known as Extracorporeal Membrane Oxygenation ("ECMO").  "Whenever nondisclosure of a particular risk information is open to debate by reasonable-minded men, the issue is for the finder of the facts." *Canterbury*, 464 F.2d at

788.

Indeed, discovery has uncovered, and Plaintiffs' experts have testified to, a plethora of informed consent issues regarding Children's National Medical Center (CNMC) under the following categories: a) there is no evidence that the written informed consent was ever given; b) defendant's employee has no recollection of providing verbal informed consent; c) there are significant informed consent issues regarding the recruitment of Quinton in human research experiments; d) there is evidence that Quinton Snowden was placed on ECMO in derogation of CNMC's own ECMO criteria, and the parents were not told of that fact and; e) the ECMO pump, Jostra HL-20 used in this case was only designed and approved for short term bypass of six (6) hours or less, not for long term ECMO. All of these are discussed below. Defendant can claim no prejudice in maintaining a defense upon the merits of these issues, as articulated in *Rahman* whether or not Plaintiffs may not have pled these facts exactly in their complaint.

### A.    There is No Evidence that Informed Consent was Ever Obtained.

#### i.    Defendant Allege That CNMC Had No Written Consent for ECMO; Plaintiffs Allege That They Did.

When it was first discovered through the testimony of defendant's employee that their position was that it did not create a written informed consent for ECMO bypass, it was unfathomable.  Especially when the concept of extracorporeal life support (ECMO) is quite complex.  It involves, *inter alia*, a series of devices: two catheters placed in the common carotid artery and jugular vein and then threaded into the vessels of the heart; plastic tubing that goes through the bypass circuit, which consists of: a membrane oxygenator; a roller pump; a venous return monitor; a heater; a heat exchanger; a gas delivery system; and a oxygen monitor. (CNMC's ECMO Training Manual, identified by

Defendant as CNMC 2423, attached hereto as Exhibit 1).   It also involves many severe

risks associated with catheter failure, medications, blood clots, etc., as a result of having

the child's blood taken from the body and run though yards of tubing.   In any event,

Stephen Baumgart, M.D., Defendant CNMC's one time director of neonatology,

maintains that CNMC had no written informed consent, thus excusing the missing

document from the medical records:

> Q:    Did children's Hospital, in fact at the time of this
> study, which would be in 2005 or before, have a written
> informed consent for ECMO?
> A:    Not that I am aware of.

(Deposition of Dr. Baumgart, p.23, ll. 2-15).   Indeed, the medical records provided to

Plaintiffs did not contain a signed consent form authorizing the placement of minor

Plaintiff on ECMO bypass.

### ii.    Undisputed Evidence Shows There Was A Consent Form In Use But It was Never Provided to the Parents.

In an unrelated document request, plaintiffs asked for and received CNMC's,

"ECMO Training Manual."   The manual was dated April 2005, (the decannulation at

issue occurred on September 15, 2005).   There, in the index listed under "Forms" (iv)

was a two page document referred to as "Consent Form." (Ex. 1, at CNMC 02422 -

02423).   The document consists of two pages, the first page contains approximately fifty

(50) lines each consisting of approximately twenty (20) words describing ECMO and its

risks and benefits,[1]   the second contains a diagram of the ECMO apparatus.   Curiously,

---

[1] Defense counsel queried Plaintiffs' expert, Dr. Van Woert, and asked him to assume, hypothetically, that the consent sheet had been provided to the parent's before ECMO was begun, and, if so, did that constitute adequate informed consent.   Defense counsel himself summarized Dr. Van Woert's four point response:

> Q:    One, it should be indicated that ECMO has more risks that
> conventional ventilator therapy, correct?
> A:    Yes.

there is no place for a signature of the parent and a witness (at least not on Plaintiffs'

copies).  Plaintiffs queried CNMC employee Billie Lou Short, MD, the director of

ECMO, about the "Consent Form," which was entitled "ECMO Information" and

whether it was provided to the parents:

> Q: And is it your testimony that this ECMO information
> sheet was given to the parents before the child was placed
> on ECMO?
> A: It is my understanding, because this baby came from
> Norfolk, Virginia, and I don't know, to be quite honest, if
> this was given prior to the cannulation. I know the baby
> was emergently transported here.
>             *               *               *
> Q: So, that means on some occasions the ECMO
> information sheet is provided prior to the time ECMO is
> performed and sometimes it cannot be and is not?
> A: Correct.
>             *               *               *
> Q: And in this case you really do not know for a fact what
> documents were provided for signature for the parents
> before the ECMO began, except for the surgical
> cannulation sheet?
> A: Correct.  I don't have any knowledge of that.

(Deposition of Dr. Short, pp.31-33).  Dr. Baumgart, perhaps in an effort to explain the

absence of the consent, testified that the "Consent Form" was only given to the parents

---

| | |
|---|---|
| Q: | Point two, the possibility of decannulation is not mentioned – |
| A: | Correct. |
| Q: | - in the ECMO information sheet and should be specifically included – |
| A: | Yes |
| Q: | - is your point |
| | Three, there is no reference on here this ECMO information sheet, to the fact that the particular pump to be used in this setting was FDA approved for only six hours of therapy? |
| A: | Right |
| Q: | You contend that should be included here, correct? |
| A: | Correct. |
| Q: | Four, the specific medical criteria applied by physicians in determining or deciding whether a patient is or is not eligible to ECMO are not included.... |
| |     *       *       * |
| A: | In layman's terms yes… |

(Deposition of Dr. Van Woert, pp. 100-101)

*after* ECMO had been started and that no document was provided before ECMO:

> Q:     And am I correct that that information sheet would
>        be provided to the guardian of the patient on ECMO
>        after the patient was on ECMO?
> A:     Yes, sir.
> Q:     It was not, am I correct, to act as any type of written
>        informed consent prior to going on ECMO?
> A:     No, sir.

(Baumgart, p. 23, ll. 2-10).  As to the lack of a signature line, the following testimony

was elicited:

> Q:     Was there ever a time when document 2422 and its
>        back side, which is 2423, had a signature lie?
> A:     Yes
>        *              *              *
> Q:     Do you recall when the ECMO sheets and what
>        period of time had a signature line. The ECMO
>        information sheet?
> A:     I do not.  It is reviewed by counsel—
>        (objection privilege)

(Short pp 34-35).  While Plaintiffs find this testimony incredulous, i.e. that a consent

form was provided *after* the treatment, not before, and that "counsel" recommended

removing the parent and witness signature lines, it remains an issue for the jury.

### iii.     <u>There Was An Informed Consent Interactive DVD That Could Have Been Shown But Was Not Shown to Plaintiffs' Parents.</u>

Plaintiffs' counsel investigated the background of Dr. Short by, *inter alia*,

Googling her name.  The following web site appeared: "ECMO Therapy…a Virtual

Conversation Information System." (with two pictures of her).   The site was a

solicitation to purchase a DVD regarding ECMO Treatment. The relevant paragraphs

read as follows:

> While doctors and ECMO therapist are administering this
> life-saving treatment most patients remain distressed and
> confused.  Although the health professionals do their best

> to communicate with the family, most parents do not feel
> informed during this critical time when the life of their
> child hangs in the balance.
>
>       *            *            *
>
> This unique program allows parents to conduct a virtual
> interview of an EMO therapy expert who answers questions
> about virtually ever aspect of the treatment.  There expert is
> Dr. Billie Lou Short, head of the Department of
> Neonatology and director of ECMO and Children's
> National Medical Center in Washington, DC.
>
>       *            *            *
>
> In a face-to-face virtual dialogue via the computer, Dr.
> Short answer the questions parents frequently have such as,
> What does ECMO stand for? How long does the treatment
> last? What risks are associated with the procedure?....and
> many others…
>
>       *            *            *
>
> This virtual dialogue program is currently installed in the
> Neonatal Intensive Care Unit at Children's Hospital to
> make this information available to parents whose children
> are on ECMO.  It is also being used for pediatric intern and
> resident training.

(http://www.idrama.com/ecmo.htm, attached hereto as Exhibit 2). When Dr. Short was

deposed about the DVD, Plaintiffs inquired as to the words placed on the site; she denied

any knowledge of said:

> Q:      Did you work on or correct in any way were
>            involved with this particular blurb which cited as
>            ECMO therapy?
> A:      What is on the internet?
> Q:      Yes
> A:      Not at all.
> Q:      Does that mean, just reading one phrase to see if
>            you had anything to do with this, there is a second
>            paragraph which states, "While doctors and ECMO
>            therapist are administering this life-saving treatment
>            most patients remain distressed and confused.
>            Although the health professionals do their best to
>            communicate with the family, most parents do not
>            feel informed during this critical time when the life
>            of their child hangs in the balance.
> Q:      Did you have anything to do with those words?
> A:      No, I did not.

              *           *           *

Q:      You don't understand that statement and had nothing to do with it?

A:      I don't understand the timing of it. Or distressed and confused at what point. And I think parents are distressed.  It is a high – a very stressful situation. Their baby is potentially going to die and we were supplying a life saving therapy.  Sure, you would be distressed.  Are they confused? I don't know. We make every effort to inform them.  So this statement I would not have put in that fashion.

(Short pp. 21-23).   Although Dr. Short denied that any of the words next to her picture were hers, she admitted that the cite and the DVD had been in existence since, "1998,99" (Short, p.10, l.13).  More incredible was Dr. Short's testimony that the DVD was ever used at Children's:

Q:      There is a paragraph third from the bottom, the bottom sentence, but in any event it says, *"This virtual dialogue program is currently installed in the Neonatal Intensive Care Unit at Children's Hospital to make this information available to parents whose children are on ECMO.  It is also being used for pediatric intern and resident training.*"

A:      When this first cane up, we had a copy of it. We really never got this program off the ground.  It was based on a lot of technology issues because the computers in the NICUs *didn't have DVD players*. So we had one of our training individuals was going to use it as one of her evaluation processes to see if parents viewed it and felt like they had more information.  We really didn't get that of the ground.  She had a laptop that she was bringing in and offered probably – I actually don't remember how many patients had the opportunity to look at it, nut we didn't have the technology to continue it an make it available to every parent.

(Short, pp. 28-29, italics added).   Again, Plaintiffs are left with bizarre testimony as to why the parents were not provided this important consent tool, and were provided only

the rather incredible excuse that CNMC did not have the "technology."

Did Defendant expect Plaintiffs to take at face value the above testimony? It is unbelievable that: CNMC did not have the parents sign a written consent form because it didn't have one when there is evidence that there was a "Consent Form" in their own manual (Ex. 1); that the document identified in the ECMO Training Manual as the "Consent Form" was, actually, not a consent form and not used in September of 2005; that the document identified in the manual as the "Consent Form" at one time had a signature line for the parents but it was removed "by counsel"; that Dr. Short had nothing to do with language on the internet site which has been up since 1998 or 1999 even though she is the only person in the DVE or mentioned on the site; and that CNMC could not play a DVD at its institution because, in 2005, it did not have the necessary technology – a DVD player?    These material facts are unbelievable and are certainly at issue.

### B.    Dr. Bais-Bahrami has No Specific Recollection of Giving Verbal Informed Consent and His Usual and Customary Informed Consent Discussions Were Inadequate.

It is undisputed that the "Consent Form" was not used and that there was no DVD player at CNMC.  It is in dispute whether there was some type of verbal exchange between Defendant's employee and the parents.  In this case, that exchange, if it occurred at all, would have been initiated by Dr. Bahrami, the attending neonatologist.  He, however, admits that he has no specific recollection of the meeting or of what words that he used:

> As I told you, I don't remember exact wording of what I
> told to this particular patient's mother.

(Bahrami, pp.140-14).  Therefore, since he had no actual recollection, inquiry was made

as to his usual and customary "informed consent" discussion to which he testified as

follows:[2]

> A:     I do start with providing them the information of
> what the infant's condition is, "at the present time in
> spite of maximum respiratory, cardio-respiratory
> and pharmacologic support, the infant's condition is
> not improving and getting worse.  His or her
> chances of dying while failing to respond to
> maximum level of conventional therapy is
> extremely high and we have an opportunity to
> provide extracorporeal life support to temporarily
> take over the heart and lung function." And then I
> go to the specific discussion of what extracorporeal
> life support entails.

> Mr. McConnell: Tell us about it. That's the question. Tell
> us the whole thing.
> Mr. Newman: Q: Don't give me a summary. Tell me what
> you said.
> A:     I clearly tell them they're consenting to do a
> surgical cut-down on the right side of the neck to
> access the major blood vessels, to cannulate or
> insert a cannula for connecting the patient's to the
> baby's heart to the extracorporeal life support
> machine and that initial circulation the blood into
> the circuit that is pre-primed with donor blood.
> So they are consenting to blood transfusion. And in
> order to run that blood into that circuit without
> constant clot formation is to maintain a certain level
> of anticoagulation which included continuous
> heparinization or blood thinners. The side effect of
> that may include or does include risk of bleeding
> from the baby which by far involved, and I said
> before involves intraventricular or intracranial
> hemorrhage.  And I usually summarize at the end
> that there are risks of surgery, there are risk of
> anesthesia, there are risk of large quantity of blood
> transfusion, there are risk of blood thinner and
> heparization and subsequent risks of spontaneous

---

[2] Plaintiffs note that what Dr. Bahrami's usual customary practices would be are not dispositive of the issue
of informed consent.  In *Miller-McGee v. Wash. Hosp. Ctr.*, 920 A.2d 430 (D.C. 2007), the Court, citing to
*Canterbury*, stated that a cause of action for lack of informed consent "is not 'dependent upon the existence
and nonperformance of a relevant professional tradition.' *Canterbury*, 464 F.2d at 783.  That is because 'to
bind the disclosure obligation to medical usage is to arrogate the decision on revelation to the physician
alone.'" *Id.*

Q:     bleeding or hemorrhage in the patient, and almost always ask them it they understood what I said. Very often I ask them to repeat what I told them. And at the end I always give then opportunity to ask questions to is they have heard this from other colleagues of mine who actually referred the patient to us, what they told them and what they understood and if any of those was covered in my discussion or if they have further questions that I need to respond to. And that is what I exactly did, as you asked me and as Mr. McConnell asked me. I answered very, very precisely.

Q:     Now, is that it?....

A:     I do mention to them that this is a very, very critical and risky procedure and there are very known major side effect and major complications that could possibly be life threatening. Very often they ask me, "can my baby die from ECMO?" And I say, "Yes. This dose not guarantee survival, does not guarantee recovery, does not guarantee life ling well being, But this is what we have to offer at the moment to see what happens next." And I'm very much up front and forward with them. I mean there is nothing I have to hide.

Q:     Anything else?

A:     No.

(Bahrami, pp. 48-50). Later he did add:

> ...I do mention that in spite of all effort with conventional support the child is failing to respond and most likely if, most likely is going to die under the current circumstances unless we do this thing that I discussed ...

(*Id.* at p.163, ll. 9-15). Even if it is assumed that Dr. Bahrami said each and any every word above, which is itself a credibility issue for the jury, it is still inadequate to provide adequate informed consent. While Dr. Bahrami explains some risks of ECMO, (not the risk of decannulation, the central issue in the present case) and a single benefit (survival), the alternatives to treatments were never addressed. And the manner he addresses the benefit is coercive, i.e., without the treatment the child "most likely is going to die." This

is not informed consent. "The topics importantly demanding a communication of information are the inherent and potential hazards of the proposed treatment, the alternatives to that treatment, if any, and the results likely if the patient remains untreated." *Canterbury*, 464 F.2d at 787-788.

As Plaintiffs' expert Melvin Van Woert, M.D., testified as to the requirement to mention alternatives:

> I think that is should be indicated that the ECMO is more risky than the conventional therapy, ventilator therapy and the nitrous oxide. So there is an increased risk for that child to go on ECMO... The parent should know that if the child will do well on conventional or adequately on conventional, that would be better than ECMO, if you had an equal choice.

(VanWoert pp. 98-99), and, as to the issue of coercion:

> ….I think there is a bit of coercion. This sort of a general statement. Leaving out the option of conventional therapy working, which they don't know yes or no...but by leaving that out and saying it has to be ECMO or the child will dies, I think that is a bit of coercion...It makes it sound like there is - really, the patient has no choice: Either put him on ECMO or your child is dead. I don't think that is a correct statement...when it was presented to the parents I don't think they have the knowledge from the statements to make an adequate informed consent."

(*Id.*, p. 107, ll. 4-25), and, as to options:

> I think the parents ought to be told that there is an option to wait and see what happens...not that your child is going to die.

(*Id.*, p. 120, l.15).

Since the aforesaid is the sum total of all the information that, even taking the evidence in a light most favorable to the Defendant, could have been transferred to the parents, they could not have been properly informed.

It is important to note that since Plaintiffs' expert neonatologist Carolyn Crawford, M.D., testified that Quinton's condition was not at such a critical level to warrant the added use of ECMO, all forms of less dangerous conventional therapy "should be attempted before ECMO because you have a lower degree of complications with those therapies," (Crawford, pp.31-32). It would also be vitally important to the family to know that conventional therapy, with its lower risks (and no risk of decannulation) was still an option.

C.    **There Are Significant Informed Consent Issues Regarding the Recruitment of Quinton into the Human Research Protocols.**

When minor plaintiff was transferred to CNMC from Children's Hospital Kings Daughters (CHKD) on September 11, 2005, it was because CNMC had an available bed for him *if* he should require ECMO.   It is undisputed that at the time of transfer he did require ECMO, for if he had, he would have been have been too unstable to be moved. (ELSO Guidelines, attached hereto as Exhibit 3).  When Quinton arrived at CNMC his mother, Teresa Morring, who was out of state, was immediately called by Dr. Bahrami to attain her agreement to place Quinton into several of CNMC's human research protocols for patients "undergoing" ECMO. (Dr. Bahrami was not only the attending neonatologist and the one who professed to have obtained the oral consent for the ECMO, he was also the principal investigator in one of those research studies).  The call for the mother's consent and release for Quinton occurred on September 11, 2005.  This is quite odd because Quinton was not undergoing ECMO at the time.  In fact, it had not been decided at that point that Quinton would ever need to be placed on ECMO.  The attending note of September 13, 2005 states, "Hopefully, the child will not need ECMO," (CHMC page 1324).  Besides being suspicious and improper, it obviously misled Ms. Morring to

believe that Quinton was undergoing or immediately undergoing ECMO.  Dr. Van Woert

testified:

> Well, I think they hadn't evaluated it so I don't think they knew whether the child needed ECMO or not during the hospitalization.

(Van Woert, p. 78, ll. 10-12)

> It says, this is on the consent to participate in a clinical research study, evaluation of serum iron - what we refers to before, and it says on the second page, "Your baby is being asked to be in this study because he or she **is going to be placed on ECMO**".
>
> It is like they made the decision just because the child is transferred to Children's Hospital, and they next say your baby is about to go on ECMO in the NICU at Children's Hospital.  To me this does not seem appropriate. This suggests that maybe that's why their child did go on ECMO after two days, is that they had already made the decision."

(_Id._ at pp.79-80, emphasis added).

> ...I think that is inappropriate to say you were asked to be in a study because he or she is going to be placed on ECMO. This is not a procedure in which it is automatic that any child transferred to their facility would automatically go on ECMO.  That has to be evaluated.  There are criteria. There are clinical parameters that need to be monitored.  I don't think that is appropriate to have it that way.

(_Id._ at pp.106-107).

> Q:    What part of his [Dr. Bahrami's] deposition leads you to the conclusion that he just decided to toss the criteria and go right to ECMO with this patient?
>
> A:    He downplayed conventional therapy and said that either you go on to ECMO or their child dies. Pretty much that... There did not seem to be any alternatives in his mind and that it was just getting the consent form right as soon as they come in with the research...It seemed to be concluded without all the considerations that I believe are necessary and

all the conversations with the parents that are, I
believe, are necessary before doing this.

(*Id.* at p. 128, ll. 9-22).  Defendant's other neonatologist, Dr. Baumgart, the original

researcher in a study conducted by Dr. Bahrami, saw the same impropriety:

> Q.    If I tell you there is a note from the neonatologist,
> which is page 1324, dated 9/13. 11:30 a.m. which
> says, "Hopefully, the child will not need ECMO,"
> those are the words, would you agree with me that
> the child had not met the criteria on 9/11 two days
> earlier when the phone consent was given?
> A.    For the study?
> Q.    Yes
> A.    Yes, Sir.

(Baumgart, p.38, ll.11-20).  Equally troubling to Dr. Baumgart was the confusion that

would set into the patient's mother mind:

> Q.    ...Would you agree that what has been read to the
> patient within the clinical research study says this
> child, in essence, has met the criteria for ECMO and
> will be placed on ECMO, but in fact, the decision
> hadn't even been made until two days later, that that
> would be confusing to the guardian or mother?
> A.    Well, I am confused, yes sir.

(*Id.,* at p. 39, ll. 14-22)

> Q:    Do you have a problem with the way it happened?
> A:    What is the question?
> Q:    Somebody went ahead and got consent for the
> research two days before they even decided that this
> child was going to go on ECMO.  Do you have a
> problem with that?
> A.    Consent for a research protocol?
> Q.    Yes
> A.    Yes.

(*Id.,* at p. 42, ll. 11- 20).  And there are other salient facts on this issue.  The consent form

used by Dr. Barhami and later signed by the mother on September 13, 2005 had expired

on September 1, 2005.  The study had been automatically terminated by the IRB. (See

Expiration Stamp, identified by Defendant as CNHC 00047, attached hereto as Exhibit

4).

> …it seems like it was fairly sloppy and that the expiration
> date was September 1st and the ECMO was approved on
> September 15th. This does not seem appropriate.

(VanWoert, pp.102-103).  Dr. Baumgart again felt that this too was improper.

> Q: Is that the policy, you would not have patients under the
> standard of care at Children's Hospital sign expired
> informed consent form sheets?
> A: Yes sir.

(Baumgart, p15, ll. 3-7).   As to the issue of why the study may have expired, Dr.

Baumgart recalls that when he was involved the study earlier in March 2005, the number

of patients had been inadequate.

> A:    I was involved with recruitment prior to 2005 for that study.
> Q:    When you were involved with recruitment, how
>       many patients had been in the study by that time?
> A:    I don't know the answer.
> Q:    Was it sufficient do you recall that, or insufficient to
>       –
> A:    Insufficient.

 (*Id.* at pp.53-54).  Beyond the impropriety, these facts raise serious material issues as to

whether the informed consent for the ECMO bypass procedure or the human research

protocols was ever obtained.

> **D.    There Is Evidence that Quinton Snowden Was Placed On
>         ECMO In Derogation of the CNMC's Own ECMO Criteria
>         Which At a Minimum Required Disclose of that Aberration to
>         the Parents.**

        As touched on above, ECMO carries with it far more side effects that

conventional therapy.  Therefore, strict guidelines are created by the institutions that use

ECMO, CNMC is no different. Its ECMO Training Manualsets outs its strict guideline,

"**At CNMC we now use a persistent PaO$_2$ <50 mmHg after maximal therapy.** (Ex. 1, p. 17, bold in original). Additionally, on the day that Quinton Snowden was placed on ECMO, September 13, 2005, the last note by attending neonatologist wrote, "Hopefully, the child will not need ECMO." (Attending Note 9/13/2005, attached hereto as Exhibit 5). Plaintiffs' expert neonatologist, Carolyn Crawford, M.D., testified that:

> A:    But he didn't really meet the ECMO criteria.
> Q:    All right. Which criteria did he not meet?
> A:    Well, he had really high PaO$_2$. I mean it was, you know, in the hundreds, two hundred and forty, something like that.
>       So that's a high enough number that he would not have met the ECMO criteria and he wasn't immediately put on ECMO and he still had good gasses on the 12th and that was with nitric oxide.

(Crawford, p. 27, ll. 7-14). This was reaffirmed by Plaintiffs' expert Dr. VanWoert:

> in terms of the pH, CO$_2$ and the oxygen, there's a lot of variation but nothing that I saw that met the criteria. Nothing that looks like we changed dramatically"

(VanWoert, p.11, ll. 1-22).

> I think the oxygen levels and the other criteria that were given for ECMO were not met in this case.

(*Id*, p. 90, ll. 7-9). At a minimum, the parents should have been told that CNMC was going to ignore its own guidelines by placing Quinton on ECMO, and subjecting him to surgeries, by-pass, and potential severe side effects. The parents should have been involved in this choice:

> I think it should be in terms of saying that we are evaluating conventional therapy by measuring blood gasses and other chemical in the blood and also pressures and - blood pressure and various other parameters are being monitored, and we have criteria that are useful in deciding when the child should be switched over to ECMO, which is more risky procedure... And at the moment your child has

- 18 -

> not reached those criteria and may never have to go on
> ECMO...

(VanWoert, pp.101-102). Again, Dr. Baumgart agreed that children are only to be placed

on ECMO bypass when their blood gas levels have fallen to the dangerously low levels,

listed in the criteria:

> Q.     And it does say, on Page 2296 that a CNHC, we
>         now use a persistent PaO2 of under 50 milliliters of
>         mercury after maximum therapy?
>           *       *       *
> Q.     Is that, in fact, what was practiced at Children's?
> A.     Yes, sir.
>           *       *       *
> Q.     And, in fact, at the time that you were at Children's,
>         is that the criteria you did use?
> A.     That is what I would use.

(Baumgart, pp. 18-19, ll. 18-22).

> Q.     The patients were not supposed to be put on ECMO
>         if they were stable and not reaching those
>         requirements. Correct?
> A.     I will say yes.

(*Id.* at p. 26, ll. 17-20).

### E.  The ECMO pump, Jostra HL-20 was Only Designed, Approved And Intended for Short Bypass Of Six (6) hours or less, Not Long Term ECMO.

Another fact at issue is Defendants' failure to inform the parents of the

unapproved nature of the heart pump for ECMO.  The Jostra HL-20 Pump is a device to

be used for cardiac bypass during heart surgery and for the immediate recovery period

thereafter.  As stated Maquet the manufacturer of the pump stated, in its manual (which

was in the possession of CNMC):

> The Jostra Heart Lung Machine HL 20 is indicated for use
> as an extra corporeal circulation device for perfusion
> appropriate to cardiopulmonary bypass procedures of six

hours or less.

(Maquet User Manual 1-1, attached hereto as Exhibit 6).  Given the fact that the pump

was in use for approximately two (2) days prior to the decannulation at issue, Plaintiffs

conducted a 30(b)(6) deposition of Maquet's representative, Mr. Philip Sax, to see if the

device was ever designed or marketed for such an extended purpose.  It was not:

> Q:     It says "indications for use and duration longer than
>        six hours is current considered investigational of the
>        device exemption (IDE application)"...do you know
>        anything, since the time you became involved with
>        Maquet, it, in fact, there had been any submissions,
>        to your knowledge, with the use of the device for an
>        IDE fro that particular purpose, greater than six
>        hours?
> A:     Not to my knowledge, no.

(Sax Depo., pp. 8-9)

> Q:     So it still remains a machine that is intended for use,
>        and that was involved in the 510(k), for six hours or
>        less?
> A:     Correct.
> *              *              *
> Q:     Let me ask you this: Do you understand that, at any
>        time, Maquet or Jostra marketed a device to the end
>        users, i.e., hospital, as a device that could be used
>        for greater than six hours?
> A:     We have not done that.

(*Id.*, at p. 22, ll. 16-23).  Not only was the device not marketed for use beyond six (6)

hours, but as seen above, the FDA stated that, "indications for use and duration longer

than six hours is current considered investigational [requiring] the device exemption."

Clearly, long-term use of ECMO would have required an investigational device

exemption (known as an "IDE"), which was never requested:

> **Deficiency 4:** … Indications for use for durations longer than 6 hours is
> currently considered investigational and would require the submission of
> an IDE.

- 20 -

> **Response:** …the labeling for the HL-20 should also include warnings informing the user that the device has been qualified only for durations appropriate to CPB procedures and has not been qualified... for long term use … or ECMO procedures.

(See FDA Deficiency Sheet to Maquet, attached hereto as Exhibit 7).

While Defendant's use of this pump may not have directly violated FDA regulations since it was approved for another purpose, the fact that it was going to be used **far beyond its manufacturers' intent** had to be divulged to the parents, especially in the IRB approved consent. (Van Woert, *infra*).

The defense again attempts to confuse the Court by citing cases where an "off-label" use (unknown to the manufacturer), used in the normal course of treatment, did not require disclosure to the patients.  The facts are clearly distinguishable on two levels. This is not the normal course of treatment; it was ECMO treatment performed in conjunction with three human research experiments.  Human Research Protocol, have statutorily strict informed consent standards. 21 C.F.R. §50.20 et seq.

 Moreover, in this case, unlike the case of most unapproved usages, the FDA has spoken and the use of this device for ECMO purposes requires an IDE.  While Plaintiffs voluntarily withdraw the negligence *per se* counts, Plaintiffs still maintain that, under these circumstances, the informed consent requires, both under the national standard of care and the federal statutes, disclosure of the unapproved use and Plaintiffs' expert agrees:

> Q:    --- is your point.
>        Three, there is no reference on here this ECMO
>        information sheet, to the fact that the particular
>        pump to be used in this setting was FDA approved
>        for only six hours of therapy?
> A:    Right

(Van Woert, p.100, ll.15-20)

Despite the overwhelming evidence of several genuine issues of material fact being at issue, which in and of itself precludes summary judgment, Defendant's argument also fails based on the semantics of Count II alone.   A cursory review of the language of Count II demonstrates that Plaintiffs' Count is broad and encompasses allegations of the aforesaid facts:

**COUNT II**
(Lack of Informed Consent)

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above and further state as follows:

14. Defendant never disclosed, inter alia, its intent to use an unapproved Class III device(s), during the cardiopulmonary support, in a combination manufactured at the time of the procedure which had never been tested previously and could never be tested and could never be duplicated.

15. Defendant never described the high failure rates for decannulations utilizing ECMO and/or provided Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, with a choice of available alternative approved and/or legal procedures with legal devices.

16. Defendant never disclosed to the Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, the fact that the use of unapproved and untested devices, which made up the ECMO device, was experimental, and never disclosed that it had not been approved by Children's National Medical Center 's IRB, which was required for any experimental procedure by the Hospital's own rules and regulations and/or never disclosed results of said monitoring.

17. Had Plaintiffs been informed of, inter alia, the aforesaid facts, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, would not have consented to the ECMO procedure, because they would have had knowledge that:
    a) there were alternative treatments available that had been FDA approved,
    b)those alternate treatments had risks equal to or less with this particular ECMO device,
    c) the risks and dangers inherent with the ECMO device,
    d) the ECMO device was never previously tested in the combination used; could not be duplicated, and whose efficacy was never tested,
    e)the Defendant intended on utilizing unapproved medical device(s) to perform the ECMO,
    f)Defendant were unauthorized to use the device and that the g) device(s) had an unacceptable failure rates.

18. Defendant had not authorized and/or created a proper informed consent form for human experimentation that set forth, inter alia:
    a) the purpose of the treatment,
    b) the fact that the decision to use the experimental device was purely voluntary,
    c) the availability of alternative devices and/or treatments,
    d) that the use of the experimental device would not be

charged to the patient, and
        e) a full description of the risks and benefits of the proposed treatment,
        f) the number of persons in the study, and
        g) the failures during present and prior usage;
without said information, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and
Next Friends of Quinton Elijah Snowden, could not provide proper consent and the Defendant was
thus not authorized to provide said treatments.
WHEREFORE, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of
Quinton Elijah Snowden, demand judgment of and against Defendant Children's National Medical Center,
in the full sum of One Hundred Million Dollars ($100,000,000.00)plus costs and interest.

Clearly, Count II is not limited to the two issues off-label use and decannulation

(relating only to paragraphs 14 and 15) "cherry-picked" by Defendant (Def. Memo., pp.

3-4), ignoring paragraphs 16, 17, and 18.  Moreover, paragraphs 14 and 15, would simply

require amending to reflect discovery, a measure that would seem to be unnecessary since

the District of Columbia is a notice pleading jurisdiction.  To argue that, because

Plaintiffs provided too-specific information in their complaint regarding informed

consent claim, the entire claim must fail, is ludicrous.  Fortunately, no introspection is

needed as Plaintiffs' complaint's ¶¶16-17, on their own, present viable issues regarding

lack of informed consent.[3]

---

[3] If mere technicalities are to be addressed, the proper avenue would be to allow plaintiffs to amend the
Complaint, not to dismiss the count.  See *Miller-McGee v. Wash. Hosp. Ctr.*, 920 A.2d 430(2007). If the
Court wishes the plaintiffs to do so the following more directly reflects discovery (stricken  text would be
removed and italicized text would be are added):

**COUNT II (Proposed Amendment)**
(Lack of Informed Consent)

       Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth
above and further state as follows:

14. Defendant never *provided* ~~disclosed, inter alia, its intent to use an unapproved Class III
device(s), during the cardiopulmonary support, in a combination manufactured at the time of the
procedure which had never been tested previously and could never be tested and could never be
duplicated.~~ *minor Plaintiffs' parents with:  proper and complete oral informed consent;  any
document that attested to the fact that any informed consent had been was given or was
understood, never were shown the DVD created by the director of neonatology explain the risks
and benefits and alternatives to ECMO; and, the ECMO Consent Form..*

15. Defendant never described the ~~high failure~~ rates for decannulations utilizing ECMO and/or
provided Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of

Paragraph 16 deals with Defendant's obligations regarding informed consent at the level of the Institutional Review Board (IRB).  It is Plaintiffs' experts' testimonies that the IRB failed to create a proper and complete IRB-approved informed consent,

---

Quinton Elijah Snowden, with a choice of available alternative approved and/or legal procedures with legal devices.

16. Defendant never disclosed to the Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, the fact that the use of ~~unapproved and untested devices, which made up the~~ ECMO device, was experimental, and never disclosed that it had not been approved by Children's National Medical Center 's IRB, which was required for any experimental procedure by the Hospital's own rules and regulations and/or never disclosed results of said monitoring. *never explaining that  the ECMO Jostra HL – 20  pump was only approved for six (6) hours or less and had never been offered by the manufacturer for bypass longer than that time period.*

17. Had Plaintiffs been informed of, inter alia, the aforesaid facts, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, would not have consented to the ECMO procedure, because they would have had knowledge that:
    a) there were alternative treatments available that had been FDA approved,
    b) those alternate treatments had risks equal to or less with this particular ECMO device,
    c) the risks and dangers inherent with the ECMO device,

    d) ~~the ECMO device was never previously tested in the combination used; could not be duplicated, and whose efficacy was never tested.~~ *Defendant was not following its own ECMO Policies and Procedures, in that it was attempting to place Quinton Snowden on ECMO even though he did not fit their criteria of a persistent PaO2's in the range of 50 mmHg*;
    e) ~~the Defendant intended on utilizing unapproved medical device(s) to perform the ECMO,~~ *the attending physicians as late as 9/13 at 11:30am stated, that "hopefully the child will not need ECMO" instead they were told that ECMO was a foregone conclusion;*
    f)~~Defendant were unauthorized to use the device and that the~~ g) the ~~device(s) had an unacceptable failure rates.~~

18. Defendant had not authorized and/or created a proper informed consent form for human experimentation that ~~set forth, inter alia:~~
    a) ~~the purpose of the treatment,~~ *had not expired and was no longer approved by the IRB;*
    b) ~~the fact that the decision to use the experimental device was purely voluntary,~~ *that set forth the fact that Quinton Snowden has not been determined to require ECMO on 9/11 when the parents were asked to consent to a human experimentation study involving ECMO;*
    c) the availability of alternative devices and/or treatments,
    d) ~~that the use of the experimental device would not be charged to the patient, and~~ *provided full disclose and written informed consent ECMO itself , because it was a seminal part of the protocol;*
    e) a full description of the risks and benefits of the proposed treatment *and ECMO;*
    f) ~~the number of persons in the study,~~ and
    g) ~~the failures during present and prior usage;~~
*instead of providing* ~~without~~ *said information, defendant's employee, Khodayar Rais-Bahrami, M.D., coerced Plaintiff  Teresa Morring by first asking for her to be part of an experimental protocol on ECMO before a decision was made to place him on ECMO and second telling her that Quinton Snowden, "is going to die" without ECMO,*  Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, could not provide proper consent and the Defendant was thus not authorized to provide said treatments… .

which, by necessity, required a full and complete written form including the nature of ECMO, its risks, benefits and alternatives.  (Van Woert, p. 100, *supra*).

Paragraph 17 states, *inter alia*, that Plaintiffs "would not have consented to the ECMO procedure, if "they would have had knowledge that: (a) there were alternative treatments available that had been FDA approved; b) those alternate treatments had risks equal to or less with this particular ECMO device; and  c) the risks and dangers inherent with the ECMO device. This remains the crux of the present informed consent case. Armed with knowledge that conventional therapy was working and carried less danger to their child, the family would not have opted upon the more dangerous ECMO treatment, if of course, they were even given the chance to decide (i.e., given the Consent Form, given a chance to review the DVD, informed of the success of the conventional therapy, and informed that the child had not deteriorated to the dangerously low CNMC criteria). (Van Woert, p. 98-99, *supra*).

Paragraph 18 deals with the informed consent form required for human research experimentation.  That also continues to be an issue in this case. One of the consent forms provided by Defendant for human research experimentation had expired (Ex. 3) and the others failed to discuss the nature, risks, benefits and alternatives to ECMO, which was required.  (Van Woert, p. 93 ll.10-13).

Even assuming, *arguendo*, that this Court were to limit the issue of informed consent to Defendant's narrow view, which it should not, Summary Judgment must still be denied. Defendant claims that the use of the ECMO device beyond six (6) hours is a simple, "off-label use." Unapproved is not synonymous with "off-label" in this case. Discovery has uncovered that the FDA told the manufacturer that, "indication for  use

and duration longer than six hours is currently considered investigational and would require the submission of the device exemption." (Sax, p. 8, ll. 19-22) (Ex. 6). True, off-label use is unregulated and does not require an IDE. So, in this case, the FDA has spoken, and this particular unapproved use is regulated and is investigational. Thus, under Defendant's own policies and procedures, investigations require IRB approval and the generation of an IRB-approved consent form. (IRB Manual, identified by Defendant as CNMC 2036, attached hereto as Exhibit 8).

It is conceded that this child was placed on three human research protocols on September 11, 2005, even though he was not placed on ECMO until September 13, 2005. Plaintiffs alleged that, at a minimum, those consent forms for human research should have contained the missing ECMO information regarding the nature, risks, benefits, and alternatives to ECMO treatment. (VanWoert, p.93, ll.10-13). Dr. VanWoert also provided the relevant federal regulation, 21 C.F.R. §50.25 (*Id.* at p. 60, l. 20).

Defendant would like the Court to believe that, based on testimony from their own employees, that the risk of decannulation was remote and, therefore, not material taking it out of the informed consent discussion. This is simply not the case. First, case law is clear that, "[i]t is a duty to warn of the dangers lurking in the proposed treatment, and that is surely a facet of due care." *Canterbury*, 464 F.2d at 782. Although the Defendant wishes that the *Canterbury* Court tied the term "material" to the number of incidents, the Court did no such thing. In fact, they pointed out that "[a] very small chance of death or serious disablement may well be significant." *Id.* at 788. The Court held that the test for determining whether a "particular peril must be divulged is its materiality to the patient's decision" not the amount of instances.

In a nut shell, which is where it belongs, the defense is arguing that because Count II of the Compliant was pled with such specificity (¶¶14-15),  that if each and every specific allegation is not established, informed consent can no longer be an issue in this case.   To wish it so does not make it so.

### III.    Fraud, Count VI, Is Viable Since There Many Factual Issues Evidencing Fraud In This Litigation

Obviously, from the aforementioned facts, Count II, the informed consent count, is quite viable and the same facts set the predicate for Count VI, the fraud count.  Thus, there are many issues of fraud to be addressed by the jury.  Again, Defendant attempts to limit Plaintiffs' claims to only those issues it picked from Count VI.   A full reading of Count VI demonstrates that its language is broad enough to cover the necessary issues and, in any event, it provided more than reasonable notice for a meritorious defense of the claim of fraud.  Count VI reads:

**COUNT VI**
**(Fraud)**

Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:

44. Defendant Children's National Medical Center, acting by and through its agents, servants, and/or employees, made and/or fraudulently withheld representations of material facts which were false and/or the falsity of what was known or should have been known to Defendant at the time the representations were made.

45. Defendant's fraud included, but was not limited to, failing to advise the Plaintiffs that:
a. Defendant intentionally did not seek and/or obtain approval from the FDA to use the individual experimental device(s), that made up the components of the ECMO device, and/or did not seek and/or obtain approval from the FDA to use the complete ECMO device and Defendant did not advise Plaintiffs of that fact;
b. Defendant Children's National Medical Center, did not seek and/or obtain an IDE for use of the(se) experimental device(s);
c. the legal status of the ECMO device;
d. that an untested device would control the cardiopulmonary support of minor Plaintiff; and that,
e. the device intended to be used was created and/or manufactured by Defendant Children's National Medical Center, by combining other approved and/or unapproved devices in a combination that had not been determined, and had never been tested at the time of, or at any time before, the manufacture and/or use of the product manufactured during the procedure.

- 27 -

46. The representations and/or omissions were made by Defendant for the purpose of defrauding each of the Plaintiffs into agreeing to the ECMO procedure to further the advances of the ECMO practice at Children's National Medical Center.

47. Defendant knew or should have known that the Plaintiffs would rely upon said representations and/or omissions and that said representations and/or omissions were material to a knowing and intelligent decision.

48. Based on the special relationship which exists between each Plaintiffs and each Defendant, Defendant had a duty to disclose the information concealed from the Plaintiffs.

49. Defendant's deceptive practices concealed, inter alia, the truth about the legal status of the components and the combination of components of the device Defendant intended to manufacture and use on the person of minor Plaintiff and how it was being acquired, combined, and to be used.

50. As a direct and proximate result of the Defendant's fraud, minor Plaintiff Quinton Elijah Snowden, suffered injuries and damages as set forth above.

WHEREFORE, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next Friends of Quinton Elijah Snowden, demand judgment of and against Defendant, Children's National Medical Center, in the full sum of One Hundred Million Dollars ($100,000,000.00) plus costs and interest.

While, the literal language in Plaintiffs' complaint, filed before discovery, could

benefit from amendment,[4]  the evidence of fraud in this litigation is voluminous: a ) the

---

[4] **COUNT VI (Proposed Amendment)**
**(Fraud )**
        Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth above, and further state as follows:
44. Defendant Children's National Medical Center, acting by and through its agents, servants, and/or employees, *and in specifically Khodayar Rais-Bahrami, M.D.,* made and/or fraudulently withheld representations of material facts which were false and/or the falsity of what was known or should have been known to Defendant at the time the representations were made *on September 11, 2005.*
45. Defendant's fraud included, but was not limited to, failing to advise the Plaintiffs that:
        a. Defendant intentionally did not seek and/or obtain approval from the FDA to use the individual experimental device(s), that made up the components of the ECMO device, and/or did not seek and/or obtain approval from the FDA to use the ~~complete ECMO device~~ *Jostra HL-20 Pump for greater than six (6) hours* and Defendant did not advise Plaintiffs of that fact;
        b. Defendant Children's National Medical Center, did not seek and/or obtain an IDE for use of the(se) experimental device(s);
        c. ~~the legal status of the ECMO device;~~ *that consent was being requested in order to place the child in a ECMO a research study because that study did not have enough volunteers, even though it was unknown whether the minor plaintiff needed ECMO;*
        d. ~~that an untested device would control the cardiopulmonary support of minor Plaintiff;~~ *that the forms that were executed for consent to conduct the study on iron had been expired, because the study had not been renewed* and that,
        e. ~~the device intended to be used was created and/or manufactured by Defendant Children's National Medical Center, by combining other approved and/or unapproved devices in a combination that had not been determined, and had never been tested at the time of, or at any time before, the manufacture and/or use of the product manufactured during the procedure.~~ *That the minor plaintiff was being placed on ECMO, a far more dangerous situation than conventional therapy, not because he was in such a unstable condition that her required ECMO (PaO2 less that 50 mmHg) but because he was to be started on the experimental protocol that required him to be on ECMO*

human research experiment run by Dr. Barhami was running low on patients before

Quinton Snowden's mother was asked if she would agree to placing him the experiment;

(see Count VI, ¶ 44) (Baumgart, pp. 53-54, *supra*); b) in order to coerce Quinton

Snowden's parents to allow the child to be enrolled, Ms. Morring was fraudulently led to

believe that the decision had *already been made* to placed Quinton on ECMO on

September 11, 2005 in order to place Quinton Snowden in the human research

experimental study (Count VI, ¶¶ 44-46)(Van Woert, p. 42, *supra*); c) when the parents

were not told that the "decision" was made to place Quinton Snowden on ECMO even

though his condition had not deteriorated to the point that was required by Defendant's

own ECMO criteria, because he was responding to conventional therapy; (Count VI, ¶¶

44-46)(Van Woert, p107, *supra*); d) the information regarding Quinton Snowden's

positive response to conventional therapy and that CNMC was going to place him on

ECMO against there own criteria, was fraudulently kept from the parents; (Count VI, ¶¶

44-46)(Ex. 1); e) Plaintiffs were not provided with *any* written information or consent

---

*d) withholding any written information or DVD regarding ECMO from the parents that would have explained the reason for the treatment;*

*e) coercing the use of ECMO on the minor plaintiff by stating that the choice was go on the by-pass or "die."*

*f) withholding full consent from the parents which would have led to a refusal of ECMO.*

*g) never informing the parents that there was a potential fro decannulation which would lead to catastrophic results.*

46. The representations and/or omissions were made by Defendant for the purpose of defrauding each of the Plaintiffs into agreeing to the ECMO procedure to further the advances of the ECMO practice at Children's National Medical Center, *including the human research experiments conducted therein.*

47. Defendant knew or should have known that the Plaintiffs would rely upon said representations and/or omissions and that said representations and/or omissions were material to a knowing and intelligent decision.

48. Based on the special relationship which exists between each Plaintiffs and each Defendant, Defendant had a duty to disclose the information concealed from the Plaintiffs.

49. Defendant's deceptive practices concealed, inter alia, the truth about the ~~legal status of the components and the combination of components of the~~ device Defendant intended to ~~manufacture and~~ *be* used on the person of minor Plaintiff ~~and how it was being acquired, combined, and to be used.~~

50. As a direct and proximate result of the Defendant's fraud, minor Plaintiff Quinton Elijah Snowden, suffered injuries and damages as set forth above.

document to execute regarding ECMO, nor were they given the opportunity to review the ECMO information DVD, even though both the "Informed Consent" documents and the DVD were in existence at CNMC; (newly acquired evidence but covered in general in preface that incorporates the prior Counts, including Count II into Count VI); f) Dr. Bahrami's "usual" information allegedly given to the parents was coercive leading them to believe that their child would die if left on conventional therapy, and leading them to accept the ECMO and the human research experiments without a full understanding of the alternatives, or the true condition of their child(Count VI, ¶¶ 44-46) g) the human research experiment (on blood iron) had expired but patients were still being enrolled (*Id.*); h) CNMC used the Jostra Pump in an experimental manner (greater than six hours requiring and IDE) without disclosure to the parents and without any contact with the FDA to attempt to secure an IDE; (¶ 45 (a, b)); i) the parents were never told of the devastating consequence of ECMO decannulation in order to convince them toward ECMO and away from conventional therapy (covered in general in preface that incorporates the prior Counts, including Count II into Count VI), (conceded by Defendant in their Statement of Material Facts as to Which There is no Genuine Dispute).

The claim of fraud is quite alive and the above material facts must be addressed by the jury.

### IV.    Punitive Damages, Count X, Is Viable As Is Count VI

Since the bulk of Defendant's argument regarding punitive damages rests on the existence of the Fraud Count, Count VI, and since the fraud count is clearly viable, punitive damages must stand. The remainder of Defendant's argument relates only to the style with which punitive damages were pled. To this issue, Plaintiffs agree that the

punitive damage claim is best pled in the *ad damnum* clause of Count IV rather than

standing alone. Again a simple amendment is the solution.[5]

### V.    The Parents' Claim, Count X, Is Properly Set Out

Plaintiffs' counsel properly set forth the elements in the present Complaint as they

have done in the same manner for decades.  As can be seen by the language of the count

itself, there is no basis for defendants' arguments.  Count X states, in total:

**Count X**
(Parents' Claim)
Plaintiffs re-plead and incorporate by reference herein each and every allegation set forth
above and further state as follows:

84. As a direct and proximate result of the injuries sustained by minor Plaintiff Quinton Elijah
Snowden as set forth hereinabove, adult Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden
have suffered and will continue to suffer throughout minor Plaintiffs' majority, damages from, but
not limited to, expenses for medical services, medical equipment, home modifications, caregivers,
supplies and other related expenses as well as, a loss of financial support.[6]

WHEREFORE, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, demand
judgment of and against Defendant, Children's National Medical Center, in the full sum of Ten
Million Dollars ($10,000,000.00) plus costs and interest.

The Count makes valid claims under the District of Columbia Law for the following:

damages incurred by "minor Plaintiffs'" for his care and treatment as well as loss of

"minor Plaintiffs'" financial support to the parents. The Parents Claim is valid and

demands no more than the Parents are entitled to under law.

Mortality tables showing the life expectancy of the parents may aid in the
ascertainment of damages.FN1 The earnings of the child during his minority
belong to his father. So too, the possibility that the child may make contributions
to the support of his parents even after he reaches majority may be taken into
account.

---

[5] WHEREFORE, Plaintiffs Teresa A. Morring and Deshaunia Q. Snowden, as Parents and Next
Friends of Quinton Elijah Snowden, demand judgment of and against Defendant, Children's National
Medical Center, in the full sum of One Hundred Million Dollars ($100,000,000.00) plus
costs and interest *in general damages and One Hundred Million Dollars ($100,000,000.00) in punitive
damages.*

[6] If any confusion existed as a result of the typographical error wherein the Count stated, "suffer
throughout minor Plaintiffs' *majority*," instead of "suffer throughout minor Plaintiffs' *minority*, this can be
easily repaired in the requested amendments to the Complaint (an obvious typo since a "minor plaintiff"
would not exist during majority).

*Hord v. National Homeopathic Hospital*, 102 F.Supp. 792, 794 (D.C.D.C. 1952), and

> where the deceased was an infant (sometimes of tender years), the recovery has not only been permitted to include probable pecuniary injury, founded on a legal claim to the deceased infant's services during minority, but also that which might be fairly estimated with reference to the reasonable expectation of the continuance, to some extent, of those services after majority, founded on conditions of age, feeble health, and poverty reasonably sufficient to create a strong moral obligation on the part of the child.

*U.S. Elec. Lighting Co. v. Sullivan*, 1903 WL 18672, *13 (App.D.C.) (C.A.D.C. 1903). Defendant is using circular logic to create an issue where none exists. It argues, "Presumably this is to be a demand for "loss of financial support provided by the minor plaintiff…either through a loss of financial contribution or a claim for loss of Q.E.S.'s household labor/services…[b]y invoking the phrase "loss of financial support," Plaintiff *may be attempting* to avoid the fact that this is, in reality, a claim for damages…a claim for loss of parent-child consortium.(Def. Memo., p. 23, italics added). Defendant is spinning a yarn. Plaintiffs are not making, and did not make, a "consortium claim" in this case. It is a parents' claim for the costs of raising a child in his minority with such severe injuries, and the monies he would have made in his minority, nothing more. "The parental right to recover expenses when a child is injured stems from the parents' legal obligation to support the child." *67A C.J.S. Parent & Child SS 138 (1978)." Lasley v. Georgetown*, 842 F.Supp 593, 595 (D.C.C. 1994). See also, *Nelson v. Nelson*, 548 A.2d 109 (D.C. 1988).

Defendant also argues that since Dr. Lurito has created a damage report that assumes that the minor plaintiff would have only begun work at the age of 18, then there can be no assumptions that he would have worked sooner. (Def. Memo., p. 24). This

argument is equally flawed. Dr. Lurito is free to create a damage report based on assumptions, assumptions which the jury can adopt or discount. Nothing precludes the jury from considering whether Quinton Snowden could have worked or not worked earlier, in his minority.

<u>CONCLUSION</u>

For the reasons aforesaid, plaintiffs' pray that the Motion For Summary Judgment with respect to Counts II, Count VI, Count X and Count XI, be denied. As to Counts III, IV, V, VII, VIII, and IX, which plaintiffs voluntarily withdraw, the portions of the Motion regarding these Counts should also be denied as moot. Finally, Plaintiffs are prepared to move this Court to amend their complaints to conform to the Court's opinion on this matter.

Respectfully submitted,

  /s/ Anthony Newman
Anthony Newman, Esquire
NEWMAN, McINTOSH & HENNESSEY, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400

  /s/ Ira Sherman
Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 659-8600
***Attorneys for Plaintiffs***

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a copy of the foregoing was served electronically via the EM/EFC system on March 3, 2008 to:

Nicholas McConnell, Esquire
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
Washington, DC 20036

　　　　　　　　　　　　　　　／s／ Anthony Newman
　　　　　　　　　　　　　　Anthony Newman

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **TERESA MORRING, *et al.*,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 06-2036 (RMC)** |
| | : | |
| **CHILDREN'S NATIONAL MEDICAL** | : | **Judge Rosemary M. Collyer** |
| **CENTER, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | : | |

## <u>ORDER</u>

Upon consideration of the Defendant's Motion for Summary Judgment, the

Opposition, and the entire record,  it is by the Court this ____ day of _____,

2008;

ORDERED, that the Motion be, and the same hereby is, DENIED.

_____
Judge Rosemary M. Collyer

Copies to:

Anthony Newman, Esquire
NEWMAN, McINTOSH & HENNESSEY, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814

Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036

Nicholas McConnell, Esquire
JACKSON & CAMPBELL, P.C.
1120 20th Street, N.W.
Washington, DC 20036

# CHILDREN'S NATIONAL MEDICAL CENTER

# ECMO TRAINING MANUAL

### *TWELFTH EDITION©*

### Revised April 2005



### WRITTEN & EDITED BY:

**Billie L. Short, M. D.**
Chairman, Division of Neonatology
ECMO Program Director

**Gerald T. Mikesell, B.S., C.C.P.**
Perfusion Coordinator, ECMO Program

**Robin G. Muir, B.S.N.,R.N.**
ECMO Program Coordinator

The CNMC ECMO Manual is provided for use during ECMO training courses and as a reference document for members of the ECMO team. This manual is copyrighted by Children's National Medical Center ECMO Program©, and therefore use of portions of the manual printed material &/or figures without permission from the authors is prohibited. Material presented in this manual represents the management approach and practice guidelines developed by the CNMC ECMO team leadership at the time of the revision of the manual. Equipment and practice guidelines may differ at other institutions and over time.

i



Pulmonary Management ....................................................................................... 117
Systemic heparinization .................................................................................... 117
Heparin Management........................................................................................ 117
Administration Sites ......................................................................................... 118
Negative Side of the Circuit............................................................................. 118

## EMERGENCIES

Coming off Bypass Emergently ........................................................................ 122
Power Failure .................................................................................................... 123
Air in the Circuit................................................................................................ 124
Accidental Decannulation................................................................................. 125
Cannulae kink ................................................................................................... 125
Raceway Rupture.............................................................................................. 125
Connector Separation ....................................................................................... 125
Broken Pigtail ................................................................................................... 125

FOLLOW UP ........................................................................................................ 127

MANAGEMENT QUESTIONS............................................................................... 131

PROCEDURES............................................................... see separate Procedure Manual

## APPENDIX
Terminology
Abbreviations
Routine Medications
Emergency Medications

### FORMS
Consent Form
Physician's Orders
Parameter Sheet
ECMO Bedside Flowsheet
ECMO Checklist
ECMO Lab sheet
Redcart Stock List

## BIBLIOGRAPHY

# ECMO INFORMATION

Your child has severe lung disease that has not responded to our usual therapy, including a ventilator (breathing machine) and dr̄
We have found that children who don't get better after a few days of this therapy have a very slim chance of living. There is anoth̄
therapy that has been successful for children like yours. It is called Extracorporeal Membrane Oxygenation, or ECMO for short, and
involves a machine much like the ones used in open-heart surgery (see the pictures below).

***The Type of ECMO*** Your child will require surgery to be placed on an ECMO machine. There are two major types of ECMO. One
uses the jugular vein, and the other uses the jugular vein and the carotid artery. We usually try to use the vein only, but we may have to
return your child to surgery to connect to the artery if blood pressure isn't stable or for other reasons. Sometimes other methods must
be used, which we will explain. Your child will be anesthetized (put to sleep and given pain medicine) and an incision will be made in
the neck on the right side. A tube (catheter) will be placed in the blood vessel(s). This takes about an hour.

***The ECMO Procedure*** After the catheters are in place, they are connected to the ECMO machine. The ECMO machine pumps blood
to an artificial lung that adds oxygen to the blood and removes carbon dioxide the way normal lungs do. The child's lungs can now
rest and recover. Your child will stay on the breathing machine on very low settings to keep the lungs open while they get better. Not
all children can be helped with this therapy, but many can. The average time on ECMO for most infants is 5-6 days. Older children are
on for at least 10 days, and many require 3-4 weeks before recovery occurs. If no improvement occurs on ECMO, the physicians will
discuss other options with you, which in most cases is to stop ECMO and try the breathing machine and drugs again.

***Daily Care While On ECMO*** We want infants on ECMO to be awake, but not moving too much, so we keep them on small amounts
of pain and sedation medications. It is good for you to be there and talk to them. Older children usually need more sedation, and are
kept very quite or even paralyzed so they do not move. During ECMO, your infant/child will be taken care of by a bedside nurse, an
ECMO Specialist, and an ECMO physician. Other doctors may be involved as needed. After the lungs start to improve, the ECMO
machine will be turned down slowly. When oxygen levels are good on low settings on the ECMO machine, the doctors will decide
whether to take your child off ECMO. Your child will be put to sleep and the tubes will be removed. The vein and/or artery will be
permanently closed. Your child will stay on a breathing machine, but at lower settings.

**The potential benefits of ECMO are:**
- Long-term use of a breathing machine at high settings can damage your child's lungs. ECMO lets the lungs rest and, hopefully,
heal themselves with less chronic lung disease.
- The lung disease and any related heart problems may be cured or improved with ECMO, allowing your child to survive.

**The potential risks and complications of ECMO:**
- The child's blood must be kept from clotting while it goes through the machine with a blood thinner called *heparin*. If the brain
has been damaged by low oxygen levels before ECMO was started, these damaged areas can bleed with heparin. If that happens, we
will talk to you about the problem in detail. *If bleeding is severe, the only choice is to stop ECMO and use a breathing machine and
drugs so that the heparin can be stopped.* If your child is taken off ECMO, we will give a drug to make the blood clot normally again.
- The surgery involves tying off (closing) either one or two major blood vessels, the internal jugular vein and the carotid artery.
Studies to date have not shown complications from using these two vessels for ECMO and then tying them off. This is probably
because several other blood vessels take over and carry blood to the brain. We have followed children into their teenage years, and
have not found complications related to tying off the blood vessels. Because ECMO is relatively new, the long-term (adulthood) risks
are not known, but an increased risk of stroke must be considered.
- The vessels can tear when placing or removing the tubes. If this happens, other vessels will be used if possible, but if not ECMO
will not be attempted and your child will receive routine therapy as before. If this happens when the tubes are taken out, the surgeon
will find the tear and tie it off. Your child may need blood if there has been much bleeding from a tear.
- Whenever a tube is inserted in a blood vessel, there is an increased risk of infection. Your child will receive antibiotics as a
precaution, and we will watch carefully for signs of infection.
- *Use of blood products:* The ECMO machine must be filled with blood before your child is connected and your child will receive
multiple transfusions of whole blood and other blood products (see attached information on blood products). Because only red blood
cells can carry oxygen there are no alternatives to transfusions. If you object to the use of blood products, we cannot use ECMO.
- The ECMO circuit can malfunction just as any piece of equipment can. If this happens, your child will be removed from ECMO
and placed on routine therapy until the malfunction is corrected, if possible.
- Blood clots or air bubbles can get into your child's blood stream from the machine. This can sometimes be fatal.

An ECMO attending physician is available at any time to answer questions 202-884-5448 (office, ask for the ECMO
Attending) or 202-884-5040 (NICU, ask for the ECMO Attending).

CNMC 02422




**ECMO USING AN ARTERY AND A VEIN
(VA ECMO)**




**ECMO USING A VEIN
(VV ECMO)**

CNMC 02423

# PATIENT SELECTION FOR ECMO:
## ECMO ENTRY CRITERIA

# PATIENT SELECTION FOR ECMO

Conventional ventilatory management saves the lives of most neonates with respiratory failure. ECMO is currently used only for neonates who are responding poorly to optimal ventilatory, medical, and surgical treatment. We consider neonates for ECMO only if they have an estimated 80% or greater mortality risk despite our usual maximal therapy.

ECMO is a temporary artificial lung. If a neonate's respiratory disorder can be reversed within a 21 day period, it is feasible for ECMO to safely support the patient. After several days on ECMO, complications such as bleeding become more difficult to control. For this reason, it is not practical to use ECMO to treat a disease process such as bronchopulmonary dysplasia. One way to be certain that a neonate does not have significant BPD is to limit initiation of ECMO to the first ten to fourteen days of assisted ventilation, although it should be remembered that this is an arbitrary number and clinical evaluation should be the determining factor. A proper evaluation of the chest x-ray findings must be done before consideration for ECMO therapy. The common causes of respiratory failure in neonates are generally reversible with ECMO therapy within a few days.

Although many very-low-birth-weight infants have severe RDS and would appear to be good ECMO candidates, 40% of these infants will develop a hemorrhage in the germinal matrix or ventricles without the stress of ECMO. The heparinization and/or the alterations in pulsatility of blood flow created by ECMO causes a significant incidence of ICH, and thus a prohibitive mortality in this group of infants. Therefore, the infant considered for ECMO is usually $\geq 2000$ grams or 34 weeks gestation. If lower gestational age infants are being considered as candidates for ECMO, the significant risk of ICH must be recognized and discussed with the parents.

Infants must be systemically heparinized on ECMO and therefore any bleeding complications such as a major intracranial hemorrhage (> grade II) should not be considered for ECMO. All attempts to correct coagulopathies should be done prior to ECMO.

All infants should have had attempts at routine therapy and have failed. Therapies such as oscillation if available, should be attempted before ECMO, if felt to be appropriate by the attending physician, because of the lower degree of complications with these procedures. Transporting on this type of ventilation is not feasible, so it is important to educate the referral hospitals on the need to consider this therapy at the ECMO Center. After maximal therapy has failed, criteria attempting to predict an 80% or greater mortality should be used. Each institution must develop their own criteria and each infant must meet criteria in that institution because of the differing therapeutic approaches.

At CNMC the alveolar-arterial oxygen gradient was found to be the best predictor or outcome at the time our program was initiated. This formula is listed below. We now use oxygenation alone due to the dramatic changes in therapies since the start of our program. Many institutions are now using the **oxygen index (OI)**.

$$OI = \frac{mean\ airway\ pressure \times F_iO_2}{pO_2} \times 100$$

**NOTE:** All criteria are linked to time. No single value can predict outcome, therefore, $AaDO_2$ and OI over 4-12 hours are used to predict mortality. Because it is difficult to change criteria after you have instituted ECMO therapy, one must continuously reevaluate criteria on a

clinical basis. **At CNMC we now use a persistent PaO$_2$ <50 mmHg after maximal therapy.** Exceptions to this rule are infants who are cardiovascularly unstable, e.g., infants in septic shock, who may need to go on before they are profoundly hypoxic.

## PRE-ECMO EVALUATION

### Studies Pre-ECMO

- Head Sonogram
- Cardiac Echo
- PT, PTT, Fibrinogen, FDP
- H/H, platelets
- Electrolytes, Calcium
- Chest X-Ray

In evaluating an infant for ECMO, the most important assessment is whether or not the patient's poor respiratory function is caused by a reversible process. Reversibility on ECMO is achieved by a combination of time and good oxygenation, allowing the baseline disease process to resolve. The good oxygenation supplied by ECMO breaks the vicious cycle of PPHN, allowing the pulmonary hypertension to resolve and thus stopping the right to left shunting. Most common neonatal diseases causing severe respiratory failure which are reversible within a week are: HMD, PPHN, MAS, CDH, sepsis and pneumonia.

Because infants must be systemically heparinized, any infant with a severe coagulopathy that cannot be corrected or major bleeding complications should not be considered for ECMO. Therefore, baseline values for PT /PTT, fibrinogen and FDP etc. should be determined. A severe ICH (greater than a Grade II) should not be considered for ECMO. Thus a head ultrasound must be done before going on ECMO.

Congenital heart disease should be ruled out by cardiac echo, but if the infant is dying ECMO can support these infants until cardiac surgery can be performed.

Infants with serious or irreversible brain damage should not be considered for ECMO therapy. This is sometimes hard to determine if the infant is paralyzed. Therefore a good history of neurologic status from the referring hospital prior to paralysis must be obtained.

Electrolyte abnormalities can be exaggerated on ECMO, so abnormal K or Ca levels should be corrected prior to ECMO if possible. If not, then they should be monitored after going on ECMO and corrected as needed.





# ECMO Therapy
### a Virtual Conversations® Information system



**ONLY $149.95**
FREE directional microphone included
**Available now!!!!**

This program is available only to educational institutions.

**Buy it now.**

**Minimum Systems Requirements**
* 100 MHz Pentium
* 16MB of RAM
  (32MB recommended)
* 18MB hard drive space
* 4X CD-ROM drive
* SVGA (800x600, 16 bit color)
* Sound Blaster® compatible
  sound card
* Microphone (included)
* Speakers
* Mouse
* Microsoft®
  Windows®95, 98, NT4

Each year in the United States, approximately 10,000 newborns arrive with critical, potentially fatal, heart or lung disease. As many as 80% of these babies can be saved by a procedure known as ECMO (Extracorporeal Membrane Oxygenation), a heart/lung bypass procedure that allows a baby's blood to be oxygenated outside of the body. This procedure is used when a child has no other chance of survival and conventional methods, such as mechanical ventilation, medications, and extra oxygen, will be unsuccessful.

While doctors and ECMO therapists are administering this life-saving treatment, most parents remain distressed and confused. Although the health professionals do their best to communicate with the family, most parents do not feel informed during this critical time when the life of their child hangs in the balance.

Interactive Drama Inc., developer of Virtual Conversations™ voice-activated, interactive dialogue programs, has created "Virtual Conversations™ ECMO Therapy" to help parents obtain basic information about ECMO.



This unique program allows parents to conduct a virtual interview of an ECMO therapy expert who answers questions about virtually every aspect of the treatment. The expert is Dr. Billie Lou Short, head of the Department of Neonatology and director of ECMO at Children's National Medical Center in Washington, DC.

In a face-to-face virtual dialogue via the computer, Dr. Short answers the questions parents frequently have such as, *What does ECMO stand for? How long does the treatment last? What risks are associated with the procedure? Does medical insurance cover ECMO therapy? How do you decide which babies to put on ECMO?*, and many others. The dynamic intelligent prompting method in every Virtual Conversations™ program displays a continuous stream of questions for the parents to ask.

The interactive session is controlled entirely by the user, so the information can be absorbed at the individual's own pace. Questions may be asked in any order, and the answers can be repeated as many times as necessary. There is enough information on the CD-ROM for parents to conduct a meaningful, uninterrupted conversation with Dr. Short for over an hour. The program also includes an actual case history of an "ECMO baby," and detailed illustrations of the ECMO machine and the procedures involved.

This virtual dialogue program is currently installed in the Neonatal Intensive Care Unit at Children's Hospital to make this information available to parents whose children are on ECMO. It is also being used for pediatric intern and resident training.

ThinkSharp, Inc. provided partial funding for this Virtual Conversations™ program and uses it as a context for teaching critical decision making. This program is available only to educational institutions.

The Virtual Conversations™ ECMO Therapy program resides on a single CD-ROM and operates on a standard personal computer with multimedia capability.



questions? info@idrama.com

# ELSO GUIDELINES
## FOR NEONATAL ECMO CONSULTATION

## PURPOSE

*The ELSO Guidelines for Neonatal ECMO Consultation* is a document developed by the Extracorporeal Life Support Organization (ELSO) as a reference for physicians considering the transfer of critically ill neonates to a critical care unit with neonatal ECMO capability.

## INFORMATION AND BACKGROUND

Extracorporeal Membrane Oxygenation (ECMO) is presently being used for term or near-term infants who are at high risk of dying from respiratory failure. Since it is not feasible for all neonatal intensive care units within a particular region to provide ECMO, the timeliness of the transfer of a critically ill neonate from a regional NICU to an ECMO center becomes an important consideration in the prudent clinical management of the patient. This document can suggest consideration for transfer of the potential ECMO patient, but because data to develop specific criteria are not available, there are no universally accepted guidelines. Early consultation with an ECMO center and continued communication between the center and the referring physician will facilitate the determination for the appropriate time for transfer. A review of representative criteria used for ECMO and typical ventilator settings and blood gas data for a potential candidate prior to ECMO will be presented and used to define reasonable guidelines for transfer.

## GENERAL INCLUSION/EXCLUSION CRITERIA FOR ECMO

There are several important "inclusion" and "exclusion" criteria for ECMO based on known benefits and complications of the procedure. These are listed in Table 1 and discussed below. Each ECMO Center may have a slightly different approach to these criteria which will be determined by consultation with that center.

1.  *Gestational age ≥ 34 weeks and Birth Weight ≥ 2000 Grams*

    The requirement for systemic heparinization of the ECMO patient places significant limitations on the population treated. In the late 1960's and early 1970's ECMO was used for premature infants who weighed less 2000 grams or were less than 34 weeks gestation. This resulted in a significant mortality and morbidity from intracranial hemorrhage. Although refinement of the procedure occurred in the early 1980's, the premature infant continued have a significant risk of intracranial hemorrhage with ECMO therapy. This increased risk may be a result of the combination of systemic heparinization and altered cerebral circulation as a result of ECMO, or it may be due to primary disease entity causing cerebral ischemia in a susceptible infant. ECMO therapy, including heparin management, has been further refined in the 1990's. Although most ECMO centers will not treat the premature infant <34 weeks gestation, some centers are cautiously studying this population to see if they can be considered as ECMO candidates. Better understanding of effects of ECMO perfusion on the brain, in addition to new technical advances such as heparin-bonded circuits, may permit lowering the gestational age cutoff in the future. However, at the present time ECMO therapy is not recommended for infants <34 weeks gestation. Although 2000 grams is generally considered a minimum birth weight, small for gestational age infants ≤ 34 weeks gestation should not be excluded based on weight only.

PLAINTIFF'S EXHIBIT
3

1

1) $$AaDO_2 = P - 47 - PaCO_2 - PaO_2$$

where P is the barometric pressure and 47 is the pressure of water vapor, when $FIO_2$ is 1.00

2) $$OI = \frac{MAP \times FIO_2 \times 100}{PaO_2}$$

where MAP is the mean airway pressure

## ECMO REFERRALS: WHEN TO CALL AND HOW TO TRANSPORT

One of the most difficult tasks for a referring physician and a consulting ECMO physician is to determine when a patient needs to be transferred to an ECMO center. The majority of infants with disease states frequently treated by ECMO improve without ECMO and, therefore, referral may not be necessary. The decision to transfer is an enormous responsibility which can be eased by early consultation with the ECMO center thereby allowing both teams to decide when to move a patient. However, when an infant is at high risk for failing maximal therapy the referring physician should decide to transfer before the patient is too moribund for safe transport.

The progression of respiratory insufficiency due to pulmonary hypertension is not linear. Deteriorating oxygenation will respond to increasing ventilatory parameters to a certain point; once this is exceeded (approximating ECMO criteria) there may be rapid progression to a refractory hypoxic cardiac arrest. **To decrease the risk of death prior to transport, infants should be transferred prior to meeting ECMO criteria.** Kanto, and associates, found that 12 percent of their ECMO referrals died prior to the transport team's arrival or during transport. Of these deaths, 32 percent were patients with congenital diaphragmatic hernias, thus indicating that early referral of these patients is especially warranted. High frequency ventilation, both jet and oscillatory ventilation, are being used more frequently in this population of infants. Referral of infants on high frequency oscillatory ventilation should be at a time when they can be converted to conventional ventilation for transfer, *for in most cases, infants cannot be transported on the oscillator*. Most centers agree that if the infant has not improved on the oscillator after 6 hours of oscillation, that referral to an ECMO center should be considered.

There are no standard criteria for transfer. As can be seen in Table 3, immediately prior to the institution of ECMO the typical patient is being ventilated at 96 breaths per minute (BPM) with a peak inspiratory pressure (PIP) of 45.9 $cmH_2O$ and $FIO_2$ of 1.00. Average arterial blood gases include a pH 7.39, $PaCO_2$ 41, and $PaO_2$ 41 torr. Consultation for transfer should occur before these ventilator settings are necessary and prior to a $PaO_2$ of 40. As noted in Table 3, a respiratory acidosis resulted in a significant increase in mortality. An infant who cannot be adequately ventilated despite maximal mechanical support is a candidate for expedient transfer.

## ECMO CONSULTATION

*The referring physician should begin to consider the need for ECMO when a patient who has received appropriate medical management has a $PaO_2$ of 50-60 mm Hg when the PIP is >35 $cmH_2O$ and the $FIO_2$ is 1.00 for conventional ventilation, and after 6 hours of high frequency ventilation without improvement in oxygenation. After consultation with an ECMO physician the time of transfer can be determined through a team approach taking into account such items as transport time, type of transport needed, and regional availability of "ECMO beds.""*

## STUDIES RECOMMENDED PRIOR TO TRANSFER FOR ECMO

4



*Form Revised December 2001*

**CONSENT:**

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)    kept in the study file by the Principal Investigator;
(2)    put in your child's medical record; and
(3)    given to you to keep.

Please call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448 if you have any questions.

Printed Name of Participant: *Quinton Snowden*
Medical Record Number: _____
Printed Name of Parent(s)/Guardian(s): *Theresa Mamie*

Signature of Participant: *Theresa A. Mamie*   Date: 09/13/05
             *(Participant must be 18 years of age or older)*

Signature of Parent(s)/Guardian(s): *Phone Consent Obtained* Date: _____
[Note: signature of both parents required if more than minimal risk and no direct benefit, unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only one parent has legal responsibility for the care and custody of the child]

Witness (to signatures): *Jordan Johnson*   Date: 9/11/05
(may be investigator)

Translator's Signature (if, applicable): *N/A*
             Language: *English*

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: *K Rais Bahrami*
Title: *MD*  Signature: *K R Bahrami*                Date: *Sept 13 / 2005*

**IRB USE:**



IRB APPROVED
SEP 1 5 2004
Children's Hospital



EXPIRATION
SEP - 1 2005
Children's Hospital

IRB Protocol No.: 3424
Date: August 16, 2004
Page 5 of 5



PLAINTIFF'S
EXHIBIT
4



**Children's**
Kids and Medical Center

**PROGRESS NOTES**





SNOWDEN,BABYBOY

| PCP | NO,PRIMARY CARE |
| MRN | 020567516 |
| Acct# | 062640072Z |
| NIC | NIII-3606-A |
| Sex | M |
| Reg: | |
| Adm: | 09/11/05 |
| DOB: | 09/06/05 |
| OR. | CHAMBERLAIN,JAMES |
| Ins.Plan | |

Patient's Name: _____

| DATE/ TIME | Education Plan: Reviewed: ☐   Updated: ☐   Continue as planned: ☐   N/A: ☐ | INITIALS |
|---|---|---|

Date: 9/13    Time: 11³⁰

## CARDIOLOGY SERVICE PROGRESS NOTE – Attending Physician Addendum

Multidisciplinary rounds made with residents & fellows, ☑Nurse, ☐Respiratory therapist, ☐Pharmacist, ☑Case Manager, ☐Family, ☐Social Worker, ☐Nutritionist.

☑I saw and evaluated the patient. ☑I reviewed the case with the Cardiology fellow/resident and agree with the findings and plan as documented in their note except as outlined below. Refer to their note for details.

I reviewed the following: ☐Radiology tests ☑Echo ☐Cath ☐EKG ☐Holter, ☑Labwork

The patient's condition and plan were discussed with: ☐PICU Team ☐Primary Cardiologist ☐CV Surgery ☐Patient ☑NICU Team ☐Primary Care Provider ☐Other Consultants ☐Patient's Family

**History & Physical Exam Additional / Pertinent Findings:**

Cd full term  10M c̄ LVH(HCM) +PPHN
4720gms  Vent 40/5  50IMV  100% FIo2
41-45  98-100% Sat  n.o. 20 ppm

**Assessment and Plan:** ☐Discharge planning in progress.   2.2 metHgb

7.54  28  188  1   PaO₂ 78-248 range
122-143  55-80 MAP 87/63.
ECG low voltage, sinus  occ PVC's - just
watch  RAD
HCM will cause you to need
higher systemic venous pressures
Cont to need vent + n.o. to control
PPHN. Hopefully will not need ECMO

Cardiology Attending: _____ Printed Name _____ Pager: _____
(Revised 7/03)
Which is still an option particularly

*(Please write on back of this page if information is to be continued)*

if ↑ MetHb, ↓n.o. 13ppm.
Hydrocortisone 7 6 hrs. ↓ because BPmildg ↑

PRINTED BY: ahenson  DATE : 3/2/2006

PLAINTIFF'S EXHIBIT 5

18557

CNHC01324

# MAQUET



*Jostra-HL. 20*

## HEART-LUNG MACHINE
## USER'S MANUAL

CARDIO-PULMONARY





PLAINTIFF'S
EXHIBIT

# 1. General

The Jostra Heart Lung Machine HL 20 is indicated for use as an extra corporeal circulation device for perfusion appropriate to cardiopulmonary bypass procedures of six hours or less.

These are some of the features of the Jostra Heart Lung Machine HL 20:

### Console

The complete system can run up to 1.5 hours on the battery backup.

### Pump modules

Master-slave operation is possible.

A more physiologically optimised pulsatile[1] pumping is possible, internally triggered or controlled by the patient's own ECG.

There are special functions for cardioplegia control and for bloodcardioplegia.

### Console modules

Air bubbles in a tube can be detected and prevented from entering the patient.

A too low liquid (blood) level in a reservoir can be detected and (gently) regulated.

Four temperature channels can be monitored.

Four pressure channels can be monitored and (gently) regulated. Suction can be controlled.

Digital and analogue communication with external devices is possible.

### System control panel

Most functions needed during an operation can be controlled from the system control panel.

### System monitor unit

Useful signals and data are displayed.

A complete perfusion protocol can be recorded on-line or off-line with JOCAP XL for later analysis and print-out.

---

[1] The use of the term "pulsatile mode" refers to a variable pressure and flow waveform that results from cyclic operation of a blood pump. Replication of a physical pulse from the natural heart is not obtained from a pump with a variable speed control. No claim of clinical benefit from use of a pulsatile mode of a blood pump has been cleared by the FDA.

**Response:** The sponsor stated that the HL-20 is a modification of an existing approved device. The labelling for the original device is on file in the relevant 510(k) application. The labelling contained only warnings to: 1)not operate the unit in the presence of flammable gases, 2) only trained persons should operate the unit, 3)switch off the power when cranking by hand, 4)fix cables so they do not interfere with tubing and 5)that monitors hooked to a slave pump would not control it. The sponsor stated that the revised labelling User's Manual is vastly expanded, including all of the above warnings, plus numerous new warnings and cautions. While these new warnings do not affect device performance, they do improve both safety and effectiveness by making the user more aware of proper operation of the equipment.

**Remaining Deficiency:** Since the predicate for the HL-20 heart lung machine is composed of several individual components, the sponsor will be asked to provide actual copies of the labelling for each predicate component, and pointed out all differences between the intended use, contraindications for use, precautions, warnings, etc., between each predicate device and HL-20 heart lung machine. Also, the sponsor should provide a discussion of these differences with respect to safety, effectiveness and device performance.

**Deficiency 4b:** The sponsor's application must include labeling according to the requirements for labeling for medical devices as found in 21 CFR part 801, and the Device Labeling Guidance (enclosed for your information). For example, your User's Manual appears to lack specific intended use and contraindication terminology. Therefore, the sponsor was asked to use the predicate device labeling as a guide, and provide detailed labeling for the HL-20 System in accordance with the requirements stated above.

**Response:** The sponsor revised the User's Manual as required.

**Deficiency 4c:** The indications for use for the JOSTRA HL-20 System appear broad. For example, currently the indications for use state "The JOSTRA HL-20 is indicated for use as an extracorporal circulation device for an arterial perfusion, a local perfusion or a cardiopulmonary bypass operation." The sponsor was asked to clarify what is meant by 'an arterial perfusion', and 'a local perfusion'. In addition, the intended use for these devices is currently limited to open chest procedures with durations of 6 hours or less (i.e., cardiopulmonary bypass). Indications for use for durations longer than 6 hours is currently considered investigational and would require the submission of an investigational device exemption (IDE) application. As such, the sponsor must modify the indications for use to state "For use during cardiopulmonary bypass only, durations of 6 hours of less", or submit an IDE application (in accordance with 21 CFR part 812) for a clinical study.

**Response:** The sponsor revised the indications for use as follows: The Jostra HL-20 is indicated for use as an extracorporeal circulation device for perfusion lasting not more than 6 hours. This is sufficient. However, the labeling for the HL-20 should also include warnings informing the user that the device has been qualified only for durations appropriate to CPB procedures and has not been qualified, through in vitro, in vivo, or clinical studies, for long term use as a bridge to transplant, pending recovery of the natural heart, or ECMO procedures.

**Remaining Deficiency:** Labeling for the HL-20 should also include warnings informing the user that the device has been qualified only for durations appropriate to CPB procedures and has not been qualified, through in vitro, in vivo, or clinical studies, for long term use as a bridge to transplant, pending recovery of the natural heart, or ECMO procedures. This warning must be included in the HL-20 User's Manual.

**Deficiency 4d:** The sponsor was asked to provide all labeling for the HL-20 System, inclusive of package labels, training manuals, and any other written materials intended to accompany the sale of the device. 21 CFR part 801.109 also requires the following statement to appear in the labeling for


PLAINTIFF'S EXHIBIT
7

EXHIBIT
Maquet-5
1-28-08 SH

0605

MAQUET000000160

**Non-Sterile:** This device is sold NON-STERILE.  See Section X for cleaning procedures.

**Caution:**    Federal law (USA) restricts this device to sale by or on the order of a physician.

**Indications**

The JOSTRA HL-20 is indicated for use as an extracorporal circulation device for perfusion lasting not more than 6 hours.

**Contraindications**

The HL-20 is contraindicated for operation in or around Magnetic Resonance Imaging (MRI) equipment or other strong magnetic fields.

Use of the HL-20 for other purposes than those indicated places responsibility for performance and results with the user.

The user is responsible that this device should be used, tested and maintained as described in this User's Manual and with later revisions that may be published. The unit physician is responsible for the use of clinical processes and techniques.

The following conventions are used throughout this manual:

┌─────────────────────────────────────────────────────────┐
│                       **WARNING:**                       │
│   **AN INSTRUCTION OR PROCEDURE, WHICH IF NOT CARRIED**   │
│ **OUT CORRECTLY, MAY RESULT IN INJURY TO THE TECHNICIAN,**│
│      **THE PATIENT OR OTHER PERSONNEL.**                 │
└─────────────────────────────────────────────────────────┘

┌─────────────────────────────────────────────────────────┐
│                      *CAUTION:*                          │
│  *An instruction or procedure, which if not carried out correctly, may* │
│              *damage the equipment.*                     │
└─────────────────────────────────────────────────────────┘

0614

# CHILDREN'S NATIONAL MEDICAL CENTER
## INSTITUTIONAL REVIEW BOARD
## POLICY AND PROCEDURE MANUAL

| INDEX | Page |
|---|---|
| 1 **OVERVIEW** | 1 |
| 1.1 What is Research | |
| 1.2 Summary of IRB Review Categories | |
| 1.3 Standard and Expedited Review by Standard IRB and Special IRB | |
| 1.4 Rapid Response IRB | |
| 1.5 Emergency Use | |
| 1.6 Exempt Research | |
| 2 **PREPARATION OF RESEARCH PROTOCOLS** | 3 |
| 2.1 Research Protocol Application and Cover Sheet | |
| 2.1.1 Designation of Review and Consent Categories | |
| 2.2 Research Plan | |
| 2.3 Consent | |
| 2.3.1 Process | |
| 2.3.2 Forms | |
| 2.3.3 Short Form Consent | |
| 2.3.4 Multi-Center Research | |
| 2.3.5 Recruitment and Compensation | |
| 3 **SUBMISSION AND REVIEW PROCESS** | 5 |
| 3.1 Initial Review | |
| 3.2 Review Criteria | |
| 3.3 Initial Review Process | |
| 3.4 IRB Review | |
| 3.5 IRB Decision | |
| 4 **MODIFICATIONS** | 6 |
| 5 **REPORTING OF ADVERSE EVENTS** | 6 |
| 6 **CONTINUING REVIEW** | 7 |
| 6.1 Progress Reports | |
| 6.2 Suspension or Termination | |
| 7 **THE INSTITUTIONAL REVIEW BOARDS** | 7 |
| 7.1 Appointment and Composition | |
| 7.2 Chair | |
| 7.3 Meetings | |
| 7.4 Decisions | |
| 8 **THE IRB ADMINISTRATIVE OFFICE** | 8 |
| 8.1 Records | |
| 8.2 Support and Tracking of Research | |
| 8.3 Policy and Procedure Manual | |
| 9 **THE AUDIT COMMITTEE** | 9 |
| 10 **RISK AND CONSENT CATEGORIES** | 10-11 |
| 11 **APPENDICES** | A, B, C, D |


PLAINTIFF'S
EXHIBIT
8

CNMC 02033

to availability of the panel and is discretionary. There is no initial review of Rapid Response protocols. The full protocol is provided to each member of the Rapid Response IRB in advance of the meeting. The Principal Investigator or knowledgeable representative of the PI shall be present at the meeting to answer questions.

## 1. 8  Emergency Use

Investigational new drugs (subjects of IND applications to FDA) and investigational devices (subjects of investigational device exceptions (IDE) by FDA) may be used in life threatening situations in which no standard acceptable treatment is available and there is no time to obtain IRB approval in advance. Informed consent is still required, except in certain narrowly defined situations, and should include discussion of the emergency and the absence of IRB review in addition to the risks and benefits.  The investigator must submit a report to the IRB within 5 working days of such   use. (See the *Emergency Use Report* in Appendix A, and the FDA Information Sheet in Appendix C, and consult the applicable regulations). *A single course of treatment may be administered to one patient under this procedure.*  Any subsequent use requires submission of a protocol for IRB review, however the subsequent use may proceed before or pending protocol submission if the review cannot be concluded before the use is clinically necessary.  The Pharmacy must be given notice and any necessary information to prepare drug formulations.

Emergency INDs are required for unapproved drugs or for uses outside ongoing protocols. Information on Emergency INDs, Open Protocol, Treatment and Group C Treatment INDs and other treatment uses of investigational drugs can be found on FDA Information Sheets at the websites referenced in Appendix C, and from the IRB Office. DHHS specifies that its requirements do not apply to emergencies but does not define the term.

## 1.  9  Investigational Drugs:

The Pharmacy maintains information abstracts on all Investiational Drugs use in the hospital. The pharmacy will maintain a copy of the protocol for all investigational medications dispensed and/or administered.

Patients receiving investigational drugs at home are instructed to bring the investigational drug to the hospital in the event of an unscheduled/unplanned inpatient admission. The pharmacy will verify the medication for content and accuracy prior to the patient's use.

1.  *Patients may continue the use of an investigational medication if the protocol is not sponsored by an institutional investigator.  The pharmacy will require a copy of the protocol to have on file.  A copy of the informed consent documents should be obtained and kept in the patient'' chart.  The IRB will need to be notified if the investigation medication will be modified by an institutional practitioner.*

2.  *Patients are allowed to bring three (3) month's supply of a medication into the United States for personal use.  This does not require IRB approval.  The*

3

*Revised December 2001*

**CNMC 02036**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TERESA MORRING,** *et al.,* | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **Civil Action No. 06-2036 (RMC)** |
| | : | |
| **CHILDREN'S NATIONAL MEDICAL** | : | **Judge Rosemary M. Collyer** |
| **CENTER, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

**PLAINTIFFS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE ARE GENUINE ISSUES OF MATERIAL FACT
REGARDING COUNT II, INFORMED CONSENT, COUNT VI FRAUD,
COUNT VII, COUNT X, PUNITIVE DAMAGES AND
<u>COUNT XI THE PARENTS CLAIM.</u>**

    **A.**    <u>Related to Plaintiffs Claims of Lack of Informed Consent, Fraud,
Punitive Damages</u>

    1.    On September 11, 2005, Quinton Snowden arrived at defendant's

Children's National Medical Center (CNMC) having been transferred from Children's

Hospital King's Daughters (CHKD) to determine whether he would be a candidate for

extracorporeal membrane oxygenation (ECMO).   If Quinton Snowden  already required

ECMO he could not have been transferred.  (See Plaintiffs' Memo., Ex. 3).

    2.     On the day of transfer, September 11, 2005, Quinton Snowden's mother

was allegedly called by servants, agents or employees of CNMC who asked her if her

child could be placed into several human research experimental protocols which would

involved the effect of ECMO on her child. By these calls, she was led to believe that

CNMC had already decided to place her son on ECMO.  One study was for the

Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing

Extracorporeal Membrane Oxygenation (ECMO) (Iron Study).  Its principal investigator was K. Rais-Bahrami, (See Plaintiff's Memo., Ex. 4).

3.      The Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) human research experiment had expired when Ms. Morring was called for her consent to have Quinton participate in the study.  It had expired on September 1, 2004. (*Id.*)

4.      Dr. Bahrami had inherited the Iron Study from another neonatologist at CNMC, Stephen Baumgart, M.D. who, after suffering a stroke in March of 2005, could not continue his research.  At the point the research was turned over to Dr. Bahrami, the study did not have enough participants to make is statistically significant.  Therefore, Dr. Bahrami needed more volunteers such as Quinton Snowden, so he had a chance to publish his results.  (Baumgart Depo., p. 54, ll. 1-3).

5.      The medical records support the fact that Quinton Snowden's treating neonatologist as late as September 13, 2005 had still not decided to place Quinton on ECMO.  In fact, the note of September 13, 2005 stated, "Hopefully, the child will not need ECMO." This was written two (2) days *after* Dr. Barhami had already signed Quinton Snowden up for a research study involving children already "undergoing" ECMO on September 11,  (See Plaintiffs' Memo., Ex. 5).

6.      Dr. Barhami negligently and falsely coerced minor Plaintiffs' parents into agreeing to allow Quinton Snowden to be a subject of human research experiments involving children "undergoing" ECMO before Quinton had become so unstable (which he never did) to fit the criteria for ECMO, which, at CNMC, required "a persistent $PaO_2$ of <50 mmHg after maximal therapy."   Quinton's $PaO_2$ level was several times this

critical point (from 90 - 250) and he had not been on maximal therapy. (See Plaintiff's Memo. Ex. 1) (Crawford Depo., pp. 31-32; p. 27, ll. 7-14) (Baumgart Depo., pp. 18-19)

7.      The parents did not consent to the ECMO on September 13, 2005,  nor were they told that Quinton Snowden's lab values had not destabilized to reach the critical required ECMO criteria when ECMO began, in fact, they believed that the decision to place Quinton on ECMO was made at the point of his transfer on September 11, 2005 (Consent Forms, attached hereto as Exhibit 1, p. 47-49).

8.      The parents were never provided the "Consent Form" regarding the ECMO procedure and thus never executed the form. (Baumgart, p. 23, ll. 2-15).

9.      The parents were not shown the ECMO consent DVD created by CNMC even though it had been available since 1998. (Short Depo., pp. 28-29).

10.      No employee agent of servant of CNMC recalls their specific discussion regarding informed consent with the mother.  Dr. Barhami has no actual recall of his discussion,  (Bahrami, pp. 140-141), but he believes that he provided his usual and customary "consent."   Dr. Bahrami failed to provide informed consent because he provided no discussion as to the alternatives to treatment and, instead, he testified that he told the parents that your "child is failing to respond and most likely if, most likely is going to die under the current circumstances." (Bahrami p.163 ll. 9-15).

11.       The documents regarding the experimental protocols (Ex. 1, CNHC 00047-00056) did not contain any explanation of the ECMO machine, its risks/benefits or its alternatives.

12.      The FDA had not approved the Jostra HL-20 model by-pass pump for any by-pass in excess of six (6) hours. (Cox p. 22, ll. 16-23). The decannulation at issue

occurred two days after the child was placed on the pump. By the defense's own admission, the family was not informed, as part of any consent process that the pump was not approved for ECMO. (Def. Memo., p. 6).

**B. Specifically disputing *Defendant's statement of material facts as to which there is no genuine dispute.*** (paragraph for paragraph)

1. Quinton Snowden was not transferred *in extremus* on September 11, 2005 as defendant intimates. Such a transfer would have been against ESLO's (the ECMO national governing body) guidelines. (Plaintiffs' Memo, Ex. 3, p.2).

2. Quinton Snowden's cardiac anomaly did not require any cardiac intervention and resolved without surgery. Defendant's own records, admit that Quinton was able to be maintained on conventional ventilation until at least September 13, 2005 for on that day it was noted in the record. (Plaintiffs' Memo., Ex. 5).

3. Conventional therapy should have been continued on Quinton following the ECMO criteria, which would have also required maximal conventional therapy, if necessary. (Crawford, pp. 31-32).

4. ECMO therapy should not be attempted until all other conventional therapies have failed. (Plaintiffs' Memo., Ex. 1).

5. See above *Plaintiffs' Material Facts at Issue* #1.

6. Quinton Snowden was not immediately placed on ECMO because his condition did not require it. In addition on September 13, 2005, when he was placed on ECMO, he still did not require it. (Plaintiffs' Memo., Ex. 5). He had been placed on ECMO so CNMC could start on the human research experimental protocols on him which included Dr. Bahrami's protocol (Ex. 5) even though he had not met the ECMO criteria. (Crawford, p. 27, ll. 7-14) (VanWoert Depo., p. 11, ll. 1-22).

7.     The Complaint speaks for itself and it is not limited to issues only involving the "ECMO device and/or its smaller component devices" (Defendant's Memo., p.3).  The relevant allegations in the Complaint are far more broad as are discussed in the attached Opposition.

8.     The Jostra HL-20 pump was only manufactured, approved, designed and marketed for short term bypass. (Cox, p. 22, ll. 16-23).  To use the device, in the manner with which it was used here, for ECMO, it would have required an Investigational Device Exemption  (IDE) from the FDA, which was never requested or obtained. (*Id.* at p. 27, ll. 7-14).

9.     The Jostra HL-20 pump is not an ECMO approved pump. (*Id.*)

10.     At the time the physicians at CNMC recommended ECMO therapy, they should not have. (*Id.*) (Plaintiffs' Memo., Ex. 1, p. 16)

11.     It is conceded that the parents were not told of the FDA status of the devices, not given any consent form for the ECMO procedure, and not told that the child had alternatives to ECMO or that he had not fit the ECMO Criteria. (Bahrami, pp. 48-50).

12.     CNMC physicians did not provide any informed consent regarding ECMO. (Plaintiff's Memo., Ex. 1) contained in the in the medical records (and the consent DVD was not shown to the parents). (Short, pp. 28-29).

13.     CHMC had previous decannulations and this decannulation would not have occurred if Quinton was not placed on ECMO.(Crawford, p. 27, ll. 7-14).

14.     If  Quinton Snowden was not placed on the ECMO Hostra Hl-20 pump for only six (6) hours, he could not have decannulated days later, and would not have suffered his brain damage for conventional therapy does not require the use of catheters

to shunt his blood out of his body into a bypass unit.   (Plaintiff's Memo., Ex. 1).

Respectfully submitted,

   /s/ Anthony Newman
Anthony Newman, Esquire
NEWMAN, McINTOSH & HENNESSEY, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400

   /s/ Ira Sherman
Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 659-8600
***Attorneys for Plaintiffs***



Form Revised December 2003

## CONSENT:

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)    kept in the study file by the Principal Investigator;
(2)    put in your child's medical record; and
(3)    given to you to keep.

Please call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448 if you have any questions.

Printed Name of Participant: _Quintin Snowden_
Medical Record Number: _____
Printed Name of Parent(s)/Guardian(s): _Theresa Mornie_

Signature of Participant: _Theresa A. Morris_ Date: _09/13/05_
                         (Participant must be 18 years of age or older)

Signature of Parent(s)/Guardian(s): _Phone Consent Obtained_ Date: _____
[Note: signature of both parents required if more than minimal risk and no direct benefit, unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only one parent has legal responsibility for the care and custody of the child]

**Witness (to signatures):** _Jordene L. _____ Date: _9/11/05_
(may be investigator)

Translator's Signature (if, applicable): _N/A_
                              Language: _English_

## INVESTIGATOR'S AFFIDAVIT: 
I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: _K Rais Bahrami_
Title: _MD_ Signature: _K.R.Bahms_ Date: _Sept 13/2005_

**IRB USE:**





IRB Protocol No.: 3424
Date: August 18, 2004
Page 5 of 5



*Form Revised December 2001*

*2co's red top*

757- 553-6793

# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:**     Evaluation of Serum Iron And Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)

**PRINCIPAL INVESTIGATOR:**     K. Rais-Bahrami, M.D., Department of Neonatology

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. If your child is seven years old or older, we will talk to your child about the study and ask your child to sign a form like this one. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

## A. PURPOSE OF STUDY

We want to study the iron levels in the blood of babies that require ECMO support. We know that during ECMO a lot of blood is broken down. A lot of iron is therefore being released in the patient's blood stream. We want to measure the level of iron in the bloodstream before we start ECMO and after ECMO, to see how high the levels of iron

**IRB USE:**



IRB Protocol No.: 3424
Date: August 16, 2004
Page 1 of 5



SNOWDEN,BABYBOY

| | |
|---|---|
| PCP | NO PRIMARY CARE |
| MR#: | 020557916 |
| Acct#: | 0525400132 |
| NIC | NRI-3006-A |
| Sex | M |
| Exp: | |
| Adm: | 09/11/05 |
| DOB: | 09/04/05 |
| OR | CHAMBERLAIN,JAMES |

PRINTED BY: ahenson    DATE : 3/2/2006

CNHC00047



*Form Revised December 2001*

## C. POTENTIAL RISKS / DISCOMFORT

Once your baby is on ECMO, there will be frequent blood sampling from the catheter or tube that will be placed for ECMO. Drawing off the additional blood for our tests will add no additional risk or discomfort.

When your baby comes back for follow-up at 4, 8 and 12 months after discharge from the NICU, we will have to draw blood at each visit either through the vein or by a heel stick. The risks of blood drawing include bruising, swelling and possible infection. However, the person that will draw your baby's blood is a professional phlebotomist (person that draws blood for a living) who will take extra care to clean the area well to avoid the risk of infection. The phlebotomist will try to minimize the discomfort of drawing blood by using a very small needle.

## D. POTENTIAL BENEFITS

The babies who are part of this study will help us find out whether babies have very high iron levels after ECMO. If that is the case, we will change the diet recommendations, possibly to recommend low iron formula and no extra iron-containing vitamins after discharge from the NICU.

## E. ALTERNATIVES TO PARTICIPATION

We do not currently know what the levels of iron are in the babies that have been treated with ECMO. You may choose not to participate in this study.

## F. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you believe you have been injured as a result of being in this study, you should call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

**IRB USE:**





IRB Protocol No.: 3424
Date: August 16, 2004
Page 3 of 5



# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5448

## HIPAA/IRB <u>AGREEMENT FOR USE AND DISCLOSURE (SHARING)</u>
## IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:** *Evaluation Of Serum Iron And Iron Storage Levels In Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)*

**PRINCIPAL INVESTIGATOR:** *K. Rais-Bahrami*

**PROTOCOL NUMBER:** *3424*

**DATE:** *August 16, 2004*

The Health Insurance Portability and Accountability Act (HIPAA) protects my personal private health information. The Privacy Rule requires me to sign an agreement in order for researchers to be able to use or share my protected health information for research purposes in the study listed above.

I give my consent for Dr. K. Rais-Bahrami and his research staff to use and share my personal private health information for the purposes written below.

1. My protected health information that may be used and shared including:

**PHI TO BE COLLECTED:** *Demographic data, levels of iron/ferritin/transferring/TIBC, duration of ECMO support.*

2. My protected health information may be used for:

**DESCRIPTION OF PROJECT:** We will measure your baby's levels of iron/ferritin/transferring/TIBC before we start ECMO, during ECMO, at completion of ECMO and at follow-up at 4, 8 and 12 months after discharge from our NICU. Based on these data, we will be able to make dietary recommendations regarding the iron intake of your baby as well as other babies that have been on ECMO support during their NICU stay and after discharge from our NICU.

3. My PHI is needed to conduct research because:

**WHY PHI WILL BE COLLECTED:** To see how high the levels of iron in your baby's blood get after ECMO, and how soon after ECMO they return to normal levels.

4. Researchers may use and share my information with:

**IRB USE:**

IRB APPROVED

SEP 1 5 2004

Children's Hosp

SNOWDEN,BABYBOY



| | |
|---|---|
| PCP | NO,PRIMARY CARE |
| MRe: | 020567816 |
| Accl#: | D626450132 |
| NIC | NIU-3606-A |
| Sex | M |
| Exp: | |
| Adm: | 05/11/06 |
| DOB: | 09/06/05 |
| DR: | CHAMBERLAIN,JAMES |
| Ins.Plan | |

**FORM A**
Page 1 of 2
Version 1, February 28, 2003

PRINTED BY: ahenson    DATE : 3/2/2006

CNHC00050




**SHARED INFORMATION:** The investigators and agencies of the federal government as well as the Institutional Review Board of the Children's Hospital can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. During the study period, the NICU nurses and ECMO specialists involved in your baby's care may also become aware of our data.

5. Once my information has been shared with anyone outside of this study, I understand that the information may no longer be protected under this agreement.

6. The Researchers agree to protect my information by using and sharing it only as allowed by me in this Agreement.

**LIST OF CNMC RESEARCHERS:** *K. Rais-Bahrami, MD, Chrysanthe G. Gaitatzes, MD/PhD and Billie L. Short, MD*

7. I understand that I do not have to sign this Agreement. If I choose not to sign it, it will not change my standard treatment, payment or enrollment in any health plans or affect my ability to receive benefits, but I may not be allowed to join in the research study.

8. After signing this Agreement, I can change my mind and:
   - ➢ if I withdraw the agreement, not let the researcher use my personal private health information.
   - ➢ if I withdraw the agreement, I will do so in writing to the Principal Investigator.
   - ➢ if I withdraw the agreement, researchers may use and share my personal private health information already collected for this research study.
   - ➢ If I withdraw this agreement, my protected health information may be used if I have an adverse event (side effect that requires reporting to the Research Staff).
   - ➢ if I withdraw the agreement, I may not be allowed to take part in the study.

9. Optional – I understand that I will not be allowed to review the information collected for the research until after the study is completed. When the study is over, I will have the right to request access to the information again.

10. The end of this study agreement will be *when the study is completed.*

11. If I have not already received a Notice of Privacy Practices from Children's National Medical Center, I will request a copy and will be given one. If I have questions about my privacy rights, I can contact the Children's Hospital Privacy Officer, by calling the Legal Department of Children's Hospital at 202-884-4550.

12. I am the subject of the study or I am allowed to act on behalf of the subject. I have read this information and will get a copy of it after it is signed.

13. The Subject or the Subject's legal representative should sign this form. If signed by the subject's legal representative, please state the relationship.

**RELATIONSHIP OF LEGAL REPRESENTATIVE:**

*Mother*

Signature _____   Date *Sept 13/05*

**IRB USE:**

> IRB APPROVED
>
> SEP 1 5 2004
>
> Children's Hospital

**FORM A**
Page 2 of 2
Version 1, February 26, 2003

CNHC00051



*Form Revised December 2001*

# CHILDREN'S HOSPITAL

Departments of Neonatology[1] and Neurology[2]
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

# CONSENT TO PARTICIPATE
# IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:**
Monitoring continuous amplitude integrated EEG (aEEG), and near-infrared spectroscopy (NIRS) brain oxygenation in neonates recovering from severe cardiopulmonary failure on extracorporeal membrane oxygenation (ECMO)

**PRINCIPAL INVESTIGATORS:**
Stephen Baumgart MD[1] (Principal Investigator, aEEG)
Khodayar Rais-Bahrami MD[1] (Principal Investigator, NIRS)
Taeun Chang MD[2] (Principal Investigator, Electroencephalography)

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

*IRB USE:*





IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 1 of 5

| | |
|---|---|
| PCP | NO.PRIMARY CARE |
| MR#: | 020582918 |
| Acct#: | 0525400132 |
| MC | NIU-3806-A |
| Sex | M |
| Exp: | |
| Adm: | 03/11/05 |
| DOB: | 03/06/05 |

PRINTED BY: ahenson   DATE : 3/27/2006

CNHC00052



*Form Revised December 2001*

## A. PURPOSE OF STUDY

We plan to look at the use of two systems to monitor brain activity while your child is on ECMO. One is NIRS (near infrared spectroscopy) a monitor of brain oxygen levels. The other is an aEEG (amplitude-integrated electroencephalogram) which records electrical activity in the brain. These machines are safe, non-invasive and have been approved by the Food and Drug Administration. We want to see if information from these machines will provide additional information about brain activity around the time your child is placed on ECMO and if this information can be useful in predicting whether a child will have problems with brain development after he/ she recovers.

Your child is being asked to be in the study because he/she is a candidate for ECMO.

## B. PROCEDURE

We will place all infants in the study on both the NIRS and aEEG machines before they are started on ECMO. These two machines will be attached to your baby's head with an adhesive like others that we already use in the nursery and on your baby. Continuous monitoring will take place through the first 24-48 hours while on the ECMO circuit. Additionally, another two 12- 24hr readings with the aEEG machine will be done when your baby comes off ECMO and one week thereafter. Information from your baby's hospital course will also be collected such as number of days on ECMO and results of head ultrasounds or other related studies. No additional tests or blood withdrawals will be required as a part of this study. Routinely, your baby will be followed-up at the Infant Development Clinic at 4-6 months and 15-18 months of age. Information from these visits will also be collected as part of this study.

## C. POTENTIAL RISKS/DISCOMFORT

All parts of this study (i.e. treatment and monitoring while on ECMO, follow-up visits) are considered routine standard of care for your baby except for the use of the aEEG and NIRS machines. These machines have been approved for use in newborns and are not associated with any major side effects. We will carefully monitor lead placement and watch for any signs of local reaction or skin irritation to the aEEG or NIRS leads. There are no other tests or blood draws associated with this study.

*IRB USE:*





EXPIRATION
APR 1 2006
Children's Hosp

IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 2 of 5

CNHC00053



*Finally Revised December 2001*

### D. POTENTIAL BENEFITS

Your infant will have the added benefit of additional methods of brain activity monitoring while on ECMO. Information about potential seizures or other problems may be detected by the use of NIRS and aEEG, and may help us in treating your baby.

This study may also help us to predict and identify those patients who are at greatest risk for problems with brain development after recovery from ECMO. This new information will provide important prognostic information for patients and families that require ECMO in the future.

### E. ALTERNATIVES TO PARTICIPATION

Participation in the study is completely voluntary. If you decide not to participate, your child will be treated with the same coordinated care routinely offered in the NICU.

### F. QUESTIONS -- WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you believe you have been injured as a result of being in this study, you should call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

### G. CONFIDENTIALITY

We will keep the records of this study confidential. We will not tell anyone you are in the study. Only the people working on the study will know your name. They will keep this information in case we have to find you later for medical reasons. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. Your child's medical record is confidential, but just like any medical record; there are some exceptions under state and federal law.

*IRB USE:*





IRB Protocol No.: {3557}
Date: {April 7, 2006}
Page 3 of 5



*Form Revised December 2001*

## H. COMPENSATION

We will not pay you or your child for participation in this study. There are no additional costs to you as a part of participating in this study. You will still have to pay for any medical care that is not part of the study.

## I. ADDITIONAL ELEMENTS

We cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something bad happened because your child was in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We do not promise to pay you anything or give your child free medical care if something bad happens, but we will look at each case carefully. We will give your child any emergency treatment needed. You do not give up any legal rights by signing this form and you are not releasing us from any responsibility if we do anything wrong.

Dr. Rais-Bahrami (one of the principal investigators involved with this study) is under contractual agreement with CAS Medical Systems for research and development of the NIRS system. However, all data from NIRS system recordings will be de-identified (your baby's name and medical information will not be provided) before it is shared with CAS medical systems for analysis.

## CONSENT:

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)    kept in the study file by the Principal Investigator;
(2)    put in your child's medical record; and
(3)    given to you to keep.

Please call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120 if you have any questions.

Printed Name of Participant: Quintin Snowden

Medical Record Number: 020567916

## IRB USE:





IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 4 of 5



*Form Revised December 2001*

*Phone consent obtained from mother*

Printed Name of Parent(s)/Guardian(s): Theresa Morris

Signature of Parent(s)/Guardian(s): _Theresa Morris_     Date: 09/15/05

Witness (to signatures): _Jordana Fenik_     Date: 9/11/05
(may be investigator)

Translator's Signature (if, applicable): N/A
                              Language: English

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: Jordana Fenik
Title: MD   Signature: _Jordana Fenik_   Date: 9/11/05

**IRB USE:**



APR 7 2005



EXPIRATION

APR 1 2006

Children's Hospital

IRB Protocol No.: (3557)
Date: (April 7, 2005)
Page 5 of 5