IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERESA A. MORRING and<br>DESHAUNIA Q. SNOWDEN, as<br>Parents and Next Friends of<br>Q.E.S., a minor | )<br>)<br>)<br>) |
| Plaintiffs, | ) Civil Action No. 06CV02036<br>) |
| | ) Judge Rosemary M. Collyer |
| v. | ) |
| | ) Next Event: Joint Pretrial |
| CHILDREN'S NATIONAL MEDICAL<br>CENTER, | ) Statement due, 05/01/08<br>) |
| Defendant. | ) |

**RESPONSE OF CHILDREN'S NATIONAL MEDICAL CENTER TO
PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE
ARE GENUINE ISSUES OF MATERIAL FACTS REGARDING COUNT II,
INFORMED CONSENT, COUNT VI, FRAUD, COUNT X, PUNITIVE DAMAGES,
AND COUNT XI, PARENTS' CLAIM**

**A.   Related to Plaintiffs Claims of Lack of Informed Consent.
Fraud, Punitive Damages**

1.   On September 11, 2005, Quinton Snowden arrived at
defendant's Children's National Medical Center (CNMC) having
been transferred from Children's Hospital King's Daughters (CHKD)
to determine whether he would be a candidate for extracorporeal
membrane oxygenation (ECMO). If Quinton Snowden already
required ECMO he could not have been transferred. (See Plaintiffs'
Memo., Ex. 3).

It is undisputed that Q.E.S. arrived at Children's National Medical Center

(Children's) from Children's Hospital of the King's Daughters ("CHKD") on

September 11, 2005.  See Children's Medical Records ("Medical Records"),

produced herein as CNMC 00357-00358 and attached hereto as Exhibit 1.  On

the date of his transfer, CHKD described Q.E.S. as "critical and unstable" and a

transfer to an ECMO center was "in the child's best interest" given "the emergent

1

nature of the situation." <u>See</u> CHKD Medical Records, produced herein as CHKD 00062 and attached hereto as Exhibit 2.

Children's disputes that, "If [Q.E.S.] already required ECMO, he could not have been transferred."  Children's understands that, according to ELSO, "to decrease the risk of death prior to transport, infants should be transferred prior to meeting ECMO criteria." <u>See</u> Pls.' Opposition, Exhibit 3, filed herein.

Children's also disputes the implication that Q.E.S. was transferred from CHKD to its facility for the mere "determination" of whether he would be a candidate for ECMO.  The record shows that Ms. Morring was told by a nurse practitioner at CHKD on September 6, 2005, that Q.E.S. was "very sick," and was on a ventilator, had an enlarged heart, and was very sensitive to stimuli, which made his blood pressure fluctuate. <u>See</u> Deposition of Teresa A. Morring ("Morring Depo."), taken September 4, 2007, relevant portions of which are attached hereto as Exhibit 3, at 23:21 – 24:21.  Ms. Morring first learned about Q.E.S'.s possible need for ECMO from a CHKD nurse practitioner on September 9, 2005.  She was told by the nurse practitioner that he may need to be transferred. <u>See</u> Morring Depo. 27:3-15.  Ms. Morring was also told on September 11, 2005, by a physician at CHKD, prior to his transfer, that "Quinton needed to go on an ECMO machine." <u>See</u> Morring Depo., 26:4-8.

> 2.    On the day of transfer, September 11, 2005, Quinton Snowden's mother was allegedly called by servants, agents or employees of CNMC who asked her if her child could be placed into several human research experimental protocols which would involved the effect of ECMO on her child. By these calls, she was led to believe that CNMC had already decided to place her son on ECMO. One study was for the Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane

Oxygenation (ECMO) (Iron Study). Its principal investigator was K. Rais-Bahrami, (See Plaintiff's Memo., Ex. 4).

It is undisputed that, on September 11, 2005, Q.E.S.'s mother spoke with Dr. Scavo, a neonatologist at Children's, and gave him her consent to place Q.E.S. on ECMO "if the need arises that night prior to my arrival." See Morring Interrogatory Responses, attached hereto as Exhibit 4.  It is also undisputed that, on September 11, 2005, Q.E.S.'s mother spoke with Dr. Fenik, a neonatologist at Children's, about research protocols on ECMO patients and gave Dr. Fenik her consent to have Q.E.S. placed on those protocols.  See Medical Records, produced herein as CNMC 00003-00012 and attached hereto as Exhibit 5. Children's disputes that Ms. Morring was led to believe that Children's "had already decided to place her son on ECMO."  The record reflects the contrary. See Exhibit 1.  Specifically, the record shows that Ms. Morring knew that Q.E.S. was not on ECMO the day after Q.E.S.'s was transported there, because she went to Q.E.S.'s bedside, saw her son, and listened in on rounds.  See Exhibit 4. On the afternoon of September 13, 2005, Ms. Morring spoke with Drs. Fenik and Rais-Bahrami before signing the consent forms for which she had given oral consent at the time of Q.E.S's transport.  See Exhibit 4.

> 3.    The Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) human research experiment had expired when Ms. Morring was called for her consent to have Quinton participate in the study. It had expired on September 1, 2004. (Id.)

Children's disputes that the "Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)" ("Iron Serum Study") research protocol had expired when Ms. Morring consented

to Q.E.S.'s participation in it.  See Medical Records, produced herein as CNMC

02826-02833 and attached hereto as Exhibit 6.

> 4.    Dr. Bahrami had inherited the Iron Study from another
> neonatologist at CNMC, Stephen Baumgart, M.D. who, after
> suffering a stroke in March of 2005, could not continue his
> research. At the point the research was turned over to Dr. Bahrami,
> the study did not have enough participants to make is statistically
> significant. Therefore, Dr. Bahrami needed more volunteers such
> as Quinton Snowden, so he had a chance to publish his results.
> (Baumgart Depo., p. 54,11. 1-3).

It is undisputed that Dr. Rais-Bahrami worked on the Iron Serum Study in

Dr. Baumgart's absence from Children's.  See Deposition of Stephen Baumgart,

M.D. ("Baumgart Depo."), taken December 20, 2007, relevant portions of which

are attached hereto as Exhibit 7, at 9:7-10.  It is undisputed that, "at the point the

research was turned over to Dr. Rais-Bahrami, the study did not have enough

participants to make it statistically significant."  See Deposition of Khodayar Rais-

Bahrami, M.D. ("Rais-Bahrami Depo."), taken October 24, 2007, relevant portions

of which are attached hereto as Exhibit 8, at 38:2-8.  Children's disputes that Dr.

Rais-Bahrami "needed more volunteers such as [Q.E.S.], so he had a chance to

publish his results."  The record does not reflect whether developing a patient

population had any sense of urgency, and also does not reflect whether Dr. Rais-

Bahrami would be presenting any results of the Iron Serum Study.

> 5.    The medical records support the fact that Quinton Snowden's
> treating neonatologist as late as September 13, 2005 had still not
> decided to place Quinton on ECMO. In fact, the note of September
> 13, 2005 stated, "Hopefully, the child will not need ECMO." This
> was written two (2) days after Dr. Barhami had already signed
> Quinton Snowden up for a research study involving children already
> "undergoing" ECMO on September 11, (See Plaintiffs' Memo., Ex.
> 5).

Children's does not dispute that, at approximately 11:30 a.m. on September 13, 2005, a cardiologist who examined Q.E.S. noted that "hopefully will not need ECMO, which is still an option particularly if [increase]metHB, [decrease]n.o. [approx.] 13 p.p.m." See Medical Records, produced herein as CNMC 00371 and attached hereto as Exhibit 9.  Children's disputes that Q.E.S.'s treating neonatologist "had still not decided" to place him on ECMO on September 13, 2005.  Q.E.S.'s neonatologist decided to do so that afternoon. See Medical Records, produced herein as CNMC 00373 and attached hereto as Exhibit 10.

> 6.    Dr. Barhami negligently and falsely coerced minor Plaintiffs' parents into agreeing to allow Quinton Snowden to be a subject of human research experiments involving children "undergoing" ECMO before Quinton had become so unstable (which he never did) to fit the criteria for ECMO, which, at CNMC, required "a persistent Pa02 of <50 mmHg after maximal therapy." Quinton's Pa02 level was several times this critical point (from 90 - 250) and he had not been on maximal therapy. (See Plaintiffs Memo. Ex. 1) (Crawford Depo., pp. 31-32; p. 27,11.7-14) (Baumgart Depo., pp. 18-19)

It is undisputed that a portion of the Children's ECMO criteria is an examination for a persistent $PaO_2$ of <50mmHg after maximal therapy.  See Medical Records, produced herein as CNMC 02295-02296 and attached hereto as Exhibit 11.  Children's disputes that the $PaO_2$ criterion is the sole ECMO evaluation criteria, see Exhibit 11, disputes Dr. Rais-Bahrami's state of mind in communicating with Q.E.S.'s parents, and also disputes Q.E.S.'s $PaO_2$s on September 13, 2005.  See Medical Records, produced herein as CNMC 00380 and attached hereto as Exhibit 12.

> 7.    The parents did not consent to the ECMO on September 13, 2005, nor were they told that Quinton Snowden's lab values had not

destabilized to reach the critical required ECMO criteria when ECMO began, in fact, they believed that the decision to place Quinton on ECMO was made at the point of his transfer on September 11, 2005 (Consent Forms, attached hereto as Exhibit 1, p. 47-49).

Children's disputes that the parents did not consent to ECMO on

September 13, 2005, that they were not told of Q.E.S.'s condition on September

13, 2005, and that they were made to believe that the decision to place Q.E.S. on

ECMO was made on September 11, 2005.  See Exhibits 3 and 4.

8.    The parents were never provided the "Consent Form" regarding the ECMO procedure and thus never executed the form. (Baumgart, p. 23,11.2-15).

Children's does not dispute that Plaintiffs did not execute the "Consent

Form" referred to by Plaintiffs.  The "Consent Form" is an information sheet

provided to decision-makers after the informed consent discussion takes place.

See Deposition of Billie Lou Short, M.D. ("Short Depo."), taken January 22, 2008,

relevant portions of which are attached hereto as Exhibit 13, at 35:5-12.

9.    The parents were not shown the ECMO consent DVD created by CNMC even though it had been available since 1998. (Short Depo., pp. 28-29).

It is undisputed that Plaintiffs were not shown the "ECMO consent DVD."

Children's disputes that characterization of the DVD and also disputes that it was

"available since 1998."  See Short Depo. at 28:18 – 29:17.

10.   No employee agent of servant of CNMC recalls their specific discussion regarding informed consent with the mother. Dr. Barhami has no actual recall of his discussion, (Bahrami, pp. 140-141), but he believes that he provided his usual and customary "consent." Dr. Bahrami failed to provide informed consent because he provided no discussion as to the alternatives to treatment and, instead, he testified that he told the parents that your "child is failing to respond and most likely if, most likely is going to die under the

current circumstances." (Bahrami p.163 11.9-15).

It is undisputed that Children's personnel does not recall any specific discussions with Ms. Morring. It is undisputed that Dr. Rais-Bahrami believes he had his usual ECMO discussion with Plaintiffs before obtaining their consent to put their son on ECMO. See Rais-Bahrami Depo. at 148:3 – 151:17. Children's disputes that his discussion fails to explain alternatives to ECMO.

11. The documents regarding the experimental protocols (Ex. 1, CNHC 00047-00056) did not contain any explanation of the ECMO machine, its risks/benefits or its alternatives.

Undisputed.

12. The FDA had not approved the Jostra HL-20 model by-pass pump for any by-pass in excess of six (6) hours. (Cox p. 22,11. 16-23). The decannulation at issue occurred two days after the child was placed on the pump. By the defense's own admission, the family was not informed, as part of any consent process that the pump was not approved for ECMO. (Def. Memo., p. 6).

Undisputed.

**B. Specifically disputing *Defendant's statement of material facts as to which there is no genuine dispute.*** (paragraph for paragraph)

1. Quinton Snowden was not transferred *in extremus* on September 11, 2005 as defendant intimates. Such a transfer would have been against ESLO's (the ECMO national governing body) guidelines. (Plaintiffs' Memo, Ex. 3, p.2).

Children's disputes the medical determination stated herein as "fact."

See Exhibit 2. Children's does not dispute the contents of Pls' Opposition, Exhibit 3.

2. Quinton Snowden's cardiac anomaly did not require any cardiac intervention and resolved without surgery. Defendant's own records, admit that Quinton was able to be maintained on conventional ventilation until at least September 13, 2005 for on

that day it was noted in the record. (Plaintiffs' Memo., Ex. 5).

Children's disputes the medical determination stated herein as "fact."

Children's does not dispute that Q.E.S. was not placed on ECMO until

September 13, 2005.  <u>See</u> Exhibits 10 and 12.  Children's does not dispute that

Q.E.S.'s cardiac anomaly resolved without surgery.

> 3.     Conventional therapy should have been continued on Quinton following the ECMO criteria, which would have also required maximal conventional therapy, if necessary. (Crawford, pp. 31-32).

Children's disputes the medical determination stated herein as

"fact."  <u>See</u> Exhibits 1, 9, 10, and 12.

> 4.     ECMO therapy should not be attempted until all other conventional therapies have failed. (Plaintiffs' Memo., Ex. 1).

Undisputed.

> 5.     See above *Plaintiffs' Material Facts at Issue #1.*

<u>See</u> Response to same.

> 6.     Quinton Snowden was not immediately placed on ECMO because his condition did not require it. In addition on September 13, 2005, when he was placed on ECMO, he still did not require it. (Plaintiffs' Memo., Ex. 5). He had been placed on ECMO so CNMC could start on the human research experimental protocols on him which included Dr. Bahrami's protocol (Ex. 5) even though he had not met the ECMO criteria. (Crawford, p. 27,11.7-14) (VanWoert Depo., p. 11, 11. 1-22).

It is undisputed that Q.E.S. was not placed on ECMO until September 13,

2005.  Children's disputes the remaining statements of "fact," noting that the

medical record does not reflect that Q.E.S. was stable without ECMO or that the

motivation behind placing him on ECMO was to "start on the human research

experimental protocols."

7.    The Complaint speaks for itself and it is not limited to issues only involving the "ECMO device and/or its smaller component devices" (Defendant's Memo., p.3). The relevant allegations in the Complaint are far more broad as are discussed in the attached Opposition.

This is a legal conclusion to which no factual response is necessary.

8.    The Jostra HL-20 pump was only manufactured, approved, designed and marketed for short term bypass. (Cox, p. 22,11. 16-23). To use the device, in the manner with which it was used here, for ECMO, it would have required an Investigational Device Exemption (IDE) from the FDA, which was never requested or obtained. (*Id.* at p. 27,11. 7-14).

The manufacturer's use recommendations for the ECMO pump are undisputed.  Children's disputes that use outside of the manufacturer's specifications requires an IDE from the FDA, and the implication that Children's would be required to obtain the same.

9.    The Jostra HL-20 pump is not an ECMO approved pump. (*Id.*)

This is a legal conclusion to which no factual response is necessary.

10.   At the time the physicians at CNMC recommended ECMO therapy, they should not have. (*Id.*) (Plaintiffs' Memo., Ex. 1, p. 16)

Children's disputes the medical determination stated herein as "fact."

11.   It is conceded that the parents were not told of the FDA status of the devices, not given any consent form for the ECMO procedure, and not told that the child had alternatives to ECMO or that he had not fit the ECMO Criteria. (Bahrami, pp. 48-50)

Children's does not dispute that Plaintiffs were not informed of the FDA status of the ECMO circuit's component devices.  Children's does dispute that Plaintiffs were given an ECMO "consent form" and were informed of their son's condition as well as alternatives to ECMO therapy for their son.  See Medical

Records, produced herein as CNMC 00015-00016 and attached hereto as

Exhibit 14.

> 12.    CNMC physicians did not provide any informed consent regarding ECMO. (Plaintiff's Memo., Ex. 1) contained in the in the medical records (and the consent DVD was not shown to the parents). (Short, pp. 28-29).

Children's does not dispute that Plaintiffs were not shown the "consent

DVD."  Children's disputes the characterization of the "consent DVD."  <u>See</u> Short

Depo. at 30:18 – 31:1.  Children's also disputes that its physicians did not receive

Plaintiffs' informed consent regarding ECMO.  <u>See</u> Exhibit 14.

> 13.    CHMC had previous decannulations and this decannulation would not have occurred if Quinton was not placed on ECMO.(Crawford, p. 27,11.7-14).

> Undisputed.

> 14.    If Quinton Snowden was not placed on the ECMO Hostra H1-20 pump for only six (6) hours, he could not have decannulated days later, and would not have suffered his brain damage for conventional therapy does not require the use of catheters.

Children's disputes the "fact" implied herein that decannulation certainly

would not have occurred within the first six hours of Quinton's ECMO therapy;

however, it is undisputed that the decannulation in this record occurred after six

hours had passed.  Children's disputes that the decannulation is the proximate

cause of Q.E.S's brain damage.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.


    /s/ Nicholas S. McConnell

Nicholas S. McConnell (#167742)
Krista A. Maizel (#503597)
Lydia A. Auzoux (#477054)
1120 – 20th Street, NW (South Tower)
Washington, DC  20036-3437
(P)(202) 457-1600
(F)(202) 457-1678
nmcconnell@jackscamp.com
kmaizel@jackscamp.com
lauzoux@jackscamp.com

*Counsel for Defendant*
*Children's National Medical Center*

# EXHIBIT 1



**PROGRESS NOTE**

PCP    NO,PRIMARY CARE
MR#:   020567916
Acct#:  0625400132
NIC    NIU-3606-A
Sex    M
Exp:
Adm:   08/11/05
DOB:   09/06/05
DR.    CHAMBERLAIN, JAMES
Ins.Plan

Patient's Name: _____

| DATE/TIME | Education Plan: Reviewed: ☐   Updated: ☐   Continue as planned: ☐   N/A: ☐ | INITIALS |
|---|---|---|
| 1-11-05 | Neonatology of note ↑ | |
| 2200hr | 38 wk GA ♂, born to 26 yo G2 P0→2, GBS ↑ TRBC | |
| | B+, ⊖ Serologies, + GBS (? Rx) and ⊕ GTT | |
| | at 45 min — Mom Read c̄ DM and said she was | |
| | well controlled. Delivery by C/S for fetal | |
| | heart tone and late decels. Apgar 5', 8', | |
| | ↑ in UCB nursery sats 70-80% — sent to | |
| | NICU where it intately intubated and | |
| | placed on high setting (30/6/60/1.0) and NO. | |
| | Did well at first but then needed to go | |
| | on Jet vent — had wide swing in PaO2. | |
| | CHD now suspected early on and ECHO | |
| | showed severe hypertrophic cardio- | |
| | myopathy and PPHN. b/c of CHD and | |
| | instability on d5 of life decision made | |
| | to send baby to CNMC for possible ECMO. | |
| | Transport by Kings Daughter Transport | |
| | Team on high conventional vent (43/6/60/1.0) and NO. | |
| | Transport c̄ cephalocon. | |
| | Once in NICU Tx on Oscillator | |
| | c̄ NO at 3000 PM, Baby did not do | |
| | well and required repeated hand bagging. | |
| | (continued) | |

*(Please write on back of this page if information is to be continued)*

**CNMC 00357**


18557

PRINTED BY: mlopez    DATE : 12/12/2006

CNMC 00358

(8) U/S signs resolved — V. M. M.D.

(7) Discussed consult w/ Mother (I.D.) Dr. ___

(6) Surg___ notified of ___ ___

(5) May but ___ ___ per R.N.

(4) Contin IVF's (LR ___) (B) I.V.

(3) R.N. — (1) NPO/IV fluid D/C __ __

(2) ___ ___

(1) Tran LCW's (2) Hypoglycemic ___

- Seen c Small ___ ___ (3) PO/IV

2 ___ ___ IV ___ (4) Rule
out Sepsis (5) Rule out ___

# EXHIBIT 2

**Children's Hospital Of The King's Daughters, Inc.**
601 Children's Lane, Norfolk, Virginia 23507-1910

### PROGRESS NOTES

Addressograph

| PATIENT NAME: | | ROOM: | MED REC#: |
|---|---|---|---|
| **DATE** | | | |

| DATE | |
|---|---|
| 9/11 1710 | Neonatal Med<br>Pt remains critical & unstable. As noted in chart, have had extreme variability in Oxygenation and now on very high support.<br>Attempts at jet ventilation did not eliminate instability.<br>Although at times pO₂'s have been quite good, I feel that pt's instability as well as inability to use vasopressors — because of hypertrophic cardiomyopathy — would make return to an ECMO center optimal<br>I have spoken with Major in state referral center at U Va — they refused pt as they do not have an available bd — all in use — therefore I called Childrens Hosp National Med Ctr in adjoining Wash DC. They (Dr Scoba) will accept, and as they are a nationally recognized leader in both clinical & research aspects of ECMO, this seems in the child's best interest, and given emergent nature of situation, I am arranging this now KHAN |

# EXHIBIT 3

**1**

1  UNITED STATES DISTRICT COURT
2  FOR THE DISTRICT OF COLUMBIA
3  - - - - - - - - - - - - - +
4  TERESA MORRING, et al.,      |
5       Plaintiffs,      |
6  v.        | Case No.
7  CHILDREN'S NATIONAL MEDICAL    | 06-2036 (RMC)
8  CENTER, INC.,        |
9       Defendant.    |
10  - - - - - - - - - - - - - +
11
12
13  Videotaped Deposition of TERESA A. MORRING
14  Washington, D.C.
15  Tuesday, September 4, 2007
16  11:27 a.m.
17
18
19
20  Job No. 1-110272
21  Pages 1 - 126
22  Reported by: Cathy Jardim

**2**

1       Deposition of TERESA A. MORRING, held at the
2  offices of:
3
4  CHAIKIN & SHERMAN, PC
5  1232 17th Street, Northwest
6  Washington, D.C. 20036
7
8
9
10
11
12
13
14
15       Pursuant to notice, before Cathy Jardim,
16  Registered Professional Reporter and Notary Public of
17  the District of Columbia.
18
19
20
21
22

**3**

1  A P P E A R A N C E S
2  ON BEHALF OF THE PLAINTIFFS:
3  IRA SHERMAN, ESQUIRE
4  Chaikin & Sherman, PC
5  1232 17th Street, Northwest
6  Washington, D.C. 20036
7  (202)659-8600
8
9  ORIGINAL
10
11
12  ON BEHALF OF THE DEFENDANT:
13  NICHOLAS S. MCCONNELL, ESQUIRE
14  KRISTA A. MAIZEL, ESQUIRE
15  Jackson & Campbell, PC
16  1120 20th Street, Northwest
17  Washington, D.C. 20036
18  (202)457-1600
19
20
21  VIDEOGRAPHER:  Alfred Gomes
22

**4**

1  C O N T E N T S
2  EXAMINATION OF TERESA MORRING      PAGE
3  By Mr. McConnell      6
4
5
6
7
8
9
10
11
12
13  E X H I B I T S
14  (Attached to transcript)
15  MORRING DEPOSITION EXHIBITS      PAGE
16  No. 1--Plaintiff's Answers to Interrogatories    10
17  No. 2--Collection of photographs and calendars    63
18
19
20
21
22

**5**

1  PROCEEDINGS
2  VIDEOGRAPHER: Here begins videotape number
3  1 in the deposition of Teresa Morring in the matter of
4  Teresa Morring et al. versus Children's National
5  Medical Center, Inc., in the United States District
6  Court for the District of Columbia, case number
7  2006-2036 (RMC). Today's date is September 4, 2007.
8  The time on the video monitor is 11:27. The video
9  operator today is Alfred Gomes. This video deposition
10  is taking place at 1232 17th Street Northwest,
11  Washington, D.C. Counsel, please voice identify
12  yourselves and state whom you represent.
13  MR. SHERMAN: Ira Sherman representing the
14  plaintiffs.
15  MR. MCCONNELL: Nick McConnell, and with me
16  is Krista Maizel, representing Children's Hospital.
17  MS. MAIZEL: Krista Maizel, Children's
18  National Medical Center.
19  VIDEOGRAPHER: The court reporter today is
20  Cathy Jardim of L.A.D. Reporting.
21  Whereupon,
22  TERESA A. MORRING

**6**

1  was called for examination by counsel for Defendant
2  and, having been first duly sworn by the notary
3  public, was examined and testified as follows:
4  EXAMINATION BY COUNSEL FOR DEFENDANT
5  BY MR. MCCONNELL:
6  Q  Ms. Morring, would you tell us your full
7  name, please.
8  A  **Teresa Ann Morring.**
9  Q  Have you ever given a deposition before?
10  A  **No.**
11  Q  I am sure Mr. Sherman has had a chance to
12  speak with you briefly about what the process will be.
13  The purpose of the deposition is primarily to give me
14  a chance to ask you questions about events as to which
15  you have knowledge related to the lawsuit you have
16  filed against Children's Hospital.
17  If at any time today I ask you a question
18  that you don't understand, that confuses you or that I
19  have phrased poorly, please let me know. If you
20  respond to my questions, I will assume you have
21  understood the question and have testified fully and
22  truthfully. All right?

**7**

1  A  **Yes.**
2  Q  If at any time you need to take a recess,
3  let me know. This is not a physical contest at all.
4  It is my chance to put questions to you, and I don't
5  mean for you to be uncomfortable in any way at any
6  time. All right?
7  Where do you presently live?
8  A  **5861 Poplar Hall Drive, apartment 23B, as**
9  **in boy, Norfolk, Virginia, 23502.**
10  Q  How long have you lived at that address?
11  A  **I have lived there since February of 2004.**
12  Q  Who lives there with you at this time?
13  A  my son                          and
14  , my daughter.
15  Q  Since 2004, has anyone else resided at that
16  address with you?
17  A  **Yes.**
18  Q  Who else?
19  A  **DeShaunia Snowden.**
20  Q  And he is          , father and
21  father?
22  A  **Yes.**

**8**

1  Q  Where does Mr. Snowden reside at this time?
2  A  **5744 East Hastings Arch, Virginia Beach,**
3  **Virginia, 23462.**
4  Q  When did he last live with you at the
5  Poplar Hall address?
6  A  **November of 2004.**
7  Q  I see from the answers to interrogatories
8  that you filed in this case that there were court
9  custody proceedings concerning custody of      and
10          Were they contested proceedings?
11  A  **No.**
12  Q  So that was done mutually by consent?
13  A  **Yes.**
14  Q  And as I understand it, Mr. Snowden has the
15  children on weekends.
16  A  **He has      on the weekends.**
17  Q  What about          does he ever physically
18  take custody of      and take him to his residence?
19  A  **On Tuesdays and Thursdays, he comes over to**
20  **the house to see**
21  Q  Does he actually ever take          back
22  with him to his residence?

21

1     A  2:35 p.m.
2     Q  And that was at Centara Hospital?
3     A  Yes.
4     Q  How long did he remain at Centara?
5     A  He was transferred the day he was born to
6  Children's Hospital.
7     Q  Tell me about that transfer.  When was the
8  first time someone spoke to you about the need to
9  transfer       from Centara to Children's?  And by
10  that, we will be talking for the moment about
11  Children's Hospital of the King's Daughters down in
12  Norfolk.  Okay?
13     A  Yes.
14     Q  When we switch to Children's up here, I
15  will make that clear and we will talk about that.
16       But let's for a moment talk about
17  was born at about 2:35 on September 6, 2005.  How soon
18  after he was born did you have a conversation with
19  anyone where questions were raised about
20  health?
21     A  No, I was in the operating room because it
22  was a C-section, and the doctor that delivered

22

1  said       was having a little trouble breathing, so
2  they were going to call over the NICU staff from
3  Children's Hospital of the King's Daughters.
4     Q  And then what happened next in terms of
5       transfer over to Children's Hospital King's
6  Daughters?
7     A  The NICU staff from the King's Daughters
8  immediately came over within five minutes, and I would
9  say       probably stayed in the OR with me -- I
10  know it was less than 30 minutes, but I can't recall
11  the actual time.
12     Q  And the doctors at Centara told you that
13       was having trouble breathing and would need to
14  be transferred to Children's Hospital KD?
15     A  Yes.
16     Q  Did the doctor tell you why it was that
17       was having this problem?
18     A  No.
19     Q  Did the doctor who discussed this with you
20  in any way quantify a level of concern about
21  health, in other words, this is a very serious problem
22  or this is a routine problem we see often, don't

23

1  worry, any discussion at all by this doctor about the
2  severity of         condition?
3     A  No.
4     Q  He remained, that is,       remained with
5  you in the delivery room less than 30 minutes.  The
6  team from King's Daughters Children's Hospital arrives
7  and they transported       to Children's in Norfolk?
8     A  Yes.
9     Q  After       was transferred, when was the
10  next time anyone had a conversation with you about
11       condition or how he was doing?
12     A  When I called from my recovery room to the
13  NICU to check       status.
14     Q  Who did you speak with?
15     A  I can't recall the nurse's name.
16     Q  But it was a nurse over at the neonatal
17  unit at King's Daughters?
18     A  Yes, a nurse practitioner.
19     Q  What did this nurse practitioner tell you
20  about         ?
21     A  Her words were       is very sick.
22     Q  What did she say in terms of he is very

24

1  sick, what was going on with       as she explained
2  it to you?
3     A  She said he was having a little trouble
4  breathing and they already put him on the ventilator,
5  and they were in the process of getting images of his
6  heart.
7     Q  What is the next conversation you had with
8  anyone at Children's Hospital King Daughter about
9       and how he was doing?
10     A  A few hours later when I was able to come
11  over to see him, I spoke with that same nurse and the
12  nurse at       bedside.
13     Q  What did they tell you at that time?
14     A  That he had an enlarged heart, and by that
15  time he was already sedated, and they told me the
16  reason why he was sedated.
17     Q  What was the reason?
18     A  He was really sensitive, his blood pressure
19  was very sensitive -- he was very sensitive to
20  stimulus, I am sorry, and it made his blood pressure
21  fluctuate.
22     Q  And at that time, you said he was already

---

**25**

1  on a ventilator?

2      A  Yes.

3      Q  Did the nurses tell you how long that they

4  thought        might need to be on a ventilator?

5      A  No.

6      Q  Was there any other discussion with these

7  nurses when you first arrived at King's Daughters?

8      A  No.

9      Q  Did there come a time when you had a

10  conversation with an attending physician,

11  neonatologist at Children's Hospital of the King's

12  Daughters --

13      A  Yes.

14      Q  About        and his condition?

15      MR. SHERMAN:  Excuse me.  Let him finish

16  the question.

17      MR. MCCONNELL:  We are doing pretty well.

18  BY MR. MCCONNELL:

19      Q  Tell me about the first conversation you

20  had with a physician at that hospital about

21      A  It was September 11, 2005.

22      Q  Who was the physician?

---

**26**

1      A  Dr. Khan, K-H-A-N.

2      Q  Dr. Khan is a neonatologist?

3      A  Yes.

4      Q  Tell me what the conversation with Dr. Khan

5  was about, what did he say?

6      A  I had arrived to the hospital that day.

7  That was the day that I was told        needed to go

8  on an ECMO machine.

9      Q  Who was the first person who told you about

10  putting        on ECMO?

11      A  The nurse practitioner.

12      Q  And is this a different nurse practitioner

13  than the one you spoke to on the first day?

14      A  No, it is the same.

15      Q  And you, at this time, simply don't recall

16  her name?

17      A  No.

18      Q  So before you met with Dr. Khan, the nurse

19  practitioner had already told you that        would

20  need to be considered for ECMO?

21      A  Yes.

22      Q  When did you have that conversation with

---

**27**

1  the nurse practitioner, was it before September 11?

2      A  Yes.

3      Q  When did you first have a conversation with

4  anyone at Children's Hospital King's Daughters about

5  having        placed on ECMO?

6      A  September 9.

7      Q  Tell me about that conversation, what were

8  you told about        condition and why he might

9  need to go on ECMO?

10      A  By this time I was told that he was

11  diagnosed with cardiomyopathy and also pulmonary

12  hypertension, and the nurse practitioner told me that

13  he is a candidate for ECMO, and if he does need to go

14  on ECMO, he would have to be transferred to another

15  hospital.

16      Q  What did the nurse tell you that

17  cardiomyopathy meant?

18      A  An enlarged heart.

19      Q  Did she tell you how enlarged

20  heart was?

21      A  All she said was that it was very large.

22      Q  Did she explain to you why that was a

---

**28**

1  medical problem for        that he had large heart?

2      A  Because I had gestational diabetes.

3      Q  But in terms of what having a large heart

4  meant to        , did she explain to you what that

5  meant for him, having a very large heart?

6      A  She said it coincides with the pulmonary

7  hypertension.

8      Q  Did she mention at all that having a very

9  large heart means the heart doesn't pump very well or

10  effectively and it is hard for a child to profuse

11  himself, did she discuss that with you?

12      A  No.

13      Q  You say she also told you about pulmonary

14  hypertension.  Did she discuss with you what that

15  meant beyond the phrase pulmonary hypertension?

16      A  She explained that pulmonary hypertension

17  is when your overall -- I am trying to get the term

18  right -- when your overall blood pressure is higher

19  than your lung pressure, I believe she explained it the way she

20  explained it to me.  That is how I understood it.

21      Q  And what effect does that have on a baby

22  like        in terms of being able to profuse his

69

1    right side of his neck, and he said that it was
2    temporary until        heart condition improved.
3        Q  Was there any discussion at all about the
4    things that can happen while a baby is on the ECMO
5    equipment?
6        A  Yes.
7        Q  What were those discussions?
8        A  A clot can get in the ECMO cannula.
9        Q  And what happens if the clot gets in the
10   cannula?
11       A  A stroke could occur.
12       Q  And when he discussed stroke, did you
13   understand that to mean that could produce brain
14   damage?
15       A  At the time, I wasn't thinking about that.
16       Q  But he specifically mentioned one of the
17   complications as being a clot producing a stroke?
18       A  Yes.
19       Q  What else did he tell you can happen when a
20   baby is on the ECMO machine?
21       A  He said they have to be on medication,
22   paralyzation medication so they can't move.

70

1       Q  And what can that do to them?
2       A  He just said they are on paralyzation
3    medication so they can't move, because the cannulas
4    are in the neck, and he said that       would be on
5    the ventilator the entire time that he is on ECMO.
6       Q  Did he also tell you that he would be on
7    anticlotting medications?
8       A  No.
9       Q  Did he mention any medications at all?
10      A  No.
11      Q  Other than the paralytic meds, did he
12   mention any other meds that would be used in
13   connection with the ECMO treatment?
14      A  No.
15      Q  Did they tell you what had happened, what
16   was going on with        that required now that he be
17   put on ECMO?
18      A  They said it was his blood pressure, and I
19   didn't ask them any further questions. They said it
20   was his blood pressure, so I just figured something
21   had to have happened between the time I was there to
22   the time we left that would cause him to go on ECMO.

71

1       Q  Have you told us everything you do recall
2    being discussed with Dr. Barami and Dr. Ferik before
3        was placed on the ECMO equipment?
4      A  Dr. Barami said they don't like the
5    children to be on ECMO longer than two weeks, and he
6    said hopefully       won't be on ECMO that long, and
7    then they asked us to go ahead and step out because
8    they were about to go ahead and perform the procedure
9    at his bedside to place him on ECMO, and they
10   instructed us where the NICU family waiting room was,
11   and that they will call when they are done.
12      Q  Had there up to this point been any
13   discussion with Dr. Barami or any of the other health
14   care providers at Children's about the long-term
15   outlook for        whether they could be positive,
16   negative, anything in between?
17      A  No.
18      Q  Any discussion?
19      A  No.
20      Q  So you were asked to step out while they
21   put       on the ECMO equipment. You understood
22   that meant they would take cannulas, tubes and put one

72

1    into an artery and one into a vein and in effect put
2    him on a heart bypass piece of equipment?
3       A  That is how I understood it.
4       Q  To your knowledge, was that done, I mean
5    did he get back to his bedside and he is now clearly
6    on the equipment that has been described to you?
7       A  Yes.
8       Q  Once       was on ECMO, can you tell me
9    how many people were at his bedside regularly while he
10   was on the ECMO equipment?
11      A  Regularly, there was one person that
12   remained at the bedside, and I asked about that. They
13   call it the pump nurse that watched the ECMO machine
14   at all times, and he also was assigned a bedside
15   nurse.
16      Q  And how much time did the bedside nurse
17   spend with      ?
18      A  I really don't have a measure of it. His
19   bedside nurse always had another child too, to tend
20   to.
21      Q  So that nurse would have more than just one
22   patient?

# EXHIBIT 4

12. Please describe all conversation(s) that you had with any individual at CNMC regarding _____ medical condition(s) upon admission to CNMC, his prognosis, proposed treatment, risks and benefits of the proposed treatment(s), any alternative forms of treatment, the risks and benefits thereof, and the risks and benefits of no treatment.

**ANSWER:**    The first person I spoke with at CNMC regarding _____ condition was Louis Scavo, M.D., the attending neonatologist in the NICU.  Dr. Scavo said _____ had just arrived and was successfully transferred. Dr. Scavo said _____ was stable at the time and there was no emergent need to place him on ECMO. That night, I spoke with a resident physician, Jordana Fenik, M.D., who told me about the studies they were conducting on ECMO patients.   One study was to monitor the brain wave activity by EEG pre and post ECMO. Dr. Fenik said that probes would be placed on _____ head and it was a very simple study. The other study measured the iron levels of _____ blood pre and post ECMO.

I gave telephone consent to place _____ on ECMO if the need arises that night prior to my arrival.  I advised Dr. Scavo of my need to be there at _____ side during his hospitalization and that I was going to try to stay at the local Ronald McDonald House (RMH) in Greater Washington. He said that there is a NICU social worker and she could assist in that happening. I spoke with Janice Farmer,  the NICU social worker, the next morning.  She told me about the hospital and more about the RMH in Washington. She said that she would contact the RMH and have them set-up for my arrival.

I told Janice that _____ father and I would arrive the next morning, which was Tuesday. Janice told me that if I arrived early enough, I would be able to sit in on rounds with his team. I told Janice that we would try to be there early enough for attendance. She said that children like my son _____ were too young to be permitted in the NICU. I

phoned throughout the day on Monday to check          status and the bedside nurse (name

unknown) assigned to Quinton updated me regularly.

On Monday, 9/12/05, I met Dr. K. Bahrami, at that time he was the attending

neonatologist on call for the NICU.  Deshaunia and I sat in on the rounds at          bedside

and listened to          team of professionals. I asked a few questions regarding the

antibiotics          was currently receiving. Everyone was pleased that          had not yet

needed to be placed on ECMO, because he was so stable. After rounds, I spoke with Janice and

advised that we had yet to check into the Ronald McDonald House and we were supposed to

check-in by a certain time. I advised that we were going to leave to check into the RMH and

unpack, then return to be with

I also reiterated the same to          bedside nurse. While lost, searching for the

RMH, I received a call on the cell phone from CNMC saying to return as soon as possible to

the hospital, because          needed to now be placed on ECMO. Deshaunia and I

immediately returned to the hospital. Once in the NICU, Deshaunia and I sat down with Dr.

Bahrami and discussed ECMO.   Dr. Bahrami discussed the ECMO program and explained

how an ECMO machine operates. I signed the forms, which I had previously given verbal

consent for on Sunday night, September 11, 2005. Dr. Bahrami explained that ECMO would

essentially act as          heart and lungs temporarily until he showed that his

cardiomyopathy had improved. He also explained that the risk that while on ECMO a clot

could develop in the ECMO circuit. He said that Quinton would slowly be weaned off of

ECMO, down to idle. Dr. Bahrami explained to Deshaunia and me that CNMC does not like to

have a child on ECMO any longer than 2 weeks. Dr. Bahrami explained that

cardiomyopathy was essentially causing very little blood flow to his lungs. At the time,

10

outlook was good and no one believed that      would have complications.

While     was hospitalized at CNMC, I spoke with and/or met with

nurse everyday, including his ECMO pump nurse, while he was on ECMO about how he was

doing, I do not remember the exact substance of each of those conversations.  I also sat in on

     rounds daily with his doctors and other professionals and his condition was

discussed, again I do not recall the specifics.

# EXHIBIT 5



*Form Reviewed December 2001*

757- 553- 6793

# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY

| | |
|---|---|
| **TITLE OF STUDY:** | Evaluation of Serum Iron And Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) |
| **PRINCIPAL INVESTIGATOR:** | K. Rais-Bahrami, M.D., Department of Neonatology |

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. If your child is seven years old or older, we will talk to your child about the study and ask your child to sign a form like this one. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

## A. PURPOSE OF STUDY

We want to study the iron levels in the blood of babies that require ECMO support. We know that during ECMO a lot of blood is broken down. A lot of iron is therefore being released in the patient's blood stream. We want to measure the level of iron in the bloodstream before we start ECMO and after ECMO, to see how high the levels of iron

**IRB USE:**

| IRB APPROVED |
|---|
| SEP 1 5 2004 |
| Children's Hospital |

| EXPIRATION |
|---|
| SEP - 1 2( |
| Children's H( |

IRB Protocol No.: 3424
Date: August 16, 2004
Page 1 of 5

PCP      NO,PRIMARY CARE
MR#:     020567916
Acct#:   0625400132
NIC      NIU-3606-A
Sex      M
Exp:
Adm:     09/11/05
DOB:     09/06/05
DR.      CHAMBERLAIN,JAMES
Ins.Plan

**CNMC 00003**



PRINTED BY: mlopez    DATE : 12/12/2006

go. We also want to measure the iron levels when you come back with your baby for follow-up, until your baby is one year old. We would like to see how long it takes for the iron levels to drop after ECMO. If babies' iron levels stay high for a long time, we will recommend that babies drink a low-iron formula and do not take a vitamin which contains iron after discharge from the NICU.

Your baby is being asked to be in this study because he or she is going to be placed on ECMO.

## B. PROCEDURE

Your baby is about to go on ECMO in the NICU at Children's Hospital. You have met or will meet a team of people involved in the care of your baby (doctors, ECMO specialists, nurses and respiratory therapists). If you agree that your baby can take part in this study, we will draw 2 cc of blood (less than half a teaspoon) from your baby as we are starting ECMO. We will send that sample to the lab for them to do iron studies. During ECMO a lot of blood will be drawn for other tests. This blood will be taken from the catheter already in place, we will not stick your baby somewhere else. If ECMO is stopped in less than 7 days, we will draw another 2 cc of blood, again from the catheter already there, and send it for iron tests. If your baby is on ECMO for longer than 7 days, we will make the same measurements after 7 days since ECMO is started, and then every 7 days until your baby is off ECMO. Then we will measure them again on the last day of ECMO.

When your baby comes back for follow-up in the Children's Hospital Developmental Clinic (at 4 months after discharge, 8 months after discharge and 12 months after discharge), we will repeat these tests, this time drawing blood from a vein or through a heel stick. We will not ask you to come back for a separate visit just for our study. If your baby needs to have other blood tests, we will try to do all blood draws at the same time.

If you would like, we will let you know what the results of our tests are, as they become available from the lab.

**IRB USE:**





IRB Protocol No.: 3424
Date: August 16, 2004
Page 2 of 5

CNMC 00003A

## C. POTENTIAL RISKS / DISCOMFORT

Once your baby is on ECMO, there will be frequent blood sampling from the catheter or tube that will be placed for ECMO. Drawing off the additional blood for our tests will add no additional risk or discomfort.

When your baby comes back for follow-up at 4, 8 and 12 months after discharge from the NICU, we will have to draw blood at each visit either through the vein or by a heel stick. The risks of blood drawing include bruising, swelling and possible infection. However, the person that will draw your baby's blood is a professional phlebotomist (person that draws blood for a living) who will take extra care to clean the area well to avoid the risk of infection. The phlebotomist will try to minimize the discomfort of drawing blood by using a very small needle.

## D. POTENTIAL BENEFITS

The babies who are part of this study will help us find out whether babies have very high iron levels after ECMO. If that is the case, we will change the diet recommendations, possibly to recommend low iron formula and no extra iron-containing vitamins after discharge from the NICU.

## E. ALTERNATIVES TO PARTICIPATION

We do not currently know what the levels of iron are in the babies that have been treated with ECMO. You may choose not to participate in this study.

## F. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you believe you have been injured as a result of being in this study, you should call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

*IRB USE:*





IRB Protocol No.: 3424
Date: August 16, 2004
Page 3 of 5


## G. CONFIDENTIALITY

We will keep the records of this study confidential. We will not tell anyone you are in the study. Only the people working on the study will know your name. They will keep this information in case we have to find you later for medical reasons. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. Your child's medical record is confidential, but just like any medical record, there are some exceptions under state and federal law.

## H. COMPENSATION

We cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something bad happened because your child was in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We do not promise to pay you anything or give your child free medical care if something bad happens, but we will look at each case carefully. We will give your child any emergency treatment needed. You do not give up any legal rights by signing this form and you are not releasing us from any responsibility if we do anything wrong.

## I. ADDITIONAL ELEMENTS

Children's Hospital will do the blood tests needed for this study for free. You will not be charged for anything else we do that is part of the study. You will still have to pay for any medical care that is not part of the study.

*IRB USE:*





IRB Protocol No.: 3424
Date: August 16, 2004
Page 4 of 5

CNMC 00004A

**CONSENT:**

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)    kept in the study file by the Principal Investigator;
(2)    put in your child's medical record; and
(3)    given to you to keep.

Please call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448 if you have any questions.

Printed Name of Participant: _____    _____

Medical Record Number: _____

Printed Name of Parent(s)/Guardian(s): _Theresa Momine_____

Signature of Participant: _Theresa A. Moung_____ Date: _09/13/05_
                                 (Participant must be 18 years of age or older)

Signature of Parent(s)/Guardian(s): _Phone Consent Obtained_ Date: _____
[Note: signature of both parents required if more than minimal risk and no direct benefit, unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only one parent has legal responsibility for the care and custody of the child]

**Witness (to signatures):** _Jordan Lucanus_____ Date: _9/11/05_
(may be investigator)

Translator's Signature (if, applicable): _N/A._____
                    Language: _English._____

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: _K Rais Bahrami_____

Title: _MD_ Signature: _K.R. Bahrami_____ Date: _Sept 13/2005_

**IRB USE:**

```
┌─────────────────────────┐
│    IRB APPROVED         │
│   ┌─────────────────┐   │
│   │  SEP 1 5 2004   │   │
│   └─────────────────┘   │
│   Children's Hospital   │
└─────────────────────────┘
```

```
┌─────────────────────────┐
│     EXPIRATION          │
│   ┌─────────────────┐   │
│   │  SEP - 1 2005   │   │
│   └─────────────────┘   │
│   Children's Hospital   │
└─────────────────────────┘
```

IRB Protocol No.: 3424
Date: August 16, 2004
Page 5 of 5

**CNMC 00005**

# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5448

## HIPAA/IRB <u>AGREEMENT FOR USE AND DISCLOSURE (SHARING)</u>

## IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:** *Evaluation Of Serum Iron And Iron Storage Levels In Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)*

**PRINCIPAL INVESTIGATOR:** *K. Rais-Bahrami*

**PROTOCOL NUMBER:** *3424*

**DATE:** *August 16, 2004*

The Health Insurance Portability and Accountability Act (HIPAA) protects my personal private health information. The Privacy Rule requires me to sign an agreement in order for researchers to be able to use or share my protected health information for research purposes in the study listed above.

I give my consent for Dr. K. Rais-Bahrami and his research staff to use and share my personal private health information for the purposes written below.

1.   My protected health information that may be used and shared including:

**PHI TO BE COLLECTED:** *Demographic data, levels of iron/ferritin/transferring/TIBC, duration of ECMO support.*

2.   My protected health information may be used for:

**DESCRIPTION OF PROJECT:**  We will measure your baby's levels of iron/ferritin/transferring/TIBC before we start ECMO, during ECMO, at completion of ECMO and at follow-up at 4, 8 and 12 months after discharge from our NICU.  Based on these data, we will be able to make dietary recommendations regarding the iron intake of your baby as well as other babies that have been on ECMO support during their NICU stay and after discharge from our NICU.

3.   My PHI is needed to conduct research because:

**WHY PHI WILL BE COLLECTED:** To see how high the levels of iron in your baby's blood get after ECMO, and how soon after ECMO they return to normal levels.

4.   Researchers may use and share my information with:

**IRB USE:**



**FORM A**

Page 1 of 2
Version 1, February 26, 2003

PCP      *NO. PRIMARY CARE*
MR#:    *020567916*
Acct#:   *0526400132*
NIC      *NN-3606-A*
Sex      *M*
Exp:
Adm:    *09/11/05*
DOB:    *09/06/05*
DR.      *CHAMBERLAIN, JAMES*
Ins.Plan

**CNMC 00006**

**SHARED INFORMATION:** The investigators and agencies of the federal government as well as the Institutional Review Board of the Children's Hospital can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. During the study period, the NICU nurses and ECMO specialists involved in your baby's care may also become aware of our data.

5.  Once my information has been shared with anyone outside of this study, I understand that the information may no longer be protected under this agreement.

6.  The Researchers agree to protect my information by using and sharing it only as allowed by me in this Agreement.

**LIST OF CNMC RESEARCHERS:** *K. Rais-Bahrami, MD, Chrysanthe G. Gaitatzes, MD/PhD and Billie L. Short, MD*

7.  I understand that I do not have to sign this Agreement. If I choose not to sign it, it will not change my standard treatment, payment or enrollment in any health plans or affect my ability to receive benefits, but I may not be allowed to join in the research study.

8.  After signing this Agreement, I can change my mind and:
    ➢ if I withdraw the agreement, not let the researcher use my personal private health information.
    ➢ if I withdraw the agreement, I will do so in writing to the Principal Investigator.
    ➢ if I withdraw the agreement, researchers may use and share my personal private health information already collected for this research study.
    ➢ if I withdraw this agreement, my protected health information may be used if I have an adverse event (side effect that requires reporting to the Research Staff ).
    ➢ if I withdraw the agreement, I may not be allowed to take part in the study.

9.  Optional – I understand that I will not be allowed to review the information collected for the research until after the study is completed. When the study is over, I will have the right to request access to the information again.

10. The end of this study agreement will be *when the study is completed.*

11. If I have not already received a Notice of Privacy Practices from Children's National Medical Center, I will request a copy and will be given one. If I have questions about my privacy rights, I can contact the Children's Hospital Privacy Officer, by calling the Legal Department of Children's Hospital at 202-884-4550.

12. I am the subject of the study or I am allowed to act on behalf of the subject. I have read this information and will get a copy of it after it is signed.

13. The Subject or the Subject's legal representative should sign this form. If signed by the subject's legal representative, please state the relationship.

RELATIONSHIP OF LEGAL REPRESENTATIVE:

*Mother*

Signature _Teresa A. Mewing_    Date _Sept 13/05_

**IRB USE:**

IRB APPROVED

SEP 1 5 2004

Children's Hospital

**FORM A**
Page 2 of 2
Version 1, February 26, 2003

**CNMC 00007**

# CHILDREN'S HOSPITAL

Departments of Neonatology[1] and Neurology[2]
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:**
Monitoring continuous amplitude integrated EEG (aEEG), and near-infrared spectroscopy (NIRS) brain oxygenation in neonates recovering from severe cardiopulmonary failure on extracorporeal membrane oxygenation (ECMO)

**PRINCIPAL INVESTIGATORS:**
Stephen Baumgart MD[1] (Principal Investigator, aEEG)
Khodayar Rais-Bahrami MD[1] (Principal Investigator, NIRS)
Taeun Chang MD[2] (Principal Investigator, Electroencephalography)

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

**CNMC 00008**

**IRB USE:**



IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 1 of 5

PCP     NO.PRIMARY CARE
MR#:    020567916
Acct#:  0525400132
NIC     NIU-3608-A
Sex     M
Exp:
Adm:    09/11/05
DOB:    09/06/05
DR.     CHAMBERLAIN,JAMES
Ins.Plan
Ins.ID#

PRINTED BY: mlopez    DATE : 12/12/2006

## A. PURPOSE OF STUDY

We plan to look at the use of two systems to monitor brain activity while your child is on ECMO. One is NIRS (near infrared spectroscopy) a monitor of brain oxygen levels. The other is an aEEG (amplitude-integrated electroencephalogram) which records electrical activity in the brain. These machines are safe, non-invasive and have been approved by the Food and Drug Administration. We want to see if information from these machines will provide additional information about brain activity around the time your child is placed on ECMO and if this information can be useful in predicting whether a child will have problems with brain development after he/ she recovers.

Your child is being asked to be in the study because he/she is a candidate for ECMO.

## B. PROCEDURE

We will place all infants in the study on both the NIRS and aEEG machines before they are started on ECMO. These two machines will be attached to your baby's head with an adhesive like others that we already use in the nursery and on your baby. Continuous monitoring will take place through the first 24-48 hours while on the ECMO circuit. Additionally, another two 12- 24hr readings with the aEEG machine will be done when your baby comes off ECMO and one week thereafter. Information from your baby's hospital course will also be collected such as number of days on ECMO and results of head ultrasounds or other related studies. No additional tests or blood withdrawals will be required as a part of this study. Routinely, your baby will be followed-up at the Infant Development Clinic at 4-6 months and 15-18 months of age. Information from these visits will also be collected as part of this study.

## C. POTENTIAL RISKS/DISCOMFORT

All parts of this study (i.e. treatment and monitoring while on ECMO, follow-up visits) are considered routine standard of care for your baby except for the use of the aEEG and NIRS machines. These machines have been approved for use in newborns and are not associated with any major side effects. We will carefully monitor lead placement and watch for any signs of local reaction or skin irritation to the aEEG or NIRS leads. There are no other tests or blood draws associated with this study.

**IRB USE:**





EXPIRATION

APR 1 2006

Children's Hosp

IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 2 of 5

APR 7 2005

**CNMC 00009**

## D. POTENTIAL BENEFITS

Your infant will have the added benefit of additional methods of brain activity monitoring while on ECMO. Information about potential seizures or other problems may be detected by the use of NIRS and aEEG, and may help us in treating your baby.

This study may also help us to predict and identify those patients who are at greatest risk for problems with brain development after recovery from ECMO. This new information will provide important prognostic information for patients and families that require ECMO in the future.

## E. ALTERNATIVES TO PARTICIPATION

Participation in the study is completely voluntary. If you decide not to participate, your child will be treated with the same coordinated care routinely offered in the NICU.

## F. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you believe you have been injured as a result of being in this study, you should call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

## G. CONFIDENTIALITY

We will keep the records of this study confidential. We will not tell anyone you are in the study. Only the people working on the study will know your name. They will keep this information in case we have to find you later for medical reasons. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. Your child's medical record is confidential, but just like any medical record; there are some exceptions under state and federal law.

**IRB USE:**




IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 3 of 5

**CNMC 00010**

## H. COMPENSATION

We will not pay you or your child for participation in this study. There are no additional costs to you as a part of participating in this study. You will still have to pay for any medical care that is not part of the study.

## I. ADDITIONAL ELEMENTS

We cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something bad happened because your child was in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We do not promise to pay you anything or give your child free medical care if something bad happens, but we will look at each case carefully. We will give your child any emergency treatment needed. You do not give up any legal rights by signing this form and you are not releasing us from any responsibility if we do anything wrong.

Dr. Rais-Bahrami (one of the principal investigators involved with this study) is under contractual agreement with CAS Medical Systems for research and development of the NIRS system. However, all data from NIRS system recordings will be de-identified (your baby's name and medical information will not be provided) before it is shared with CAS medical systems for analysis.

## CONSENT:

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)     kept in the study file by the Principal Investigator;
(2)     put in your child's medical record; and
(3)     given to you to keep.

Please call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120 if you have any questions.

Printed Name of Participant: _____     _____
Medical Record Number: _____     _____

*IRB USE:*




IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 4 of 5

**CNMC 00011**

*Form Revised December 2001*

Phone consent obtained from mother

Printed Name of Parent(s)/Guardian(s): Theresa Morris

Signature of Parent(s)/Guardian(s): Terri Morris          Date: 09/13/05

**Witness (to signatures):** Jordana Finz, MD          Date: 9/11/05
(may be investigator)

Translator's Signature (if, applicable): N/A
                              Language: English

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: Jordana Fenit
Title: MD   Signature: Jordana Finz, MD          Date: 9/11/03

*IRB USE:*



APR 7 2005



EXPIRATION

APR 1 2006

Children's Hospital

IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 5 of 5

**CNMC 00012**

# EXHIBIT 6



Consent Form Revised January 12, 2005

# CHILDREN'S NATIONAL MEDICAL CENTER
Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY AND AUTHORIZATION TO
## USE PROTECTED HEALTH INFORMATION

| | |
|---|---|
| **TITLE OF STUDY:** | Evaluation of Serum Iron And Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) |
| **PRINCIPAL INVESTIGATOR:** | K. Rais-Bahrami, MD, Department of Neonatology |

### *"You" refers to "You" or "Your Child" throughout this document*

**INTRODUCTION:**  We would like to invite you to be part of a research study at Children's National Medical Center.  Before you decide if you would like to participate, we want you to know why we are doing the study.  We also want you to know about any risks (anything unexpected that might happen) and what you will be expected to do in the study.

This form gives you information about the study.  Your doctor will talk to you about the study and answer any questions you have.  We encourage you to discuss this study with your family and anyone else you trust before making your decision.  We will ask you to sign this form to show that you understand the study.  If your child is seven years old or older, we may talk to your child about the study and ask your child to sign a form like this one but shorter.  We will give you a copy of this form to keep.  It is important that you know:

- You do not have to join the study;
- You may change your mind and stop being in the study any time you want.  In some cases however, stopping the study medication early may cause harm to you.  Your doctor will discuss this with you.

**IRB APPROVAL DATE:**          **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 1 of 9
Reviewed by IRB _____

**CNMC 02826**



Consent Form Revised January 12, 2005

- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

## A. PURPOSE OF STUDY

We want to study the iron levels in the blood of babies that require ECMO support. We know that during ECMO a lot of blood is broken down. A lot of iron is therefore being released in the patient's blood stream. We want to measure the level of iron in the bloodstream before we start ECMO and after ECMO, to see how high the levels of iron go. We also want to measure the iron levels before your baby is discharged from the CNMC NICU, as well as when you come back with your baby for follow-up, until your baby is one year old. We would like to see how long it takes for the iron levels to drop after ECMO. If babies' iron levels stay high for a long time, we will recommend that babies drink a low-iron formula and do not take a vitamin which contains iron after discharge from the NICU.

Your baby is being asked to be in this study because he or she is going to be placed on ECMO.

## B. PROCEDURE

Your baby is about to go on ECMO in the NICU at Children's Hospital. You have met or will meet a team of people involved in the care of your baby (doctors, ECMO specialists, nurses and respiratory therapists). If you agree that your baby can take part in this study, we will draw 2 cc of blood (less than half a teaspoon) from your baby as are starting ECMO. We will send that sample to the lab for them to do iron studies. During ECMO a lot of blood will be drawn for other tests. This blood will be taken from the catheter already in place, we will not stick your baby somewhere else. If ECMO is stopped in less than 7 days, we will draw another 2 cc of blood , again from the catheter already there, and send it for iron tests. If your baby is on ECMO for longer than 7 days, we will make the same measurements after 7 days since ECMO is started, and then every 7 days until your baby is off ECMO. Then we will measure them again on the last day of ECMO.

We will subsequently draw 2 cc of blood and run the same tests before your baby is discharged from the CNMC NICU, and subsequently when your baby comes back for follow-up in the Children's Hospital Developmental Clinic (at 4 months after discharge, 8 months after discharge and 12 months after discharge), this time drawing blood from a

**IRB APPROVAL DATE:**          **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6 2005
Page 2 of 4
Reviewed by IRB _____

**CNMC 02827**



vein or through a heel stick.   We will not ask you to come back for a separate visit just for our study.  If your baby needs to have other blood tests, we will try to do all blood draws at the same time.

If you would like, we will let you know what the results of our tests are, as they become available from the lab.

## C. POTENTIAL RISKS/DISCOMFORT

Once your baby is on ECMO, there will be frequent blood sampling from the catheter or tube that will be placed for ECMO.  Drawing off the additional blood for our tests will add no additional risk or discomfort.

Prior to your baby's discharge, and when your baby comes back for follow-up at 4, 8 and 12 months after discharge from the NICU, we will have to draw blood at each visit either through the vein or by a heel stick.  The risks of blood drawing include bruising, swelling and possible infection.  However, the person that will draw your baby's blood is a professional phlebotomist (person that draws blood for a living) who will take extra care to clean the area well to avoid the risk of infection.  The phlebotomist will try to minimize the discomfort of drawing blood by using a very small needle.

## D. VOLUNTARY PARTICIPATION

There will be no penalty or loss of benefits to which you are otherwise entitled if you decide to withdraw from the study.

## E. POTENTIAL BENEFITS

The babies who are part of this study will help us find out whether babies have very high iron levels after ECMO.  If that is the case, we will change the diet recommendations, possibly to recommend low iron formula and no extra iron-containing vitamins after discharge from the NICU.

IRB APPROVAL DATE:

IRB EXPIRATION DATE:

IRB Approved

AUG 1 7 2005

Children's Hospital

EXPIRATION

SEP – 0 2006

Children's Hospital

IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 3 of 9
Reviewed by IRB _____

CNMC 02828



Consent Form Revised January 12, 2005

## F. ALTERNATIVES TO PARTICIPATION

We do not currently know what the levels of iron are in the babies that have been treated with ECMO. You may choose not to participate in this study.

## G. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you believe you have been injured as a result of being in this study, you should call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

## H. CONFIDENTIALITY

We will keep the records of this study confidential. Only the people working on the study will know your name. They will keep this information in case we have to find you later to let you know of any new information that may affect your health. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study. Your medical record is confidential, but just like any medical record, there are some exceptions under state and federal law.

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY

In 1996 the government passed a law known as The Health Insurance Portability and Accountability Act (HIPAA). This privacy law protects your individually identifiable health information (Protected Health Information or PHI). The privacy law requires you to sign an agreement so researchers can use or share your PHI for research purposes. This describes to you how information about you may be used or shared if you are in a research study. It is important that you read this carefully and ask a member of the research team to explain anything you do not understand.

I authorize Dr. K. Rais-Bahrami and his research staff to create, access, use, and disclose my PHI for the purposes described below.



IRB APPROVAL DATE:        IRB EXPIRATION DATE:

IRB Approved
AUG 1 7 2005
Children's Hospital

EXPIRATION
SEP - 8 2006
Children's Hospital

IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 4 of 9
Reviewed by IRB _____

CNMC 02829



*Consent Form Revised January 12, 2005*

**Protected Health Information that may be used and shared includes:**

☒ Information that identifies you such as name, address, telephone number, date of birth, Social Security number, and other details about you
☒ Information that relates to your health or medical condition from your medical records
☒ Information obtained from the study procedures outlined in this consent form, for example: things done to see if you can join the study such as physical exams, blood and urine tests, x-rays and other tests, and any other medical information we learn from you about your health history and family history
☒ Laboratory results obtained on specimens collected from you (blood, urine, tissue)
☐ Questionnaires or surveys you complete
☐ Interviews conducted with you by members of the research team
☐ Audio/ video recordings
☐ Other *[please specify]:
   *Example: *list any additional information that may be obtained from participants that is listed above such as information about financial and social circumstances, or educational level.*

**The Researchers may use and share my Protected Health Information with:**

♦ The Principal Investigator, other Investigators, Study Coordinators, and all administrative staff in charge of doing work for the study;
♦ Government agencies that have the right to see or review your PHI, including but not limited to the Office of Human Research Protections and the Food and Drug Administration;
♦ Children's National Medical Center Institutional Review Board;
♦ Audit Committee of the Children's National Medical Center Institutional Review Board;
♦ Quality Improvement Program Coordinator and other staff in the Office for the Protection of Human Subjects at Children's National Medical Center.

**In addition to the above people and organizations, the Researchers may also use and share my Protected Health Information with:**

☐ Doctors and staff at other places that are participating in the study. The name(s) of the other place(s) that are participating in this study are
☒ Laboratories and other people or organizations that look at your health information in

**IRB APPROVAL DATE:**

> **IRB Approved**
> AUG 1 7 2005
> **Children's Hospital**

**IRB EXPIRATION DATE:**

> **EXPIRATION**
> SEP – 1 2006
> **Children's Hospital**

IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 5 of 9
Reviewed by IRB _____

**CNMC 02830**



Consent Form Revised January 12, 2005

connection with this study. The name(s) of the laboratory(ies) being used in this study is (are) the Children's National Medical Center Laboratory.

☐ The Sponsor of the study and people that the Sponsor may contract with for the study. The name of the Sponsor is

☐ The Contract Research Organization (an organization that helps the Sponsor run the study). The name of the Contract Research Organization is

☒ The Data Safety Monitoring Board (a group of people who examine the medical information during the study)

☒ The Medical Monitor for the Study (a person who reviews medical information during the study)

☒ The Patient Advocate or Research Ombudsman (person who watches out for your best interest)

☐ Any other outside entity who will receive health information
  Please list:

Also, your primary physician will be contacted if during the course of the study the researcher learns of a medical condition that needs immediate attention.

Should your health information be disclosed to anyone outside of the study, your information may no longer be protected by HIPAA and this Authorization. However, the use of your health information will still be regulated by applicable federal and state laws.

If you agree to participate in this research study, the research team, the research sponsor (when applicable) and the sponsor's representatives, may use Personally Unidentified Study Data. The Personally Unidentified Study Data does not include your name, address, telephone, or social security number. Instead, the researcher assigns a code to the Personally Unidentified Study Data. Personally Unidentified Study Data may include your date of birth, initials, and dates you received medical care. Personally Unidentified Study Data may also include the health information used, created, or collected in the research study. The research team or the research sponsor may share the Personally Unidentified Study Data with others to perform additional research, place it into research databases, share it with researchers in the U.S. or other countries, or use it to improve the design of future studies. They may also publish it in scientific journals, or share it with business partners of the sponsor and to file applications with U.S. or foreign government agencies to get approval for new drugs or health care products.

**IRB APPROVAL DATE:**          **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 6 of 9
Reviewed by IRB _____

**CNMC 02831**



Consent Form Revised January 12, 2005

**You do not have to sign this Consent/Authorization.** If you decide not to sign the Authorization, you will not be allowed to participate in the research study.

**After signing the Consent/Authorization, you can change your mind and:**

♦ Revoke this Authorization. If you revoke the Authorization, you will send a written letter to: K. Rais-Bahrami to inform him/her of your decision.

♦ If you revoke this Authorization, researchers may only use and disclose the PHI that was collected for this research study before you revoked the Authorization.

♦ If you revoke this Authorization your PHI may still be used and disclosed if you should have an adverse event (unexpected side effect).

♦ If you change your mind and withdraw the Authorization, you will not be allowed to participate in the study.

You will be allowed to review the information collected for this research study until after the study is completed. If you are not allowed to review your information during participation in the study, when the study is over you will have the right to access the information. This Authorization does not have an expiration date .

**If you have not already received a Notice of Privacy Practices from Children's National Medical Center, you may request a copy and will be given one. If you have any questions or concerns about your privacy rights, you may contact the Children's Hospital Privacy Officer at 202-884-4550.**

**I. COMPENSATION**

Children's National Medical Center cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something unexpected happened because you were in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We will give your child any emergency treatment needed.

**IRB APPROVAL DATE:**        **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 7 of 9
Reviewed by IRB _____

**CNMC 02832**



*Consent Form Revised January 12, 2005*

## J. ADDITIONAL ELEMENTS

You or your health insurance will not be charged for the lab tests we do for this study. You will still have to pay for any medical care that is not part of the study. There will be no consequences to you or your child for withdrawing from this study.

### Research Subject Advocate:

The National Institutes of Health supports a Research Subject Advocate or RSA for the research study that you are being asked to join. The RSA, Dr. Tomas Silber, is here to answer your questions or concerns about taking part in this research. Dr. Silber does not work for the doctors who are doing this research and they do not pay him. He is here only to help and protect you during any research.

You may contact Dr. Silber at any time. This can be done before you decide to take part in the research, during the study, or even after you finish the study. You can call Dr. Silber at 202-884-3066 or reach him by e-mail at tsilber@cnmc.org.

### CONSENT / AUTHORIZATION:

I am the participant or I am authorized to act on behalf of the participant. I have read this information and will receive a copy of this form after it is signed.

By signing this form, you agree that you have talked to your doctor about the study and understand it, and you want to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may decide to stop being in this study at any time and no one will mind and nothing will change about your medical care other than not being in the study. Copies of this form will be:

(1) Kept in the study file by the Principal Investigator;
(2) Put in your medical record; and
(3) Given to you to keep.

Please call the Principal Investigator, K. Rais-Bahrami, M.D. at (202) 884-5448 if you have any questions.



**IRB APPROVAL DATE:**

IRB Approved
AUG 1 7 2005
Children's Hospital

**IRB EXPIRATION DATE:**

EXPIRATION
SEP - 1 2006
Children's Hospital

IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 8 of 9
Reviewed by IRB _____

**CNMC 02833**

# EXHIBIT 7

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
-------------------------x
                         :
TERESA A. MORRING,       :
et al.                   :
                         :
        Plaintiffs       :
                         : Civil Action
   vs.                   : No. 06cv0206
                         :
CHILDREN'S NATIONAL      :
MEDICAL CENTER           :
                         :
        Defendant        :
                         :
-------------------------x
```

Washington, D.C.

Thursday, December 20, 2007

Deposition of:

STEPHEN BAUMGART, M.D.

called for oral examination by counsel for
Plaintiffs, pursuant to notice, at the
Children's National Medical Center, Risk
Management Conference Room, Floor 2.5,
111 Michigan Avenue, N.W., Washington, D.C.,
beginning at 2:08 p.m., before Renee A. Feder,
CSR, a Notary Public in and for the District
of Columbia, when were present on behalf of
the respective parties:

Case 1:06-cv-02036-RMC    Document 24-8    Filed 03/17/2008    Page 3 of 4

## Page 2

On behalf of the Plaintiffs:
Chaikin & Sherman
By: ANTHONY G. NEWMAN, ESQ.
    1232 17th Street, N.W.
    Washington, D.C. 20036
    (202) 659-8600

On behalf of the Defendant:

Jackson & Campbell
By: NICHOLAS S. McCONNELL, ESQ.
By: KRISTA MAIZEL, Esq.
    1120 20th Street, N.W., 300 South Tower
    Washington, D.C. 20036
    (202) 457-1600

+ + +
C O N T E N T S

WITNESS: STEPHEN BAUMGART, M.D.
EXAMINATION BY:                PAGE
MR. NEWMAN                     3
MR. McCONNELL                  -

EXHIBITS
DEPOSITION NO.    MARKED FOR IDENTIFICATION
None.

## Page 3

Thereupon,
        STEPHEN BAUMGART, M.D.
was called for examination by counsel and,
after having been duly sworn by the Notary,
was examined and testified as follows:
    EXAMINATION BY COUNSEL FOR PLAINTIFF
        BY MR. NEWMAN:
    Q.    State your full name for the record.
    A.    Stephen Michael Baumgart.
    Q.    Dr. Baumgart, are you presently on any kind of medication or any other substance that would impair your decision making or judgment?
    A.    No.
    Q.    And I understand you had some type of -- I want to say a cardiovascular accident or cerebral accident?
    A.    A stroke. March 1, 2005.
    Q.    And I understand you also, from at least looking at you, you had a good recovery from that?

## Page 4

    A.    Yes. It took a better part of twelve months working at that.
    Q.    Are you back to work?
    A.    Yes. Full time.
    Q.    Just so I understand, what is your -- let's do it this way. Back in 2005, was there a difference in your position at Children's as it is today?
    A.    No.
    Q.    What do you do?
    A.    I am a neonatologist.
    Q.    Any involvement whatsoever with the ECMO program?
    A.    Yes.
    Q.    What is that?
    A.    I am responsible as a faculty member to decide, make the final decision which babies would benefit from ECMO and obtain informed consent from them for that procedure from the families.
    Q.    Besides making the decision which I guess means fitting the criteria for

## Page 5

inclusion?
    A.    Yes.
    Q.    And doing informed consent, any other role you play as far as hands-on in the treatment of the child?
    A.    I am supervisory for the neonatology fellows in training, and the ECMO team comprised of the profusion specialist, the nurses who specialize in ECMO.
    Q.    Do you have any role with regard to -- I know there is an ECMO manual and a policies and procedures guide. Do you have any involvement with review, promulgating those types of documents?
    A.    Not yet.
    Q.    Does that mean you will be involved in doing that in the future?
    A.    Yes.
    Q.    New guidelines, new rules? Is that what you are looking at?
    A.    We are adding information to the Extracorporeal Life Support Organizations.

Page 6

1  **What would you call that? It is not a policy**
2  **or a procedure. It is a manual of modern**
3  **practices with ECMO.**
4      Q.    When you say that, are we talking
5  about any involvement you have with ELSO or
6  just within the institution of Children's?
7      A.    **With ELSO, through Dr. Billie Lou**
8  **Short.**
9      Q.    First of all, back in 2005, I do
10 understand you were at least a principal
11 investigator in what is called an aEEG study?
12     A.    **Yes.**
13     Q.    And back in 2005, just to get an
14 idea, how many studies were you involved in,
15 do you remember?
16     A.    **That would be the only one in**
17 **2005.**
18     Q.    As far as Dr. Rais Bahrami, any
19 other that he was involved with that you know
20 of besides the one that you guys participated
21 in which involved the aEEG?
22     A.    **I believe he was involved with**

Page 7

1  **several studies in his role as director of the**
2  **neonatology fellowship program. It is a**
3  **requirement of our fellowship that every**
4  **fellow participate in a research protocol.**
5      Q.    If I am correct, that actually
6  means that in order to finish their fellowship
7  they must be involved with a research
8  protocol?
9      A.    **Yes.**
10     Q.    So, at least during 2005, or for
11 that matter, the years before, there were
12 always studies going run by, along with the
13 attending, a fellow?
14     A.    **Yes.**
15     Q.    And that was because they had to
16 finish that to get their curriculum finished?
17     A.    **Yes.**
18     Q.    Now, with respect to this case
19 with regard to informed consent, do you, as a
20 broad topic, do you remember Teresa Morring or
21 the        baby?
22     A.    **No, sir.**

Page 8

1      Q.    Am I correct that outside of there
2  being some records in this case to that
3  effect, that would be the only knowledge you
4  would have, or your recollection of Teresa
5  Moore?
6          MR. McCONNELL:  Can we correct
7  this?  We had mentioned at the beginning that
8  Dr. Baumgart had a stroke on March 1, 2005.  I
9  think if asked, he would tell you he was on
10 medical leave of absence right through the
11 entire period of time that this infant was
12 here.  So he had no actual --
13         THE WITNESS:  I resumed active
14 clinical duties with night call full time in
15 October.
16         BY MR. NEWMAN:
17     Q.    So, basically, you were out for
18 medical reasons during the time this child was
19 being treated?
20     A.    **Yes.  I was pursuing rehab.  And I**
21 **would come in for half days to work on**
22 **manuscripts and such things.**

Page 9

1      Q.    Let me understand this.  It looks
2  from the stamp that in April of 2005,
3  specifically April 7, the clinical study
4  involving the aEEG began.  Am I correct that
5  in April you were no longer able --
6      A.    **I was incapacitated.**
7      Q.    As far as the role in the aEEG
8  portion of the study then, who was doing that?
9      A.    **I was working with a fellow, with**
10 **Jordana Fenik, and with Dr. Raiz Bahrami.**
11     Q.    In the form that I have, which
12 appears to be at least the consent, it lists
13 Dr. Bahrami as the principal investigator of
14 what is referred to as the NIRS; you as the
15 principal investigator of the aEEG; and
16 Dr. Chang as an investigator --
17     A.    **-- of the aEEG.**
18     Q.    But, in fact, he would be the one
19 that was involved in that along with this
20 fellow that you mentioned?
21     A.    **Yes.**
22     Q.    How do you spell the fellow's

# EXHIBIT 8

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


```
-------------------------x
                         :
TERESA A. MORRING,       :
et al.                   :
                         :
          Plaintiffs     :
                         :  Civil Action
     vs.                 :  No. 06cv0206
                         :
CHILDREN'S NATIONAL      :
MEDICAL CENTER           :
                         :
          Defendant      :
                         :
-------------------------x
```

Washington, D.C.
October 24, 2007

Deposition of:

KHODAYAR RAIS-BAHRAMI, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 12:30 p.m., before Lynell C.S.

Abbott, a Notary Public in and for the

District of Columbia, when were present on

Page 2

```
1
2   behalf of the respective parties:
3
4   On behalf of the Plaintiffs:
5   Chaikin & Sherman
    By:  ANTHONY G. NEWMAN, ESQ.
6      1232 17th Street, N.W.
       Washington, D.C. 20036
7      (202) 659-8600
8
    On behalf of the Defendant:
9
    Jackson & Campbell
10  By:  NICHOLAS S. McCONNELL, ESQ.
    By:  KRISTA MAIZEL, Esq.
11     1120 20th Street, N.W., 300 South Tower
       Washington, D.C. 20036
12     (202) 457-1600
13            + + +
14          C O N T E N T S
15  WITNESS: KHODAYAR RAIS-BAHRAMI, M.D.
16  EXAMINATION BY:              PAGE
17  MR. NEWMAN                3, 137, 163
18  MR. McCONNELL               129, 160
19
20          EXHIBITS
21  None.
22
```

Page 3

```
1
2   Whereupon,
3      KHODAYAR RAIS-BAHRAMI, M.D.
4   was called for examination by counsel and,
5   having been duly sworn by the Notary, was
6   examined and testified as follows:
7   EXAMINATION BY COUNSEL FOR PLAINTIFFS
8      BY MR. NEWMAN:
9   Q.   Good afternoon, Doctor.
10  A.   Good afternoon.
11  Q.   I have been provided a document
12  which is 14 pages long, apparently.  I think
13  only the first two or three pages -- for the
14  record, it's Pages 2538 to actually just 2540.
15  It's a three-page document which doesn't say
16  it's your CV but it looks like it came off the
17  Internet.
18       Is that the only curriculum vitae
19  you have?  It says, also, "Punch here for
20  map."  I'm assuming it comes off the Internet.
21  Do you have another document like that or is
22  that it?
```

Page 4

```
1   A.   You are asking me to verify these
2   informations are correct?
3   Q.   Well, I'm first asking you is that
4   your curriculum vitae?
5   A.   No.
6   Q.   Okay.  It seems to be a printout
7   from the Internet.  Do you have a curriculum
8   vitae printed up somewhere?
9      MR. McCONNELL:  Do we have one?
10     MR. NEWMAN:  That's the one you
11  gave to me, actually.
12     THE WITNESS:  I do.
13     MR. McCONNELL:  Let's see if we
14  have something better than that.
15     BY MR. NEWMAN:
16  Q.   But you could look through it just
17  to say -- does it appear to be incomplete, in
18  other words, between your publications and
19  other works, or is it relatively complete?
20  A.   The information is correct.  This
21  is part of my -- I mean it's a part of my CV.
22  Q.   All right.  Meaning there is a
```

Page 5

```
1   document that has more entries than that that
2   is your actual CV.
3   A.   Yes.
4   Q.   If you can provide that to counsel
5   to provide to me, that will be fine.  Is this
6   a CV that is kept at Children's on the
7   Internet?
8   A.   Correct.
9   Q.   The last publication on this
10  document is in Perfusion 2004.  Have you
11  written anything since then that's been
12  published?
13  A.   Yes.
14  Q.   Is there any other research or
15  funding that you've been involved with besides
16  what's on here?
17  A.   May I see that.  No.
18  Q.   When did you first come to
19  Children's, what year?
20  A.   July of 1991.
21  Q.   While it does not give me the
22  years of what's called Past Research
```

Page 38

1    A.    Yes.
2    Q.    How many patients had been signed
3  up, if you will, for that protocol by that
4  time?
5    A.    I don't know.
6    Q.    Did you ultimately continue with
7  that protocol and study or did you abandon it?
8    A.    Continued it.
9    Q.    Has it ever been published?
10   A.    Not yet.
11   Q.    Was there a mean number of
12 patients that you had to have before you could
13 --
14   A.    Yes.
15   Q.    -- play with the data?
16   A.    Yes.
17   Q.    How many was that?
18   A.    30.
19   Q.    Do you know where this patient sat
20 in relationship to that number?
21   A.    No.
22   Q.    Was it somewhere in the middle of

Page 39

1  the study or at the beginning of the study?
2    A.    Probably in the -- I don't
3  remember.
4    Q.    Were you the one that talked to
5  the mother -- well, first of all, would you be
6  the one to talk to the guardian of the patient
7  about informed consent for the study?
8    A.    Not necessarily.
9    Q.    And do you remember in this case
10 speaking to the mother -- let's start with the
11 broad question -- ever?  Do you remember
12 speaking to her as you sit here today?
13   A.    Yes.
14   Q.    Do you remember speaking to her on
15 more than one occasion?
16   A.    Absolutely.
17   Q.    Do you remember ever speaking to
18 her about this protocol?
19   A.    No.
20   Q.    Were there other people working
21 with you on the protocol?
22   A.    Yes.

Page 40

1    Q.    Were there other investigators and
2  you were the principal investigator?
3    A.    Yes.
4    Q.    And was it many times their
5  responsibility to go over the informed consent
6  with the guardian?
7    A.    Absolutely.
8    Q.    As far as the study was concerned,
9  I assume that the procedure was followed and
10 the risk/benefit ratio was determined, in
11 other words, the potential risks versus the
12 benefit and the outcome.
13   A.    Yes.
14   Q.    Am I correct that this would have
15 been a minimal risk procedure?
16   A.    Correct.
17   Q.    The process of using ECMO itself,
18 is that considered a significant risk device,
19 a device with significant risks?
20   MR. McCONNELL:  Objection to the
21 characterization of ECMO as a device.  It's
22 not a device.  It's a therapy, I would argue.

Page 41

1  But subject to my objection, you may answer.
2    THE WITNESS:  Would you kindly
3  rephrase that question?
4    BY MR. NEWMAN:
5    Q.    Let's at least take, for example,
6  the use of the Jostra pump.  Is that
7  associated with significant risks as opposed
8  to, let's say, your study that was involving
9  checking iron in the blood which is a minimal
10 risk?
11   MR. McCONNELL:  Again, objection
12 as to form and foundation.  But to the extent
13 you understand the question, you may answer.
14   THE WITNESS:  I still do not
15 understand what you are comparing and asking
16 me for.
17   BY MR. NEWMAN:
18   Q.    You do know from your own study as
19 an investigator of the titles of minimal or
20 significant, moderate risk devices, use of
21 devices.
22   A.    Absolutely, yes.

Page 146

1. things, and I don't want to keep going back
2. over other things. So my point is if you want
3. to stick with what you said to me earlier as
4. what you would definitely have said to a
5. patient like this and what Mr. McConnell's
6. answers are if someone asked you and if you
7. did this you might say that, we'll leave it at
8. that.
9.      But I just need to know what your
10. general core information is and what you
11. believe you said in this case, if you had any
12. recollection beyond that. So if you want to
13. stick to your old testimony before Mr.
14. McConnell's questions, fine. And then you can
15. say that if a patient asks as Mr. McConnell
16. asked --
17.      MR. McCONNELL: I didn't ask that.
18. You are misstating the record.
19.      MR. NEWMAN: We'll see. The
20. record is the record. I'm just trying to give
21. this man an opportunity to rely on his prior
22. testimony.

Page 147

1.      MR. McCONNELL: He specifically
2. mentioned, for example, the risk of heparin,
3. and what's the explanation of that, what does
4. it mean, what does he discuss. That was the
5. context.
6.      MR. NEWMAN: Right, you asked. He
7. didn't say he discussed those issues, and
8. especially intraventricular hemorrhage. Very
9. amusing he didn't mention that. He did when
10. you asked him. You can ask him something
11. about whether there's blood in the urine but
12. that doesn't mean unless the patient asked
13. that that he would say that.
14.      So if you understand, Doctor, I
15. see no other way to do it. Either you adopt
16. your prior testimony or continue again.
17.      MR. McCONNELL: Please take your
18. time. Just do it. Go through an
19. explanation--
20.      BY MR. NEWMAN:
21.   Q.   What the minimum you would tell a
22. patient is unless they ask further questions

Page 148

1. or unless you felt that there was some
2. specific reason.
3.   A.   I do start with providing them the
4. information of what the infant's condition is.
5. "At the present time in spite of maximum
6. respiratory, cardiorespiratory and
7. pharmacologic support, the infant's condition
8. is not improving and getting worse. His or
9. her chances of dying while failing to respond
10. to maximum level of conventional therapy is
11. extremely high and we have opportunity to
12. provide extracorporeal life support to
13. temporarily take over the heart and lung
14. function." And then I go to the specific
15. discussion of what extracorporeal life support
16. entails.
17.      MR. McCONNELL: Tell us about it.
18. That's the question. Tell us the whole thing.
19.      BY MR. NEWMAN:
20.   Q.   Don't give me a summary. Tell me
21. what you said.
22.   A.   I clearly tell them they're

Page 149

1. consenting to do a surgical cut-down on the
2. right side of the neck to access the major
3. blood vessels, to cannulate or insert a
4. cannula for connecting the patient's or the
5. baby's heart to the extracorporeal life
6. support machine and that entails circulating
7. the blood into the circuit that is pre-primed
8. with donor blood.
9.      So they are consenting to blood
10. transfusion. And in order to run that blood
11. into that circuit without constant clot
12. formation is to maintain a certain level of
13. anticoagulation which includes continuous
14. heparinization or blood thinner.
15.      The side effect of that may
16. include or does include risk of bleeding from
17. the baby which by far involves, and I said
18. before, involves intraventricular or
19. intracranial hemorrhage. And I usually
20. summarize at the end that there are risk of
21. surgery, there are risk of anesthesia, there
22. are risk of large quantity of blood

Page 150

1  transfusion, there are risk of blood thinner
2  and heparinization and the subsequent risks of
3  spontaneous bleeding or hemorrhage in the
4  patient, and almost always ask them if they
5  understood what I said.
6        Very often I ask them to repeat
7  what I told them. And at the end I always
8  give them opportunity to ask questions or if
9  they have heard this from other colleagues of
10  mine who actually referred the patients to us,
11  what they told them and what they understood
12  and if any of those was covered in my
13  discussion or if they have further questions
14  that I need to respond to.
15        And that is what I exactly did, as
16  you asked me and as Mr. McConnell asked me. I
17  answered very, very precisely.
18    Q.    Now, is that it? I don't want to
19  hear anything else you talked about or
20  anything else you would generally say to
21  patients in informed consent. Have we now
22  completed the list of what you would talk

Page 151

1  about with regard to everything, from why to
2  the risks to the issues that could happen and
3  of course to asking them to repeat it, does
4  that complete it now?
5    A.    I do mention to them that this is
6  a very, very critical and risky procedure and
7  there are very known major side effects and
8  major complications that could potentially be
9  life-threatening. Very often they ask me,
10  "Can my baby die on ECMO?" And I say, "Yes.
11  This does not guarantee survival, does not
12  guarantee recovery, does not guarantee
13  lifelong well being. But this is what we have
14  to offer at the moment to see what happens
15  next." And I'm very much up front and forward
16  with them. I mean there is nothing I have to
17  hide.
18    Q.    Anything else?
19    A.    No.
20    Q.    In this particular case you would
21  have also told the mother, would you not, as
22  far as condition is concerned, not necessarily

Page 152

1  with informed consent, but that the hope is
2  that the hypertrophic condition of the heart
3  would improve when the patient is placed on
4  bypass for a period of time.
5    A.    Without that hope, why would I
6  even do this?
7    Q.    And that's what you are getting
8  the consent for and that's what the purpose
9  was in this case.
10    A.    Yes.
11    Q.    Now, the record will reflect that
12  earlier I asked you if this patient had
13  suffered a cardiac arrest. And you said, "I
14  do not know." Is that still your testimony?
15  You went through the respiratory, went through
16  cardiac. Do you know if this patient suffered
17  a cardiac arrest?
18        MR. McCONNELL:  Again, objection
19  as to the form of the question, because it may
20  mean several different things. Subject to
21  that, you may answer.
22        BY MR. NEWMAN:

Page 153

1    Q.    Or do you still not know?
2    A.    May I rephrase your question or
3  answer to your question?
4        MR. McCONNELL:  It's your
5  testimony.
6        BY MR. NEWMAN:
7    Q.    That means you can't answer it as
8  I stated it, did this patient suffer a cardiac
9  arrest. Is that to say you can't answer that
10  question? That is my question.
11        MR. McCONNELL:  There is an
12  ambiguity in it. But subject to my form
13  objection, you may answer. You may answer in
14  whatever way under oath you feel comfortable.
15  That's what a witness needs to do.
16        THE WITNESS:  The patient required
17  cardiac compression but not at any given time
18  had cardiac arrest, i.e., asystole.
19        BY MR. NEWMAN:
20    Q.    And how are you aware during the
21  time when there are no recordations of pulse,
22  blood pressure, and only bagging, that this

# EXHIBIT 9



**PROGRESS NOTES**

PCP   NO_PRIMARY CARE
MR#:  020567916
Acct#:  0626400132
NIC  NIU-3606-A
Sex  M
Exp:
Adm:  03/11/05
DOB:  09/06/05
DR.  CHAMBERLAIN, JAMES
Ins.Plan

Ins.ID#




Patient's Name: _____

| DATE/TIME | Education Plan: | INITIALS |
|---|---|---|

**Education Plan:** Reviewed: ☐  Updated: ☐  Continue as planned: ☐  N/A: ☐

Date: 9/13   Time: 11³⁰

### CARDIOLOGY SERVICE PROGRESS NOTE – Attending Physician Addendum

Multidisciplinary rounds made with residents & fellows, ☒Nurse, ☐Respiratory therapist, ☐Pharmacist, ☐Case Manager, ☐Family, ☐Social Worker, ☐Nutritionist.

☒I saw and evaluated the patient. ☒I reviewed the case with the Cardiology fellow/resident and agree with the findings and plan as documented in their note except as outlined below. Refer to their note for details.

I reviewed the following: ☐Radiology tests ☒Echo ☐Cath ☐EKG ☐Holter ☒Labwork

The patient's condition and plan were discussed with: ☐PICU Team ☐Primary Cardiologist ☐CV Surgery ☐Patient ☒NICU Team ☐Primary Care Provider ☐Other Consultants ☐Patient's Family

**History & Physical Exam Additional / Pertinent Findings:**

Gd full term IDM c̄ LVH (HCM) + PPHN
4720 gms   Vent 40/5   50 IMV   100% FIO₂
41-45   98-100% Sat   n.o. 20 ppm
2.2 metHgb

**Assessment and Plan:** ☐Discharge planning in progress.

7.54 28 188 1   PaO₂ 78-248 range
122-143   55-80 MAP 87/63.
ECG low voltage, sinus occ PVC's – just
watch   RAD
HCM will cause you to need
higher systemic venous pressures.
Con't to need vent + n.o. to control
PPHN. Hopefully will not need ECMO,

CNMC 00371

**Cardiology Attending:** _L. D. Sutherby_  Printed Name  Pager: _____
(Revised 7/03)

Which is still an option particularly

(Please write on back of this page if information is to be continued)

if ↑ MetHb, ↓ n.o. ~15 ppm.
Hydrocartisone 7 6 hrs ↓ because BP mildy ↑



# EXHIBIT 10



**PROGRESS NOTES**



```
PCP        NO,PRIMARY CARE
MR#:       020567916
Acct#:     0625440132
NIC        NIU-3606-A
Sex        M
Exp:
Adm:       09/11/05
DOB:       09/06/05
DR.        SHORT,BILLIE LOU
las.Plan
VA MEDICAID OPTIMA
```

LABEL

Patient's Name:

| DATE/TIME | Education Plan:<br>Reviewed: ☐  Updated: ☐  Continue as planned: ☐  N/A: ☐ | INITIALS |
|---|---|---|
| 9/11/05<br>11:00 pm | Ecmo Consultation Note.<br>Infant had frequent D-sats requiring hand bag ventilation<br>Boles of albumen. Vent Settings were ↑ to 50/6 & 50 x 100<br>on Nitric Oxid @ 20 ppm<br>Consulted for V-A Ecmo Support 2° to failure OF<br>Maximum Conventional Vent Support.<br>10Fr Biomedicus art and 12Fr Biomed Venous Cannula were<br>Placed By Dr. Newman<br>CXR to confirm the Cannula position done<br>Ecmo flow ↑ to 500 cc/min Vent Settings Weaned.<br>Meds Fentyl 40 Microgm x 2 doses, and<br>heparin Bolus of 100 u/kg given<br>Plan: Keep Ecmo Flow Fixed. Wean Blender FiO₂<br>DIC Vacurunium drip<br>Wfeeds @ 100 cc/kg/d.<br>Lasix BID & HydroCortison to BID.<br>↑Nutrilizene 8° MAP's ≤ 80<br>√ CXR & head U/S Tomorrow. | RR Bufa |

(Please write on back of this page if information is to be continued)

CNMC 00373

CNMC350 (9/93)


18557

PRINTED BY: mlopez    DATE : 12/12/2006

# EXHIBIT 11

# PATIENT SELECTION FOR ECMO

Conventional ventilatory management saves the lives of most neonates with respiratory failure. ECMO is currently used only for neonates who are responding poorly to optimal ventilatory, medical, and surgical treatment. We consider neonates for ECMO only if they have an estimated 80% or greater mortality risk despite our usual maximal therapy.

ECMO is a temporary artificial lung. If a neonate's respiratory disorder can be reversed within a 21 day period, it is feasible for ECMO to safely support the patient. After several days on ECMO, complications such as bleeding become more difficult to control. For this reason, it is not practical to use ECMO to treat a disease process such as bronchopulmonary dysplasia. One way to be certain that a neonate does not have significant BPD is to limit initiation of ECMO to the first ten to fourteen days of assisted ventilation, although it should be remembered that this is an arbitrary number and clinical evaluation should be the determining factor. A proper evaluation of the chest x-ray findings must be done before consideration for ECMO therapy. The common causes of respiratory failure in neonates are generally reversible with ECMO therapy within a few days.

Although many very-low-birth-weight infants have severe RDS and would appear to be good ECMO candidates, 40% of these infants will develop a hemorrhage in the germinal matrix or ventricles without the stress of ECMO. The heparinization and/or the alterations in pulsatility of blood flow created by ECMO causes a significant incidence of ICH, and thus a prohibitive mortality in this group of infants. Therefore, the infant considered for ECMO is usually $\geq$ 2000 grams or 34 weeks gestation. If lower gestational age infants are being considered as candidates for ECMO, the significant risk of ICH must be recognized and discussed with the parents.

Infants must be systemically heparinized on ECMO and therefore any bleeding complications such as a major intracranial hemorrhage (> grade II) should not be considered for ECMO. All attempts to correct coagulopathies should be done prior to ECMO.

All infants should have had attempts at routine therapy and have failed. Therapies such as oscillation if available, should be attempted before ECMO, if felt to be appropriate by the attending physician, because of the lower degree of complications with these procedures. Transporting on this type of ventilation is not feasible, so it is important to educate the referral hospitals on the need to consider this therapy at the ECMO Center. After maximal therapy has failed, criteria attempting to predict an 80% or greater mortality should be used. Each institution must develop their own criteria and each infant must meet criteria in that institution because of the differing therapeutic approaches.

At CNMC the alveolar-arterial oxygen gradient was found to be the best predictor or outcome at the time our program was initiated. This formula is listed below. We now use oxygenation alone due to the dramatic changes in therapies since the start of our program. Many institutions are now using the **oxygen index (OI)**.

$$OI = \frac{\text{mean airway pressure x } F_iO_2}{pO_2} \times 100$$

**NOTE:** All criteria are linked to time. No single value can predict outcome, therefore, $AaDO_2$ and OI over 4-12 hours are used to predict mortality. Because it is difficult to change criteria after you have instituted ECMO therapy, one must continuously reevaluate criteria on a

**CNMC 02295**

clinical basis. **At CNMC we now use a persistent PaO$_2$ <50 mmHg after maximal therapy.** Exceptions to this rule are infants who are cardiovascularly unstable, e.g., infants in septic shock, who may need to go on before they are profoundly hypoxic.

**CNMC 02296**

# EXHIBIT 12

| DATE/ TIME | Education Plan: Reviewed: ☐    Updated: ☐    Continue as planned: ☐  N/A: ☐ | INITIALS |
|---|---|---|
| .505 | RN Focus Note: | |
| 1930 | P3/P4 (Alt in Cardiac function/Gas Exchange | |
| | S: Livia this am orally intubated on mechanical vent | |
| | See RT flowsheet for settings). At 12:30 pm infant had | |
| | prolonged desats ↓ to 70's c̄ ↓ PO₂. Hand bagged for | |
| | prolonged times, placed on oscillator c̄ sats continuing | |
| | to be in 80's. Hand bagged x 15-20 min. Placed back on | |
| | mechanical ventilator. Infant unable to maintain sats >90% | |
| | Infant became hypotensive c̄ MAPs in 40s. Albumen | |
| | fluid bolus given. Still unable to maintain sats >90%. | |
| | A: Placed on V/A ECMO by surgical team | |
| | R: Up to 60% bypass. Incision site c̄ small amt of | |
| | sanguineous drainage. PO₂ 70 on initial ABG p̄ ECMO. | |
| | Pulses +2/+1. Remains pale. On minimal vent settings | |
| | & weaning NO 186. Infant tolerated procedure well. | |
| | Care ongoing. UAC placed by NNP. —— R.Carter RN | |

# EXHIBIT 13

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


--------------------------x

                          :

TERESA A. MORRING,        :

et al.                    :

                          :

        Plaintiffs        :

                          : Civil Action

    vs.                   : No. 06cv0206

                          :

CHILDREN'S NATIONAL       :

MEDICAL CENTER            :          RECEIVED

                          :        JAN 2 5 2008

        Defendant         :    JACKSON & CAMPBELL, PC

                          :

--------------------------x


                  Washington, D.C.

                  Tuesday, January 22, 2008

Deposition of:

        BILLIE LOU SHORT, M.D.

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 2:17 p.m., before Renee A. Feder,

CSR, a Notary Public in and for the District

of Columbia, when were present on behalf of

the respective parties:

Page 2

1
2  On behalf of the Plaintiffs:
3  Chaikin & Sherman
3  By: ANTHONY G. NEWMAN, ESQ.
4      1232 17th Street, N.W.
4      Washington, D.C. 20036
5      (202) 659-8600
5
6
6  On behalf of the Defendant:
7
7  Jackson & Campbell
8  By: NICHOLAS S. McCONNELL, ESQ.
8      1120 20th Street, N.W., 300 South Tower
9      Washington, D.C. 20036
9      (202) 457-1600
10
10          + + +
11       C O N T E N T S
12  WITNESS: BILLIE LOU SHORT, M.D.
13  EXAMINATION BY:                    PAGE
14  MR. NEWMAN                          3
15  MR. McCONNELL                       -
16
17          EXHIBITS
18  DEPOSITION NO.    MARKED FOR IDENTIFICATION
19  1 (DVD)                    10
20  2 (Description of DVD on the Internet)  21
21
22       * *** *

Page 3

1   Thereupon,
2         BILLIE LOU SHORT, M.D.
3   was called for examination by counsel and,
4   after having been duly sworn by the Notary,
5   was examined and testified as follows:
6    EXAMINATION BY COUNSEL FOR PLAINTIFFS
7         BY MR. NEWMAN:
8    Q.    State your full name for the
9   record.
10   A.    Billy Lou Short.
11   Q.    Dr. Short, do you have a current
12  CV?
13   A.    Not here.
14   Q.    In any event, you do have one and
15  you can get a hold of one for me?
16   A.    Yes.
17   Q.    Just so I understand, when did you
18  first start working at Children's?
19   A.    I started in 1977 doing a neonatal
20  fellowship. And joined the faculty in 1980.
21   Q.    Before that, where were you?
22   A.    I did my residency at the

Page 4

1   University of Oklahoma.
2    Q.    As far as your involvement with
3   Dr. Bartlett, when did that begin? I know it
4   began with ECMO, but did it begin before that
5   time?
6    A.    Yes -- actually, no, I am sorry.
7   It began with training for ECMO in 1983, I
8   believe is when we first started our training.
9    Q.    Did you actually, from what I
10  understand, go to Dr. Bartlett so you could
11  set up an ECMO program at Children's?
12   A.    Yes.
13   Q.    Was that in 1983?
14   A.    1982, '83.
15   Q.    As far as your contacts with
16  Dr. Bartlett, have they been pretty much all
17  the way up to the present?
18   A.    Yes.
19   Q.    With regard to the training
20  manual, et cetera, that there is at Children's
21  Hospital for ECMO, is any of this under a
22  similar prototype as the manuals that

Page 5

1   Dr. Bartlett has? Did you use it as any kind
2   of a guide?
3    A.    He had a training manual and we
4   actually used his as a guide to create ours.
5   In fact, in 1983, '84.
6    Q.    Looking at one aspect of it, as
7   far as the ECMO inclusion criteria, where did
8   that come from initially?
9    A.    The original criteria was designed
10  here and it was based on our retrospective
11  analysis of patients at Children's and had to
12  take into account all of our different
13  therapies that we do here.
14   Q.    In other words, it was not taking
15  from another institution, but more or less
16  actually from the results you were having at
17  Children's and what would be the best protocol
18  to follow?
19   A.    Yes.
20   Q.    So would it be safe to say, since
21  it began -- by the way, when did the ECMO
22  program begin at Children's?

Page 26

1.  flipped it up.  I didn't read it.
2.      Q.    When was that?
3.      A.    I have no idea.
4.      Q.    Was it years ago?
5.      A.    About two or three years ago.
6.      Q.    Beyond flipping it up, you said
7.  you did not read it at that time?
8.      A.    Right.
9.      Q.    Now, the next sentence that I
10.  read, just so -- because you did ask me to
11.  reread the first sentence.  Just so we are
12.  clear, the next sentence says, "Although, the
13.  health care professionals do their best to
14.  communicate with the family, most parents do
15.  not feel informed during this critical time
16.  when the life of their child hangs in the
17.  balance."
18.          First of all, do you agree with
19.  that statement?
20.      A.    I don't agree the way it is
21.  written.  I think it is misleading the way it
22.  is written.  I think it takes a long period of

Page 27

1.  time to get the families totally informed
2.  about ECMO because it is a very complex
3.  treatment.  So you spend most of the ECMO run
4.  meeting, talking to parents about what is
5.  going on with their child.  So, in ways they
6.  are being informed as we are providing -- as
7.  any therapy that we provide in the intensive
8.  care unit, you can't inform them of every
9.  aspect of care in one setting.  You have got
10.  to do that in multiple settings.  As the child
11.  is on, we spend discussions every day with
12.  them at what the next step is, what is going
13.  on, what is the outcome, based on that day's
14.  data, and where we are going with that child.
15.  So it is a continual, informed information
16.  process with the parents.
17.      Q.    Do I understand then that in any
18.  given patient whose -- in any given patient,
19.  and the family that you discuss what is going
20.  on with ECMO, it is not simply the first time
21.  the person is placed on the ECMO unit but
22.  during the entire procedure, if you will, or

Page 28

1   the duration, that continuing information
2   about ECMO is being given to inform the
3   patient?
4       A.   Yes.
5       Q.   There is a paragraph, third from
6   the bottom, the bottom sentence, but in any
7   event it says "This virtual dialogue program
8   is currently installed in the neonatal
9   intensive care unit at Children's Hospital to
10   make this information available to parents
11   whose children are on ECMO.  It is also being
12   used for pediatric intern and resident
13   training."
14          Let me ask you the first question,
15   is that correct, that this virtual dialogue
16   program was currently installed at the
17   neonatal intensive care unit?
18       A.   When this first came up, we had a
19   copy of it.  We really never got this program
20   off the ground.  It was based on a lot of
21   technology issues because the computers in the
22   NICUs didn't have DVD players.  So we had one

Page 29

1   of our training individuals was going to use
2   it as one of her evaluation processes to see
3   if parents viewed it and felt like they had
4   more information.  We really didn't get that
5   off the ground.  She had a laptop that she was
6   bringing in and offered probably -- I actually
7   don't even remember how many parents had the
8   opportunity to look at it, but we didn't have
9   the technology to continue it and make it
10   available to every parent.
11       Q.   Does that mean that, in fact, it
12   was never installed in the neonatal intensive
13   care unit?
14       A.   Correct.  It was in -- let me
15   correct that.  It was installed on her laptop
16   and a handful of parents saw that.  That is
17   all that happened.
18       Q.   When did these parents see it and
19   how many parents do you believe saw it on the
20   laptop?
21       A.   This was after the baby was on and
22   they were given the opportunity to view it.

Page 30

1  And I would say not more than -- I actually
2  don't know how many parents, to be quite
3  honest with you. It was less than five and it
4  was technically too difficult to do because,
5  as you go through it, it is a very lengthy
6  process and we had no place for them to sit
7  and do this in a private area. And, as you
8  obviously have gone through it, you have to
9  sit and ask me questions. So it was not
10  technically an environment that we could do it
11  in successfully.
12      Q.    The next sentence is, "It is also
13  being used for pediatric intern and resident
14  training." Was that true?
15      A.    That was the intent. And we
16  didn't, again, because of technical issues, we
17  never used it that way.
18      Q.    Well, let me ask you this, besides
19  what you stated with regard to statisticians,
20  et cetera, was one of the intents of the DVD
21  to actually provide an interactive informed
22  consent document for parents?

Page 31

1      A.    Not at all.
2      Q.    Was, in fact, an informed consent
3  document that you created at Children's at any
4  time that was to be reviewed and signed by the
5  parents before ECMO was provided?
6      A.    We have gone -- we have had
7  several versions of an informed consent. And
8  the last version, and I don't remember at this
9  time period which one we were using, but we
10  were using the surgical consent form with an
11  information sheet that goes to the parents.
12      Q.    Well, the information sheet, what
13  has been marked by Bates stamp 2422 of
14  Children's Hospital --
15      A.    Yes, this is the information sheet
16  and that is on the back side.
17      Q.    And the back side being 2423 which
18  is, basically, the diagram of the ECMO
19  procedure?
20      A.    Yes.
21      Q.    And is it your testimony that this
22  ECMO information sheet was given to the

Page 32

1  parents before the child was placed on ECMO?
2      A.    It is my understanding, because
3  this baby came from Norfolk, Virginia, and I
4  don't know, to be quite honest, if this was
5  given prior to cannulation. I know the baby
6  was emergently transported here.
7      Q.    Let me ask you this. If
8  Dr. Baumgart testified that the procedure was
9  to provide the information sheet once the
10  patient was on ECMO, do you have a reason to
11  dispute that as a procedure?
12      A.    If we have the parents physically
13  here, which is very unusual, the consent would
14  be discussed with them and that would be
15  handed to them. The majority of the cases,
16  the parents are not here, they are at the
17  referring hospital, and so we don't have the
18  opportunity to give them this information
19  sheet. And when we transport the patient
20  using our transport team, our team will take
21  that sheet and leave it with the parents at
22  the time.

Page 33

1      This baby was transported, my
2  understanding by the Norfolk transport system.
3      Q.    So, that means on some occasions
4  this ECMO information sheet is provided prior
5  to the time ECMO is performed and sometimes it
6  cannot be and is not?
7      A.    Correct.
8      Q.    Now, did you understand in this
9  case that it was a number of days before this
10  patient was placed on ECMO after arriving at
11  Children's?
12      A.    Yes.
13      Q.    And in this case you really do not
14  know for a fact what documents were provided
15  for signature for the parents before the ECMO
16  began except for the surgical cannulation
17  sheet?
18      A.    Correct. I don't have any
19  knowledge of that.
20      Q.    First of all, did you have
21  anything to do with the creation of this
22  information sheet?

Page 34

1      A.   Yes.
2      Q.   Did you, in fact, create it or is
3  it copied from another institution's?
4      A.   This is created through our ECMO
5  attending staff, created that.  It has been
6  revised and rewritten by them.
7      Q.   Was there ever a time when
8  document 2422 and its back side, which is
9  2423, had a signature line?
10     A.   Yes.
11     Q.   Is that one of the prior versions?
12     A.   Yes.
13     Q.   Was there any other form of
14  informed consent that would be signed by the
15  parent besides the surgical cannulation sheet
16  and this ECMO information sheet?
17         MR. McCONNELL:  Objection as to
18  the form of that question.  Because at the
19  time of this event, I don't know that we have
20  established there was a signature line on the
21  then extant ECMO information sheet.
22         MR. NEWMAN:  I don't know if that

Page 35

1  is relevant.
2         BY MR. NEWMAN:
3      Q.   But let me ask my question again
4  and then I can ask the next one.
5         Which is, besides the ECMO
6  information sheet, whether it had a signature
7  line or not, and the surgical consent form,
8  was there a prior version of a consent that
9  did not resemble either of those documents?
10     A.   A ECMO consent?
11     Q.   Yes.
12     A.   No.
13     Q.   Do you recall when the ECMO sheets
14  and what period of time had a signature line,
15  the ECMO information sheet?
16     A.   I do not.  It is reviewed by
17  counsel --
18         MR. McCONNELL:  Don't go into
19  legal advice you may have been given by
20  in-house counsel for hospital.
21         THE WITNESS:  I don't know when we
22  changed.

Page 36

1         BY MR. NEWMAN:
2      Q.   In fact, could there have been a
3  signature line in 2005 and you do not remember
4  when that came into being or whether it was at
5  that time?
6      A.   I can't -- I don't know when we
7  changed it.
8      Q.   Now, the signature line, itself,
9  was it actually on Page 2422?
10     A.   It was a different form.  It was
11  not that form.
12     Q.   And if I understand when the forms
13  changed, whether it was in 2005, 2004, 2006 --
14  obviously, in 2005 this form came into being
15  at some point.  Do you know if there was
16  another form in 2005?
17     A.   I do not know.
18     Q.   Was there ever developed by
19  yourself or any of the groups with any
20  individuals within -- who were preparing the
21  training manuals or the policies and
22  procedures, whether there was a checklist of

Page 37

1  what should be included in the informed
2  consent?
3      A.   No.
4      Q.   No protocol or policy specifically
5  laying forth any of those elements that you
6  are aware of?
7      A.   No.
8      Q.   Did you ever see from Dr. Baumgart
9  the informed consent documents that he had
10  from other institutions such as CHOP or
11  Jefferson or Michigan?
12     A.   No.
13     Q.   Was there a time when you ever
14  evaluated the informed consent documents from
15  Michigan, for example?
16     A.   No.
17     Q.   Besides any discussion that you
18  may or may not have had with counsel regarding
19  the informed consent, was there a particular
20  meeting prior to 2005 where the elements of
21  informed consent had been discussed with the
22  staff?

# EXHIBIT 14



**CONSENT FOR SURGERY,
TREATMENT, DIAGNOSTIC
PROCEDURE, USE OF
BLOOD AND BLOOD
PRODUCTS, SEDATION OR
ANESTHESIA**

Children's
*National Medical Center.*






| | |
|---|---|
| PCP | NO PRIMARY CARE |
| MRF: | 020567916 |
| Acct#: | 0525400132 |
| NIC | NIU-3606-A |
| Sex | M |
| Exp: | |
| Adm: | 09/11/06 |
| DOB: | 09/06/05 |
| DR. | CHAMBERLAIN JAMES |
| Ins.Plan | |

*I hereby authorize Dr.* ___Newman___ *and/or such associates or assistants
as he/she may select to treat: (name of patient)* _____
*for the following condition(s) requiring treatment:* ___PPHN. Hypertrophic Cardiomyopathy___

☑ Surgical or other procedure(s) ___Right Side of Neck Cannulation for___
___Veno-arterial ECMO Support___

Check one box (site: ☑ right ☐ left ☐ both ☐ n/a)

**RISKS, BENEFITS AND ALTERNATIVES** I understand the patient's condition and what the treatment or
procedure described above is supposed to do and how it will help the condition. I have been told that the treatment
may not work. I understand that if there are complications or if unexpected conditions are found, other procedures
may be needed. I consent to those procedures if there is no time to talk to me. I have been told about the risks
(what might go wrong), other treatment choices, and what might happen if the treatment is not done. Common risks
to surgical procedures include bleeding, infection, failure of the procedure to work, and possible need for further
surgery. In addition, the following risks specific to this procedure have been discussed with me and include:

_____
_____
_____
_____

**ANESTHESIA, SEDATION AND ANALGESIA** I consent to the administration of anesthesia or sedation, if
applicable. I have been made aware that complications of anesthesia or deep sedation are rare, but may include
cardiac arrest (heart stoppage), brain damage, or death. Complications of moderate sedation include nausea,
agitation, and allergic reactions to the medicine. Also, if the child becomes deeply sedated, there can be difficulty
breathing and loss of oxygen to the brain. If I have any questions, I am aware that I may call an anesthesiologist at
(202) 884-2025.

**BLOOD AND BLOOD PRODUCTS** I understand that blood or blood products will be given if needed. I
understand that the risks are rare but include fever, chills, rash, itching, back pain, kidney problems, shortness of
breath and hepatitis. The risk of other diseases such as HIV/AIDS and death is very low. I have been told about
donations from family or friends, using the patient's own blood, and any other options. I have access to the
information sheet on blood use and the testing and safety of donated blood. Because new tests may be discovered
later, I may be told later about problems with blood donated before new tests were used.

If I object to the use of blood or blood products, I will be notified as soon as possible of any need to administer
blood so that I may take any action I consider necessary. *Note for Jehovah's Witnesses:* Contact the Hospital's
Family Services Department at 202-884-3070 if you have questions.

INFORMED CONSENT 7/2004


*CNMCCONSENT*

**CNMC 00015**

## CONSENT

I have read, been informed, and understand the above and any attached information, and what my doctors have told me about risks, benefits and alternatives or options. I have been given the chance to ask questions. I consent to the procedures or treatments listed, and to the use of anesthesia/sedation or blood/blood products if noted above. This consent lasts for the duration of the continuous course of treatment, with the exception of surgical informed consent. Surgical informed consent may be obtained up to 30 days before admission and is applicable for the duration of the admission until used.

_Teresa A. Morris_     _Teresa A. Morris_     _09/13/05_
Signature                    Print Name                Date

_(757) 553-6793_
Telephone Number

_R R. Bahru MD_        _Sept 13 - 2005_        _1505 Pm_
Witness (To Signature)           Date                    Time

Relationship of consenting person to the patient:
☐ Parent                            ☐ Guardian (attach copy of court order)
☐ Public Agency (acceptable by fax w/o witness)    ☐ Person with written authorization (attach)
☐ Patient: (☐ 18 years or older ☐ consenting for self for certain procedures ☐ emancipated minor)
☐ Other (see consent policy) _____

## SPECIAL CONSENT CIRCUMSTANCES

☐ The above was read to the consenting person     ☐ Read to the consenting person by a translator
☐ The above information was discussed by telephone with the consenting person by the physician signing below. (Print name and telephone number of consenting person and indicate relationship above)

## PHYSICIAN CONFIRMATION

I informed the consenting party of the condition requiring treatment, and have, consistent with my best medical judgment, explained the nature, purposes, risks, benefits and complications of the procedure(s) identified above, any alternatives, and the contents of this form.

_R R. Bahru_                          _9/13/05_
M.D. / L.I.P.                                   Date

---

**VERIFICATION OF PROCEDURE AND SITE IMMEDIATELY PRIOR TO INCISION OR START OF PROCEDURE**

Verified by: _Montumala, R.H._

Date & Time: _09-13-05   1545_

---

INFORMEDCONSENT 7/2004


*CNMCCONSENT*

**CNMC 00016**