IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TERESA A. MORRING and ) | |
| DESHAUNIA Q. SNOWDEN, as ) | |
| Parents and Next Friends of ) | |
| Q.E.S., a minor ) | |
| ) | Civil Action No. 06CV02036 |
| Plaintiffs, ) | |
| ) | Judge Rosemary M. Collyer |
| v. ) | |
| ) | Next Event: Joint Pretrial |
| CHILDREN'S NATIONAL MEDICAL ) | Statement due, 05/01/08 |
| CENTER, ) | |
| Defendant. ) | |

### REPLY OF DEFENDANT CHILDREN'S NATIONAL MEDICAL CENTER TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Confronted with long-standing authority in Defendant's motion for summary judgment establishing the frivolous nature of the claims set forth in Counts III, IV, and V (all product liability counts) and Counts VII, VIII, and IX (all negligence *per se* counts) of their Complaint, Plaintiffs have declared their intention to abandon those claims. Plaintiffs characterize their proposal as one to "voluntarily withdraw" those counts "based on factual discovery" (Plaintiffs' Opposition to Defendant's Motion For Summary Judgment ["Opposition"], p. 1), but there was no information developed during discovery relevant to the dismissal of the claims. They were baseless from the outset.[1]

Having acknowledged the futility of attempting to proceed on either a "product liability" or a "negligence per se" theory, Plaintiffs attempt to salvage their "informed

---

[1] Plaintiffs' mere statement of an intent to "voluntarily withdraw" the Counts, of course, is not sufficient to accomplish that result. Fed. R. Civ. P. 54(a). Defendant is forwarding a proposed stipulation of dismissal to Plaintiffs to be signed by all parties and filed with the Court to establish that Counts III, IV, V, VII, VII and IX are to be dismissed with prejudice.

consent" (Count II), fraud (Count VI), and punitive damages claims (Count X) by ignoring the fundamental requirements of an informed consent claim, i.e., (1) non-disclosure, (2) of a "material" risk, (3) that actually materializes, and (4) is a cause of harm,[2] and by reciting a litany of alleged, but in any event irrelevant, shortcomings on the part of CNMC providers in the informed consent process. Without citing any legal authority to support their argument, Plaintiffs even attempt to revive the product liability claims, "voluntarily" abandoned in the first paragraph of their opposition, by repackaging them within their informed consent claim as an FDA related "investigational device exemption" ("IDE") matter. Finally, Plaintiffs acknowledge that their Complaint attempts to demand damages not authorized by District of Columbia law and offer to correct the error by amending their Complaint (Opposition, p. 31, note 6), but insist they are entitled to offer proof on damages as to alleged loss of income from the minor's employment during his minority, a matter as to which, however, they have produced no evidence during pretrial discovery.

Plaintiff's Opposition fails to establish any basis, either in law or fact, that Defendant is not entitled to the partial summary judgment sought in its motion and the motion should be granted in its entirety.

**I. The Only Injury Claimed By Plaintiffs Resulted From The Decannulation on September 15, 2005, Not From The ECMO Treatment, Itself**

Plaintiffs contend that they should be allowed to expand their informed consent claim beyond the allegations set forth in their Complaint to include a smorgasbord of events allegedly uncovered during the course of pretrial discovery. The fact is,

---

[2] Canterbury v. Spence, 464 F.2d 786, 790 (1972) ("An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is without consequence").

Plaintiffs' Complaint, never amended at any time while discovery was open or before dispositive pleadings were due to be filed, does not include a general allegation of an alleged lack of informed consent.  The informed consent claims were narrowly framed by Plaintiffs' own pleading and were limited to the matters set forth in Defendant's motion for summary judgment.  Since those claims are not sufficient to survive summary judgment, Plaintiffs now attempt to create a fact dispute as to "informed consent" based on a characterization of the underlying events – made implausible by Plaintiff Teresa Morring's own testimony – suggesting that practitioners at Children's did not obtain Plaintiffs' consent prior to placing Q.E.S.[3] on ECMO on September 13, 2005, but also fraudulently hid material information to rush the infant onto ECMO so he could be enrolled in research protocols – one of which had allegedly expired – to boost the human study population to support academic research.  See Plaintiffs' Statement of Material Facts As To Which There Are Genuine Issues of Material Fact  ("Pltfs' SOF"), ¶¶ A2, A3, and A4.  Plaintiffs further allege that Children's placed Q.E.S. on ECMO without adequate reason to do so, that sufficient and proper informed consent regarding ECMO did not take place, and that the ECMO device itself was unapproved for use in providing ECMO.  See Pltfs' SOF, ¶¶ A6, A7, A10, A12, B3, B8, B10, and B11.  The record, however, including Plaintiff Teresa Morring's testimony, reflects otherwise. Even more significantly, there is no evidence in any event that any of the matters Plaintiffs now assert create a fact dispute as to informed consent involved the non-disclosure of a risk of ECMO which actually materialized and caused harm to Q.E.S.

---

[3] Although Plaintiffs repeatedly reveal the name of the minor child involved in this litigation through their Opposition in violation of LCvR 5.4(f)(2), Children's continues to refer to the child as Q.E.S.

A.     <u>Plaintiffs' New Theory Is Inherently Implausible</u>

Given the tack taken by Plaintiffs in their effort to keep these claims alive, a review of Ms. Morring's own testimony regarding the events leading up to Q.E.S.'s being placed on ECMO illustrates the implausibility of their theory, and, hence, a sufficient reason, standing alone, for their failure to state a claim sufficient to survive for trial.  The U.S. Supreme Court has recently held that a complaint must include enough factual matter to suggest plausible grounds for the requested relief.  <u>Bell Atl. Corp. v. Twombly</u>, 127 S. Ct. 1955, 1965 (U.S. 2007) (finding that the plausibility requirement "serves the practical purpose of preventing a plaintiff with 'a largely groundless claim' from 'taking up the time of a number of other people'").  The plausibility requirement should be even more stringent at the summary judgment stage, when discovery is complete and the plaintiff faces a heightened burden beyond the notice-pleading requirement of the Complaint stage.  Given Plaintiff Teresa Morrings' own testimony regarding the sequence of these events, even construing the alleged facts set forth in Plaintiffs' Complaint and Plaintiffs' Statement of Material Facts in the light most favorable to Plaintiffs, it is utterly implausible that a reasonable fact-finder would have any basis to conclude that the CNMC providers fraudulently induced Ms. Morring through coercion and a series of purposeful misstatements or omissions to consent to ECMO to obtain another human subject for ECMO research protocols.  The newest version of matters not plead in Counts II, VI, and X is not even remotely plausible and, as a result, Defendant is entitled to summary judgment on Counts II, VI, and X as a matter of law.  <u>Papasan v. Allain</u>, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209

(1986) (courts "are not bound to accept as true a legal conclusion couched as a factual allegation").

      B.    <u>Additional Facts Related to the Initiation of ECMO Therapy</u>

Q.E.S. was born at 2:35 a.m. on September 6, 2005, at Sentara Hospital in Norfolk, VA, by C-section; Ms. Morring was told in the delivery room that he was having "a little trouble breathing" and that the NICU staff from Children's Hospital of the King's Daughters ("CHKD") would be called over to attend him. Deposition of Teresa A. Morring ("Morring Depo."), taken September 4, 2007, relevant portions of which are attached as Exhibit A, at 21:7 – 22:3. The NICU staff arrived within five minutes and transported Q.E.S. to CHKD. <u>Id.</u>, at 22:4 – 23:8. Ms. Morring called from her C-section recovery room to CHKD and spoke with a NICU nurse practitioner who told her that Q.E.S. was "very sick," that he was having trouble breathing, and that "they already put him on a ventilator." <u>Id.</u>, at 23:9 – 24:6. A few hours later, Ms. Morring was able to visit with Q.E.S. at CHKD and spoke with the same nurse practitioner who told her that Q.E.S. had an enlarged heart, had been sedated, and was very sensitive to stimulus which made his blood pressure fluctuate. <u>Id.</u>, at 24:7 – 21.

On September 11, Ms. Morring spoke with an attending physician (Dr. Khan, a neonatologist) at CHKD who told her that Q.E.S. "<u>needed to go on an ECMO machine</u>." <u>Id.</u>, at 25:9 – 26:3 (emphasis added). In fact, as early as September 9, the neonatal nurse practitioner had discussed ECMO with Ms. Morring:

        Q.     When did you first have a conversation with anyone at Children's Hospital King's Daughters about having [Q.E.S.] placed on ECMO?

        A.     September 9.

> Q.    Tell me about that conversation, what were you told about [Q.E.S.]'s condition and why he might need to go on ECMO?
>
> A.    By this time I was told that he was diagnosed with cardiomyopathy and also pulmonary hypertension, and the nurse practitioner told me <u>that he is a candidate for ECMO, and if he does need to go on ECMO, he would have to be transferred to another hospital</u>.

<u>Id.</u>, at 26:4 – 27:3-15 (emphasis added).

Thus, as early as September 9, Ms. Morring was aware, and had been so advised by health care providers at CHKD  (not by Defendant CNMC's providers) that a transfer signified a probable need for the infant to be placed on ECMO and by September 11, that, inf fact, he did need to be on ECMO.[4]  Further, as to the events at CHKD immediately before the transfer to CNMC, Ms. Morring testified:

> A.    She called me, the nurse practitioner called me, on September 11 and told me I needed to get to the hospital.
>
> Q.    Did she tell you why?
>
> A.    Because [Q.E.S.] needed to be transferred to go on ECMO.

<u>Id.</u>, at 31:6 – 11.  Ms. Morring states she was further told by the CHKD providers that the therapy at CHKD was not working in that "[H]e was still on the highest setting on the ventilator and they couldn't wean him off of it."  <u>Id.</u>, at 32:15 – 18.  She also testifies that Dr. Kahn recommended to her "that [Q.E.S.] <u>be transferred for ECMO</u>" because "[h]e

---

[4] In her Answers to Interrogatories, Ms. Morring says that it was actually September 8 when she was told that Q.E.S. would probably need ECMO,"[O]n 09/08/05, I was given a pamphlet explaining PPHN and HCM.  On this day, I was informed that [Q.E.S.] would need treatment on ECMO <u>if his condition did not improve</u>."  Exhibit D, p. 8, Answer to Interrogatory No. 11.  She also says she spoke daily with the care providers and, on the day Q.E.S. was transferred to CNMC, was told "that, <u>because [Q.E.S.'s] status had not improved</u>, it was time for [Q.E.S.] to be transferred to another hospital for treatment on ECMO and to get there as soon as possible."  <u>Id.</u>, pp. 8 – 9.

[Dr. Kahn] believed that [Q.E.S.] would benefit from the ECMO treatment and it would help resolve his hypertension and cardiomyopathy." Id., at 33:12 – 34:12.  According to Ms. Morring, Dr. Kahn also told her "[t]hat Children's King's Daughters had done everything they could do, that is what he told me." Id., at 34:16 – 20.  Dr. Kahn told Ms. Morring that "[i]t was really important that [Q.E.S.] get on ECMO treatment as soon as possible." Id., at 35: 2 – 6 (emphasis added).  Dr. Kahn discussed the ECMO procedures and equipment. Id., at 35:11 – 18.  Ms. Morring understood that this was a life-or-death struggle for her infant:

> Q.    Did you understand at any time that [Q.E.S.] was really sort of in a life-or-death struggle at this point in terms of being able to survive?
>
> A.    At that time, yes, I knew he was critical.

Id., 37:11 – 14.  She was informed that Q.E.S. would be transported by helicopter to CNMC and that she would not be able to fly with him because there was room only for the transport team. Id., 37:15 – 38:6.  At that point, the family "said our goodbyes to [Q.E.S.]" and had him baptized. Id., at 40:6 – 10.

Q.E.S. was flown to CNMC that night (September 11) and, shortly after he arrived there, Ms. Snowden had her first direct contact with CNMC while she was still in Norfolk. Id., at 41:11 – 42:13.  She spoke with Dr. Scavo who told her that Q.E.S. had arrived, was stable, and, "there was no need to put him on ECMO at the time, so he wasn't on ECMO." Id., at 42:14 – 43:8 (emphasis added).  Significantly, Dr. Scavo then discussed with Ms. Snowden what might happen before she could get to the hospital:

> Q.    What if anything else was said in this first conversation with anybody at Children's about [Q.E.S.'s] condition, at least the conversation you had with Dr. Scavo?

A.    They asked me if in the middle of the night, if [Q.E.S.] required ECMO, do they have permission to place him on it if it happened in the middle of the night.

Q.    And what did you say?

A.    Yes.

*    *    *    *    *    *

Q.    Was there any discussion at all about putting cannulas into an artery and a vein and put him on equipment that would circulate his blood for him?

A.    All he asked was that, if they had permission to place [Q.E.S.] on ECMO if the need arises. He asked me was I told what ECMO was at King's Daughters, and I told him yes. Then I spoke with another doctor that got on the line with me.

Q.    What did this other doctor [Dr. Fenik] say?

A.    She told me about two studies they were doing on ECMO children.

*    *    *    *    *    *

A.    She said there was one study. They were monitoring the brain wave activity of [Q.E.S.], and they would place probes on his forehead. They wanted to do that before he was placed on ECMO, and they wanted to do it again after he came off of ECMO. The next study was a study to – the iron levels in his blood. They wanted to do blood studies pre-ECMO and post-ECMO.

Q.    And what, if any discussion was there about those studies beyond describing briefly what they were looking at?

A.    None. She said it was a simple study and she asked if she had permission to do it, and I said yes.

Id., at 43:9 – 45:16 (emphasis added).

Ms. Morring checked again on Q.E.S.'s status in the early morning hours of September 12 and was told Q.E.S. was still stable. Id., at 47:5 – 19. At this time, Ms. Morring was not planning even to arrive at CNMC until September 13. Id., at 47:20 – 48:20. Through the day on September 12, Ms. Morring continued to phone CNMC

- 8 -

about Q.E.S.'s status and was told that he was "comfortable" and "[h]e was still not on ECMO." Id., 50:11 – 51:8.  That information made Ms. Morring happy "[b]ecause that [ECMO] was the reason why he was there, and being that he wasn't on ECMO yet, I considered himself to be doing pretty good." Id., at 52:16 – 53:2.  Ms. Morring understood that if Q.E.S. could avoid being on ECMO, that was better than having to go on ECMO.  Id., 53:3 – 6.

Ms. Morring arrived with the infant's father at CNMC sometime before noon on September 13 and shortly afterwards met with Dr. Bahrami and a nurse.  Id., at 55:14 – 56:3.  Ms. Morring was actually present for the medical team "rounds" on Q.E.S. and listened to the discussion which included Dr. Bahrami and Dr. Fenik.  Id., at 56:13 – 57:4.  Dr. Bahrami introduced himself to Ms. Morring, and during the discussion on rounds, the CNMC providers "said that he currently was not on ECMO yet, and they were quite pleased that he wasn't on ECMO at the time . . . ." Id., at 59:11 – 60:11.

It was not until later that day, on September 13, when Ms. Morring and the infant's father were on their way to the Ronald McDonald House, that she got a phone call on her cellphone from Dr. Fenik asking here to "turn around and get back to the hospital, [Q.E.S.] needed to go on ECMO as soon as possible." Id., at 60:19 – 62:15.  Ms. Morring returned to CNMC sometime before 4:30 p.m.  Id., at 62:9 – 63:4.

Ms. Morring has testified as to what occurred as follows:

> Q.     *   *   *   *   *  Tell me what happened when you got back to the hospital that day?

> A.     Dr. Barami [sic] and Dr. Fenik were sitting at [Q.E.S.'s] bedside, and he had the paperwork for me to sign authorizing [Q.E.S.] to go on ECMO.

Q.      Did you have any further discussion with Dr. Barami [sic] at that time about the ECMO?

A.      Yes.

Q.      What was that discussion?

A.      He explained how the ECMO machine works.  He described to us that [Q.E.S.] will have two cannulas.  They said at the time it will go on the right side of his neck, and he said that it was temporary until [Q.E.S.'s] heart condition improved."

Id., at 68:8 – 69:2 (emphasis added).  Ms. Morring testified that Dr. Bahrami further discussed potential complications with her, including a clot in the ECMO cannula and that the clot could produce a stroke, that the baby would be on "paralyzation medication so they can't move, because the cannulas are in the neck," and that the reason Q.E.S. now needed to be on ECMO was because of his blood pressure.  Id., at 69:3 – 70:22.  Dr. Bahrami further explained that they preferred not to have children on ECMO longer than two weeks.  According to Ms. Morring's answers to interrogatories, following the meeting with Dr. Bahrami that afternoon when he "discussed the ECMO program and explained how an ECMO machine operates . . . ," she then "signed the forms, which I had previously given verbal consent for on Sunday night, September 11, 1005."  Exhibit D, p. 10 (emphasis added).  Ms. Morring also signed a form labeled "Consent for Surgery, Treatment, Diagnostic Procedure, Use of Blood and Blood Products, Sedation or Anesthesia," which authorized "surgical or other procedures(s)" designated in the form as "[R]ight side of neck cannulation for veno-arterial ECMO support." Exhibit F (emphasis added).  Dr. Bharami then asked the parents to go to the NICU family waiting room while the procedure was performed at bedside to begin ECMO.  Morring Depo., at 71:1 – 11.

This sequence of events, utterly inconsistent with a fraud worked upon this infamnt's family to get another research subject, is corroborated by the contemporaneous medical records.  The infant's stormy course and need for transfer for ECMO, <u>per the judgment of the care providers at CHKD</u>, is unambiguously documented. <u>See</u> CHKD Medical Records, attached hereto as Exhibit B (produced herein as CHKD 0055 and 0062).  Upon his arrival at CNMC on September 11, 2005, the admitting neonatologist, Dr. Louis Scavo, noted that Q.E.S. was first placed on an oscillator with nitrous oxide but "did not do well" and then was transitioned to a conventional ventilator and "did better."  <u>See</u> CNMC Medical Record ("Medical Record"), attached hereto as Exhibit C (CNMC 00357-00358).  In his note, Dr. Scavo set out his Plan, not that Q.E.S. should be rushed into ECMO, but that Q.E.S. should receive "vent support as needed—ECMO if needed," that a blood-bank order should be made in anticipation of ECMO, that surgery and the perfusionist were both notified that Q.E.S. may need ECMO, and, most importantly, that he "discussed consent with mother."  <u>See</u> Exhibit C.  Dr. Scavo's note about Q.E.S.'s condition and the plan of management coincides with Ms. Morring's sworn statement of these events.  From this record, it is impossible for a rational fact finder to conclude that Ms. Morring was "coerced" into thinking that her son needed ECMO immediately (but was not placed on ECMO) simply to get her consent to enroll him in research protocols.  In fact, she refutes as much in her response to Children's Interrogatory 12 when she states, "I gave telephone consent to place [Q.E.S.] on ECMO if the need arises that night prior to my arrival."  <u>See</u> Morring's Answers to Interrogatories, attached hereto as Exhibit D.

Even if Plaintiffs continue to assert such coercion took place on September 11, 2005, it is evident that the infant was <u>not</u> placed on ECMO at that time, and, moreover, there can be no colorable claim of coercion and a "rush to ECMO" when Ms. Morring indisputably affirmed her consent to ECMO therapy and Q.E.S.'s participation in the ECMO-related research protocols two days later.  As the record shows, Ms. Morring gave her consent to enroll her son in the two ECMO-related research protocols over the phone on September 11, 2005, because it might be necessary to place her son on ECMO while she was unavailable to be reached for further discussion.  Ms. Morring was not in Washington, D.C. on September 11, 2005, and therefore could not be expected to sign any documents on that date.  It is undisputed, however, that Ms. Morring was in Washington, D.C. on September 13, 2005, and on that date, she affirmed her consent to Q.E.S.'s participation in the two ECMO-related research protocols by signing a consent form for each.  <u>See</u> Medical Record, Exhibit E hereto (CNMC 00003-00012). She also affirmed her consent to have Q.E.S. placed on ECMO.  <u>See</u> Exhibit D.  <u>See also</u> Morring Depo., Exhibit A, at 68:8 – 71:19.  Specifically, she signed Children's "Consent for Surgery, Treatment, Diagnostic Procedure, Use of Blood and Blood Products, Sedation or Anesthesia" form authorizing Dr. Kurt Newman, a surgeon at Children's, to perform a "right side of neck cannulation for veno-arterial ECMO support." <u>See</u> Medical Records, produced herein as CNMC 00015-00016 and attached hereto as Exhibit F.

There is no plausible factual basis for Plaintiffs' lack of informed consent, fraud, and punitive damages claims.  While Plaintiffs may believe (erroneously, as it turns out) that the CNMC providers failed to comply with their own ECMO criteria in deciding to

recommend ECMO for Plaintiff's infant, that is the grist for a classic medical malpractice – failure to comply with the standard of care negligence claim, not claims related to informed consent or fraud.  Therefore, the informed consent count, the fraud count, and the punitive damages count of Plaintiffs' Complaint must be dismissed.

**II.    Defendant is entitled to Summary Judgment with respect to Count II of the Complaint (Informed Consent).**

        **A.    Plaintiffs' contention that they did not receive, review, or sign the ECMO "Consent Form" is irrelevant.**

According to <u>Canterbury</u> and its progeny, informed consent, as understood by District of Columbia law, is not a signature on a particular form.  It is an exchange of information between a physician and a patient (or surrogate decision-maker).  <u>See</u>, <u>e.g.</u>, <u>Canterbury</u>, 464 F.2d at 787 (describing topics "demanding a communication of information).  <u>See also</u> <u>Crain v. Allison</u>, 442 A.2d 558, 562 (describing the "mandatory disclosure of information").  As noted in <u>Stivers v. George Washington Univ.</u>, 320 F.2d 751 (D.C. Cir. 1963), the act of obtaining a writing acknowledging that an exchange of informed consent information has occurred between physician and patient is merely a ministerial or administrative act, not even necessary to the informed consent function, such that it can even be performed by a lay employee.  <u>Id.</u> At 753.  Therefore, the contention that Plaintiffs did not receive what they describe as the ECMO "Consent Form,"[5] Exhibit G hereto (CNMC 02422), is irrelevant to the determination of whether

---

[5] Although the Children's ECMO Training Manual implies that Exhibit G is the ECMO Consent Form, it is clearly labeled as "ECMO Information."  In September 2005, Exhibit G was not used as a document evidencing informed consent at Children's.  Plaintiffs' counsel stated that he understood there was an ECMO consent form in use at Children's, but that has never been confirmed by its practitioners.  <u>See</u> Deposition of Khodayar Rais-Bahrami, M.D. ("Rais-Bahrami Depo."), taken October 24, 2007, relevant portions of which are attached hereto as Exhibit H, at 118:15-17 and 119:1-3.

Children's met the duty to obtain an informed consent to ECMO.  Interestingly, however,

Plaintiffs' demand that they should have been provided the ECMO Information Sheet

before ECMO clashes with their argument that it would be unduly "coercive" to advise a

parent that ECMO was being recommended because it constitutes the only remaining

therapy absent which death is likely to occur.  The first two sentences of the Form state

"Your child has severe lung disease that has not responded to our usual therapy,

including a ventilator (breathing machine) and drugs.  <u>We have found that children who

don't get better after a few days of this therapy have a very slim chance of living</u>."

Exhibit G, (emphasis added).

### B.    Plaintiffs' contention that they did not receive or review the ECMO DVD is irrelevant for the same reason.

During discovery, it was learned that in approximately 1998, Dr. Billie Lou Short,

a neonatologist at Children's, created an interactive DVD regarding ECMO.  The DVD

"was made for a statistician who was teaching a statistical analysis to high school

students . . .."  Deposition of Billie Lou Short, M.D. ("Short Depo."), taken January 22,

2008, relevant portions of which are attached hereto as Exhibit J, at 23:17-22.  Indeed,

for the same reason that a written consent form is not necessary, neither was CNMC

obliged to use this particular document to obtain Plaintiff's informed consent.  The

purpose of the DVD was not to be an educational tool at Children's, but it was kept and

shown to some, but not all, parents of ECMO children *after* the children were placed on

ECMO; it was not made regularly available because Children's did not have a laptop in

---

<u>See also</u> Deposition of Stephen Baumgart ("Baumgart Depo."), taken December 20,
2007, relevant portions of which are attached hereto as Exhibit I, at 22:11 – 24:14
(clarifying that Exhibit G is presented to parents *after* informed consent is obtained to
begin ECMO therapy, and that the informed consent is memorialized on a surgical
consent form).

house to use with parents consistently.  <u>See</u> Short Depo. at 23:19 – 30:11.  It was never intended to be used as an informed consent tool.  <u>See</u> Short Depo. at 30:18 – 31:1. Plaintiffs' contention that they could not give informed consent because they were not provided the opportunity to watch a years-old DVD which was never intended to be an informed consent tool and had never been presented as an informed consent tool does not save their Informed Consent claim from summary judgment in favor of Children's.

**C.**     **Plaintiffs' allegation that their consent is invalid because they disagree in retrospect with the recommendation to begin ECMO therapy does not save their Informed Consent claim from summary judgment.**

According to their Opposition, Plaintiffs decided that physicians from Children's recommended Q.E.S. be placed on ECMO therapy when his physical condition did not warrant such therapeutic change.  As support for this contention, Plaintiffs cite to the Children's ECMO Training Manual and testimony from their experts.

The ECMO Training Manual states that Children's uses "a persistent $PaO_2$ <50mmHg after maximal therapy" as a criterion for placement of children on ECMO. <u>See</u> Medical Record, produced herein as CNMC 02295-02296 and attached hereto as Exhibit K.  Plaintiffs conveniently neglect to mention the next sentence, which states, "Exceptions to this rule are infants who are cardiovascularly unstable, e.g., infants in septic shock, who may need to go on before they are profoundly hypoxic."  <u>See</u> Exhibit K.

Dr. Carolyn Crawford opined on whether Q.E.S. met the ECMO criteria mentioned only Q.E.S.'s $PaO_2$ and did not discuss whether Q.E.S. was cardiovascularly unstable.  <u>See</u> Deposition of Carolyn S. Crawford, M.D. ("Crawford Depo."), taken December 10, 2007, relevant portions of which are attached hereto as Exhibit L, at 27:3

– 33:10.  However, Dr. Van Woert testified that Q.E.S.'s conditions which "placed him in a position where ECMO therapy became a consideration" were "cardio and respiratory difficulties," which comprise part of the ECMO criteria used at Children's.  See Deposition of Melvin H. Van Woert, M.D. ("Van Woert Depo."), taken January 4, 2008, relevant portions of which are attached hereto as Exhibit M, at 56:8-12.  And, Plaintiffs' own expert Robert F. Cullen, M.D., has testified on deposition that this infant experienced cardiovascular instability on the afternoon of September 13 when the decision was made to recommend ECMO.  See Deposition of Robert F. Cullen, Jr., M.D., taken February 25, 2008, copies of relevant portions of which are attached as Exhibit Q hereto at 41:7-44:17.  See also Medical Record, Exhibit N hereto CNMC 00380) (documenting Q.E.S.'s instability just prior to placement on ECMO).

Plaintiffs make this allegation hoping to transpose a malpractice claim into an informed consent claim.  They should not succeed.  Again, informed consent claims focus on the transfer of material information from practitioner to patient before a medical decision is made.  They do not focus on differences of medical opinion or meeting a relevant standard of care.  If Plaintiffs want to argue that Q.E.S. was not ECMO-eligible, they may attempt to do so in their medical negligence case, not their Informed Consent case.

**D.    As a matter of law, Children's was not required to tell Plaintiffs of the usage recommendations of the ECMO equipment.**

Plaintiffs claim, despite contrary federal statutes and common law, that they were entitled to be told that the ECMO equipment was approved under a Food and Drug Administration ("FDA") process wherein its duration of use was limited to six hours or less in order to make an informed decision regarding ECMO therapy for their son.  As

Children's argued in its Motion for Summary Judgment, they were not.  See, e.g., 21

U.S.C. § 396; Buckman Co. v. Plaintiffs' Legal Committee, 531 U.S. 341 (2001);

Southard v. Temple University Hospital, 781 A.2d 101 (Pa. 2001).

　　　　As a new approach to this contention, Plaintiffs also claim that they should have

been told that Children's never requested an investigational device exemption ("IDE") in

order to use ECMO equipment in excess of six hours.  This is flawed in two ways.  First,

this is a more detailed way of claiming that Plaintiffs should have been informed of the

FDA status of the ECMO equipment, which practitioners are not required to do.

Second, according to the testimony of Philip Sax, if an IDE were required in order for

use of the ECMO equipment in excess of six hours, it would have been the

responsibility of the equipment's manufacturer to obtain that IDE.  A hospital cannot do

that.  See Deposition of Philip Sax ("Sax Depo."), taken January 28, 2008, relevant

portions of which are attached hereto as Exhibit O, at 9:16 – 10:1.  Therefore, Plaintiffs

point their grievance at the incorrect entity: if there were an FDA-approval issue with the

placement of ECMO equipment on the market, Children's is not accountable for that

problem.

　　　　Finally, and most importantly to the informed consent issue, in order for the

Informed Consent claim related to the use of a medical device to survive summary

judgment, *there must been a causal relationship between the information not provided

to the decision-makers and the injury.*  In other words, in this case, if Plaintiffs want to

hang their medical device Informed Consent claim on the fact that they were not told the

ECMO pump could not be used in excess of six hours, what must occur is that the

pump was used in excess of six hours and *failed.*  There is nothing in the record which

reflects that the ECMO pump failed.  In fact, the record shows that the pump worked

properly and continuously (save for about fifteen minutes on September 15, 2005 when

it was turned off by the Children's perfusionist) for the thirteen days while Q.E.S.

received ECMO therapy.  Therefore, Plaintiffs' demand for information with respect to

the usage limitations of the ECMO equipment is irrelevant not only according to federal

statute and common law, but also with respect to meeting the elements of the Informed

Consent claim itself.

> **F.    Plaintiffs received adequate information regarding the decision to place Q.E.S. on ECMO-related research protocols.**

To obtain informed consent from Plaintiffs about to enroll their son in ECMO-

related research protocols, Children's would need to provide them with material

information related to that decision, including any inherent or potential hazards in the

protocol, alternatives, and consequences of not participating in the research.  The

record reflects that Ms. Morring was presented with that information.  See Exhibit D.

Therefore, Plaintiffs conjure two new allegations about the informed consent

presumptively obtained to try to bolster their informed consent claim.  Because neither

allegation can be supported by the record, they cannot save the informed consent claim

from summary judgment.

> **1.    Ms. Morring was not coerced into enrolling Q.E.S. in the research protocols by "suspicious and improper" timing of the conversation.**

The two research protocols to which Ms. Morring consented were being

conducted on neonatal ECMO patients at Children's.  See Exhibit E; see also Baumgart

Depo. at 28:8-15 (babies who were ECMO-eligible were eligible for monitoring under his

research protocol).  As the record shows, on September 11, 2005, Ms. Morring only

gave her consent to Q.E.S.'s placement on ECMO "if the need arises that night prior to my arrival." See Exhibit D.  Like her consent to the placement on ECMO, Ms. Morring reaffirmed her consent to the enrollment of her son on the two ECMO-related research protocols by signing the relevant consent forms on September 13, 2005, right before Q.E.S. was placed on ECMO.  See Exhibit E.  This sequence of events, clearly reflected in the record, must be lost on Plaintiffs, who focus on the portion of Dr. Van Woert's testimony revolving around his opinion that it was inappropriate for Children's to get preliminary consent for research protocols related to a therapy to which a parent consented but had not begun.  See Van Woert Depo. at 77:19 – 80:7.  Instead, Plaintiffs should turn their attention to Dr. Van Woert's testimony where he agreed that Ms. Morring signed the consent forms for the research protocols on September 13, 2005. See Van Woert Depo. at 65:22-23, 69:23-24, 70:21-23.  Dr. Van Woert also assumed that the dates of the physician's signatures on those same forms indicates that informed consent was actually obtained on the date indicated.  See Van Woert Depo. at 65:24 – 66:14.  The record does not reflect that Ms. Morring was confused or coerced into enrolling her son in the research protocols; in fact, the record reflects that she consented to his enrollment *twice*.  Nothing in the record supports Plaintiffs' claim that she failed to give informed consent to Q.E.S.'s participation in these research protocols.

> **2. The aEEG protocol had not expired at the time Q.E.S. participated in it.**

Plaintiffs try to attack Ms. Morring's consent to Q.E.S.'s participation in the research protocols by saying she should have been, and then was not, informed that the "Evaluation of Serum Iron and Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)" ("Iron Serum Study") had expired.

Plaintiffs know otherwise.  The Iron Serum Study was reapproved by the Children's IRB on August 17, 2005 and was current the next month when Q.E.S. enrolled in it.  See Medical Record, produced herein as CNMC 02826-02834 and attached hereto as Exhibit P.  Ms. Morring signed a form which was not current, but the research protocol was.  And the form she did sign was substantively equivalent to the form reapproved by the IRB less than one month prior to Q.E.S.'s arrival at Children's.  To allege that Children's enrolled Q.E.S. in an expired research protocol is simply false, and the fact that the protocol was current negates any argument that Ms. Morring could not have given her informed consent to Q.E.S.'s participation in a protocol because she was not told it had expired.

### G.    Conclusion

Plaintiffs were obliged in their Opposition to use discovery material to "designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Plaintiffs did use discovery material in their Opposition, but none of it shows a genuine dispute for trial.  As a result, Children's is entitled to summary judgment with respect to Count II.

Given the record in this case, amending Count II is futile and unwarranted.  Although Children's understands that, pursuant to Fed. R. Civ. P. 15(a), the Court, in its discretion, may allow Plaintiffs to amend their Complaint, amendment is limited to situations where "the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief."  Boyd v. District of Columbia, 465 F. Supp. 2d 1, 3 (D.D.C. 2006), quoting Foman v. Davis, 371 U.S. 178, 182 (1962).  As shown above, these underlying facts and circumstances are not a proper subject of relief.  Therefore,

Plaintiffs should not be permitted to amend their Complaint to reflect allegations properly subject to summary judgment.

**III.    Summary judgment must be granted in favor of Children's with respect to the Fraud and Punitive Damages counts (Counts VI and X).**

In order to survive summary judgment relating to Plaintiffs' Fraud claim (Count VI), they must show a dispute of material fact somewhere within the elements of fraud. "The essential elements of common law fraud are: (1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." Bennett v. Kiggins, 377 A.2d 57, 59 (D.C. 1977) (internal citations omitted). See also Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992); Calvetti v. Antcliff, 346 F. Supp. 2d 92, 100 (D.D.C. 2004). In order to survive summary judgment with respect to their claim for Punitive Damages (Count X), Plaintiffs must maintain a colorable action with respect to an intentional tort. See, e.g., Robinson v. Sarisky, 535 A.2d 901 (D.C. 1988). Therefore, the success of Count X is wholly dependent on the viability of Count VI, because Plaintiffs have not pled or pursued any other intentional torts in this action.

**A.    The Fraud count cannot withstand summary judgment.**

What Plaintiffs list in their Opposition as bases for a viable Fraud claim neither support a Fraud claim nor are evident in the record. See Opposition pp. 28-30 for that list. Children's briefly responds as follows:

- Dr. Baumgart was not practicing medicine at Children's between March and October, 2005, and therefore cannot speak with accuracy about the patient

enrollment in his ECMO-related research protocol.  See Baumgart Depo. at 3:16-19, 8:17-22.

- As discussed above, Ms. Morring had full knowledge on September 11, 2005 that the decision had not been made to place Q.E.S. on ECMO, and that the decision was not made until September 13, 2005.  See Exhibits A and D.

- Q.E.S. was not responding to conventional therapy and was placed on ECMO in accordance with the criteria in use at Children's at the time.  See Exhibits N and G.

- Children's was not required to provide a consent document to Plaintiffs regarding ECMO, but, nevertheless, it did.  See Exhibit F.

- Children's was not required to provide Dr. Short's DVD to Plaintiffs.

- Children's fairly represented that there were no viable alternatives to ECMO therapy for Q.E.S., and that the consequence of not receiving treatment would be his death; it was not required to replace "death" with "wait and see."

- The Iron Serum Study had not expired.  See Exhibit P.

- The ECMO equipment was not being used in an experimental manner.

- Finally, as mentioned in Children's Motion for Summary Judgment, it was not required to inform Plaintiffs of the risk of decannulation from ECMO because the risk was so small as to be immaterial, and Children's is only required to provide decision-makers information material to the decision to be made in order to obtain informed consent.  See Canterbury, 464 F.2d 787; see also Motion for Summary Judgment at 3-4 and 6-8.

The record shows that there were no false representations made to Plaintiffs. For this reason alone, the Fraud count must be dismissed.  Moreover, there is a complete lack of evidence presented by Plaintiffs regarding Children's *intent* to deceive Plaintiffs (assuming, only for the moment, that they made misrepresentations to Plaintiffs).  Although intent can be inferred from surrounding circumstances, <u>see</u>, <u>e.g.</u>, District of Columbia Standard Jury Instruction § 20.22, Plaintiffs have failed to accurately represent any surrounding circumstances to any decision made by Plaintiffs wherein Children's intent to deceive may be inferred.  For this reason as well, the Fraud count cannot withstand summary judgment.

### B. Because the Fraud count is subject to summary judgment, so is the Punitive Damages claim.

As discussed above and within Children's Motion for Summary Judgment, the viability of the Punitive Damages claim rises or falls with the Fraud claim, because Fraud is the only intentional tort brought by Plaintiffs herein.  The Fraud claim is subject to summary judgment; therefore, the Punitive Damages claim is as well.

### C. Amending Counts VI and X is futile.

Again, Plaintiffs argue that amending the Complaint to reflect their new allegations insofar as fraud is concerned and to change a technicality insofar as punitive damages are concerned may be a solution to their deficiencies.  But, amendment is not proper unless the underlying facts or allegations are the proper subject of relief.  The underlying facts in the record flatly contradict any proposed amendment to the Fraud count, so amendment of Count VI is improper, while an entry of summary judgment is proper.  Similarly, amending the Complaint to reflect a new *ad damnum* clause in Count VI does not spare Count X from summary judgment.

**IV.    Plaintiffs may not recover damages related to Q.E.S.'s injury that accrue after Q.E.S. reaches majority or for loss of financial support from Q.E.S.**

In Section V. of their Opposition, Plaintiffs concede that they are not entitled to damages stemming from Q.E.S.'s injury which accrue after Q.E.S. reaches majority. See Opposition at 21, fn. 6.  Therefore, there is no genuine issue of material fact as to this issue, and Plaintiffs' claim for any damages which Q.E.S. may incur in his majority should be dismissed.

Plaintiffs further limit their broad request set forth in Count XI (Parents' Claim) by refuting the notion that they are making a claim for parent-child consortium.  They describe Count XI in their Opposition as "a parents' claim for the costs of raising a child in his minority with such severe injuries and the monies he would have made in his minority, nothing more."  See Opposition at 32.  Because Plaintiffs aver that they will not seek damages for loss of parent-child consortium, this aspect of Count XI should be dismissed as well.

As to the remaining contested claim in Count XI, adult Plaintiffs' claim for "loss of financial support," Children's is entitled to summary judgment because Plaintiffs cannot offer any admissible evidence that Q.E.S. would have earned any money before he reached the age of 18.  There is no genuine issue of material fact as to the age at which Q.E.S. would have become a wage-earner, especially since the report from Plaintiffs' own expert, Dr. Richard Lurito, states that Q.E.S. would not have begun earning money until he graduated from high school.  See Motion for Summary Judgment at 24.  In their Opposition and throughout the many months of extensive discovery, Plaintiffs have failed to offer any evidence, much less any specific facts from which a lay jury could do anything other than speculate as to when Q.E.S.'s earning power would have begin

during his minority, what he would have earned, and how much of those earnings would have found their way to Plaintiffs' pockets. In the absence of sufficient admissible evidence for a reasonable trier-of-fact to find for the non-moving party, the moving party is entitled to summary judgment. Robinson v. District of Columbia, 403 F. Supp. 2d 39, 48 (D.D.C. 2005), citing Laningham v. U.S. Navy, 813 F.2d 1236 (D.C. Cir 1987). Thus, Plaintiffs' failure to meet their burden of proof precludes the trier-of-fact from finding, without any factual support whatsoever, that Q.E.S. would have earned money during his minority. Plaintiffs' claim for loss of financial support cannot succeed, and Children's is entitled to summary judgment on this issue, leaving open only Plaintiffs' claim for damages which accrue during Q.E.S.'s minority.

## V.    Conclusion

For the reasons noted above, Defendant Children's National Medical Center is entitled to summary judgment on Counts II, VI, X, and XI, save the demand in Count XI to damages which accrue during Q.E.S.'s minority.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.

By:  Nicholas S. McConnell                    
      Nicholas S. McConnell (#167742)
      Krista A. Maizel (#503597)
      1120 – 20th Street, NW (South Tower)
      Washington, DC  20036-3437
      (P)(202) 457-1600
      (F)(202) 457-1678
      nmcconnell@jackscamp.com
      kmaizel@jackscamp.com

      *Counsel for Defendant*
      *Children's National Medical Center*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of March, 2008, I caused the foregoing Reply of Defendant Children's National Medical Center to Plaintiffs' Opposition to Motion for Summary Judgment, Exhibits A through P, and proposed form of Order, to be electronically served upon the following:

Ira Sherman, Esq.
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth St., NW
Washington, DC 20036

Anthony Newman, Esq.
NEWMAN, MCINTOSH & HENNESSEY, LLP
7315 Wisconsin Ave.
Suite 700E
Bethesda, MD 20814

*Counsel for Plaintiffs*

_Nicholas S. McConnell_
Nicholas S. McConnell

678723v.1

# EXHIBIT A

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

1 (Pages 1 to 4)

---

**1**

1      UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF COLUMBIA
3 - - - - - - - - - - - - - - +
4 TERESA MORRING, et al.,   |
5      Plaintiffs,   |
6 v.          | Case No.
7 CHILDREN'S NATIONAL MEDICAL   |06-2036 (RMC)
8 CENTER, INC.,      |
9      Defendant.   |
10 - - - - - - - - - - - - - - +
11
12
13     Videotaped Deposition of TERESA A. MORRING
14        Washington, D.C.
15      Tuesday, September 4, 2007
16        11:27 a.m.
17
18
19
20 Job No. 1-110272
21 Pages 1 - 126
22 Reported by: Cathy Jardim

---

**2**

1     Deposition of TERESA A. MORRING, held at the
2 offices of:
3
4     CHAIKIN & SHERMAN, PC
5     1232 17th Street, Northwest
6     Washington, D.C. 20036
7
8
9
10
11
12
13
14
15     Pursuant to notice, before Cathy Jardim,
16 Registered Professional Reporter and Notary Public of
17 the District of Columbia.
18
19
20
21
22

---

**3**

1      A P P E A R A N C E S
2 ON BEHALF OF THE PLAINTIFFS:
3     IRA SHERMAN, ESQUIRE
4     Chaikin & Sherman, PC
5     1232 17th Street, Northwest
6     Washington, D.C. 20036
7     (202)659-8600
8
9     **ORIGINAL**
10
11
12 ON BEHALF OF THE DEFENDANT:
13     NICHOLAS S. MCCONNELL, ESQUIRE
14     KRISTA A. MAIZEL, ESQUIRE
15     Jackson & Campbell, PC
16     1120 20th Street, Northwest
17     Washington, D.C. 20036
18     (202)457-1600
19
20
21 VIDEOGRAPHER: Alfred Gomes
22

---

**4**

1      C O N T E N T S
2 EXAMINATION OF TERESA MORRING     PAGE
3    By Mr. McConnell         6
4
5
6
7
8
9
10
11
12
13      E X H I B I T S
14     (Attached to transcript)
15 MORRING DEPOSITION EXHIBITS      PAGE
16 No. 1--Plaintiff's Answers to Interrogatories    10
17 No. 2--Collection of photographs and calendars   63
18
19
20
21
22

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

9

1  A  Yes.
2  Q  How often does he do that?
3  A  I would say, maybe once every two weeks.
4  Q  When Mr. Snowden takes          to his
5  residence, does he keep him overnight?
6  A  No.
7  Q  How long will he have        |when he picks
8  him up and takes him back to his place?
9  A  Roughly about eight hours or so.
10  Q  Is there any special equipment that
11  Mr. Snowden needs to carry with him when he has got
12           , any breathing equipment, any feeding
13  equipment?
14  A  Yes.
15  Q  What equipment does he have to take with
16  him?
17  A            has a suction pump that he takes;
18        's feeding pump;        has an adaptive seat
19  that he takes; his Farrell valves --
20  Q  I am sorry.  I didn't understand the last
21  answer.
22  A  Farrell valves, F-A-R-R-E-L-L valves.

10

1  Q  Valves?
2  A  Yes.
3  Q  What are those?
4  A  They are attached to        's GJ tube.
5         (Morring Exhibit No. 1
6         was marked for identification.)
7  BY MR. MCCONNELL:
8  Q  I will place before you what I have asked
9  the reporter to mark as Exhibit No. 1 for
10  identification.  This a document we received on
11  Friday, right before the weekend.  It is headed at the
12  top of the page, "Plaintiffs' Answers to
13  Interrogatories."  If you could look through that
14  briefly, if you would, Ms. Morring, and tell me if
15  those are the answers to interrogatories you recently
16  signed in this matter?
17  A  Yes.
18  Q  To the best of your knowledge as you sit
19  here today, the information supplied was true,
20  complete and accurate?
21  A  Yes.
22  Q  Did you have a chance to review them before

11

1  you signed them?
2  A  Yes.
3  Q  Is there any information that you have that
4  would supplement any of the facts or other information
5  provided in here?
6  A  No.
7  Q  Where are you presently employed?
8  A  I am unemployed.
9  Q  When were you last employed?
10  A  August of 2004.
11  Q  Where was that?
12  A  The American Red Cross.
13  Q  What did you do there?
14  A  My last position there was quality systems
15  support specialist.
16  Q  What was your level of pay, your wages or
17  salary?
18  A  Hourly or yearly?
19  Q  Why don't we take yearly?
20  A  I believe 32,000.
21  Q  How long had you been working for the Red
22  Cross?

12

1  A  Since February of 2001.
2  Q  Had you had any pay increases from the time
3  you started in 2001 until you last worked there in
4  2004?
5  A  Yes.
6  Q  What was your starting salary or pay?
7  A  About $11.03 a year.
8  Q  What did that work out to per year,
9  ballpark?
10  A  I can't recall, actually.  I believe it was
11  21,000.
12  Q  When was your daughter        born?
13  A  August 27, 2004.
14  Q  Did her birth have anything to do with the
15  fact that you stopped working in 2004?
16  A  Yes.
17  Q  And why was that?
18  A  She was born prematurely, three months
19  prematurely.
20  Q  What was her condition at birth?
21  A  Extremely low birth weight.
22  Q  What was her birth weight?

Case 1:06-cv-02036-RMC    Document 25-2    Filed 03/17/2008    Page 4 of 19
VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

4 (Pages 13 to 16)



**13**

1    A  Two pounds, three ounces.
2    Q  Where was she hospitalized for neonatal
3  care?
4    A  Children's Hospital of the King's Daughters
5  and also Centara Norfolk General Hospital in the level
6  2 nursery.
7    Q  How long did she remain hospitalized after
8  her birth?
9    A  Combined in both hospitals?
10    Q  Yes.
11    A  Eight weeks.
12    Q  She is now just over three years old?
13    A  Yes.
14    Q  How is she doing?
15    A  She is doing well.
16    Q  Is she being seen by any child
17  developmental specialist at this time?
18    A  Not at this time.
19    Q  What have you been told, if anything, about
20  her developmental progress?
21    A  She still has developmental delay.  She is
22  in special education through the Norfolk public

**14**

1  schools.
2    Q  When you say            has developmental
3  delays, how have those been described to you, what are
4  they and how have they been described?
5    A  Twenty-five percent, that is the range they
6  have always given me, a 25 percent delay, cognitive.
7    Q  How about motor skills, does she have any
8  deficits in motor skills at all?
9    A  Gross motor planning, that is what I was
10  told.
11    Q  Is she able to walk?
12    A  Yes.
13    Q  Does she have any assistance devices that
14  she uses?
15    A  No.
16    Q  When you say she attends special Ed
17  programs, where does she actually go for these
18  programs?
19    A  Easton Elementary School.
20    Q  Has a child developmental specialist been
21  able to discuss with you at all what her ultimate
22  educational outlook is, whether she will graduate from

**15**

1  elementary school, high school, college?
2    A  Yes.
3    Q  What have you been told about that?
4    A  She is in the school system now, and she
5  will begin -- if she can test out of special
6  education, by the time she is five years old she will
7  be able to go to a regular elementary school with her
8  peers.
9    Q  Does she have any other sort of ongoing
10  physical problems or illnesses of any kind?
11    A  No.
12    Q  When            was discharged from the
13  hospital, the neonatal units, at about -- it would
14  have been age eight weeks at that point -- she was in
15  the hospital about eight weeks total?
16    A  Yes.
17    Q  Did you care for her at home at that point?
18    A  Yes.
19    Q  Did she require ongoing special care beyond
20  those of a normal full-term neonate?
21    A  Yes.
22    Q  What special care did she need at that

**16**

1  point?
2    A  She receiving RSV shots monthly.  She also
3  received physical therapy weekly.  She had an educator
4  come out, I believe, weekly from the Norfolk Infant
5  Development Program, and she also received speech
6  therapy weekly.  I am sorry.  She was also followed by
7  her ophthalmologist for retinopathy, and she was there
8  every two weeks to be examined.
9    Q  At this time, does she have any eye
10  problems at all?
11    A  No.
12    Q  Was there a reason at some point after she
13  was discharged from the hospital that you didn't
14  return to work before you became pregnant with
15
16    A  Yes.
17    Q  What was the reason?
18    A  I was afraid to actually take her to day
19  care because she was premature and a lot of day care
20  centers in the area you had to pay extra if you had a
21  premature child, and a lot of the areas there didn't
22  know how to care for a premature child.

**17**

1    Q  What was your own plan at that time in
2  terms of returning to work if you were going to do so
3  at any point?
4    A  In the spring of 2005, I had actual plans
5  to return to the American Red Cross.
6    Q  But then, I take it, you discovered you
7  were pregnant with          and there were difficulties
8  with that pregnancy?
9    A  Yes.
10    Q  Is that the reason you didn't return to
11  work as planned in the spring of 2005?
12    A  Yes.
13    Q  What was the difficulty with your pregnancy
14  with
15    A  I was told I was high-risk.
16    Q  For what reason?
17    A  Because I had a history of premature labor,
18  and I also was diagnosed with gestational diabetes.
19    Q  At what point in the pregnancy was your
20  gestational diabetes diagnosed?
21    A  I can't remember the exact date, which
22  month it was.

**18**

1    Q  Do you recall by trimester, was it early in
2  the pregnancy?
3    A  I believe it was the second trimester.
4    Q  Were there any particular steps taken
5  during your pregnancy given the diagnosis of the
6  gestational diabetes?  By that I mean were you placed
7  on any medications, any restrictions on activities,
8  what was done?
9    A  Yes.
10    Q  What happened?
11    A  I was receiving Metformin.  I believe that
12  is the generic for Glucophage.  I had to take
13  Metformin.  I also had to monitor my blood sugars
14  daily.  I was placed on a special diet.
15    Q  How were your blood sugars during the
16  pregnancy?
17    A  Normal.
18    Q  As far as you knew, right up to the time
19  you went to the hospital for          delivery, how
20  was your pregnancy going?
21    A  I would say it was going well.  I was
22  uncomfortable.  I had gained a lot of weight, but

**19**

1  aside from that, it was going well.
2    Q  During your pregnancy and before delivery,
3  did any physician tell you there was any concern about
4  the health of          as a fetus?
5    A  No.
6    Q  Who was your primary obstetrician for that
7  pregnancy?
8    A  I can't recall his first name, but his last
9  name was Abuhamad, Dr. Abuhamad.
10    Q  Can you give me some help on the spelling?
11    A  A-B-U-H-A-M-A-D, I believe.
12    Q  Where did you actually see Dr. Abuhamad?
13    A  At EVMS, Eastern Virginia Medical School,
14  Maternal Fetal Medicine, that was the name of the
15  department.
16    Q  Were they your regular obstetricians or
17  were you referred there when you realized you were
18  pregnant and they diagnosed you with the gestational
19  diabetes?
20    A  I actually went there because I was having
21  a problem with my insurance, I didn't have any at the
22  time, so I went someplace I could go once they took my

**20**

1  Medicaid; so I wasn't referred there at all.
2    Q  Who actually delivered          the
3  Centara hospital?
4    A  I have no idea, I can't recall the doctor's
5  name.
6    Q  I take it it was not Dr. Abuhamad.
7    A  No.
8    Q  And          birth date was what?
9    A  September 6, 2005.
10    Q  When was the first time after          was
11  born that any health care provider told you there were
12  any concerns about          health, was it
13  immediately in the delivery room or some point further
14  down the road?
15    A  I would say the day he was born, when I
16  called over from my recovery room to the NICU at
17  Children's Hospital to check his status.
18      MR. MCCONNELL:  Let's take a short break.
19      (Brief recess.)
20      BY MR. MCCONNELL:
21    Q  About what time of day was          was
22  delivered?

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

6 (Pages 21 to 24)

21

1    A  2:35 p.m.
2    Q  And that was at Centara Hospital?
3    A  Yes.
4    Q  How long did he remain at Centara?
5    A  He was transferred the day he was born to
6  Children's Hospital.
7    Q  Tell me about that transfer.  When was the
8  first time someone spoke to you about the need to
9  transfer        from Centara to Children's?  And by
10  that, we will be talking for the moment about
11  Children's Hospital of the King's Daughters down in
12  Norfolk.  Okay?
13    A  Yes.
14    Q  When we switch to Children's up here, I
15  will make that clear and we will talk about that.
16    But let's for a moment talk about
17  was born at about 2:35 on September 6, 2005.  How soon
18  after he was born did you have a conversation with
19  anyone where questions were raised about
20  health?
21    A  No, I was in the operating room because it
22  was a C-section, and the doctor that delivered

22

1  said        was having a little trouble breathing, so
2  they were going to call over the NICU staff from
3  Children's Hospital of the King's Daughters.
4    Q  And then what happened next in terms of
5        transfer over to Children's Hospital King's
6  Daughters?
7    A  The NICU staff from the King's Daughters
8  immediately came over within five minutes, and I would
9  say        probably stayed in the OR with me -- I
10  know it was less than 30 minutes, but I can't recall
11  the actual time.
12    Q  And the doctors at Centara told you that
13        was having trouble breathing and would need to
14  be transferred to Children's Hospital KD?
15    A  Yes.
16    Q  Did the doctor tell you why it was that
17        was having this problem?
18    A  No.
19    Q  Did the doctor who discussed this with you
20  in any way quantify a level of concern about
21  health, in other words, this is a very serious problem
22  or this is a routine problem we see often, don't

23

1  worry, any discussion at all by this doctor about the
2  severity of        condition?
3    A  No.
4    Q  He remained, that is,        remained with
5  you in the delivery room less than 30 minutes.  The
6  team from King's Daughters Children's Hospital arrives
7  and they transported        to Children's in Norfolk?
8    A  Yes.
9    Q  After        was transferred, when was the
10  next time anyone had a conversation with you about
11        condition or how he was doing?
12    A  When I called from my recovery room to the
13  NICU to check        status.
14    Q  Who did you speak with?
15    A  I can't recall the nurse's name.
16    Q  But it was a nurse over at the neonatal
17  unit at King's Daughters?
18    A  Yes, a nurse practitioner.
19    Q  What did this nurse practitioner tell you
20  about
21    A  Her words were        very sick.
22    Q  What did she say in terms of he is very

24

1  sick, what was going on with        as she explained
2  it to you?
3    A  She said he was having a little trouble
4  breathing and they already put him on the ventilator,
5  and they were in the process of getting images of his
6  heart.
7    Q  What is the next conversation you had with
8  anyone at Children's Hospital King Daughter about
9        and how he was doing?
10    A  A few hours later when I was able to come
11  over to see him, I spoke with that same nurse and the
12  nurse at        bedside.
13    Q  What did they tell you at that time?
14    A  That he had an enlarged heart, and by that
15  time he was already sedated, and they told me the
16  reason why he was sedated.
17    Q  What was the reason?
18    A  He was really sensitive, his blood pressure
19  was very sensitive -- he was very sensitive to
20  stimulus, I am sorry, and it made his blood pressure
21  fluctuate.
22    Q  And at that time, you said he was already

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

7 (Pages 25 to 28)

**Page 25**

1    on a ventilator?
2        A  Yes.
3        Q  Did the nurses tell you how long that they
4    thought          might need to be on a ventilator?
5        A  No.
6        Q  Was there any other discussion with these
7    nurses when you first arrived at King's Daughters?
8        A  No.
9        Q  Did there come a time when you had a
10   conversation with an attending physician,
11   neonatologist at Children's Hospital of the King's
12   Daughters --
13       A  Yes.
14       Q  About          and his condition?
15          MR. SHERMAN:  Excuse me.  Let him finish
16   the question.
17          MR. MCCONNELL:  We are doing pretty well.
18          BY MR. MCCONNELL:
19       Q  Tell me about the first conversation you
20   had with a physician at that hospital about
21       A  It was September 11, 2005.
22       Q  Who was the physician?

**Page 26**

1        A  Dr. Khan, K-H-A-N.
2        Q  Dr. Khan is a neonatologist?
3        A  Yes.
4        Q  Tell me what the conversation with Dr. Khan
5    was about, what did he say?
6        A  I had arrived to the hospital that day.
7    That was the day that I was told          needed to go
8    on an ECMO machine.
9        Q  Who was the first person who told you about
10   putting          ECMO?
11       A  The nurse practitioner.
12       Q  And is this a different nurse practitioner
13   than the one you spoke to on the first day?
14       A  No, it is the same.
15       Q  And you, at this time, simply don't recall
16   her name?
17       A  No.
18       Q  So before you met with Dr. Khan, the nurse
19   practitioner had already told you that          would
20   need to be considered for ECMO?
21       A  Yes.
22       Q  When did you have that conversation with

**Page 27**

1    the nurse practitioner, was it before September 11?
2        A  Yes.
3        Q  When did you first have a conversation with
4    anyone at Children's Hospital King's Daughters about
5    having          placed on ECMO?
6        A  September 9.
7        Q  Tell me about that conversation, what were
8    you told about          s condition and why he might
9    need to go on ECMO?
10       A  By this time I was told that he was
11   diagnosed with cardiomyopathy and also pulmonary
12   hypertension, and the nurse practitioner told me that
13   he is a candidate for ECMO, and if he does need to go
14   on ECMO, he would have to be transferred to another
15   hospital.
16       Q  What did the nurse tell you that
17   cardiomyopathy was?
18       A  An enlarged heart.
19       Q  Did she tell you how enlarged
20   heart was?
21       A  All she said was that it was very large.
22       Q  Did she explain to you why that was a

**Page 28**

1    medical problem for          that he had large heart?
2        A  Because I had gestational diabetes.
3        Q  But in terms of what having a large heart
4    meant to          did she explain to you what that
5    meant for him, having a very large heart?
6        A  She said it coincides with the pulmonary
7    hypertension.
8        Q  Did she mention at all that having a very
9    large heart means the heart doesn't pump very well or
10   effectively and it is hard for a child to profuse
11   himself, did she discuss that with you?
12       A  No.
13       Q  You say she also told you about pulmonary
14   hypertension.  Did she discuss with you what that
15   meant beyond the phrase pulmonary hypertension?
16       A  She explained that pulmonary hypertension
17   is when your overall -- I am trying to get the term
18   right -- when your overall blood pressure is higher
19   than your lung pressure, I believe that is the way she
20   explained it to me.  That is how I understood it.
21       Q  And what effect does that have on a baby
22   like          in terms of being able to profuse his

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

29

1  blood?
2      MR. SHERMAN: Objection. You are asking
3  her --
4      BY MR. MCCONNELL:
5      Q  Was there any discussion of that at all
6  with you?
7      A  No.
8      Q  When the nurse practitioner first mentioned
9  that        may be a candidate for ECMO, what did she
10  tell you, if anything, about ECMO?
11      A  She said -- I remember saying is that like
12  **the iron lung, and she said it is a heart-and-lung**
13  **machine.**
14      Q  And she said       | may need to be
15  transferred to another hospital if that were
16  indicated, that is, ECMO treatment?
17      A  Yes.
18      Q  Did she tell you why he would need to be
19  transferred?
20      A  **Children's Hospital at King's Daughters**
21  **didn't have an ECMO machine.**
22      Q  Did she tell you what the nearest facility

30

1  was that did have ECMO equipment?
2      A  No.
3      Q  Did she mention Children's National Medical
4  Center up here in Washington at that time?
5      A  No.
6      Q  Did this nurse or any other health care
7  provider up to this point have a discussion with you
8  about the long-term prognosis for        \ given his
9  severe cardiomyopathy?
10      A  No.
11      MR. SHERMAN: Objection. I don't think she
12  said severe.
13      BY MR. MCCONNELL:
14      Q  Did anyone have a discussion with you about
15  the long-term outlook for ·        า given the fact that
16  he was born with a very large heart and had primary --
17  pulmonary hypertension and cardiomyopathy?
18      A  No.
19      Q  Between this discussion with the nurse
20  practitioner you have just described for us, which I
21  believe is the first time ECMO was mentioned to you --
22  is that correct?

31

1      A  Yes.
2      Q  And the conversation we were talking about
3  a moment ago with Dr. Khan, did you have any other
4  discussions between those two conversations about ECMO
5  and ·        ; need to be considered for ECMO?
6      A  **She called me, the nurse practitioner**
7  **called me on September 11 and told me I needed to get**
8  **to the hospital.**
9      Q  Did she tell you why?
10      A  **Because :              needed to be transferred to**
11  **go on ECMO.**
12      Q  Did she tell you what was going on with
13         that required the transfer?
14      A  No.
15      Q  Had anyone up to this point told you that,
16  in effect,        was a very sick newborn and was
17  requiring a lot of medical support?
18      A  **That same nurse practitioner, she told me**
19  **the day he was born when I called over to the**
20  **hospital.**
21      Q  How did she describe the severity of his
22  disease or his illness?

32

1      A  **She just said he was very sick.**
2      Q  Did anybody at Children's Hospital of the
3  King's Daughters discuss with you in any way at any
4  time the long-term outlook for        even if he were
5  placed on ECMO, or did that ever come up?
6      A  No.
7      Q  Was it explained to you by anyone at the
8  Children's Hospital for the King's Daughters that
9  despite all of their efforts including having
10  on a ventilator and using special ventilator
11  techniques that they simply weren't able to have him
12  breathe effectively, did anyone describe it to you
13  that way?
14      A  **No, not that way.**
15      Q  How was it described to you what they were
16  trying to do and the reason it wasn't working?
17      A  **He was still at the highest setting on the**
18  **ventilator and they couldn't wean him off of it.**
19      Q  So you had a conversation with a nurse
20  practitioner sometime -- was this in the morning on
21  September 11?
22      A  **The afternoon.**

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

9 (Pages 33 to 36)

**33**

1    Q  How soon after you got the call from the
2  nurse practitioner did you go to the hospital?
3    A  On which date?
4    Q  On the 11th.
5    A  I was there within 45 minutes.
6    Q  Was Mr. Snowden with you as well?
7    A  Yes.
8    Q  When you arrived at the hospital, you have
9  told us you met with Dr. Khan and had a discussion
10  about          condition and the need for transfer?
11    A  Yes.
12    Q  Tell me what you recall about that
13  discussion with Dr. Khan?
14    A  Dr. Khan said that there were three
15  hospitals that were options for          go to be
16  placed on ECMO.
17    Q  Which were those hospitals?
18    A  Children's National, University of Virginia
19  Medical Center and Duke University.
20    Q  What other discussion did you have with Dr.
21  Khan?
22    A  Dr. Khan said that he first tried UVA, and

**34**

1  UVA did not have an ECMO bed available, and that he
2  called Children's National next and that they had a
3  bed available for him.
4    Q  What did Dr. Khan discuss with you about
5  his recommendation -- did he recommend to you that
6          be transferred for ECMO?
7    A  Yes.
8    Q  What did he tell you about why he was
9  making that recommendation?
10    A  He believed that          would benefit from
11  the ECMO treatment and it would help resolve his
12  hypertension and cardiomyopathy.
13    Q  Did he discuss with you in any way any of
14  the risks and complications of the ECMO treatment?
15    A  No.
16    Q  Did he explain to you that without ECMO,
17  there was really no hope for          at this point,
18  they had done everything they could do?
19    A  That children's King's Daughters had done
20  everything they could do, that is what he told me.
21    Q  And did he explain to you that without ECMO
22  therapy,          would not survive?

**35**

1    A  He didn't say that.
2    Q  What, if anything, did he indicate to you
3  as to the importance of having          transferred and
4  placed on ECMO therapy?
5    A  He said it was really important that
6          get on ECMO treatment as soon as possible.
7    Q  Did he make any comment at all on what the
8  outlook would be for          if he were not
9  transferred and placed on ECMO?
10    A  No.
11    Q  Did Dr. Khan discuss with you at all how
12  ECMO is actually done, the procedures, the equipment
13  used and so forth?
14    A  He said there are two cannulas that go in
15  on -- I can't recall what side of the neck, but he
16  said there are two cannulas that will go in
17  neck, and the machine will transfuse blood out and
18  transfuse blood in.
19    Q  How long was this conversation you had with
20  Dr. Khan, both you and Mr. Snowden -- was Mr. Snowden
21  present throughout the conversation with Dr. Khan?
22    A  Yes.

**36**

1    Q  How long was the conversation?
2    A  I can't recall the exact time.  I would say
3  it was less than an hour.
4    Q  Was the nurse practitioner you had spoken
5  with earlier and who had been following          also
6  present for this conversation with Dr. Khan?
7    A  Yes.
8    Q  Anyone else present besides you,
9  Mr. Snowden, Dr. Khan and the nurse practitioner?
10    A  Yes.
11    Q  Who else?
12    A  My family members.
13    Q  Who were they?
14    A  My mother, my father, DeShaunia's mother
15  and father, my brother, the King's Daughters chaplain
16  and the pastor of DeShaunia's mother.
17    Q  During this meeting, was it mentioned at
18  all by anyone that          was really in a critical
19  state and at risk for dying?
20    A  No.  They said          was critical.
21    Q  Has          been baptized?
22    A  No.

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

10 (Pages 37 to 40)

37

1    Q  Was        baptized before he left
2  Children's Hospital for the King's Daughters?
3    A  Yes.
4    Q  Why?
5    A  The chaplain suggested it as soon as
6  DeShaunia and I got there.
7    Q  Was there a statement to you that it would
8  be important to have       baptized because he was
9  at severe risk?
10   A  No.
11   Q  Did you understand at any time that
12  was really sort of in a life-or-death struggle at this
13  point in terms of being able to survive?
14   A  At that time, yes, I knew he was critical.
15   Q  During this meeting with Dr. Khan that you
16  have been describing for us, did any of the other
17  family members ask any questions of Dr. Khan or the
18  nurse or any other of the providers who may have been
19  there?
20   A  Yes.
21   Q  What were the questions that were asked?
22   A  How would      be transported.

38

1    Q  What were they told about that?
2    A  He would be flown out, and I asked if I
3  would be able to accompany him for the flight.
4    Q  What were you told?
5    A  No, because there was only enough room for
6  the transport team.
7    Q  Were there any other questions asked by
8  family members about the transfer,
9  condition, what would be done and so forth?
10   A  No.
11   Q  Do you know why        was being flown up
12  to Children's rather than simply transported by an
13  ambulance?
14   A  No, I don't know why.
15   Q  Was there anything else that was said
16  during this meeting that you recall that you haven't
17  told us about?
18   A  No.
19   Q  About what time of day did the meeting end?
20   A  I don't recall.  It was in the afternoon,
21  but I don't know the exact time.
22   Q  Was      then flown up to Children's

39

1  Hospital here?
2    A  Yes, but where is here?
3    Q  Washington, D.C.?
4    A  Yes.
5    Q  And he was flown up here that same day,
6  September 11?
7    A  Yes.
8    Q  Other than Dr. Khan, did you have
9  conversations with any other physicians at Children's
10  Hospital of the King's Daughters concerning
11  condition, its severity and the need for ECMO
12  treatment?
13   A  No.
14   Q  Before        was put on a plane to be
15  flown up to Children's, did you speak with anyone at
16  Children's Hospital?
17   A  Which Children's Hospital?
18   Q  Up here in Washington, D.C.
19   A  Before
20   Q  Yes.
21   A  No, I did not speak to anyone.
22   Q  After the meeting, tell me what happened

40

1  next?
2    A  The transport team came and transferred
3          from his bed that was in the NICU at King's
4  Daughters to one of the isolettes for the helicopter
5  and --
6    Q  Did you speak with any members -- I am
7  sorry.  Did I cut you off?
8    A  We said our goodbyes to      , we kissed
9  him, we prayed over him, and we baptized him, and they
10  left.
11   Q  Did you speak with any of the members of
12  the transport team from Children's National Medical
13  Center here in Washington, D.C., while they were down
14  at Children's Hospital of the King's Daughters in
15  Norfolk preparing for the transfer and actually taking
16          out to be flown up here, did you have any
17  conversations with anybody from Children's Hospital up
18  here?
19   A  The question was kind of two-part.  What
20  was the first part of the question?
21   Q  Did you have any conversations with any of
22  the members of the transport team from Children's

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

11 (Pages 41 to 44)

---

**41**

1  National Medical Center, the hospital up here, while
2  they were down in Norfolk preparing to carry out the
3  transfer and actually transferring Quinton?
4  A  No.  The transport team was from King's
5  Daughters.  They told me that it was clear outside and
6  the flight shouldn't take long.
7  Q  So the people actual carrying out the
8  transfer were also people from King's Daughters
9  Hospital?
10  A  Yes.
11  Q  And you have already told us that
12  was then flown to Children's National Medical Center
13  here that same day?
14  A  Yes.
15  Q  What was the first contact you had with
16  anybody up here at Children's National Medical Center?
17  A  That night of September 11.
18  Q  About what time?
19  A  I don't recall the exact time.  I know it
20  was dark by then, but I don't recall the exact time.
21  Q  Who was the first person from Children's
22  National Medical Center you spoke with about        ?

---

**42**

1  A  I called admissions.  Whoever answered the
2  line from the front desk at admissions at Children's
3  National.
4  Q  Was that the general admissions office or
5  was it the special office in the NICU, do you
6  remember?
7  A  It was the general admissions office to the
8  hospital.
9  Q  What happened when you phoned the
10  admissions office?
11  A  I told her I was trying to see if my son
12  had arrived, and I gave her        name, and she
13  said he had just arrived.
14  Q  Did you get any other information during
15  the call other than that        was here?
16  A  She said she would transfer me to the NICU,
17  and I could speak to someone there.
18  Q  Did that happen?
19  A  Yes.
20  Q  Who did you speak with in the NICU?
21  A  Dr. Scavo.
22  Q  Tell me about the conversation, this would

---

**43**

1  be on the evening of September 11, with Dr. Scavo?
2  A  Dr. Scavo said        had just arrived, he
3  successfully transferred from the King's Daughters
4  equipment to their equipment, and he was stable.
5  Q  Did he tell you whether        was on
6  ECMO?
7  A  No --        -- he said there was no need
8  to put him on ECMO at the time, so he wasn't on ECMO.
9  Q  What if anything else was said in this
10  first conversation with anybody at Children's about
11          condition, at least the conversation you had
12  with Dr. Scavo?
13  A  They asked me if in the middle of the
14  night, if        required ECMO, do they have
15  permission to place him on it if it happened in the
16  middle of the night.
17  Q  And what did you say?
18  A  Yes.
19  Q  At that time, did you ask any further
20  questions about ECMO, how it was done, what would
21  actually be involved in the ECMO treatment or
22  anything?

---

**44**

1  A  No.
2  Q  Was there any further discussion by
3  Dr. Scavo about what ECMO actually was, how it would
4  be done, what they would do, if they had to place
5          on ECMO?
6  A  No.
7  Q  Was there any discussion at all about
8  putting cannulas into an artery and a vein and put him
9  on equipment that would circulate his blood for him?
10  A  All he asked was that, if they had
11  permission to place        on ECMO if the need
12  arises.  He asked me was I told what ECMO was at
13  King's Daughters, and I told him yes.  Then I spoke
14  with another doctor that got on the line with me.
15  Q  What did this other doctor say?
16  A  She told me about two studies they were
17  doing on ECMO children.
18  Q  So this was a female doctor.  Do you
19  remember her the name?
20  A  Dr. Fenik.
21  Q  Can you give me a spelling?
22  A  F-E-N-I-K, I believe.

---

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

45

1    Q    What did she tell you about the ECMO
2  studies?
3    A    She said there was one study.  They were
4  monitoring the brain wave activity of :          and
5  they would place probes on his forehead.  They wanted
6  to do that before he was placed on ECMO, and they
7  wanted to do it again after he came off of ECMO.  The
8  next study was a study to -- the iron levels in his
9  blood.  They wanted to do blood studies pre-ECMO and
10  post ECMO.
11    Q    And what, if any, discussion was there
12  about those studies beyond describing briefly what
13  they were looking at?
14    A    None.  She said it was a simple study and
15  she asked if she had permission to do it, and I said
16  yes.
17    Q    Was there any other conversation with
18  either Dr. Scavo or Dr. Ferik during that first
19  telephone call to Children's beyond what you have now
20  told us about?
21    A    I asked about if there was a Ronald
22  McDonald House in the area.

46

1    Q    And what were you told?
2    A    Yes, Dr. Scavo told me there was, and he
3  said that the NICU has a social worker and I could
4  speak with her in the morning when she comes in.
5    Q    Was there any other discussion with
6  Dr. Scavo or Dr. Ferik at that time other than what
7  you have told us?
8    A    No.
9    Q    Was there any report of how          \ was
10  doing beyond he had been successfully transferred from
11  the Children's Hospital of the King's Daughter
12  equipment onto the Children's Hospital equipment, any
13  other discussion about his condition?
14    A    I called later in the middle of the night
15  and checked his status, and they said he was fine.
16    Q    Let me go back first, though, with this
17  first conversation with Dr. Scavo and Ferik.  Was
18  there any discussion at all about          condition
19  other than he had been successfully transferred from
20  the Norfolk equipment to their own equipment at
21  Children's National Medical Center?
22    A    They said he was stable and comfortable.

47

1    Q    Was there anything else said at all during
2  that conversation either by Dr. Scavo, Dr. Ferik or by
3  you that you haven't told us about?
4    A    No.
5    Q    You said somewhere during the night, you
6  phoned the hospital to see how          was doing?
7    A    Yes.
8    Q    About what time and with whom did you
9  speak?
10    A    I can't recall the nurse's name and I don't
11  recall what time.  I know it was past midnight.
12    Q    So we are over on September 12.  Tell me
13  about that conversation.  What was said?
14    A    I called and checked to see how ·          was
15  doing, and they said that he was still stable, he was
16  asleep.
17    Q    Was anything else said during this
18  conversation by you or anyone else?
19    A    No.
20    Q    What was the next contact you had with
21  anyone at Children's concerning          And now we
22  are focusing on Children's Hospital up here.

48

1    A    Okay.  It was the morning of September 12.
2    Q    What happened then?
3    A    The social worker for the NICU called,
4  Ms. Farmer.
5    Q    F-A-R-M-E-R?
6    A    Yes.
7    Q    She phoned you?
8    A    And she was told by Dr. Scavo that I was
9  interested in the Ronald McDonald House, so she gave
10  me information about the Ronald McDonald House and she
11  said she would call over to make accommodations for
12  me.
13    Q    Was there any other discussion with
14  Ms. Farmer?
15    A    Yes.  She asked me what day would I arrive,
16  and she told me if I arrived early enough, I would be
17  able to sit in on the rounds with the doctors for
18  ·
19    Q    What day were you planning to arrive?
20    A    The morning of September 13.
21    Q    Was there any other conversation at this
22  time with Ms. Farmer beyond what you have already told

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

13 (Pages 49 to 52)

49

1  us about?
2      A  I asked whether or not I would be able to
3  bring my daughter       , and she said that she
4  wouldn't be allowed in the NICU because of her age,
5  and--
6      Q        at this point was less than
7  three?
8      A  Yes.
9      Q  Was there any other conversation with
10  Ms. Farmer?
11      A  She asked whether or not DeShaunia would
12  need paperwork for his job saying that Quinton was
13  being hospitalized there, and I told her yes.
14      Q  Where was DeShaunia working at that time?
15      A  The city of Virginia Beach.
16      Q  What was he doing there?
17      A  He is a heavy equipment operator.
18      Q  Have you told us everything that was said
19  during this conversation with Ms. Farmer?
20      MR. SHERMAN:  Objection.
21      You can answer.
22      BY MR. MCCONNELL:

50

1      Q  Is there anything else you recall from this
2  conversation with Ms. Farmer?
3      A  Ms. Farmer told me that, roughly, children
4  who are on ECMO are normally, they are no longer than
5  two and a half weeks, and so she said she would try to
6  make accommodations at the Ronald McDonald House for
7  that time for me, that timeframe.
8      Q  Have you now described for us fully the
9  conversation you had with Ms. Farmer?
10      A  Yes.
11      Q  When is the next contact you had with
12  anyone at Children's concerning
13      A  It was September 12, it was September 12.
14      Q  Same day?
15      A  Yes.  I called -- I called throughout the
16  day to check (       status.
17      Q  When you phoned, what did you do, did you
18  phone the NICU at Children's?
19      A  Yes.
20      Q  So you phoned directly into the NICU -- you
21  had been given that number?
22      A  Yes.

51

1      Q  Do you recall whom you spoke with during
2  that day?
3      A  Whoever was at his bedside at the time,
4  whatever nurse was at his bedside.
5      Q  During the day, what do you recall being
6  told about       when you phoned?
7      A  That he was comfortable.  He was still not
8  on ECMO.
9      MR. SHERMAN:  Off the record.
10      VIDEOGRAPHER:  Going off the record.  The
11  time is now 12:25 p.m.
12      (Discussion off the record.)
13      (Brief recess.)
14      VIDEOGRAPHER:  Back on the record.  The
15  times is now 12:34 p.m.
16      BY MR. MCCONNELL:
17      Q  Ms. Morring, before that short recess we
18  were talking about the conversations during the day on
19  September 13 with various nurses in the NICU at
20  Children's, and you were telling us that they reported
21  to you that        remained comfortable and he was
22  still not on ECMO, correct?

52

1      A  Yes.
2      Q  When you had that first conversation with
3  Dr. Scavo, did he discuss with you that while they
4  wanted permission to put Quinton on ECMO overnight if
5  necessary, that their approach to treatment would be
6  to try other modalities to attempt to avoid putting
7  him on ECMO if they could?
8      A  No.
9      Q  Was there any discussion with the nurses
10  during the day on the 13th that he was comfortable,
11  and when they said he is still not on ECMO, was there
12  any suggestion in their conversations with you that
13  they were using whatever efforts they could to avoid
14  putting your child on ECMO?
15      A  No.
16      Q  When they reported to you that        was
17  comfortable but still not on ECMO, did you ask them
18  when he is going to be put on ECMO?
19      A  No, I didn't.  I was so happy that he
20  wasn't on ECMO.
21      Q  Why was that?
22      A  Because that was the reason why he was

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

14 (Pages 53 to 56)

**53**

1  there, and being that he wasn't on ECMO yet, I
2  considered himself to be doing pretty good.
3      Q  So you understood that if he could avoid
4  being on ECMO, that was better than having to go on
5  ECMO?
6      A  Yes.
7      Q  Was there anything else you were told by
8  the nurses during the day on September 13 other than
9  that _____ was comfortable and still not on ECMO,
10  any other reports to you of his condition?
11      A  On the 12th or the 13th?
12      Q  This would be on the 13th, when you are
13  phoning up during the day.
14      A  No. I phoned on the 12th during the day.
15      Q  I am sorry. You are right. You were
16  phoning on the 12th. You were going to arrive on the
17  13th?
18      A  Yes.
19      Q  Were there any other conversations or
20  statements made to you by the nurses on the 12th
21  concerning _____ condition other than he was still
22  comfortable and still not on ECMO?

**54**

1      A  No.
2      Q  You told us that you spoke to nurses during
3  the day. Do you remember the names of any of those
4  nurses?
5      A  No, not from that day.
6      Q  Did you speak to Dr. Scavo that day?
7      A  No.
8      Q  Did you speak with any physicians?
9      A  On which day?
10      Q  On the 12th.
11      A  No.
12      Q  Other than phoning the nurses at the NICU
13  during the day, did you speak with anyone later that
14  day, late afternoon or into the evening hours?
15      A  No, just the nurses.
16      Q  And as you have reported to us, through the
17  12th whenever you spoke to anybody at the hospital,
18  you were told _____ was still comfortable, still not
19  on ECMO?
20      A  Yes.
21      Q  Going over to the 13th, what is the first
22  contact you had with anyone at Children's?

**55**

1      A  I called the morning of the 13th and I
2  spoke with the bedside nurse. I told them that we
3  were leaving and we should be there early enough for
4  the rounds.
5      Q  Did you ask the nurse how _____ was
6  doing?
7      A  Yes.
8      Q  What did she say?
9      A  He was doing fine.
10      Q  Was there any other conversation with the
11  nurse on the morning of the 13th when you first phoned
12  up to Children's?
13      A  No.
14      Q  You then drove up here to Washington on the
15  morning of the 13th?
16      A  Yes.
17      Q  What time did you arrive at Children's?
18      A  It was before noon. I don't recall the
19  exact time.
20      Q  This was you and DeShaunia?
21      A  Yes.
22      Q  When you arrived at Children's, tell me

**56**

1  what happened.
2      A  When we got there, I met with the nurse
3  that was at his bedside, and I met with Dr. Barami.
4      Q  Who was the bedside nurse?
5      A  I can't recall the nurse's name.
6      Q  Can you describe her for us?
7      A  No, actually, she was a female. I can't
8  remember what her race was or anything.
9      Q  So this is the first meeting face-to-face
10  you are having with anyone at Children's who is caring
11  for _____
12      A  Yes.
13      Q  Tell me what happened during that first
14  meeting where you saw Dr. Barami?
15      A  I actually first saw Dr. Barami during the
16  rounds. DeShaunia and I got there probably 10 minutes
17  before the doctors came by to do _____ rounds, so
18  we sat and listened as the doctors did their rounds.
19      Q  This was shortly before noon?
20      A  Yes.
21      Q  Who were the doctors that did the rounds
22  with Dr. Barami?

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

15 (Pages 57 to 60)

57

1    A  I don't know all of the doctors' names.  I
2  do recall seeing Dr. Fenik in that group and just Dr.
3  Barami, those are the only two doctors that I can
4  recall their names.
5    Q  When you arrived, were they already in the
6  room doing rounds or did you and DeShaunia get to the
7  room before the team came into the room?
8    A  They were already in the NICU, in another
9  section of the NICU.  They weren't in
10  section.
11    Q  So when you first arrived, you spoke with
12  the nurse and went to           ; bedside?
13    A  Yes.
14    Q  Did the nurse say anything to you at all
15  about how        a had been doing?
16    A  She said he had been doing fine.  I asked
17  about how his blood pressure was.
18    Q  What did she tell you?
19    A  She said that it was doing pretty well.
20  She explained to me that the monitors -- and that is
21  it.
22    Q  What did she explain to you about the

58

1  monitors?
2    A  I asked what the different things were
3  reading on the monitors, and she explained to me which
4  was what.
5    Q  What did she tell you about the monitors?
6    A  She told me one was for respiration, one
7  was for the heart rate, and one was measuring the
8  oxygen level.
9    Q  You were telling us you went to
10  bedside and then the round team came to his bedside?
11    A  Shortly after, yes.
12    Q  Tell me everything you recall overhearing
13  by way of the discussion by the health care team while
14  they were at           bedside doing the rounds?
15    A  They did a brief history of
16  describing what hospital he was transferred from.
17  They mentioned that I had gestational diabetes.  Let's
18  see.  They gave a list of all of the medications he
19  was currently on.  They -- I actually can't recall
20  everything they said.  I just remember asking a
21  question about the different antibiotics that he was
22  on.

59

1    Q  Why did you ask that question?
2    A  I asked because I didn't know if he had
3  some form of infection, so I asked why is he on
4  antibiotics?
5    Q  What were you told?
6    A  They said it was a general precaution that
7  they always do to rule out anything, they place the
8  child on antibiotics.
9    Q  Who responded to your questions?
10    A  Dr. Barami.
11    Q  This is the first time Dr. Barami had
12  spoken directly to you as        ; parent, true?
13    A  Yes.
14    Q  Did he first introduce himself to you?
15    A  Yes.
16    Q  What did he say?
17    A  He said, I am Dr. Barami.  He said, I am
18  sure Dr. Scavo has probably told you that I would be
19           i doctor for the week, and I said, Yes,
20  Dr. Scavo told me that you would be on, and they
21  started their rounds, and DeShaunia and I sat around
22  and listened.

60

1    Q  What else, if anything, was said about
2           other than a brief history, the fact that you
3  had had gestational diabetes, a list of his
4  medications, and the question that you asked about
5  antibiotics, what else happened while the round team
6  was present there at           bedside?
7    A  They said that he currently was not on ECMO
8  yet, and they were quite pleased that he wasn't on
9  ECMO at the time, and that is all I can recall from
10  the conversation that the doctors were having in
11  rounds.
12    Q  Did you have any other questions at this
13  time for the team doing rounds other than the question
14  of the various antibiotics that        was taking?
15    A  No.
16    Q  About how long was the round team at
17        . bedside that morning?
18    A  I would say about 20 minutes.
19    Q  When is the next time you had a
20  conversation with anyone at Children's where there was
21  any question or concern raised about how things were
22  going?  I am assuming while you were at the bedside

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

16 (Pages 61 to 64)

61

1 from time to time you had conversations with nurses
2 that were pretty routine, he is still comfortable,
3 still doing well, we think he is okay. What I would
4 like to do is move it along and go to the next
5 conversation you had with anyone where suddenly that
6 tone changes and now there is a suggestion that maybe
7 things aren't going so well for
8    A  I believe it was Dr. Fenik that called. It
9 was a female, I believe it was Dr. Fenik that called.
10 DeShaunia and I had left to go check in at the Ronald
11 McDonald House. We were lost, and we got a phone call
12 on the cellphone and I was told to turn around and get
13 back to the hospital,        needed to go on ECMO as
14 soon as possible.
15    Q  I take it this was on the 13th, the same
16 day you had come up.
17    A  Yes.
18    Q  So you were there for the rounds and you
19 have told us about the rounds. About how long after
20 rounds did you and DeShaunia then leave to go to the
21 Ronald McDonald House?
22    A  I would say about an hour and a half.

62

1    Q  You were on your way to the Ronald McDonald
2 House when DeShaunia's cellphone rang, and you believe
3 it was Dr. Fenik who said you needed to get back to
4 the hospital?
5    A  Yes.
6    Q  And the explanation she gave at that time
7 was things have changed with        we think he
8 needs to go on ECMO right away?
9    A  Yes. Those were about his exact words too.
10    Q  Did she explain to you what had changed,
11 what was going on, either his heart rate was up, his
12 blood pressure was up, his O2 readings had changed?
13    A  No. She didn't say any of that. I told
14 her that we were turning around and we were coming
15 right back.
16    Q  And I take it you did that and went
17 immediately back to the NICU.
18    A  Yes.
19    Q  Tell what happened when you got back to the
20 NICU. First, about what time of day was this,
21 mid-afternoon, late, where would you put it?
22    A  It was -- I -- it was before 4:30. I say

63

1 that because check-in time at the Ronald McDonald
2 House was 4:30, and that is why we left to check in.
3 So it was before 4:30, but I don't know the exact
4 time.
5    Q  During these events, did you or DeShaunia
6 keep any sort of a diary, write down things that were
7 being said, make any notes, do anything other than --
8 I have been given a copy of a calendar that you kept,
9 a daily calendar, it looks like your calendar -- you
10 are looking at me quizzically. Let me see, maybe I
11 have leaped to an assumption that is not a correct
12 examination.
13    I will hand the reporter an 18-page series
14 of photographs and other documents that I will ask be
15 marked as Exhibit 2 to the deposition.
16        (Morring Exhibit No. 2
17         was marked for identification.)
18    BY MR. MCCONNELL:
19    Q  Let me hand you what I have had the
20 reporter mark as your Deposition Exhibit No. 2 for
21 identification, and we can paginate the pages later.
22 I am showing you specifically the second page in this

64

1 group of documents and would ask you, have you seen
2 that document before?
3    A  Yes.
4    Q  Can you tell us what that is?
5    A  This is a calendar that was in
6 chart.
7    Q  Okay. This is not a calendar that you
8 personally kept?
9    A  No.
10    MR. SHERMAN:  Counsel, this is a
11 photograph, this packet is packet of photographs.
12    BY MR. MCCONNELL:
13    Q  Almost the entire package is -- it looks to
14 me these are pictures of        .
15    A  Yes.
16    Q  And various medical equipment and supplies
17 related to his care, I am assuming, true?
18    A  Yes.
19    Q  But in there, among those, is a
20 photograph -- it is actually, I am sorry, the third
21 page of this copy -- that is a calendar, it looks like
22 the bottom half of the page is -- shows the month as



65

1  being September, the year is cut off, it is 2000
2  something. This is a photograph of a calendar. Can
3  you tell me where the calendar was?
4      A  In              chart.
5      Q  And when you say in his chart, was that at
6  his bedside?
7      A  Yes.
8      Q  Who took the picture, if you know?
9      A  I did.
10     Q  Did you take other pictures while you were
11  at Children's Hospital besides those that are here in
12  what has been marked as your Deposition Exhibit 2, are
13  there other photographs that were taken?
14     A  Yes, they are in -- some of the pictures I
15  took are in this packet.
16     MR. SHERMAN:  Excuse me.  His question was
17  do you have any other photographs other than those
18  which we have provided to them?
19     THE WITNESS:  No.
20     BY MR. MCCONNELL:
21     Q  So every picture you took of          or
22  related to his care and treatment at Children's

66

1  Hospital at any time are included here in the
2  documents labeled Exhibit 2?
3      A  Yes.
4      Q  So that clarifies the question that
5  prompted this whole series of questions.  This is not
6  a document that you maintained; this was maintained by
7  people on his unit at Children's?
8      A  I am assuming.  It was in his chart.
9      Q  Let's go back to my original question.
10  During this sequence of events we are talking about
11  related to          hospitalization at Children's
12  Hospital in September 2005 and on through the next
13  several months, did you maintain any notes, diaries,
14  writings, calendars, anything at all concerning these
15  events?
16     A  Yes.
17     Q  Tell me about the writings you had.  Did
18  you have a diary type, or what did you write?
19     A  No.  I had a little note pad from the
20  Ronald McDonald House, and I just wrote
21  milestones.
22     Q  Where is that, the little note pad?

67

1      A  I typed it up and put it in a little Word
2  document.
3      Q  How about the note pad itself, where is
4  that?
5      A  I destroyed that once I typed it up and put
6  it in a Word document.
7      MR. MCCONNELL:  I would like a copy of
8  that, if I may.
9      MR. SHERMAN:  Send me, if you wouldn't
10  mind, just for purposes of reminding me of the items
11  that come up during this deposition, if you could just
12  send me a note, a letter to that effect, I would
13  appreciate it, rather than relying on me.
14     BY MR. MCCONNELL:
15     Q  The notes you made that you typed up into
16  this Word document, you actually wrote them down in
17  the little notebook that you got from Ronald McDonald
18  House as the events were going on?
19     A  It was just one sheet of paper from the
20  note pad from the Ronald McDonald House, the day that
21  he started taking breast milk in the G-tube, the day
22  he came off of the vent, his milestones.

68

1      Q  Other than that document that you wrote on
2  the notebook from the Ronald McDonald House, did you
3  make any notes, recordings of any kind, audio
4  recordings, visual recordings, anything else at all
5  related to          admission to Children's Hospital
6  beginning in September 2005?
7      A  No.
8      Q  We were talking about the events on
9  September 13, and sometime before 4:30, you got a call
10  to come back to Children's, things have changed,
11           needs to go on ECMO.  Tell me what happened
12  when you got back to the hospital that day?
13     A  Dr. Barami and Dr. Fenik were sitting at
14       bedside, and he had the paperwork for me to
15  sign authorizing          to go on ECMO.
16     Q  Did you have any further discussion with
17  Dr. Barami at that time about the ECMO?
18     A  Yes.
19     Q  What was that discussion?
20     A  He explained how the ECMO machine works.
21  He described to us that          will have two
22  cannulas.  They said at the time it will go on the



**69**

1 right side of his neck, and he said that it was
2 temporary until           heart condition improved.
3     Q  Was there any discussion at all about the
4 things that can happen while a baby is on the ECMO
5 equipment?
6     A  Yes.
7     Q  What were those discussions?
8     A  A clot can get in the ECMO cannula.
9     Q  And what happens if the clot gets in the
10 cannula?
11     A  A stroke could occur.
12     Q  And when he discussed stroke, did you
13 understand that to mean that could produce brain
14 damage?
15     A  At the time, I wasn't thinking about that.
16     Q  But he specifically mentioned one of the
17 complications as being a clot producing a stroke?
18     A  Yes.
19     Q  What else did he tell you can happen when a
20 baby is on the ECMO machine?
21     A  He said they have to be on medication,
22 paralyzation medication so they can't move.

**70**

1     Q  And what can that do to them?
2     A  He just said they are on paralyzation
3 medication so they can't move, because the cannulas
4 are in the neck, and he said that          would be on
5 the ventilator the entire time that he is on ECMO.
6     Q  Did he also tell you that he would be on
7 anticlotting medications?
8     A  No.
9     Q  Did he mention any medications at all?
10     A  No.
11     Q  Other than the paralytic meds, did he
12 mention any other meds that would be used in
13 connection with the ECMO treatment?
14     A  No.
15     Q  Did they tell you what had happened, what
16 was going on with          that required now that he be
17 put on ECMO?
18     A  They said it was his blood pressure, and I
19 didn't ask them any further questions. They said it
20 was his blood pressure, so I just figured something
21 had to have happened between the time I was there to
22 the time we left that would cause him to go on ECMO.

**71**

1     Q  Have you told us everything you do recall
2 being discussed with Dr. Barami and Dr. Ferik before
3          was placed on the ECMO equipment?
4     A  Dr. Barami said they don't like the
5 children to be on ECMO longer than two weeks, and he
6 said hopefully          won't be on ECMO that long, and
7 then they asked us to go ahead and step out because
8 they were about to go ahead and perform the procedure
9 at his bedside to place him on ECMO, and they
10 instructed us where the NICU family waiting room was,
11 and that they will call when they are done.
12     Q  Had there up to this point been any
13 discussion with Dr. Barami or any of the other health
14 care providers at Children's about the long-term
15 outlook for          whether they could be positive,
16 negative, anything in between?
17     A  No.
18     Q  Any discussion?
19     A  No.
20     Q  So you were asked to step out while they
21 put          on the ECMO equipment. You understood
22 that meant they would take cannulas, tubes and put one

**72**

1 into an artery and one into a vein and in effect put
2 him on a heart bypass piece of equipment?
3     A  That is how I understood it.
4     Q  To your knowledge, was that done, I mean
5 did he get back to his bedside and he is now clearly
6 on the equipment that has been described to you?
7     A  Yes.
8     Q  Once          was on ECMO, can you tell me
9 how many people were at his bedside regularly while he
10 was on the ECMO equipment?
11     A  Regularly, there was one person that
12 remained at the bedside, and I asked about that. They
13 call it the pump nurse that watched the ECMO machine
14 at all times, and he also was assigned a bedside
15 nurse.
16     Q  And how much time did the bedside nurse
17 spend with          ?
18     A  I really don't have a measure of it. His
19 bedside nurse always had another child too, to tend
20 to.
21     Q  So that nurse would have more than just one
22 patient?

VIDEOTAPED DEPOSITION OF TERESA A. MORRING
CONDUCTED ON TUESDAY, SEPTEMBER 4, 2007

19 (Pages 73 to 76)

73

1  A  Yes.
2  Q  Was it explained to you why there was a
3  pump nurse who was literally there around the clock?
4  A  Yes.
5  Q  What were you told about that, why there
6  was a pump nurse there at the bedside virtually every
7  second?
8  A  **Because it was a very critical piece of**
9  **equipment and it needed to be maintained.**
10  Q  Were there any discussions about the risks
11  that might occur if for any reason the equipment were
12  to stop or any have sort of a failure while
13  was on ECMO?
14  A  No.
15  Q  What did you understand just from looking
16  at this equipment might happen if        were to be
17  on this equipment and it were to stop functioning?
18  MR. SHERMAN: Objection. I am sorry. I
19  don't understand the question. What does she
20  understand?
21  BY MR. MCCONNELL:
22  Q  What was your understanding or thought with

74

1  respect to looking at       on this equipment, what
2  would happen if for any reason there should be a
3  malfunction or failure of performance of the
4  equipment?
5  MR. SHERMAN: Objection. I am sorry,
6  counsel. Are you asking her --
7  MR. MCCONNELL: Yes.
8  MR. SHERMAN: Excuse me.
9  MR. MCCONNELL: You stated your objection.
10  BY MR. MCCONNELL:
11  Q  What did you understand, sitting there as a
12  parent looking at this child, what did you understand
13  were the risks to       if for any reason there was
14  a failure with the equipment?
15  A  **I never considered it failing, so that**
16  **thought never crossed my mind.**
17  Q  Never occurred to you that there may be a
18  malfunction in the equipment or that anything may
19  happen while he is on the equipment?
20  A  **The only thing I had in the back of my mind**
21  **was what Dr. Barami mentioned, was a clot, that is the**
22  **only thing that I possibly thought of. I never**

75

1  thought of it failing in any sense.
2  Q  When you got back to the bedside after
3  had been placed on the ECMO circuit, what were
4  you told about how the procedure had gone when they
5  placed the cannulas and put him on the circuit, if
6  anything?
7  A  **They told me it went well and that the**
8  **surgeons at his bedside weren't there very long. It**
9  **was successful.**
10  Q  When is the next time in the sequence of
11  events -- I am assuming -- well, you tell me. You and
12  DeShaunia were there on the 13th when       was
13  placed at ECMO. Did you remain at Children's for the
14  next several days or how long were you there?
15  A  **I was there from the 13th until the evening**
16  **of the 14th.**
17  Q  During that period of time as you
18  understood it, how was       doing?
19  A  **Well.**
20  Q  Were there any problems at all with his
21  blood pressures or getting oxygen to him during that
22  period of time that you were aware of?

76

1  A  **Before or after ECMO?**
2  Q  After he was on the ECMO equipment.
3  A  **No, no problems.**
4  Q  So on the evening of the 14th, did you go
5  back to Norfolk?
6  A  **Yes.**
7  Q  Before you left to go back home to Norfolk,
8  who did you last speak with at Children's about how
9        was doing?
10  A  **The nurse at his bedside.**
11  Q  What were you told?
12  A  **That he was doing well on ECMO.**
13  Q  Were you told they were having any
14  difficulty at all controlling his blood pressures,
15  level of perfusion or any other complications in his
16  course?
17  A  **On which?**
18  Q  From the point he was placed on ECMO up to
19  the time you went back to Norfolk on the 14th?
20  A  **No.**
21  Q  So as far as you understood it from any
22  conversations with anybody at Children's during that

# EXHIBIT B

Children's Hospital Of The King's Daughters, Inc.
601 Children's Lane, Norfolk, Virginia 23507-1910

PROGRESS NOTES

Addressograph

| PATIENT NAME: | | ROOM: | | MED REC#: | |
|---|---|---|---|---|---|
| **DATE** | | | | | |
| 9/8 0910 | Neonatology | | | | |

Pt seen & case plus reviewed c̄ NNPs
My exam above find still satisfy baby—
very good chest rise c̄ wet breaths, no
further nothil. Lungs clear c̄ good aent
ACH spot, CV - RRR 's/6 (PM)

Has continued unstable requiring many volume
boluses to treat low BP accompanied by
a decrease in sats. Because of hypertrophic
cardiomyopathy — we have avoided vasopressors
Increased NO to 10 ppm, no response,
so will go back to 5 ppm.

O.I. remains high
Will attempt to discuss situation c̄
cardiology. A trial of high frequency
jet ventilation may be reasonable
Prognosis guarded

CHKD 00055

**Children's Hospital Of The King's Daughters, Inc.**
601 Children's Lane, Norfolk, Virginia 23507-1910

## PROGRESS NOTES

Addressograph

| PATIENT NAME: | ROOM: | MED REC#: |
|---|---|---|

| DATE | |
|---|---|
| 9/11 1710 | Neonatal Med<br>Pt remains critical & unstable. As noted in chart, have had extreme variability in Oxygenation and now on very high support.<br>Attempts at jet ventilation did not eliminate instability.<br>Although at times pO₂'s have been quite good, I feel that pt's instability as well as inability to use vasopressors — because of hypertrophic Cardiomyopathy — would make retaxal to an ECMO center optimal. I have spoken with Major in state referral center at U Va — they refund pt as they do not have an available bd — all in use — therefore I called Childrens Hosp National Med Ctr in adjoining Wash DC They (Dr Scoba) will accept, and as they are a nationally recognized leader in both clinical & research aspects of ECMO, this seems in the child's best interest, and given emergent nature of situation, I am arranging this now. KHAN |

# EXHIBIT C



**PROGRESS NOTE**

PCP | NO PRIMARY CARE
MR# | 020567916
Acct# | 0525400132
NIC | NIU-3606-A
Sex | M
Exp |
Adm | 09/11/05
DOB | 09/06/05
DR. | CHAMBERLAIN, JAMES
Ins.Plan |



Patient's Name: _____    Ins./ID# _____

| DATE/TIME | Education Plan:<br>Reviewed: ☐    Updated: ☐    Continue as planned: ☐  N/A: ☐ | INITIALS |
|---|---|---|
| 1-11-05 | Newborn of white ♀ | |
| 2200 | 38 wk GA ♂, born to 26 y/o G2 P1→2, blood type B+, ⊖ serologies, + GBS (? tx) and ⊕ GTT at ~5mo. Mom Rxed ⊥ DM and said she was well controlled. Delivery by C/S for fetal heart tones and late decels. Apgar 5, 85. In WB nursery sats 70-80% — sent to NICU where it intubated and placed on high settings (30/6/60/1.0) and NO. Did well at first but then needed to go on Jet vent — had wide swing in PaO2. CHD was suspected early on and ECHO showed severe hypertrophic cardiomyopathy and PPHN. Given CHM and volatility on d5 of life decision made to send baby to CNMC for possible ECMO. Transport by Kings Daughter Transport Team on high conventional vent (43/6/60/1.0) and NO. Transport ē cardracon. | |
| | Once in NICU → Tried Oscillator ē NO at 200PM. Baby did not do well and required repeated hand bagging. ( Continued ) | |

*(Please write on back of this page if information is to be continued)*

**CNMC 00357**


18557

PRINTED BY: mlopez    DATE : 12/12/2006

CNMC058 (6/03)

| DATE/TIME | Education Plan:<br>Reviewed: ☐    Updated: ☐    Continue as planned: ☐  N/A: ☐ | INITIALS |
|---|---|---|

-18-05 (Continued)

Transitioned to conventional vent and he did better.

P/E — Paralyzed, LGA ♂. Edematous + Pale. AFOF. thought a C/S delivery body seems too large molding, also ears appear rotated posteriorly.
Good chest movement. BS clear + equal.
RRR, $S_1 S_2$ and — $\bar{s}$ m. Pulses 2+, Hot soft $\bar{s}$ masses.
il ♂ ↓↓, Anus patent
Neuro — deferred — on paralysis

Impression
① Term LGA ♂   ② Hypertrophic Cardiomyopathy
— severe $\bar{c}$ small LV chamber. ③ PPHN
$\bar{c}$ suprasystem RV pressures. ④ Rule
out Sepsis ⑤ Rule out syndrome
(Beckwith Wiedemann) i

**CNMC 00358**

Plan ① NPO / IV fluid $D_{10} \bar{c}$ lytes / Ca
② Cardiac ECHO (in progress) ③ HUS
④ Blood bank order as for pre ECMO.
⑤ Surgery notified, preop consult advised.
⑥ Discussed consent $\bar{c}$ Mother (2 Doctor signature consent). ⑦ Avoid pressors — nuclear BP $\bar{a}$ volume as needed
⑧ Vent support as needed — ECMO if worse
⑨ Genetics consult

Louis Scavo MD
/fg MD

CNMC058 book (6/02)

# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **TERESA MORRING**, *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **Civil Action No. 06-2036 (RMC)** |
| | : | **Next Event:** |
| **CHILDREN'S NATIONAL MEDICAL** | : | Status Conference 9/5/07 |
| **CENTER, INC.,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## PLAINTIFFS' ANSWERS TO INTERROGATORIES

**TO:**     **Children's National Medical Center, Inc., Defendant**
c/o Nicholas McConnell, Esquire

**FROM:**    **Teresa Morring, Plaintiff**
c/o Ira Sherman, Esquire

The above-named party, represented by Ira Sherman, Esquire, and the law firm of Chaikin & Sherman, P.C., and Anthony Newman, Esquire, and the law firm of Newman, McIntosh, & Hennessy, L.L.P., answers the Interrogatories propounded herein and states as follows:

(a) The information contained in these Answers is being provided in accordance with the provisions and intent of the applicable Rules of Procedure, which require the disclosure of all facts, which may be relevant or may lead to the discovery of relevant information. Accordingly, the party answering these Interrogatories, by providing the information requested, does not waive objections to its admission in evidence on grounds of materiality or relevancy or other proper grounds for objection.

(b) The information supplied in these Answers is not based solely on the knowledge of the executing party, but includes knowledge of the party, his agents, representatives and attorneys unless privileged.

(c) The word usage, sentence structure, and syntax may be that of the attorney assisting in the preparation of these Answers, and thus, does not necessarily purport to be the precise language of the executing party.

\* \* \* \* \*

**ANSWER:**          was born with Persistent Pulmonary Hypertension of the

Newborn (PPHN) and Hypertrophic Cardiomyopathy (HCM). I was advised of           acute

condition the very same day of his birth, and later that _          _ would be a candidate for

Extracorporeal Membrane Oxygenation (ECMO) if his condition did not improve. I was

advised by the nurse practitioner in CHKD's NICU that           would need to be transferred

to another hospital for ECMO if this occurs.          was sedated the same day he was born,

and I was informed he was very sensitive to stimulation as his blood pressure would fluctuate.

On September 11, 2005, I was advised that it was time for  _          to undergo treatment at

another hospital for ECMO.   The attending neonatologist at the time, Jamil Khan, M.D.,

advised that CNMC had a bed available to treat Quinton for ECMO.   Thereafter he was

transferred.

11. Please identify all persons at Sentara General Hospital and at Children's Hospital of
the King's Daughters with whom you had any conversations(s) regarding Quinton Snowden's
condition and the need for transfer to another facility for further care and treatment, including a
description of the substance thereof, the date, and the time of the conversation.

**ANSWER:**   See answer to interrogatory #10 above. In addition I spoke with the

neonatal nurse practitioner at SNGH. She advised me that           had been sedated  after birth

for his cardiac condition. She said that he was receiving heavy fluids to relieve stress from his

heart. The same information was also told to me by the nurse that was caring for           that

day.  The next day, 09/07/05, during a visit with          , I was informed by the nurses that

          was diagnosed with PPHN and HCM. On 09/08/05, I was given a pamphlet explaining

PPHN and HCM. On this day, I was informed that           would need treatment on ECMO if

his condition did not improve. From the day           was born, up until the day           was

transferred to CNMC, I spoke in person and via phone with the nurse that was responsible for

8

12. Please describe all conversation(s) that you had with any individual at CNMC regarding                    medical condition(s) upon admission to CNMC, his prognosis, proposed treatment, risks and benefits of the proposed treatment(s), any alternative forms of treatment, the risks and benefits thereof, and the risks and benefits of no treatment.

**ANSWER:**    The first person I spoke with at CNMC regarding                    condition was Louis Scavo, M.D., the attending neonatologist in the NICU. Dr. Scavo said                    had just arrived and was successfully transferred. Dr. Scavo said                    was stable at the time and there was no emergent need to place him on ECMO. That night, I spoke with a resident physician, Jordana Fenik, M.D., who told me about the studies they were conducting on ECMO patients.   One study was to monitor the brain wave activity by EEG pre and post ECMO. Dr. Fenik said that probes would be placed on                    head and it was a very simple study. The other study measured the iron levels of                    blood pre and post ECMO.

I gave telephone consent to place                    on ECMO if the need arises that night prior to my arrival.  I advised Dr. Scavo of my need to be there at                    side during his hospitalization and that I was going to try to stay at the local Ronald McDonald House (RMH) in Greater Washington.  He said that there is a NICU social worker and she could assist in that happening. I spoke with Janice Farmer,  the NICU social worker, the next morning.  She told me about the hospital and more about the RMH in Washington. She said that she would contact the RMH and have them set-up for my arrival.

I told Janice that                    s father and I would arrive the next morning, which was Tuesday. Janice told me that if I arrived early enough, I would be able to sit in on rounds with his team. I told Janice that we would try to be there early enough for attendance. She said that children like my son                    were too young to be permitted in the NICU. I

9

phoned throughout the day on Monday to check            ; status and the bedside nurse (name unknown) assigned to Quinton updated me regularly.

On Monday, 9/12/05, I met Dr. K. Bahrami, at that time he was the attending neonatologist on call for the NICU.   Deshaunia and I sat in on the rounds at            bedside and listened to            team of professionals. I asked a few questions regarding the antibiotics            was currently receiving. Everyone was pleased that            had not yet needed to be placed on ECMO, because he was so stable. After rounds, I spoke with Janice and advised that we had yet to check into the Ronald McDonald House and we were supposed to check-in by a certain time. I advised that we were going to leave to check into the RMH and unpack, then return to be with

I also reiterated the same to            bedside nurse. While lost, searching for the RMH, I received a call on the cell phone from CNMC saying to return as soon as possible to the hospital, because            needed to now be placed on ECMO. Deshaunia and I immediately returned to the hospital. Once in the NICU, Deshaunia and I sat down with Dr. Bahrami and discussed ECMO.   Dr. Bahrami discussed the ECMO program and explained how an ECMO machine operates. I signed the forms, which I had previously given verbal consent for on Sunday night, September 11, 2005. Dr. Bahrami explained that ECMO would essentially act as            heart and lungs temporarily until he showed that his cardiomyopathy had improved. He also explained that the risk that while on ECMO a clot could develop in the ECMO circuit. He said that            would slowly be weaned off of ECMO, down to idle. Dr. Bahrami explained to Deshaunia and me that CNMC does not like to have a child on ECMO any longer than 2 weeks. Dr. Bahrami explained that            cardiomyopathy was essentially causing very little blood flow to his lungs. At the time,

10

outlook was good and no one believed that          would have complications.

While          was hospitalized at CNMC, I spoke with and/or met with

nurse everyday, including his ECMO pump nurse, while he was on ECMO about how he was

doing, I do not remember the exact substance of each of those conversations.  I also sat in on

          rounds daily with his doctors and other professionals and his condition was

discussed, again I do not recall the specifics.

## VERIFICATION

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTY OF PERJURY THAT THE FOREGOING ANSWERS TO INTERROGATORIES ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION, AND BELIEF.

TERESA MORRING

Respectfully submitted,

Ira Sherman, Esquire
CHAIKIN & SHERMAN, P.C.
1232 Seventeenth Street, N.W.
Washington, D.C. 20036
(202) 659-8600

Anthony Newman, Esquire
NEWMAN, McINTOSH & HENESSEY, LLP
7315 Wisconsin Avenue, Suite 700E
Bethesda, Maryland 20814
(301) 654-3400
**Attorneys for Plaintiffs**

# EXHIBIT E

757- 553- 6793

*2ec's red top*

# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY

| | |
|---|---|
| **TITLE OF STUDY:** | Evaluation of Serum Iron And Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) |
| **PRINCIPAL INVESTIGATOR:** | K. Rais-Bahrami, M.D., Department of Neonatology |

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. If your child is seven years old or older, we will talk to your child about the study and ask your child to sign a form like this one. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

## A. PURPOSE OF STUDY

We want to study the iron levels in the blood of babies that require ECMO support. We know that during ECMO a lot of blood is broken down. A lot of iron is therefore being released in the patient's blood stream. We want to measure the level of iron in the bloodstream before we start ECMO and after ECMO, to see how high the levels of iron

**IRB USE:**



IRB APPROVED
SEP 1 5 2004
Children's Hospital



EXPIRATION
SEP - 1 2(
Children's H(

IRB Protocol No.: 3424
Date: August 16, 2004
Page 1 of 5

| | |
|---|---|
| PCP | NO, PRIMARY CARE |
| MR#: | 020667916 |
| Acct#: | 0525400132 |
| NIC | NNU-3606-A |
| Sex | M |
| Exp: | |
| Adm: | 09/11/05 |
| DOB: | 09/06/05 |
| DR. | CHAMBERLAIN, JAMES |
| Ins.Plan | |

**CNMC 00003**



PRINTED BY: mlopez    DATE : 12/12/2006


go. We also want to measure the iron levels when you come back with your baby for follow-up, until your baby is one year old. We would like to see how long it takes for the iron levels to drop after ECMO. If babies' iron levels stay high for a long time, we will recommend that babies drink a low-iron formula and do not take a vitamin which contains iron after discharge from the NICU.

Your baby is being asked to be in this study because he or she is going to be placed on ECMO.

## B. PROCEDURE

Your baby is about to go on ECMO in the NICU at Children's Hospital. You have met or will meet a team of people involved in the care of your baby (doctors, ECMO specialists, nurses and respiratory therapists). If you agree that your baby can take part in this study, we will draw 2 cc of blood (less than half a teaspoon) from your baby as we are starting ECMO. We will send that sample to the lab for them to do iron studies. During ECMO a lot of blood will be drawn for other tests. This blood will be taken from the catheter already in place, we will not stick your baby somewhere else. If ECMO is stopped in less than 7 days, we will draw another 2 cc of blood, again from the catheter already there, and send it for iron tests. If your baby is on ECMO for longer than 7 days, we will make the same measurements after 7 days since ECMO is started, and then every 7 days until your baby is off ECMO. Then we will measure them again on the last day of ECMO.

When your baby comes back for follow-up in the Children's Hospital Developmental Clinic (at 4 months after discharge, 8 months after discharge and 12 months after discharge), we will repeat these tests, this time drawing blood from a vein or through a heel stick. We will not ask you to come back for a separate visit just for our study. If your baby needs to have other blood tests, we will try to do all blood draws at the same time.

If you would like, we will let you know what the results of our tests are, as they become available from the lab.

*IRB USE:*





IRB Protocol No.: 3424
Date: August 16, 2004
Page 2 of 5

CNMC 00003A



*Form Revised December 2001*

## C. POTENTIAL RISKS / DISCOMFORT

Once your baby is on ECMO, there will be frequent blood sampling from the catheter or tube that will be placed for ECMO. Drawing off the additional blood for our tests will add no additional risk or discomfort.

When your baby comes back for follow-up at 4, 8 and 12 months after discharge from the NICU, we will have to draw blood at each visit either through the vein or by a heel stick. The risks of blood drawing include bruising, swelling and possible infection. However, the person that will draw your baby's blood is a professional phlebotomist (person that draws blood for a living) who will take extra care to clean the area well to avoid the risk of infection. The phlebotomist will try to minimize the discomfort of drawing blood by using a very small needle.

## D. POTENTIAL BENEFITS

The babies who are part of this study will help us find out whether babies have very high iron levels after ECMO. If that is the case, we will change the diet recommendations, possibly to recommend low iron formula and no extra iron-containing vitamins after discharge from the NICU.

## E. ALTERNATIVES TO PARTICIPATION

We do not currently know what the levels of iron are in the babies that have been treated with ECMO. You may choose not to participate in this study.

## F. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you believe you have been injured as a result of being in this study, you should call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

**IRB USE:**





IRB Protocol No.: 3424
Date: August 16, 2004
Page 3 of 5

PRINTED BY: mlopez     DATE : 12/12/2006

Form Revised December 2001

## G. CONFIDENTIALITY

We will keep the records of this study confidential. We will not tell anyone you are in the study. Only the people working on the study will know your name. They will keep this information in case we have to find you later for medical reasons. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. Your child's medical record is confidential, but just like any medical record, there are some exceptions under state and federal law.

## H. COMPENSATION

We cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something bad happened because your child was in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We do not promise to pay you anything or give your child free medical care if something bad happens, but we will look at each case carefully. We will give your child any emergency treatment needed. You do not give up any legal rights by signing this form and you are not releasing us from any responsibility if we do anything wrong.

## I. ADDITIONAL ELEMENTS

Children's Hospital will do the blood tests needed for this study for free. You will not be charged for anything else we do that is part of the study. You will still have to pay for any medical care that is not part of the study.

**IRB USE:**





IRB Protocol No.: 3424
Date: August 16, 2004
Page 4 of 5

*Form Revised December 2001*

**CONSENT:**

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)     kept in the study file by the Principal Investigator;
(2)     put in your child's medical record; and
(3)     given to you to keep.

Please call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448 if you have any questions.

Printed Name of Participant: _____     _____
Medical Record Number: _____
Printed Name of Parent(s)/Guardian(s): Theresa Momie
Signature of Participant: Theresa A. Moung           Date: 09/13/05
(Participant must be 18 years of age or older)

Signature of Parent(s)/Guardian(s): Phone Consent Obtained  Date: _____
[Note: signature of both parents required if more than minimal risk and no direct benefit, unless one parent is deceased, unknown, incompetent, or not reasonably available, or when only one parent has legal responsibility for the care and custody of the child]

Witness (to signatures): Jordan Lucous           Date: 9/11/05
(may be investigator)

Translator's Signature (if, applicable): N/A
Language: English

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: K Rais Bahrami
Title: MD   Signature: KR Bahrami           Date: Sept 13/2005

**IRB USE:**

IRB APPROVED
SEP 15 2004
Children's Hospital

EXPIRATION
SEP - 1 2005
Children's Hospital

IRB Protocol No.: 3424
Date: August 16, 2004
Page 5 of 5

**CNMC 00005**

PRINTED BY: mlopez     DATE : 12/12/2006

# CHILDREN'S HOSPITAL

Department of Neonatology
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5448

## HIPAA/IRB AGREEMENT FOR USE AND DISCLOSURE (SHARING)

## IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:** *Evaluation Of Serum Iron And Iron Storage Levels In Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO)*

**PRINCIPAL INVESTIGATOR:** *K. Rais-Bahrami*

**PROTOCOL NUMBER:** *3424*

**DATE:** *August 16, 2004*

The Health Insurance Portability and Accountability Act (HIPAA) protects my personal private health information. The Privacy Rule requires me to sign an agreement in order for researchers to be able to use or share my protected health information for research purposes in the study listed above.

I give my consent for Dr. K. Rais-Bahrami and his research staff to use and share my personal private health information for the purposes written below.

1.   My protected health information that may be used and shared including:

**PHI TO BE COLLECTED:** *Demographic data, levels of iron/ferritin/transferring/TIBC, duration of ECMO support.*

2.   My protected health information may be used for:

**DESCRIPTION OF PROJECT:**  We will measure your baby's levels of iron/ferritin/transferring/TIBC before we start ECMO, during ECMO, at completion of ECMO and at follow-up at 4, 8 and 12 months after discharge from our NICU.  Based on these data, we will be able to make dietary recommendations regarding the iron intake of your baby as well as other babies that have been on ECMO support during their NICU stay and after discharge from our NICU.

3.   My PHI is needed to conduct research because:

**WHY PHI WILL BE COLLECTED:** To see how high the levels of iron in your baby's blood get after ECMO, and how soon after ECMO they return to normal levels.

4.   Researchers may use and share my information with:

**IRB USE:**



IRB APPROVED

SEP 1 5 2004

Children's Hosp



| | |
|---|---|
| PCP | *NO.PRIMARY CARE* |
| MR# | 020567916 |
| Acct#: | 0525400132 |
| NIC | NRJ-3606-A |
| Sex | M |
| Exp: | |
| Adm: | 09/11/05 |
| DOB: | 09/06/05 |
| DR. | *CHAMBERLAIN,JAMES* |
| Ins.Plan | |

**FORM A**
Page 1 of 2
Version 1, February 26, 2003

**CNMC 00006**

PRINTED BY: mlopez    DATE : 12/12/2006

**SHARED INFORMATION:** The investigators and agencies of the federal government as well as the Institutional Review Board of the Children's Hospital can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. During the study period, the NICU nurses and ECMO specialists involved in your baby's care may also become aware of our data.

5. Once my information has been shared with anyone outside of this study, I understand that the information may no longer be protected under this agreement.

6. The Researchers agree to protect my information by using and sharing it only as allowed by me in this Agreement.

**LIST OF CNMC RESEARCHERS:** *K. Rais-Bahrami, MD, Chrysanthe G. Gaitatzes, MD/PhD and Billie L. Short, MD*

7. I understand that I do not have to sign this Agreement. If I choose not to sign it, it will not change my standard treatment, payment or enrollment in any health plans or affect my ability to receive benefits, but I may not be allowed to join in the research study.

8. After signing this Agreement, I can change my mind and:
   - if I withdraw the agreement, not let the researcher use my personal private health information.
   - if I withdraw the agreement, I will do so in writing to the Principal Investigator.
   - if I withdraw the agreement, researchers may use and share my personal private health information already collected for this research study.
   - if I withdraw this agreement, my protected health information may be used if I have an adverse event (side effect that requires reporting to the Research Staff).
   - if I withdraw the agreement, I may not be allowed to take part in the study.

9. Optional – I understand that I will not be allowed to review the information collected for the research until after the study is completed. When the study is over, I will have the right to request access to the information again.

10. The end of this study agreement will be *when the study is completed*.

11. If I have not already received a Notice of Privacy Practices from Children's National Medical Center, I will request a copy and will be given one. If I have questions about my privacy rights, I can contact the Children's Hospital Privacy Officer, by calling the Legal Department of Children's Hospital at 202-884-4550.

12. I am the subject of the study or I am allowed to act on behalf of the subject. I have read this information and will get a copy of it after it is signed.

13. The Subject or the Subject's legal representative should sign this form. If signed by the subject's legal representative, please state the relationship.

RELATIONSHIP OF LEGAL REPRESENTATIVE:

_Mother_

Signature _~Tere A. Mewing_          Date _Sept 13/05_

**IRB USE:**

IRB APPROVED

SEP 1 5 2004

Children's Hospital

**FORM A**
Page 2 of 2
Version 1, February 26, 2003

**CNMC 00007**



*Form Revised December 2001*

# CHILDREN'S HOSPITAL

Departments of Neonatology[1] and Neurology[2]
111 Michigan Avenue, NW
Washington, DC 20010
(202) 884-5000

# CONSENT TO PARTICIPATE
# IN A CLINICAL RESEARCH STUDY

**TITLE OF STUDY:**
Monitoring continuous amplitude integrated EEG (aEEG), and near-infrared spectroscopy (NIRS) brain oxygenation in neonates recovering from severe cardiopulmonary failure on extracorporeal membrane oxygenation (ECMO)

**PRINCIPAL INVESTIGATORS:**
Stephen Baumgart MD[1] (Principal Investigator, aEEG)
Khodayar Rais-Bahrami MD[1] (Principal Investigator, NIRS)
Taeun Chang MD[2] (Principal Investigator, Electroencephalography)

**INTRODUCTION:** We would like you and your child to be part of a research study at Children's Hospital. Before you decide, we want you to know why we are doing the study and if it will help your child. We also want you to know about any risks (what might go wrong) and what you and your child will have to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We will ask you to sign this form to show that you understand the study. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and drop out of the study any time you want
- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

**CNMC 00008**

**IRB USE:**





IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 1 of 5

| PCP | NO.PRIMARY CARE |
|---|---|
| MR#: | 020567916 |
| Acct#: | 0525400132 |
| NIC | NIU-3608-A |
| Sex | M |
| Exp: | |
| Adm: | 09/11/05 |
| DOB: | 09/06/05 |
| DR. | CHAMBERLAIN,JAMES |
| Ins.Plan | |

PRINTED BY: mlopez    DATE : 12/12/2006

## A. PURPOSE OF STUDY

We plan to look at the use of two systems to monitor brain activity while your child is on ECMO. One is NIRS (near infrared spectroscopy) a monitor of brain oxygen levels. The other is an aEEG (amplitude-integrated electroencephalogram) which records electrical activity in the brain. These machines are safe, non-invasive and have been approved by the Food and Drug Administration. We want to see if information from these machines will provide additional information about brain activity around the time your child is placed on ECMO and if this information can be useful in predicting whether a child will have problems with brain development after he/ she recovers.

Your child is being asked to be in the study because he/she is a candidate for ECMO.

## B. PROCEDURE

We will place all infants in the study on both the NIRS and aEEG machines before they are started on ECMO. These two machines will be attached to your baby's head with an adhesive like others that we already use in the nursery and on your baby. Continuous monitoring will take place through the first 24-48 hours while on the ECMO circuit. Additionally, another two 12- 24hr readings with the aEEG machine will be done when your baby comes off ECMO and one week thereafter. Information from your baby's hospital course will also be collected such as number of days on ECMO and results of head ultrasounds or other related studies. No additional tests or blood withdrawals will be required as a part of this study. Routinely, your baby will be followed-up at the Infant Development Clinic at 4-6 months and 15-18 months of age. Information from these visits will also be collected as part of this study.

## C. POTENTIAL RISKS/DISCOMFORT

All parts of this study (i.e. treatment and monitoring while on ECMO, follow-up visits) are considered routine standard of care for your baby except for the use of the aEEG and NIRS machines. These machines have been approved for use in newborns and are not associated with any major side effects. We will carefully monitor lead placement and watch for any signs of local reaction or skin irritation to the aEEG or NIRS leads. There are no other tests or blood draws associated with this study.

**IRB USE:**





EXPIRATION

APR 1 2006

Children's Hosp

IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 2 of 5

**CNMC 00009**

PRINTED BY: mlopez    DATE : 12/12/2006

## D. POTENTIAL BENEFITS

Your infant will have the added benefit of additional methods of brain activity monitoring while on ECMO. Information about potential seizures or other problems may be detected by the use of NIRS and aEEG, and may help us in treating your baby.

This study may also help us to predict and identify those patients who are at greatest risk for problems with brain development after recovery from ECMO. This new information will provide important prognostic information for patients and families that require ECMO in the future.

## E. ALTERNATIVES TO PARTICIPATION

Participation in the study is completely voluntary. If you decide not to participate, your child will be treated with the same coordinated care routinely offered in the NICU.

## F. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you believe you have been injured as a result of being in this study, you should call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

## G. CONFIDENTIALITY

We will keep the records of this study confidential. We will not tell anyone you are in the study. Only the people working on the study will know your name. They will keep this information in case we have to find you later for medical reasons. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study and to make sure our results are correct. Your child's medical record is confidential, but just like any medical record; there are some exceptions under state and federal law.

**IRB USE:**





IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 3 of 5

**CNMC 00010**


## H. COMPENSATION

We will not pay you or your child for participation in this study. There are no additional costs to you as a part of participating in this study. You will still have to pay for any medical care that is not part of the study.

## I. ADDITIONAL ELEMENTS

We cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something bad happened because your child was in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We do not promise to pay you anything or give your child free medical care if something bad happens, but we will look at each case carefully. We will give your child any emergency treatment needed. You do not give up any legal rights by signing this form and you are not releasing us from any responsibility if we do anything wrong.

Dr. Rais-Bahrami (one of the principal investigators involved with this study) is under contractual agreement with CAS Medical Systems for research and development of the NIRS system. However, all data from NIRS system recordings will be de-identified (your baby's name and medical information will not be provided) before it is shared with CAS medical systems for analysis.

## CONSENT:

By signing this form, you agree that you have talked to your child's doctor about the study and understand it, and want your child to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may take your child out of the study at any time and no one will mind and nothing will change about your child's medical care other than not being in the study. Copies of this form will be:

(1)    kept in the study file by the Principal Investigator;
(2)    put in your child's medical record; and
(3)    given to you to keep.

Please call the Principal Investigators, Dr. Rais Bahrami or Dr. Stephen Baumgart, at 202-884-5448 or Dr. Taeun Chang at 202-884-2120 if you have any questions.

Printed Name of Participant: _                    _____
Medical Record Number: _____                    _____

*IRB USE:*





IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 4 of 5

**CNMC 00011**

**Children's** National Medical Center

*Phone consent obtained from mother*

Printed Name of Parent(s)/Guardian(s): *Theresa Morris*

Signature of Parent(s)/Guardian(s): *Theresa Morris*        Date: 09/15/05

**Witness (to signatures):** *Jordana Fenix mo*        Date: 9/11/05
(may be investigator)

Translator's Signature (if, applicable): *N/A*
Language: *English*

**INVESTIGATOR'S AFFIDAVIT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: *Jordana Fenix*
Title: *MD*    Signature: *Jordana Fenix mo*        Date: 9/11/05

*IRB USE:*



APR 7 2005



EXPIRATION

*APR | 2006*

Children's Hospital

IRB Protocol No.: {3557}
Date: {April 7, 2005}
Page 5 of 5

**CNMC 00012**

# EXHIBIT F



**CONSENT FOR SURGERY,
TREATMENT, DIAGNOSTIC
PROCEDURE, USE OF
BLOOD AND BLOOD
PRODUCTS, SEDATION OR
ANESTHESIA**

Children's
*National Medical Center.*





PCP     *NO PRIMARY CARE*
MRF:    02056 7916
Acct#:  0525400132
NIC     NIU-3606-A
Sex     M
Exp:
Adm:    09/11/05
DOB:    09/06/05
DR.     CHAMBERLAIN, JAMES
Ins.Plan

*I hereby authorize Dr.* ___Newman.___ *and/or such associates or assistants
as he/she may select to treat: (name of patient)* ___
*for the following condition(s) requiring treatment:* ___PPHN. Hypertrophic Cardiomyopathy___

☑ Surgical or other procedure(s) ___Right Side of Neck Connection of___
___Veno-arterial ECMO Support___

Check one box  (site: ☑ right  ☐ left  ☐ both  ☐ n/a)

**RISKS, BENEFITS AND ALTERNATIVES** I understand the patient's condition and what the treatment or procedure described above is supposed to do and how it will help the condition. I have been told that the treatment may not work. I understand that if there are complications or if unexpected conditions are found, other procedures may be needed. I consent to those procedures if there is no time to talk to me. I have been told about the risks (what might go wrong), other treatment choices, and what might happen if the treatment is not done. Common risks to surgical procedures include bleeding, infection, failure of the procedure to work, and possible need for further surgery. In addition, the following risks specific to this procedure have been discussed with me and include:

**ANESTHESIA, SEDATION AND ANALGESIA** I consent to the administration of anesthesia or sedation, if applicable. I have been made aware that complications of anesthesia or deep sedation are rare, but may include cardiac arrest (heart stoppage), brain damage, or death. Complications of moderate sedation include nausea, agitation, and allergic reactions to the medicine. Also, if the child becomes deeply sedated, there can be difficulty breathing and loss of oxygen to the brain. If I have any questions, I am aware that I may call an anesthesiologist at (202) 884-2025.

**BLOOD AND BLOOD PRODUCTS** I understand that blood or blood products will be given if needed. I understand that the risks are rare but include fever, chills, rash, itching, back pain, kidney problems, shortness of breath and hepatitis. The risk of other diseases such as HIV/AIDS and death is very low. I have been told about donations from family or friends, using the patient's own blood, and any other options. I have access to the information sheet on blood use and the testing and safety of donated blood. Because new tests may be discovered later, I may be told later about problems with blood donated before new tests were used.

If I object to the use of blood or blood products, I will be notified as soon as possible of any need to administer blood so that I may take any action I consider necessary. *Note for Jehovah's Witnesses:* Contact the Hospital's Family Services Department at 202-884-3070 if you have questions.

<u>INFORMED CONSENT 7/2004</u>


*CNMCCONSENT*

**CNMC 00015**

PRINTED BY: mlopez    DATE : 12/12/2006

## CONSENT

I have read, been informed, and understand the above and any attached information, and what my doctors have told me about risks, benefits and alternatives or options. I have been given the chance to ask questions. I consent to the procedures or treatments listed, and to the use of anesthesia/sedation or blood/blood products if noted above. This consent lasts for the duration of the continuous course of treatment, with the exception of surgical informed consent. Surgical informed consent may be obtained up to 30 days before admission and is applicable for the duration of the admission until used.

_Teresa A. Morring_    _Teresa A. Morring_    _09/13/05_
Signature                          Print Name                          Date

_(757) 553-6793_
Telephone Number

_K R. Bahru MD_    _Sept 13 - 2005_    _1505 pm_
Witness (To Signature)              Date                          Time

Relationship of consenting person to the patient:
- [ ] Parent
- [ ] Public Agency (acceptable by fax w/o witness)
- [ ] Patient: [ ] 18 years or older [ ] consenting for self for certain procedures [ ] emancipated minor)
- [ ] Other (see consent policy) _____
- [ ] Guardian (attach copy of court order)
- [ ] Person with written authorization (attach)

## SPECIAL CONSENT CIRCUMSTANCES

- [ ] The above was read to the consenting person
- [ ] Read to the consenting person by a translator
- [ ] The above information was discussed by telephone with the consenting person by the physician signing below. (Print name and telephone number of consenting person and indicate relationship above)

## PHYSICIAN CONFIRMATION

I informed the consenting party of the condition requiring treatment, and have, consistent with my best medical judgment, explained the nature, purposes, risks, benefits and complications of the procedure(s) identified above, any alternatives, and the contents of this form.

_K R. Bahru_    _9/13/05_
M.D. / L.I.P.                          Date

| VERIFICATION OF PROCEDURE AND SITE IMMEDIATELY PRIOR TO INCISION OR START OF PROCEDURE |
|---|
| Verified by: _Jon Tumala, R.N._ |
| Date & Time: _09-13-05  1547_ |

INFORMEDCONSENT 7/2004


*CNMCCONSENT*

**CNMC 00016**

# EXHIBIT G

# ECMO INFORMATION

Your child has severe lung disease that has not responded to our usual therapy, including a ventilator (breathing machine) and dr... We have found that children who don't get better after a few days of this therapy have a very slim chance of living. There is another therapy that has been successful for children like yours. It is called Extracorporeal Membrane Oxygenation, or ECMO for short, and involves a machine much like the ones used in open-heart surgery (see the pictures below).

*The Type of ECMO*  Your child will require surgery to be placed on an ECMO machine. There are two major types of ECMO. One uses the jugular vein, and the other uses the jugular vein and the carotid artery. We usually try to use the vein only, but we may have to return your child to surgery to connect to the artery if blood pressure isn't stable or for other reasons. Sometimes other methods must be used, which we will explain. Your child will be anesthetized (put to sleep and given pain medicine) and an incision will be made in the neck on the right side. A tube (catheter) will be placed in the blood vessel(s). This takes about an hour.

*The ECMO Procedure*  After the catheters are in place, they are connected to the ECMO machine. The ECMO machine pumps blood to an artificial lung that adds oxygen to the blood and removes carbon dioxide the way normal lungs do. The child's lungs can now rest and recover. Your child will stay on the breathing machine on very low settings to keep the lungs open while they get better. Not all children can be helped with this therapy, but many can. The average time on ECMO for most infants is 5-6 days. Older children are on for at least 10 days, and many require 3-4 weeks before recovery occurs. If no improvement occurs on ECMO, the physicians will discuss other options with you, which in most cases is to stop ECMO and try the breathing machine and drugs again.

*Daily Care While On ECMO*  We want infants on ECMO to be awake, but not moving too much, so we keep them on small amounts of pain and sedation medications. It is good for you to be there and talk to them. Older children usually need more sedation, and are kept very quite or even paralyzed so they do not move. During ECMO, your infant/child will be taken care of by a bedside nurse, an ECMO Specialist, and an ECMO physician. Other doctors may be involved as needed. After the lungs start to improve, the ECMO machine will be turned down slowly. When oxygen levels are good on low settings on the ECMO machine, the doctors will decide whether to take your child off ECMO. Your child will be put to sleep and the tubes will be removed. The vein and/or artery will be permanently closed. Your child will stay on a breathing machine, but at lower settings.

**The potential benefits of ECMO are:**
- Long-term use of a breathing machine at high settings can damage your child's lungs. ECMO lets the lungs rest and, hopefully, heal themselves with less chronic lung disease.
- The lung disease and any related heart problems may be cured or improved with ECMO, allowing your child to survive.

**The potential risks and complications of ECMO:**
- The child's blood must be kept from clotting while it goes through the machine with a blood thinner called *heparin*. If the brain has been damaged by low oxygen levels before ECMO was started, these damaged areas can bleed with heparin. If that happens, we will talk to you about the problem in detail. *If bleeding is severe, the only choice is to stop ECMO and use a breathing machine and drugs so that the heparin can be stopped.* If your child is taken off ECMO, we will give a drug to make the blood clot normally again.
- The surgery involves tying off (closing) either one or two major blood vessels, the internal jugular vein and the carotid artery. Studies to date have not shown complications from using these two vessels for ECMO and then tying them off. This is probably because several other blood vessels take over and carry blood to the brain. We have followed children into their teenage years, and have not found complications related to tying off the blood vessels. Because ECMO is relatively new, the long-term (adulthood) risks are not known, but an increased risk of stroke must be considered.
- The vessels can tear when placing or removing the tubes. If this happens, other vessels will be used if possible, but if not ECMO will not be attempted and your child will receive routine therapy as before. If this happens when the tubes are taken out, the surgeon will find the tear and tie it off. Your child may need blood if there has been much bleeding from a tear.
- Whenever a tube is inserted in a blood vessel, there is an increased risk of infection. Your child will receive antibiotics as a precaution, and we will watch carefully for signs of infection.
- *Use of blood products*: The ECMO machine must be filled with blood before your child is connected and your child will receive multiple transfusions of whole blood and other blood products (see attached information on blood products). Because only red blood cells can carry oxygen there are no alternatives to transfusions. If you object to the use of blood products, we cannot use ECMO.
- The ECMO circuit can malfunction just as any piece of equipment can. If this happens, your child will be removed from ECMO and placed on routine therapy until the malfunction is corrected, if possible.
- Blood clots or air bubbles can get into your child's blood stream from the machine. This can sometimes be fatal.

An ECMO attending physician is available at any time to answer questions 202-884-5448 (office, ask for the ECMO Attending) or 202-884-5040 (NICU, ask for the ECMO Attending).

CNMC 02422

# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


------------------------x
                        :
TERESA A. MORRING,      :
et al.                  :
                        :
        Plaintiffs      :
                        : Civil Action
    vs.                 : No. 06cv0206
                        :
CHILDREN'S NATIONAL     :
MEDICAL CENTER          :
                        :
        Defendant       :
                        :
------------------------x


                    Washington, D.C.
                    October 24, 2007

Deposition of:

    KHODAYAR RAIS-BAHRAMI, M.D.,

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 12:30 p.m., before Lynell C.S.

Abbott, a Notary Public in and for the

District of Columbia, when were present on

Page 2

```
 1
 2   behalf of the respective parties:
 3
 4   On behalf of the Plaintiffs:
 5   Chaikin & Sherman
     By:  ANTHONY G. NEWMAN, ESQ.
 6       1232 17th Street, N.W.
         Washington, D.C. 20036
 7       (202) 659-8600
 8
     On behalf of the Defendant:
 9
     Jackson & Campbell
10   By:  NICHOLAS S. McCONNELL, ESQ.
     By:  KRISTA MAIZEL, Esq.
11       1120 20th Street, N.W., 300 South Tower
         Washington, D.C. 20036
12       (202) 457-1600
13              + + +
14          C O N T E N T S
15   WITNESS:  KHODAYAR RAIS-BAHRAMI, M.D.
16   EXAMINATION BY:             PAGE
17   MR. NEWMAN           3, 137, 163
18   MR. McCONNELL           129, 160
19
20           EXHIBITS
21   None.
22
```

Page 3

```
 1
 2   Whereupon,
 3       KHODAYAR RAIS-BAHRAMI, M.D.
 4   was called for examination by counsel and,
 5   having been duly sworn by the Notary, was
 6   examined and testified as follows:
 7   EXAMINATION BY COUNSEL FOR PLAINTIFFS
 8       BY MR. NEWMAN:
 9       Q.   Good afternoon, Doctor.
10       A.   Good afternoon.
11       Q.   I have been provided a document
12   which is 14 pages long, apparently.  I think
13   only the first two or three pages -- for the
14   record, it's Pages 2538 to actually just 2540.
15   It's a three-page document which doesn't say
16   it's your CV but it looks like it came off the
17   Internet.
18           Is that the only curriculum vitae
19   you have?  It says, also, "Punch here for
20   map." I'm assuming it comes off the Internet.
21   Do you have another document like that or is
22   that it?
```

Page 4

```
 1       A.   You are asking me to verify these
 2   informations are correct?
 3       Q.   Well, I'm first asking you is that
 4   your curriculum vitae?
 5       A.   No.
 6       Q.   Okay.  It seems to be a printout
 7   from the Internet.  Do you have a curriculum
 8   vitae printed up somewhere?
 9       MR. McCONNELL:  Do we have one?
10       MR. NEWMAN:  That's the one you
11   gave to me, actually.
12       THE WITNESS:  I do.
13       MR. McCONNELL:  Let's see if we
14   have something better than that.
15       BY MR. NEWMAN:
16       Q.   But you could look through it just
17   to say -- does it appear to be incomplete, in
18   other words, between your publications and
19   other works, or is it relatively complete?
20       A.   The information is correct.  This
21   is part of my -- I mean it's a part of my CV.
22       Q.   All right.  Meaning there is a
```

Page 5

```
 1   document that has more entries than that that
 2   is your actual CV.
 3       A.   Yes.
 4       Q.   If you can provide that to counsel
 5   to provide to me, that will be fine.  Is this
 6   a CV that is kept at Children's on the
 7   Internet?
 8       A.   Correct.
 9       Q.   The last publication on this
10   document is in Perfusion 2004.  Have you
11   written anything since then that's been
12   published?
13       A.   Yes.
14       Q.   Is there any other research or
15   funding that you've been involved with besides
16   what's on here?
17       A.   May I see that.  No.
18       Q.   When did you first come to
19   Children's, what year?
20       A.   July of 1991.
21       Q.   While it does not give me the
22   years of what's called Past Research
```

Page 18

1       A.   Is this a general question or do
2  you want me to take you through an ECMO
3  course?
4           MR. McCONNELL:  I object as being
5  very, very broad.  I think that's the doctor's
6  problem with the question.  Subject to the
7  breadth of the question, to the extent you can
8  answer it, what are all the criteria that
9  might lead to a patient being admitted for
10 ECMO, if you can answer that, you are free to
11 do so.
12          MR. NEWMAN:  I never asked
13 anything of the kind.  And I resent this
14 recent line of objections to my question.
15 We'll really do it slow.
16          THE WITNESS:  Sure.
17          BY MR. NEWMAN:
18      Q.   Here we go.  Let me ask you this:
19 What with regard to respiratory status
20 specifically requires a patient to be on ECMO?
21 Tell me about that, just the respiratory
22 status of a patient.  What would have to meet

Page 19

1  the minimum to be put on ECMO?
2       A.   Failed responding to conventional
3  respiratory support, pharmacologic support and
4  approaching ECMO as a rescue treatment or
5  rescue support.
6       Q.   Now, when you say rescue
7  treatment, is the purpose of ECMO to maintain
8  a patient permanently on the ECMO unit?
9       A.   No.
10      Q.   Is there a duration wherein
11 there's a cutoff point for using the ECMO unit
12 at Children's?
13      A.   No.
14      Q.   The longest that you've seen a
15 patient on ECMO in the time that you have been
16 here was how long?
17      A.   You're asking my own personal
18 experience?
19      Q.   Yes, what you've seen.
20      A.   29 days.
21      Q.   Assuming the patient does not
22 expire while on ECMO, what is the purpose of

Page 20

1  ECMO?  To provide a temporary bypass measure
2  and then hope the patient can survive without
3  the device?
4       A.   Absolutely.
5       Q.   Now, we went through respiratory
6  status.  What are the criteria for cardiac
7  status of a patient to be placed on ECMO?
8       A.   If I understand the question
9  correctly, the answer is many cardiac
10 conditions that may require cardiorespiratory
11 support.
12      Q.   Let's take out for a moment the
13 actual bypass during a procedure.  In cases
14 where ECMO is being used as a bypass for a
15 procedure is it literally started, if you
16 will, at the beginning and ended shortly after
17 the procedure?  Is there a duration that it
18 must be on even if a cardiac surgery is
19 performed?  Is it short or long?
20      A.   I still don't understand the
21 question.
22      Q.   You can't take a patient off ECMO

Page 21

1  abruptly, can you, following, say, a cardiac
2  surgery?
3       A.   Yes, you can.
4       Q.   So there are patients that are
5  simply on for the time and duration of the
6  surgeries.
7       A.   Correct.
8       Q.   Taking those patients out for a
9  moment, of the remaining patients that are on
10 ECMO, is there any particular group or
11 category they fall under with regard to
12 cardiac status, not talking about the acute
13 ones that have been operated on, the other
14 ones, or do they take all comers, all
15 different kinds?
16      A.   Of what?
17      Q.   Is the criteria after you take out
18 the surgical patients that there are all
19 different kinds of cardiac anomalies, all
20 different kinds of cardiac conditions, all
21 different types of ejection fractions?
22 Nothing in particular, any kind of cardiac

Page 118

1    Q.    Do you recall following specific
2  procedures when you did submit your device
3  studies to the IRB?  I mean specific to
4  devices as opposed to drug or general
5  research.
6    A.    Yes.
7    Q.    As far as ECMO in general, who
8  gives the informed consent as to a patient's
9  representative when the patient is about to go
10  on ECMO?  Who does that procedure?
11    A.    Any of my colleagues and myself.
12    Q.    Safe to say not you?  Or do you
13  sometimes?
14    A.    I do sometimes.
15    Q.    I understand that there is a form
16  to fill out which is a usual consent type
17  document in general.  Is there specific
18  information that you tell the patient
19  regarding ECMO, or actually the patient's
20  representative, beyond what's on the form?  I
21  want to know what do you tell them besides
22  what's sitting on a document?

Page 119

1    There's a document in here
2  regarding informed consent which seems like a
3  standardized form.  And my question to you is
4  do you say anything besides what's in that
5  form as to ECMO and its risks, benefits,
6  procedure, et cetera, in obtaining informed
7  consent?
8    MR. McCONNELL:  Do you understand
9  the question, what you are being asked?
10    BY MR. NEWMAN:
11    Q.    I'll make it real easy.  What do
12  you tell the patient to try to get their
13  informed consent, to have a patient's
14  representative to have ECMO performed on their
15  child?
16    MR. McCONNELL:  What's the usual
17  conversation with a patient or a parent.
18    BY MR. NEWMAN:
19    Q.    First of all, am I safe to say you
20  don't remember what you said to this patient?
21  Is that safe to say, in particular?
22    A.    Not in exact wording, but I can

Page 120

1  tell you in general what I tell a parent or
2  guardian of an ECMO patient, near ECMO
3  patient.
4    Q.    Right.  For some reason in my
5  inartful way I've never been able to get that
6  simply answered.  So tell me what you tell
7  people in general.
8    A.    Right.  In short version, I tell
9  them that the infant has cardiorespiratory
10  failure.  It is not responding to usual
11  conventional mechanical and pharmacological
12  support.  I do believe that the patient
13  without considering ECMO support would die,
14  and with their understanding and consent we
15  would proceed with ECMO cannulation.  And that
16  involves an incision on the right side of the
17  neck to implant cannulas in the baby's large
18  vessels to access their heart in order to be
19  able to provide cardiopulmonary bypass
20  support.
21    In addition, it involves blood
22  donor transfusion which is a requirement to

Page 121

1  prime the circuit and the continuous use of
2  blood thinner, i.e., heparin, which maintains
3  the circuit from clotting and does have a
4  substantial side effect or risk to a patient
5  as far as potential bleeding complication, and
6  they should be aware of those.
7    And the other side of the coin is
8  that this temporary support allows the
9  patients to recover from their underlying
10  disease that put them in extreme
11  cardiopulmonary failure and potentially
12  recover to come off or be weaned off
13  extracorporeal life support.
14    Q.    You did say before you started,
15  "in short."  I just want to make sure there's
16  nothing else you would tell them that we
17  haven't covered.  Is that basically what you
18  would tell them?
19    A.    Yes.
20    Q.    And beyond that, you don't have
21  any specific recollection of any words you
22  said to this mother but that it would be those

Page 130

1. that that could not have occurred because you
2. don't remember a nine-month pregnant lady
3. being there?
4.     MR. NEWMAN: Objection. You're
5. testifying.
6.     MR. McCONNELL: I understand. I'm
7. asking.
8.     MR. NEWMAN: What you are doing
9. now is trying to rehabilitate.
10.     MR. McCONNELL: Of course.
11.     MR. NEWMAN: It's your own
12. witness.
13.     MR. McCONNELL: Of course. You
14. are allowed to do that on redirect.
15.     MR. NEWMAN: Oh, you can do it.
16.     MR. McCONNELL: Sure.
17.     MR. NEWMAN: He's testified.
18.     MR. McCONNELL: Sure.
19.     BY MR. McCONNELL:
20.   Q.  If that's her recollection, are
21. you saying you definitely recall that that
22. could not have occurred or is that something

Page 131

1. that may have happened, in fact?
2.     MR. NEWMAN: Objection to him
3. guessing.
4.     MR. McCONNELL: Sure.
5.     THE WITNESS: It may have
6. happened. I don't recall.
7.     BY MR. McCONNELL:
8.   Q.  You were asked why a code would be
9. called in an infant who is on ECMO support.
10. Are these infants very, very sick to begin
11. with?
12.   **A.  Very.**
13.   Q.  Is ECMO -- you used the word
14. rescue therapy. Without ECMO are these
15. children going to die?
16.   **A.  Yes.**
17.   Q.  And would this child without ECMO,
18. before he went on ECMO, can you tell us would
19. he have had, what, maybe a day or two to live
20. without the ECMO?
21.     MR. NEWMAN: Objection to
22. guessing.

Page 132

1.     BY MR. McCONNELL:
2.   Q.  In your opinion to a reasonable
3. degree of medical probability, if this child
4. hadn't been placed on ECMO would he have died
5. within a day or two?
6.   **A.  Yes.**
7.   Q.  So when you have these very sick
8. infants and they're on the ECMO system and a
9. cannula inadvertently is displaced and a code
10. is called, is a purpose in calling the code to
11. bring to the bedside immediately all the
12. people necessary to get the baby recannulated
13. and to support the baby during that process?
14.   **A.  Yes.**
15.   Q.  Does the code serve that function
16. in the ECMO unit, that is, gets the people to
17. the bedside immediately necessary to get the
18. baby recannulated?
19.   **A.  Yes.**
20.   Q.  I mean the fact that a code is
21. called, the suggestion has been made through
22. the questions that codes are only called if a

Page 133

1. patient's heart stops and/or their lung stops.
2. In this case, did this baby's heart or lung
3. stop at any time that you are aware of?
4.   **A.  No, it did not.**
5.   Q.  You mentioned that during the
6. informed consent conversation with parents
7. about ECMO, one of the things they're told is
8. a requirement for this type of perfusion and
9. support is the continuous use of heparin.
10.   **A.  Yes.**
11.   Q.  You mentioned that. Heparin is a
12. medication that reduces the clotting of blood?
13.   **A.  Yes, it is an anticoagulant that**
14. **prevents spontaneous clot formation.**
15.   Q.  Particularly in brand new babies
16. like       going on ECMO therapy,
17. where are the places where they might bleed
18. that are of principal concern?
19.   **A.  Incision site, intracranial,**
20. **intraventricular.**
21.   Q.  Is that discussed with the
22. parents, that one consequence of this

# EXHIBIT I

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

```
--------------------------x
                          :
TERESA A. MORRING,        :
et al.                    :
                          :
       Plaintiffs         :
                          : Civil Action
   vs.                    : No. 06cv0206
                          :
CHILDREN'S NATIONAL       :
MEDICAL CENTER            :
                          :
       Defendant          :
                          :
--------------------------x
```

Washington, D.C.

Thursday, December 20, 2007

Deposition of:

STEPHEN BAUMGART, M.D.

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 2:08 p.m., before Renee A. Feder,

CSR, a Notary Public in and for the District

of Columbia, when were present on behalf of

the respective parties:

## Page 2

On behalf of the Plaintiffs:
Chaikin & Sherman
By:  ANTHONY G. NEWMAN, ESQ.
     1232 17th Street, N.W.
     Washington, D.C. 20036
     (202) 659-8600


On behalf of the Defendant:

Jackson & Campbell
By:  NICHOLAS S. McCONNELL, ESQ.
By:  KRISTA MAIZEL, Esq.
     1120 20th Street, N.W., 300 South Tower
     Washington, D.C. 20036
     (202) 457-1600

        + + +
     C O N T E N T S
WITNESS: STEPHEN BAUMGART, M.D.
EXAMINATION BY:                    PAGE
MR. NEWMAN                          3
MR. McCONNELL                       -

        EXHIBITS
DEPOSITION NO.     MARKED FOR IDENTIFICATION
None.

## Page 3

Thereupon,
        STEPHEN BAUMGART, M.D.
was called for examination by counsel and,
after having been duly sworn by the Notary,
was examined and testified as follows:
   EXAMINATION BY COUNSEL FOR PLAINTIFF
        BY MR. NEWMAN:
   Q.   State your full name for the
record.
   A.   **Stephen Michael Baumgart.**
   Q.   Dr. Baumgart, are you presently on
any kind of medication or any other substance
that would impair your decision making or
judgment?
   A.   **No.**
   Q.   And I understand you had some type
of -- I want to say a cardiovascular accident
or cerebral accident?
   A.   **A stroke.  March 1, 2005.**
   Q.   And I understand you also, from at
least looking at you, you had a good recovery
from that?

## Page 4

   A.   **Yes.  It took a better part of**
**twelve months working at that.**
   Q.   Are you back to work?
   A.   **Yes.  Full time.**
   Q.   Just so I understand, what is
your -- let's do it this way.  Back in 2005,
was there a difference in your position at
Children's as it is today?
   A.   **No.**
   Q.   What do you do?
   A.   **I am a neonatologist.**
   Q.   Any involvement whatsoever with
the ECMO program?
   A.   **Yes.**
   Q.   What is that?
   A.   **I am responsible as a faculty**
**member to decide, make the final decision**
**which babies would benefit from ECMO and**
**obtain informed consent from them for that**
**procedure from the families.**
   Q.   Besides making the decision which
I guess means fitting the criteria for

## Page 5

inclusion?
   A.   **Yes.**
   Q.   And doing informed consent, any
other role you play as far as hands-on in the
treatment of the child?
   A.   **I am supervisory for the**
**neonatology fellows in training, and the ECMO**
**team comprised of the profusion specialist,**
**the nurses who specialize in ECMO.**
   Q.   Do you have any role with regard
to -- I know there is an ECMO manual and a
policies and procedures guide.  Do you have
any involvement with review, promulgating
those types of documents?
   A.   **Not yet.**
   Q.   Does that mean you will be
involved in doing that in the future?
   A.   **Yes.**
   Q.   New guidelines, new rules?  Is
that what you are looking at?
   A.   **We are adding information to the**
**Extracorporeal Life Support Organizations.**

Page 6

1. **What would you call that? It is not a policy**
2. **or a procedure. It is a manual of modern**
3. **practices with ECMO.**
4.     Q.    When you say that, are we talking
5. about any involvement you have with ELSO or
6. just within the institution of Children's?
7.     A.    **With ELSO, through Dr. Billie Lou**
8. **Short.**
9.     Q.    First of all, back in 2005, I do
10. understand you were at least a principal
11. investigator in what is called an aEEG study?
12.     A.    **Yes.**
13.     Q.    And back in 2005, just to get an
14. idea, how many studies were you involved in,
15. do you remember?
16.     A.    **That would be the only one in**
17. **2005.**
18.     Q.    As far as Dr. Rais Bahrami, any
19. other that he was involved with that you know
20. of besides the one that you guys participated
21. in which involved the aEEG?
22.     A.    **I believe he was involved with**

Page 7

1. **several studies in his role as director of the**
2. **neonatology fellowship program. It is a**
3. **requirement of our fellowship that every**
4. **fellow participate in a research protocol.**
5.     Q.    If I am correct, that actually
6. means that in order to finish their fellowship
7. they must be involved with a research
8. protocol?
9.     A.    **Yes.**
10.     Q.    So, at least during 2005, or for
11. that matter, the years before, there were
12. always studies going run by, along with the
13. attending, a fellow?
14.     A.    **Yes.**
15.     Q.    And that was because they had to
16. finish that to get their curriculum finished?
17.     A.    **Yes.**
18.     Q.    Now, with respect to this case
19. with regard to informed consent, do you, as a
20. broad topic, do you remember Teresa Morring or
21. the       baby?
22.     A.    **No, sir.**

Page 8

1.     Q.    Am I correct that outside of there
2. being some records in this case to that
3. effect, that would be the only knowledge you
4. would have, or your recollection of Teresa
5. Moore?
6.     MR. McCONNELL: Can we correct
7. this? We had mentioned at the beginning that
8. Dr. Baumgart had a stroke on March 1, 2005. I
9. think if asked, he would tell you he was on
10. medical leave of absence right through the
11. entire period of time that this infant was
12. here. So he had no actual --
13.     THE WITNESS: I resumed active
14. clinical duties with night call full time in
15. October.
16.     BY MR. NEWMAN:
17.     Q.    So, basically, you were out for
18. medical reasons during the time this child was
19. being treated?
20.     A.    **Yes. I was pursuing rehab. And I**
21. **would come in for half days to work on**
22. **manuscripts and such things.**

Page 9

1.     Q.    Let me understand this. It looks
2. from the stamp that in April of 2005,
3. specifically April 7, the clinical study
4. involving the aEEG began. Am I correct that
5. in April you were no longer able --
6.     A.    **I was incapacitated.**
7.     Q.    As far as the role in the aEEG
8. portion of the study then, who was doing that?
9.     A.    **I was working with a fellow, with**
10. **Jordana Fenik, and with Dr. Raiz Bahrami.**
11.     Q.    In the form that I have, which
12. appears to be at least the consent, it lists
13. Dr. Bahrami as the principal investigator of
14. what is referred to as the NIRS; you as the
15. principal investigator of the aEEG; and
16. Dr. Chang as an investigator --
17.     A.    **-- of the aEEG.**
18.     Q.    But, in fact, he would be the one
19. that was involved in that along with this
20. fellow that you mentioned?
21.     A.    **Yes.**
22.     Q.    How do you spell the fellow's

Page 22

1. for ECMO, whatever they are, is usually
2. recorded in the record?
3.     **A.  Yes.**
4.     Q.    There is, since you were involved
5. in informed consent -- and, by the way, as far
6. as this particular baby fitting one criteria
7. or another, you have no independent knowledge
8. and have not reviewed the records to arrive at
9. an opinion?
10.     **A.  No.  That is correct.**
11.     Q.    Within the same documents
12. regarding, potentially, consent -- and this is
13. in the manual, Page 2421 -- there is an ECMO
14. information sheet.
15.     **A.  Yes, sir.**
16.     Q.    Have you seen that document
17. before?
18.     **A.  Yes, sir.**
19.     Q.    As far as that document is
20. concerned, am I correct that that is -- well,
21. first of all, was that provided to every
22. patient regarding every patient on ECMO?

Page 23

1.     **A.  Yes, sir.**
2.     Q.    And am I correct that that
3. information sheet would be provided to the
4. guardian of the patient on ECMO after the
5. patient was on ECMO?
6.     **A.  Yes, sir.**
7.     Q.    It was not, am I correct, to act
8. as any type of written informed consent prior
9. to going on ECMO?
10.     **A.  No, sir.**
11.     Q.    Did Children's Hospital, in fact,
12. at the time of this study, which would be in
13. 2005 or before, have a written informed
14. consent for ECMO?
15.     **A.  Not that I am aware of.**
16.     Q.    And do you know why not?
17.     **A.  Our surgical staff requires a**
18. **surgical consent to perform cannulation**
19. **surgery for ECMO.**
20.     Q.    I understand that is actually
21. putting the cannula in to begin the process.
22.     **A.  Correct.**

Page 24

1.     Q.    But am I correct there was no
2. policy at Children's to have informed consent
3. as to the actual process of ECMO?
4.         MR. McCONNELL:  Let me object to
5. that.  There is a distinction between having a
6. piece of paper, a document, and a requirement
7. or understanding that there would be the
8. exchange of information reflecting what, is in
9. fact, the legal informed consent.  So I object
10. to the form of the question.
11.         Subject to that, the doctor may
12. answer.
13.         THE WITNESS:  I would say yes to
14. that.
15.     BY MR. NEWMAN:
16.     Q.    Were you ever involved in any
17. discussions as to changing that policy to
18. actually have an informed consent sheet signed
19. and executed by the guardian of the patient
20. receiving ECMO?
21.     **A.  Yes.**
22.     Q.    What was your position on that?

Page 25

1.         MR. McCONNELL:  Let me object as
2. to form and foundation and relevance to the
3. extent this pertains to any conversations or
4. communications as to events post the admission
5. of this child and obtaining of informed
6. consent and placement of the child on ECMO.
7.         Subject to that, however, you may
8. answer.
9.         THE WITNESS:  Can you repeat the
10. question, please?
11.         BY MR. NEWMAN:
12.     Q.    The question was, did you have any
13. discussion regarding the need for a written,
14. executed informed consent for ECMO?
15.     **A.  Recently?**
16.     Q.    Yes.
17.     **A.  Yes.**
18.     Q.    And, again, the objection went to
19. the nature of what was the discussion.
20.     **A.  I think it is probably wise that**
21. **we have parents provide signed informed**
22. **consent after verbal consent is secured in the**

Page 26

1  **emergency moment.**
2     Q.   As you understood it, is the
3  reason that there did not need to be a signed
4  informed consent is that, if the patient met
5  the criteria for ECMO, it was an emergent
6  problem?
7     **A.   Yes.**
8     Q.   And, in fact, am I correct that if
9  you met the criteria, if a patient met the
10  criteria in the selection entry criteria form,
11  that there would be documentation on the chart
12  that the patient was --
13    **A.   So informed.**
14    Q.   -- and that there was an emergency
15  at that time?
16    **A.   Yes, sir.**
17    Q.   The patients were not supposed to
18  be put on ECMO if they were stable and not
19  reaching those requirements.  Correct?
20    **A.   I will say yes.**
21    Q.   Were you aware back in --
22  actually, the time prior to, say, around 2005,

Page 27

1  that Dr. Short was developing an interactive
2  informed consent video?
3     **A.   No.**
4     Q.   Have you heard anything about that
5  at all?
6     **A.   No, sir.**
7     Q.   Was there any such -- first of
8  all, is there today any such interactive
9  device for patients to be involved with, a
10  DVD, a computer program?
11    **A.   Not that I am aware of.**
12    Q.   And would it be safe to say you
13  would be aware of it if it is being used
14  regularly?
15    **A.   Yes, sir.**
16    Q.   And, certainly, then back in 2005
17  there was no device that you are aware of?
18    **A.   That I am aware of.**
19    Q.   Do you recall having discussions
20  with Dr. Short back before this case, say in
21  2005, that there had been many patients that
22  were confused and had not been fully informed

Page 28

1  regarding ECMO?
2     **A.   No, sir.**
3     Q.   Do you remember Dr. Short ever
4  saying anything about that to you, that there
5  needed to be a system to make sure that there
6  was better interaction?
7     **A.   No, sir.**
8     Q.   The EEG, aEEG study, I assume that
9  it had exclusion and inclusion criteria?
10    **A.   Yes, sir.**
11    Q.   And do you remember what they
12  were?
13    **A.   Babies who required ECMO**
14  **intervention were eligible for aEEG**
15  **monitoring.**
16    Q.   Am I correct, for example, that
17  brain damaged children or children with
18  coagulopathy would have been available -- been
19  excluded from the aEEG because they would also
20  be excluded from being on ECMO?
21    **A.   A coagulopathy is not sufficient**
22  **criteria for me to obtain an aEEG for research**

Page 29

1  **purposes.**
2     Q.   Am I correct that even -- for a
3  patient to be put on ECMO, they must not have
4  a hyper or hypocoagulable state?
5     MR. McCONNELL:  If known?
6     MR. NEWMAN:  Yes.
7     THE WITNESS:  I would agree with
8  that.
9     BY MR. NEWMAN:
10    Q.   In fact, was the procedure at
11  Children's to determine whether a child had a
12  hyper or hypocoagulable state prior to placing
13  them on ECMO?
14    **A.   We check coagulation studies.**
15    Q.   As a routine prior to ECMO?
16    **A.   I don't know the answer to that.**
17    Q.   As far as any evidence of brain
18  damage, am I correct that there would be,
19  prior to ECMO, there was always a sonography
20  performed?
21    **A.   Yes, sir.**
22    Q.   And if there had been signs of

# EXHIBIT J

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


```
------------------------x
                        :
TERESA A. MORRING,      :
et al.                  :
                        :
        Plaintiffs      :
                        : Civil Action
    vs.                 : No. 06cv0206
                        :
CHILDREN'S NATIONAL     :
MEDICAL CENTER          :
                        :
        Defendant       :
                        :
------------------------x
```

**RECEIVED**

JAN 2 5 2008

JACKSON & CAMPBELL, PC


Washington, D.C.

Tuesday, January 22, 2008

Deposition of:

BILLIE LOU SHORT, M.D.

called for oral examination by counsel for

Plaintiffs, pursuant to notice, at the

Children's National Medical Center, Risk

Management Conference Room, Floor 2.5,

111 Michigan Avenue, N.W., Washington, D.C.,

beginning at 2:17 p.m., before Renee A. Feder,

CSR, a Notary Public in and for the District

of Columbia, when were present on behalf of

the respective parties:

Page 2

1
2      On behalf of the Plaintiffs:
3      Chaikin & Sherman
3      By: ANTHONY G. NEWMAN, ESQ.
4          1232 17th Street, N.W.
4          Washington, D.C. 20036
5          (202) 659-8600
5
6
6      On behalf of the Defendant:
7
7      Jackson & Campbell
8      By: NICHOLAS S. McCONNELL, ESQ.
8          1120 20th Street, N.W., 300 South Tower
9          Washington, D.C. 20036
9          (202) 457-1600
10
10              + + +
11          C O N T E N T S
12   WITNESS: BILLIE LOU SHORT, M.D.
13   EXAMINATION BY:              PAGE
14   MR. NEWMAN                   3
15   MR. McCONNELL                -
16
17              EXHIBITS
18   DEPOSITION NO.    MARKED FOR IDENTIFICATION
19   1 (DVD)                    10
20   2 (Description of DVD on the Internet) 21
21
22              *  ***  *

Page 3

1    Thereupon,
2          BILLIE LOU SHORT, M.D.
3    was called for examination by counsel and,
4    after having been duly sworn by the Notary,
5    was examined and testified as follows:
6      EXAMINATION BY COUNSEL FOR PLAINTIFFS
7          BY MR. NEWMAN:
8      Q.   State your full name for the
9    record.
10     **A.   Billy Lou Short.**
11     Q.   Dr. Short, do you have a current
12   CV?
13     **A.   Not here.**
14     Q.   In any event, you do have one and
15   you can get a hold of one for me?
16     **A.   Yes.**
17     Q.   Just so I understand, when did you
18   first start working at Children's?
19     **A.   I started in 1977 doing a neonatal**
20   **fellowship.  And joined the faculty in 1980.**
21     Q.   Before that, where were you?
22     **A.   I did my residency at the**

Page 4

1    **University of Oklahoma.**
2      Q.   As far as your involvement with
3    Dr. Bartlin, when did that begin?  I know it
4    began with ECMO, but did it begin before that
5    time?
6      **A.   Yes -- actually, no, I am sorry.**
7    **It began with training for ECMO in 1983, I**
8    **believe is when we first started our training.**
9      Q.   Did you actually, from what I
10   understand, go to Dr. Bartlett so you could
11   set up an ECMO program at Children's?
12     **A.   Yes.**
13     Q.   Was that in 1983?
14     **A.   1982, '83.**
15     Q.   As far as your contacts with
16   Dr. Bartlett, have they been pretty much all
17   the way up to the present?
18     **A.   Yes.**
19     Q.   With regard to the training
20   manual, et cetera, that there is at Children's
21   Hospital for ECMO, is any of this under a
22   similar prototype as the manuals that

Page 5

1    Dr. Bartlett has?  Did you use it as any kind
2    of a guide?
3      **A.   He had a training manual and we**
4    **actually used his as a guide to create ours.**
5    **In fact, in 1983, '84.**
6      Q.   Looking at one aspect of it, as
7    far as the ECMO inclusion criteria, where did
8    that come from initially?
9      **A.   The original criteria was designed**
10   **here and it was based on our retrospective**
11   **analysis of patients at Children's and had to**
12   **take into account all of our different**
13   **therapies that we do here.**
14     Q.   In other words, it was not taking
15   from another institution, but more or less
16   actually from the results you were having at
17   Children's and what would be the best protocol
18   to follow?
19     **A.   Yes.**
20     Q.   So would it be safe to say, since
21   it began -- by the way, when did the ECMO
22   program begin at Children's?

Page 22

1      That is what is contained in it.
2  Did you have anything to do with those words?
3      A.  No, I did not.
4      Q.  Do you disagree with those words?
5  In other words, that on this aspect, most
6  parents remain distressed and confused?
7      A.  Read it again because I frankly
8  have not actually seen this.
9      Q.  Sure.  I can read it over the top
10  so you can see what we are talking about.
11  "While doctors and ECMO therapists are
12  administering this lifesaving treatment, most
13  parents remained distressed and confused."
14      First of all, back at least at the
15  time this DVD was created --
16      A.  That is so -- I don't even
17  understand that statement, to be quite honest.
18      MR. McCONNELL:  I was going to
19  object to the form of the question because
20  there are actually three different questions,
21  at least.  Are they distressed?  Are they
22  confused?  All patients?  At what level?

Page 23

1  Subject to the form of the question.  The
2  doctor has answered.
3      BY MR. NEWMAN:
4      Q.  You don't understand that
5  statement and had nothing to do with it?
6      A.  I don't understand the timing of
7  it.  Or distressed and confused at what point
8  And I would never have written that statement.
9  I think parents are distressed.  It is a
10  high -- a very stressful situation.  Their
11  baby is potentially going to die and we are
12  supplying a life saving therapy.  Sure, you
13  would be distressed.  Are they confused?  I
14  don't know.  We make every effort to inform
15  them.  So this statement I would not have put
16  in that fashion.
17      Q.  Did you ever look on the internet
18  to see how your DVD was being advertised?
19      A.  No.  This DVD was not made for
20  that purpose.  It was made for a statistician
21  who was doing -- teaching a statistical
22  analysis to high school students of which we

Page 24

1  had been giving lectures so he can then take
2  this as a process on how you apply statistics
3  and develop criteria.  That is why I did the
4  DVD.  It was not with the intent of it being
5  an educational tool.
6      When we finished it we felt it
7  might be a tool that someone might want to
8  use.  So that is why all rights were given to
9  this group to market it as they wished.
10      Q.  Are you aware that the group would
11  not distribute a single copy of it without
12  your permission?
13      A.  It is given to health care -- in
14  fact, the contract is very clear as to health
15  care institutions and representatives of
16  health care institutions.  And that is why he
17  called me to get permission to sell you a copy
18  of it.
19      Q.  First of all, just so we are
20  clear, is this -- in fact, you recognize the
21  DVD?
22      A.  Yes.

Page 25

1      Q.  Is that, in fact -- did you ever
2  go through the words that are contained on the
3  DVD?  In other words, your own video images?
4      A.  I did at the time we did it.  And
5  then the only other time I looked at it was
6  last night.
7      Q.  And at least at the time that it
8  was created, did you believe it was correct,
9  factually correct?  They are your words?
10      A.  Yes.
11      Q.  And now do I understand, from what
12  you have testified to, that some things have
13  changed since the 1998, 1999 creation of this
14  document?
15      A.  Yes.
16      Q.  We will go through that in a
17  minute.  I just wanted to clarify.
18      As far as Exhibit Number 2, you
19  basically have never seen this in any of its
20  forms on the internet?
21      A.  I saw this when my mother said she
22  had Googled my name and this came up.  I

Page 26

1  flipped it up. I didn't read it.
2      Q.   When was that?
3      A.   I have no idea.
4      Q.   Was it years ago?
5      A.   About two or three years ago.
6      Q.   Beyond flipping it up, you said
7  you did not read it at that time?
8      A.   Right.
9      Q.   Now, the next sentence that I
10 read, just so -- because you did ask me to
11 reread the first sentence. Just so we are
12 clear, the next sentence says, "Although, the
13 health care professionals do their best to
14 communicate with the family, most parents do
15 not feel informed during this critical time
16 when the life of their child hangs in the
17 balance."
18      First of all, do you agree with
19 that statement?
20     A.   I don't agree the way it is
21 written. I think it is misleading the way it
22 is written. I think it takes a long period of

Page 27

1  time to get the families totally informed
2  about ECMO because it is a very complex
3  treatment. So you spend most of the ECMO run
4  meeting, talking to parents about what is
5  going on with their child. So, in ways they
6  are being informed as we are providing -- as
7  any therapy that we provide in the intensive
8  care unit, you can't inform them of every
9  aspect of care in one setting. You have got
10 to do that in multiple settings. As the child
11 is on, we spend discussions every day with
12 them at what the next step is, what is going
13 on, what is the outcome, based on that day's
14 data, and where we are going with that child.
15 So it is a continual, informed information
16 process with the parents.
17     Q.   Do I understand then that in any
18 given patient whose -- in any given patient,
19 and the family that you discuss what is going
20 on with ECMO, it is not simply the first time
21 the person is placed on the ECMO unit but
22 during the entire procedure, if you will, or

Page 28

1  the duration, that continuing information
2  about ECMO is being given to inform the
3  patient?
4      A.   Yes.
5      Q.   There is a paragraph, third from
6  the bottom, the bottom sentence, but in any
7  event it says "This virtual dialogue program
8  is currently installed in the neonatal
9  intensive care unit at Children's Hospital to
10 make this information available to parents
11 whose children are on ECMO. It is also being
12 used for pediatric intern and resident
13 training."
14      Let me ask you the first question,
15 is that correct, that this virtual dialogue
16 program was currently installed at the
17 neonatal intensive care unit?
18     A.   When this first came up, we had a
19 copy of it. We really never got this program
20 off the ground. It was based on a lot of
21 technology issues because the computers in the
22 NICUs didn't have DVD players. So we had one

Page 29

1  of our training individuals was going to use
2  it as one of her evaluation processes to see
3  if parents viewed it and felt like they had
4  more information. We really didn't get that
5  off the ground. She had a laptop that she was
6  bringing in and offered probably -- I actually
7  don't even remember how many parents had the
8  opportunity to look at it, but we didn't have
9  the technology to continue it and make it
10 available to every parent.
11     Q.   Does that mean that, in fact, it
12 was never installed in the neonatal intensive
13 care unit?
14     A.   Correct. It was in -- let me
15 correct that. It was installed on her laptop
16 and a handful of parents saw that. That is
17 all that happened.
18     Q.   When did these parents see it and
19 how many parents do you believe saw it on the
20 laptop?
21     A.   This was after the baby was on and
22 they were given the opportunity to view it.

Page 30

1.  **And I would say not more than -- I actually**
2.  **don't know how many parents, to be quite**
3.  **honest with you. It was less than five and it**
4.  **was technically too difficult to do because,**
5.  **as you go through it, it is a very lengthy**
6.  **process and we had no place for them to sit**
7.  **and do this in a private area. And, as you**
8.  **obviously have gone through it, you have to**
9.  **sit and ask me questions. So it was not**
10. **technically an environment that we could do it**
11. **in successfully.**
12.     Q.   The next sentence is, "It is also
13. being used for pediatric intern and resident
14. training." Was that true?
15.     A.   **That was the intent. And we**
16. **didn't, again, because of technical issues, we**
17. **never used it that way.**
18.     Q.   Well, let me ask you this, besides
19. what you stated with regard to statisticians,
20. et cetera, was one of the intents of the DVD
21. to actually provide an interactive informed
22. consent document for parents?

Page 31

1.      A.   **Not at all.**
2.      Q.   Was, in fact, an informed consent
3.  document that you created at Children's at any
4.  time that was to be reviewed and signed by the
5.  parents before ECMO was provided?
6.      A.   **We have gone -- we have had**
7.  **several versions of an informed consent. And**
8.  **the last version, and I don't remember at this**
9.  **time period which one we were using, but we**
10. **were using the surgical consent form with an**
11. **information sheet that goes to the parents.**
12.     Q.   Well, the information sheet, what
13. has been marked by Bates stamp 2422 of
14. Children's Hospital --
15.     A.   **Yes, this is the information sheet**
16. **and that is on the back side.**
17.     Q.   And the back side being 2423 which
18. is, basically, the diagram of the ECMO
19. procedure?
20.     A.   **Yes.**
21.     Q.   And is it your testimony that this
22. ECMO information sheet was given to the

Page 32

1.  parents before the child was placed on ECMO?
2.      A.   **It is my understanding, because**
3.  **this baby came from Norfolk, Virginia, and I**
4.  **don't know, to be quite honest, if this was**
5.  **given prior to cannulation. I know the baby**
6.  **was emergently transported here.**
7.      Q.   Let me ask you this. If
8.  Dr. Baumgart testified that the procedure was
9.  to provide the information sheet once the
10. patient was on ECMO, do you have a reason to
11. dispute that as a procedure?
12.     A.   **If we have the parents physically**
13. **here, which is very unusual, the consent would**
14. **be discussed with them and that would be**
15. **handed to them. The majority of the cases,**
16. **the parents are not here, they are at the**
17. **referring hospital, and so we don't have the**
18. **opportunity to give them this information**
19. **sheet. And when we transport the patient**
20. **using our transport team, our team will take**
21. **that sheet and leave it with the parents at**
22. **the time.**

Page 33

1.      **This baby was transported, my**
2.  **understanding by the Norfolk transport system.**
3.      Q.   So, that means on some occasions
4.  this ECMO information sheet is provided prior
5.  to the time ECMO is performed and sometimes it
6.  cannot be and is not?
7.      A.   **Correct.**
8.      Q.   Now, did you understand in this
9.  case that it was a number of days before this
10. patient was placed on ECMO after arriving at
11. Children's?
12.     A.   **Yes.**
13.     Q.   And in this case you really do not
14. know for a fact what documents were provided
15. for signature for the parents before the ECMO
16. began except for the surgical cannulation
17. sheet?
18.     A.   **Correct. I don't have any**
19. **knowledge of that.**
20.     Q.   First of all, did you have
21. anything to do with the creation of this
22. information sheet?

Page 58

1    Q.    So it is generally not the
2  myopathy by itself?
3    A.    It can be. But the sicker kids
4  have the pulmonary hypertension.
5    Q.    Just so I understand, the patients
6  with cardiomyopathy versus the pulmonary
7  hypertension, what is the role supposed in the
8  duration of ECMO in treating their condition?
9    A.    I am sorry, say that again.
10    Q.    For patients with persistent
11  pulmonary hypertension and cardiomyopathies,
12  what is the role of ECMO in that type of
13  patient? Is it a supportive care for an
14  interim period and then the patient recovers
15  without any particular intervention beyond
16  that? Or is there something else that is
17  planned for those patients?
18    A.    It is support. If you are talking
19  about it is caused by the infant of a diabetic
20  mother? Is that what you are saying?
21    Q.    Yes.
22    A.    It is a supportive therapy. The

Page 59

1  pulmonary hypertension has to resolve over
2  time. And then we take -- the babies usually
3  need quite a bit of support even off of ECMO
4  because of the cardiomyopathy but most of them
5  resolve over time. It is a life therapy. The
6  kids would die without it that have that
7  combination, pulmonary hypertension and
8  cardiomyopathy.
9    Q.    As far as the myopathy itself, is
10  it a spontaneous recovery as opposed to any
11  surgical intervention or any other type of
12  intervention?
13    A.    Yes.
14    Q.    By 2005, what was the overall
15  average duration patients were placed on ECMO?
16    A.    I would have to look that up. We
17  have ranged from five days and we are now at
18  eight days. So somewhere in between.
19    Q.    It appears, at least in the video
20  back in 1998, '99, it was five days. And do I
21  understand the average was somewhere between
22  that and eight days during all of the periods

Page 60

1  of time ECMO was being used?
2    A.    And depended on -- that is the
3  average of all of the kids. Different
4  diseases have different times. Different
5  babies have different time periods. And that
6  is the average.
7    Q.    Do you know or have a range for
8  the average of patients born of diabetic
9  mothers?
10    A.    No, I do not.
11    Q.    They run the gamut of time with
12  ECMO?
13    A.    They are variable because of the
14  cardiomyopathy.
15      They are also a very uncommon case
16  going on. So the data is not -- if you are
17  looking at a meconium, you have 40 percent,
18  and you feel comfortable saying seven, eight
19  days. But this is just a variable disease.
20    Q.    With regard to that, to the
21  disease, which is a child born of a
22  gestational diabetic, versus the pulmonary

Page 61

1  hypertension and cardiomyopathy, what patient
2  population are you talking about? Let's say
3  if we looked at 2003, 2005, how many kids were
4  on ECMO for those conditions?
5    A.    For that condition? I would have
6  to look it up.
7    Q.    Is it less than five?
8    A.    Yes.
9    Q.    By looking it up, is there
10  actually, if you will, a catalog of the types
11  of patients?
12    A.    Yes.
13    Q.    Do you actually have that in your
14  own records?
15    A.    That is quality review and we
16  review it all the time, look at outcomes.
17    Q.    As far as adverse events that
18  occur, what is the policy of Children's
19  Hospital reporting to ELSO?
20    A.    Adverse events? There is an ELSO
21  form and we participate in the registry so
22  that form is filled out.

# EXHIBIT K

# PATIENT SELECTION FOR ECMO

Conventional ventilatory management saves the lives of most neonates with respiratory failure. ECMO is currently used only for neonates who are responding poorly to optimal ventilatory, medical, and surgical treatment. We consider neonates for ECMO only if they have an estimated 80% or greater mortality risk despite our usual maximal therapy.

ECMO is a temporary artificial lung. If a neonate's respiratory disorder can be reversed within a 21 day period, it is feasible for ECMO to safely support the patient. After several days on ECMO, complications such as bleeding become more difficult to control. For this reason, it is not practical to use ECMO to treat a disease process such as bronchopulmonary dysplasia. One way to be certain that a neonate does not have significant BPD is to limit initiation of ECMO to the first ten to fourteen days of assisted ventilation, although it should be remembered that this is an arbitrary number and clinical evaluation should be the determining factor. A proper evaluation of the chest x-ray findings must be done before consideration for ECMO therapy. The common causes of respiratory failure in neonates are generally reversible with ECMO therapy within a few days.

Although many very-low-birth-weight infants have severe RDS and would appear to be good ECMO candidates, 40% of these infants will develop a hemorrhage in the germinal matrix or ventricles without the stress of ECMO. The heparinization and/or the alterations in pulsatility of blood flow created by ECMO causes a significant incidence of ICH, and thus a prohibitive mortality in this group of infants. Therefore, the infant considered for ECMO is usually $\geq$ 2000 grams or 34 weeks gestation. If lower gestational age infants are being considered as candidates for ECMO, the significant risk of ICH must be recognized and discussed with the parents.

Infants must be systemically heparinized on ECMO and therefore any bleeding complications such as a major intracranial hemorrhage (> grade II) should not be considered for ECMO. All attempts to correct coagulopathies should be done prior to ECMO.

All infants should have had attempts at routine therapy and have failed. Therapies such as oscillation if available, should be attempted before ECMO, if felt to be appropriate by the attending physician, because of the lower degree of complications with these procedures. Transporting on this type of ventilation is not feasible, so it is important to educate the referral hospitals on the need to consider this therapy at the ECMO Center. After maximal therapy has failed, criteria attempting to predict an 80% or greater mortality should be used. Each institution must develop their own criteria and each infant must meet criteria in that institution because of the differing therapeutic approaches.

At CNMC the alveolar-arterial oxygen gradient was found to be the best predictor or outcome at the time our program was initiated. This formula is listed below. We now use oxygenation alone due to the dramatic changes in therapies since the start of our program. Many institutions are now using the *oxygen index (OI)*.

$$OI = \frac{\text{mean airway pressure x } F_IO_2}{pO_2} \times 100$$

**NOTE:** All criteria are linked to time. No single value can predict outcome, therefore, $AaDO_2$ and OI over 4-12 hours are used to predict mortality. Because it is difficult to change criteria after you have instituted ECMO therapy, one must continuously reevaluate criteria on a

CNMC 02295

clinical basis. **At CNMC we now use a persistent PaO$_2$ <50 mmHg after maximal therapy.** Exceptions to this rule are infants who are cardiovascularly unstable, e.g., infants in septic shock, who may need to go on before they are profoundly hypoxic.

CNMC 02296

# EXHIBIT L

DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

1 (Pages 1 to 4)

---

**Page 1**

1        IN THE UNITED STATES DISTRICT COURT
2            FOR THE DISTRICT OF COLUMBIA
3                    - - -
4    TERESA A. MORRING     : CIVIL ACTION
5    and DESHAUNIA Q.      :
6    SNOWDEN, as Parents   :
7    and Next Friends of   :
8
9        Plaintiffs,  : JUDGE ROSEMARY M. COLLYER
10   VS.               :
11                     :
12   CHILDREN'S NATIONAL   :
13   MEDICAL CENTER,       :
14       Defendant.  : NO. 06-CV-02036
15
16                    - - -
17
18   DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
19       Philadelphia, Pennsylvania
20       MONDAY, DECEMBER 10, 2007
21            4:30 p.m.
22                    - - -

---

**Page 2**

1    Job No.: 118081
2    Pages 1-
3    Reported By: Robin Frattali
4
5
6            I-N-D-E-X
7
8    CAROLYN S. CRAWFORD, M.D.            PAGE
9
10       Mr. McConnell...........................6
11
12           Documents received and
13   EXHIBITS        marked for identification
14
15   Notice of Expert Witness Deposition, consisting
16   of four pages, received and marked for
17   identification Defendant's Exhibit 1.......Page 5
18
19   Plaintiff's Preliminary 26(B)(4) Statement,
20   consisting of six pages, received and marked for
21   identification Defendant's Exhibit 2.......Page 6
22

---

**Page 3**

1    Curriculum Vitae of Carolyn Stocker Crawford,
2    M.D., consisting of seventeen pages, received
3    and marked for identification Defendant's
4    Exhibit 3................................Page 38
5
6    EXHIBITS (Continued)
7
8    Letters to Dr. Carolyn S. Crawford from Newman,
9    McIntosh & Hennessey, LLP dated April 26, 2006,
10   December 5, 2007, December 3, 2007 and November
11   27, 2007, consisting of four pages, received
12   and marked for identification Defendant's
13   Exhibit 4................................Page 41
14
15   Operative Report, consisting of one page,
16   received and marked for identification
17   Defendant's Exhibit 5...................Page 149
18
19
20
21
22

---

**Page 4**

1            Deposition of CAROLYN S.
2    CRAWFORD, M.D., Witness, on behalf of the
3    Defendant, pursuant to the Federal Rules of Civil
4    Procedure, taken at Philadelphia International
5    Airport, U.S. Airways Club, Conference Room A,
6    Terminal B, 8000 Essington Avenue, Philadelphia,
7    Pennsylvania, December 10, 2007, commencing at or
8    about four-thirty o'clock p.m., Eastern Standard
9    Time, before Robin Frattali, Registered
10   Professional Reporter - Notary Public.
11                    - - -
12   APPEARANCES:
13
14       NEWMAN, McINTOSH & HENNESSEY, LLP
15       BY: ANTHONY G. NEWMAN, ESQUIRE
16       7315 Wisconsin Avenue
17       Suite 700 East Tower
18       Bethesda, Maryland 20814
19       (301)654-3400
20       Attorneys for Plaintiffs
21
22

DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

2 (Pages 5 to 8)

5

1    APPEARANCES (Continued):
2
3         JACKSON & CAMPBELL, P.C.
4         BY: NICHOLAS S. McCONNELL, ESQUIRE
5         1120 20th Street, Northwest
6         Suite 300
7         Washington, DC  20036
8         (202)457-1600
9         Attorneys for Defendant
10
11              - - -
12
13
14
15
16
17
18
19
20
21
22

6

1              CAROLYN S. CRAWFORD, M.D.,
2    having been duly sworn, was examined and
3    testified as follows:
4              - - -
5         MR. McCONNELL:  You can mark
6    this as Exhibit 1 and this Exhibit 2.
7              - - -
8         (Notice of Expert Witness
9    Deposition, consisting of four pages,
10    received and marked for identification
11    Defendant's Exhibit 1.)
12         (Plaintiff's Preliminary
13    26(B)(4) Statement, consisting of six pages,
14    received and marked for identification
15    Defendant's Exhibit 2.)
16              - - -
17    BY MR. McCONNELL:
18         Q.  Tell us your full name, if you would,
19    please.
20         A.  Carolyn S. Crawford --
21         Q.  You're a medical --
22         A.  -- M.D.

7

1         Q.  You're a medical doctor, licensed to
2    practice in New Jersey?
3         A.  New Jersey, that's correct.
4         Q.  Licensed anywhere else at this time?
5         A.  No.  I have an inactive license in
6    Pennsylvania.
7         Q.  Where are you presently practicing
8    medicine, if at all?
9         A.  Our Lady of Lourdes Medical Center,
10    based in Camden, New Jersey.
11         Q.  And what are you doing there in terms
12    of clinical practice at this time?
13         A.  The same thing I was the last time you
14    deposed me, but for the record, well, this past
15    week, I worked eighty hours, but I'm taking off
16    the next week, so it averages out to somewhere
17    between twenty and thirty-four hours clinically in
18    the nursery a week and then I work every third
19    night and every third weekend.
20         Q.  You're with a group called Lourdes
21    Neonatologists?
22         A.  Neonatal Associates.

8

1         Q.  Neonatal Associates.
2              How many members of Neonatal
3    Associates are on staff at Lourdes?
4         A.  Well, probably twenty, twenty-two,
5    twenty-three.
6         Q.  Is that distinct from a group called On
7    Site Neonatal Partners, Inc.?
8         A.  Well, On Site Neonatal Partners, Inc.
9    was an old name for the group that worked at
10    Rancocas Valley Hospital and when that hospital
11    was bought out or taken over by Lourdes, it became
12    known as Lourdes Medical Center of Burlington
13    County and On Site Medical Consultants, or
14    whatever their name was, ceased to exist and that
15    facility is covered by -- by the group now.
16         Q.  At this time, do you still estimate
17    that you earn approximately two hundred and fifty
18    thousand dollars a year from your total forensic
19    related activities, including review of medical
20    records, consulting with attorneys, testifying at
21    deposition, testifying at trial and so forth?
22         A.  Somewhere around there.

DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

7 (Pages 25 to 28)

25

1    Q.  Before that significant improvement
2  over the last several years, what was the
3  mortality rate in a range?
4    A.  You know, I don't know.  Most -- my
5  recall is that most of them made it.
6    Q.  Are you able to do any better than
7  fifty percent made it?
8    A.  It's more than fifty percent.
9    Q.  As high as eighty percent?
10    A.  Probably seventy to eighty percent.
11    Q.  All right.  And of the survivors, how
12  many of them survived but despite ECMO
13  intervention nonetheless had profound neurologic
14  impairment?
15    A.  I don't recall.
16        I recall, you know, babies that
17  have had neurological impairment that were on ECMO
18  because of like air emboli and complications of
19  the procedure, but I'm not familiar with those
20  statistics.
21        I don't think it's a high
22  percentage.

26

1    Q.  When you say it's not a high
2  percentage, you do not think there's a high
3  percentage of infants transferred from Lourdes for
4  ECMO therapy who survive but survive with profound
5  neurologic impairment?
6    A.  Correct.
7    Q.  Have you reviewed the prenatal records
8  for this patient?
9    A.  No.
10    Q.  Have you reviewed any of the --
11    A.  You know, I need to actually correct
12  something that I said.
13        When this baby actually got to
14  Children's, he probably didn't meet ECMO criteria
15  and he wasn't put on as some kind of emergency
16  patient.
17    Q.  When you say Children's, because there
18  are two Children's Hospitals involved, let's be
19  sure we make the distinction, you mean Children's
20  National Medical Center, Washington, DC?
21    A.  Right.  Right.  That's the only place
22  where he would have been able to go on ECMO.  They

27

1  didn't have it at Kings' Daughters.
2    Q.  All right.
3    A.  But he didn't really meet ECMO
4  criteria.
5    Q.  All right.  Which criteria did he not
6  meet?
7    A.  Well, he had really high PAO2.  I mean,
8  it was, you know, in the two hundreds, two hundred
9  and forty, something like that.
10        So that's a high enough number
11  that he would not have met ECMO criteria and he
12  wasn't immediately put on ECMO and he still had
13  good gases on the 12th and that was with nitric
14  oxide.
15    Q.  Do you in any way criticize the
16  decision that was made to place this child on ECMO
17  when it was made?
18    A.  Um.  I don't -- well, I think it was
19  kind of marginal.
20    Q.  On what basis do you say the decision
21  to place this child on ECMO at the time he was
22  placed on ECMO was, quote, marginal, close quote?

28

1    A.  The criteria that Children's uses now
2  is just if you have a persistent PAO2 of fifty or
3  less.
4    Q.  Let's stay away from now and let's talk
5  about September of 2005.
6    A.  Okay.  Well --
7    Q.  What are all the factors you point to
8  that lead you to state an opinion, to a reasonable
9  scientific certainty, that it was marginal to
10  place this child on ECMO at the time he was placed
11  on ECMO at Children's?
12    A.  Okay.  On the 13th he had gases that
13  were -- where he had a PAO2 of a hundred and
14  eighty-eight, a pH of seven point five-four, a
15  PCO2 of twenty-three, base deficit of minus one,
16  sats were ninety-eight to a hundred percent.
17    Q.  So with all that going on with the
18  arterial blood gases, you say it was a marginal
19  decision to place this child on ECMO?
20    A.  Oh, based on the gases.
21    Q.  All right.  I'm asking all the factors
22  that call you -- that lead you to opine that the

DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

8 (Pages 29 to 32)

**29**

1  decision to place this child on ECMO when he was
2  placed on ECMO at Children's was, quote, marginal,
3  close quote.
4          You've pointed to the blood
5  gases and I'm assuming from, what you've said,
6  they don't justify that decision at that time.
7          What else?
8      A.  Well, I think what led to the decision,
9  as I understood it, was that although they were
10  able to achieve some good blood gases, he did have
11  some desats and they were having to use pretty
12  high pressures on the ventilator, like fifty over
13  six and a hundred percent and nitric oxide at
14  twenty.
15          So he was -- he actually got
16  somewhat worse from the 11th to the 13th and
17  it was my understanding that based on that -- the
18  deterioration and failure to improve, that that's
19  why he was put on ECMO.
20      Q.  I'm asking you to tell me all of the
21  factors that you point to as a basis for your
22  opinion that it was marginal to place this child

**30**

1  on ECMO on September 13th, 2005.
2          So far you've cited blood gases
3  that on the 13th, as I take it you are
4  describing them, were within accepted ranges and
5  didn't require ECMO therapy?
6      A.  Right, but --
7      Q.  What else do you point to?
8      A.  Well, no, but he had -- he was having
9  desats.
10          So despite the blood gases,
11  because of the desats and the need for high
12  pressures, I believe that's what prompted the
13  decision to put him on ECMO.
14      Q.  Well, are you pointing to the desats as
15  a reason not to put this child on ECMO?
16      A.  No, I think that was the reason that
17  they put him on.
18      Q.  All right.  I'm asking you for all the
19  reasons you can -- the factual bases, all of the
20  factual bases you can point to for your opinion in
21  this case that it was marginal to place this child
22  on ECMO.

**31**

1          You've cited me a reason why it
2  would be appropriate to do that.  I want to know
3  all the reasons why that was a marginal decision
4  by his attending physicians.
5      A.  Well, they didn't push the nitric and
6  they were still on conventional ventilation and/or
7  hand bagging.  So they didn't put him on the
8  oscillator with nitric.
9      Q.  And the child had already been on the
10  oscillator with nitric, hadn't he?
11      A.  He had been on the jet.
12      Q.  Had he ever been on the oscillator?
13      A.  I don't think they ever tried high
14  frequency oscillator.  They just went from
15  conventional ventilator with nitric to -- this
16  is -- because he was needing more support they put
17  him on VA -- VA ECMO.
18      Q.  All right.  Is it your testimony that
19  the standard of care required first that they try
20  high frequency ventilator before placing this
21  child on ECMO, given all the things that were
22  going on?

**32**

1      A.  Well, it's usually done.
2      Q.  Is it your testimony that the standard
3  of care required that to be done in this case
4  before the child was placed on ECMO or do you
5  know?
6      A.  I think it would usually be done.  So I
7  think it's a...
8      Q.  And what would be the reasons for not
9  placing this child on a high frequency
10  ventilator --
11      A.  I don't --
12      Q.  -- as of September 13th?
13      A.  Because they say in their own patient
14  selection for ECMO that, as part of this child's
15  chart, that therapy such as oscillation, if
16  available, should be attempted before ECMO,
17  because you have a lower degree of complications
18  with those therapies.
19      Q.  Do you know if there were reasons why
20  in this case it was preferable to go to ECMO?
21      A.  I didn't see any stated.
22      Q.  Are there any other contraindications

DEPOSITION OF CAROLYN S. CRAWFORD, M.D.
CONDUCTED ON MONDAY, DECEMBER 10, 2007

9 (Pages 33 to 36)

33

1  to placing this child on ECMO as of September 13
2  other than the arterial blood gases and the fact
3  that he wasn't first tried on the high frequency
4  ventilator?
5          Any other facts you point to as
6  a basis for your opinion in this case that it was,
7  quote, marginal, close quote, for the attending
8  physicians to place this child on ECMO as of
9  September 13 or is that it?
10     A.  That's it.
11     Q.  Was there anything else going on with
12  this child from birth up to the point the decision
13  was made that pointed in the direction of needing
14  to place this child on ECMO as of September 13?
15     **A.  Well, he had a hypertrophic**
16  **myocardiopathy, but ECMO is not a particular cure**
17  **for that, and he had persistent pulmonary**
18  **hypertension, which is a common reason why**
19  **children are put on ECMO.**
20          **His hypoglycemia had been**
21  **resolved.**
22     Q.  Is that a reason to place him on ECMO?

34

1      A.  No.
2      Q.  All right.  I'd asked you, looking at
3  the record, are there factors from the time of his
4  birth up to the point he was placed on ECMO that
5  suggest that was, in fact, the correct
6  decision to make?
7      **A.  I think the main reason was the PPHN.**
8      Q.  And when you say the main reason to
9  place him on ECMO was the PPHN, was that because
10  the PPHN was not resolving despite all the other
11  attempts at all the different forms of therapy?
12     **A.  It would appear so, yes.**
13     Q.  Do you have any opinion as to whether,
14  in fact, this child's PPHN would have responded to
15  the high frequency ventilator therapy or do you
16  know?
17     **A.  I think it's possible that it would**
18  **have, but we -- you know, we'll never know.**
19          **It certainly would be lower**
20  **pressures than what they were using with a**
21  **conventional ventilator and with hand bagging.**
22     Q.  Other than stating it's possible his

35

1  PPHN would have responded to high frequency
2  ventilator therapy, are you able to quantify that
3  in any other way?
4      A.  No.
5          **It just was -- it was a**
6  **reasonable step to take as defined by Children's**
7  **Hospital and since he didn't go on ECMO until six**
8  **days of age, they had ample time to implement**
9  **oscillator therapy along with nitric.**
10     Q.  Would there be any particular risks to
11  this infant in placing him on oscillator therapy
12  with nitric?
13     **A.  I don't think so.  Less risky than**
14  **ECMO.**
15     Q.  You had said earlier they already had
16  nitric oxide at twenty.
17          What is the outer limit?
18     **A.  I've seen it used up to forty.**
19     Q.  Where have you seen someone do that?
20     **A.  I've seen it -- well, in the**
21  **literature.**
22     Q.  Again, I take it this wouldn't be in

36

1  your own practice because you don't actually treat
2  ECMO babies?
3      **A.  But we use nitric.  You asked me a**
4  **question regarding the parts per million of**
5  **nitric.  Personally, I've not gone over twenty,**
6  **but I know that others have.**
7      Q.  Is it your opinion in this case that
8  they should have gone over twenty on the nitric
9  for this child?
10     **A.  I think that was a consideration.**
11     Q.  Well, that's a consideration.
12          Is it your opinion that the
13  standard of care required the oscillator to be done?
14     **A.  I think it required -- I think the**
15  **standard of care required the oscillator to be**
16  **tried and I think it was, you know, plus minus**
17  **about increasing the nitric.**
18     Q.  When you say plus minus about
19  increasing the nitric, are you saying it was not
20  within the standard of care not to increase the
21  nitric?
22     **A.  It was -- I don't think it was**

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - - - - -x
TERESA A. MORRING and
DESHAUNIA Q. SNOWDEN, as
Parents and Next Friends of
Q.E.S., a Minor,

    Plaintiffs,

            Index No.

 -against-

           06CV02036

CHILDREN'S NATIONAL MEDICAL
CENTER,

    Defendant.
- - - - - - - - - - - - - - - - - - - - - -x


    DEPOSITION of MELVIN H. VAN WOERT, M.D., taken

by Defendant, held at the offices of Fink & Carney

Reporting and Video Services, 39 West 37th Street, New

York, New York 10018, on Friday, January 4, 2008,

commencing at 10:56 a.m., before Jean Wilm, a

Registered Professional Reporter, Certified LiveNote

Reporter and Notary Public within and for the State of

New York.

Page 2

```
 1
 2  A P P E A R A N C E S:
 3
 4      NEWMAN, McINTOSH & HENNESSEY, LLP
           Attorneys for Plaintiff
 5         7315 Wisconsin Avenue
           Suite 700 East Tower
 6         Bethesda, Maryland 20814
 7      BY:  ANTHONY G. NEWMAN, Esq.
 8
 9      JACKSON & CAMPBELL, PC
           Attorneys for Defendant
10         1120 - 20th Street, NW
           South Tower
11         Washington, DC 20036-3437
12      BY:  NICHOLAS S. McCONNELL, Esq.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
                    Van Woert
 1
 2      A    Not now.
 3      Q    Where have you previously been
 4  licensed?
 5      A    In Illinois.
 6      Q    When did that license last -- when
 7  was it last in effect?
 8      A    I had that from my residency at
 9  University of Chicago, and then after that, I
10  didn't renew it.
11      Q    Your residency ended when?
12      A    '60.  1960, I believe.
13          MR. McCONNELL:  You are
14      reaching for a piece of paper to help
15      remind us of some details.
16          Can we have this marked as
17      Deposition Exhibit 1?
18          (Curriculum Vitae was marked
19      as Deposition Exhibit 1 for
20      identification, as of this date.)
21  BY MR. McCONNELL:
22      Q    The court reporter has now marked as
23  your Deposition Exhibit 1, a document you just
24  handed to me entitled "Curriculum Vitae,
25  Melvin H. Van Woert, MD."
```

Page 3

```
 1                  Van Woert
 2
 3  D R.   M E L V I N   H.   V A N   W O E R T,
 4      called as a witness, having been first duly
 5      sworn/affirmed by Jean Wilm, a Notary Public
 6      within and for the State of New York, was
 7      examined and testified as follows:
 8  EXAMINATION
 9  BY MR. McCONNELL:
10      Q    Doctor, would you tell us your full
11  name, please?
12      A    Melvin H. Van Woert.
13      Q    Your residence address?
14      A    752 Ridgewood Road in Millburn, New
15  Jersey.
16      Q    How long have you lived there?
17      A    About four years.
18      Q    And your current professional
19  address?
20      A    Mount Sinai Medical Center, Fifth
21  Avenue, 100 Street, New York New York.
22      Q    You are a physician licensed to
23  practice in the State of New York?
24      A    That's correct.
25      Q    Are you licensed anywhere else?
```

Page 5

```
 1                  Van Woert
 2      Is this a complete, current,
 3  accurate copy of your CV?
 4      A    Yes, I believe I can say that's -- I
 5  haven't changed it in a lot of years, but as far
 6  as I know, it's fairly current.  I mean, it has
 7  most everything in it.
 8      Q    Does this include all of your
 9  publications and research projects?
10      A    All of the publications, yes.  Not
11  all the grants.  I didn't put that in.  And that's
12  not totally complete, the last page.
13      Q    Are you currently in clinical
14  practice of any kind?
15      A    Yes.  Outpatient clinic, medical.
16      Q    Outpatient medical clinic?
17      A    Yes.
18      Q    Here at Sinai Hospital?
19      A    Mt. Sinai, uh-huh.
20      Q    You need to say yes or no.
21      A    I'm sorry.
22      Q    You need to say yes or no.
23      A    I'm sorry.  Thank you.  Yes.
24      Q    What type of patients do you see at
25  this clinic?
```

Page 54

Van Woert

1
2    A    That's correct, yes. I believe
3  those documents you are looking at now came from
4  those -- were copies of what was in here, and so I
5  took them separately and made a copy.
6    Q    So you pulled this aside because it
7  had some particular significance to your review of
8  the case?
9    A    Relevant to my testimony, yes.
10    Q    And then you have also included in
11  this group of materials of particular relevance to
12  your testimony a document styled "Table 1, General
13  Inclusion/Exclusion Criteria for ECMO," correct?
14    A    Correct.
15    Q    This doesn't indicate on its face
16  the source of this particular document.
17        Do you know whether this is
18  Children's or ELSO or what the source is?
19    A    I don't think it is Children's. It
20  may be ELSO. I'm not sure.
21    Q    Again, do you have any medical
22  training, knowledge, experience, or expertise with
23  respect to the decision-making process as to when
24  or under what circumstances an infant is to be or
25  a recommendation is to be made that an infant

Page 55

Van Woert

1
2  should be taken off all conventional forms of
3  therapy and recommended for ECMO?
4        Do you have any knowledge, training,
5  expertise, experience, whatsoever, in making that
6  decision?
7    A    The information that was provided to
8  me lists many of the criteria that are used and I
9  did read these.
10    Q    So you read those.
11        Have you ever discussed, or do you
12  know whether the use of particular criteria vary
13  in the clinical judgement of neonatologists who
14  are expert in this field depending upon the
15  underlying medical conditions or pathology that
16  brings the infant to the hospital in the first
17  instance for consideration for ECMO?
18    A    I think that's discussed in the
19  documents, yes. For example, in this last
20  document that we identified, the general
21  inclusion/exclusion material for ECMO, there are
22  references here to ranges of PAO2.
23    Q    Do you know, for example, whether
24  those ranges and that criterion is applicable to
25  an infant who presents with the specific

Page 56

Van Woert

1
2  underlying abnormalities that this child had?
3        Do you know whether clinicians would
4  apply that particular criterion to a decision
5  whether to put this infant on ECMO?
6    A    From the information provided that
7  these criteria are used even for this infant.
8    Q    What was this infant's condition
9  that placed him in a position where ECMO therapy
10  became a consideration?
11    A    He had both cardio and respiratory
12  difficulties.
13    Q    Is that all that is relevant to an
14  attending physician's determination whether to
15  recommend the institution of ECMO therapy, simply
16  that they have cardiorespiratory difficulty?
17    A    The diagnosis in terms of the
18  prognosis would be important.
19    Q    Do you know whether, in fact, in
20  practice it makes a difference among
21  neonatologists confronting a decision whether to
22  recommend ECMO therapy that the child initially
23  presents to the hospital as a result of a meconium
24  aspiration syndrome as compared with, as in this
25  case, an infant presenting with a cardiomyopathy,

Page 57

Van Woert

1
2  a hypertrophic cardiomyopathy? Does it make any
3  difference in terms of selecting or applying the
4  various criteria that you have seen? Do you know?
5    A    I think these criteria are applied
6  to all of the cases. One would also consider
7  other aspects of the clinical course of the child
8  as well. I mean, there are other factors. There
9  are obviously different diagnoses, different
10  prognoses.
11    Q    My question is a somewhat different
12  question, Doctor.
13        Do you know as a result of either
14  your experience, your training, your communication
15  with other physicians, whether the selection or
16  application of these criteria varies depending
17  upon the underlying pathology or condition that
18  brings the child or infant to the hospital for
19  consideration for ECMO? Do you know?
20        MR. NEWMAN: Objection. He
21        answered the question.
22    A    I thought I answered the question.
23  I thought I said that these criteria would still
24  be used, but other factors could also be involved.
25    Q    Do you have any source of

Page 62

Van Woert

2    separate studies --
3    A    Yes, I saw them.  I saw both of
4  those.
5    Q    Those were, as you understand it,
6  research studies that would fall within the scope
7  of the CFR discussion of informed consent on human
8  subjects, true?
9    A    That's true.
10    Q    You also have pulled out a document,
11  two-page document styled as "Guidelines for
12  Writing Informed Consent"?
13    A    Yes, I think when I was looking for
14  the first one, I ended up with that one as well,
15  and I just threw it in there because I think it is
16  pretty much the same thing, but the other one has
17  the source of it.
18    Q    Where did this document come from?
19    A    That came off a Web page, and I
20  probably should have tossed it out because it is
21  the same thing as the other one.
22    Q    This came off a Web page that says
23  "For further information, contact Ms. Renee Jones,
24  grant officer."  Is that at Sinai Hospital?
25    A    No.

Page 63

Van Woert

2    Q    Where is that?
3    A    I'm not sure where that is.
4    Q    What Web page did it come from?
5    A    I don't know the exact Web page.  I
6  was looking myself to find -- it came at the time
7  I was looking for the other document, the first
8  one you pulled out, and that one came along with
9  it.  That is also the same idea.
10    Q    The next document you put in the
11  pile of particularly relevant documents is, it
12  looks to me, from a Website at the National Cancer
13  Institute, and the document is styled "A Guide to
14  Understanding Informed Consent," correct?
15    A    That's correct.
16    Q    There is no date on this.  When did
17  you visit the NCI Website?
18    A    They all -- all three of those came
19  at the same time.
20    Q    When you say "all three of those
21  came at the same time," where did you get them
22  from?
23    A    From the Web page related to the
24  federal government guidelines for the informed
25  consent for research.

Page 64

Van Woert

2    Q    The next document you've pulled
3  aside as particularly relevant to your
4  testimony -- I don't know.  This is a document
5  relating to newborn circumcision.
6        Was that of any particular
7  relevance?
8    A    No, they all came -- they all were
9  sent to me together and referred to informed
10  consent.
11    Q    Then the next documents that you
12  have pulled aside are the consent forms at
13  Children's, one to consent to participate in a
14  clinical research study.
15        This study is evaluation of serum
16  iron and iron storage levels in neonates
17  undergoing ECMO; is that correct?
18    A    That's correct.
19    Q    And that is a five-page document,
20  correct?
21    A    That sounds right, yes.
22    Q    Signed by Ms. Morring on
23  September 13, 2005, and also signed by
24  Dr. Rais-Bahrami on September 13, 2005, concerning
25  the informed consent conversation related to this

Page 65

Van Woert

2  particular study evaluation of serum iron, and so
3  forth, correct?
4    A    That's correct.
5    Q    Do you assume from the signatures on
6  the page dated as of September 13, 2005, by both
7  Ms. Morring and by Dr. Rais-Bahrami that that
8  conversation did occur on September 13, 2005?
9        MR. NEWMAN:  You are asking
10      him about reference to a telephone --
11        MR. McCONNELL:  No, I'm asking
12      my question.
13    Q    Do you assume based on the fact that
14  this document has been signed both by Ms. Morring
15  on September 13, 2005, and by Dr. Bahrami on
16  September 13, 2005, on that date there was a
17  discussion between them as to this particular
18  consent form and clinical research study?
19    A    I found it somewhat confusing
20  because there is a witness signing on 9/11.  I
21  understand there was a telephone consent obtained
22  initially on some of this, but my understanding is
23  that the parent did sign on the 13th.
24    Q    Do you have an understanding based
25  on Dr. Bahrami's signature on September 13th

Page 66

Van Woert

1  
2 where he is certifying that he has explained this
3 to the patient that, in fact, in the ordinary
4 course that would signify that he had that
5 conversation with, and the explanation of the
6 procedure with the patient's mother in this
7 instance on this date, September 13th?
8    A    That's what he signed, yes.
9    Q    And you would assume in the ordinary
10 course of events, he would sign that as of the
11 date and time he is engaged in this conversation
12 with the patient, true?
13    A    That should be -- it should be done
14 that way, yes.
15    Q    This was originally noted as a phone
16 consent obtained as you pointed out on
17 September 11, 2005, and there is a witness to
18 that.
19       Where was this patient on
20 September 11, 2005?
21    A    The patient was admitted on the
22 9/11/2005.
23    Q    Where was the patient, if you have
24 any understanding, as of the time the person who
25 has served as a witness to this the signature, and

Page 67

Van Woert

1  
2 it looks like it may be Jardena Lewis, MD -- where
3 was this doctor at the time this telephone
4 conversation occurred on September 11, 2005?
5    A    I don't know where the doctor was.
6    Q    Where was Ms. Morring or the father
7 of this baby at the time this conversation
8 occurred, if you know?
9    A    I don't know.
10    Q    Do you know what was going on
11 medically with this baby at the time this
12 conversation documented as having been taken -- as
13 having occurred on September 11, 2005 -- do you
14 know what was going on with the baby at that time?
15    A    There is no hour on there, I don't
16 believe, so the baby was admitted that day. Now,
17 I don't know --
18    Q    Is it your understanding and belief
19 that as of the time the doctor who witnessed this
20 procedure as having obtained the telephone
21 consent, the form itself specifically stating
22 quote, phone consent obtained, close quote, is it
23 your understanding by this time the baby and
24 Ms. Morring had arrived at Children's and the
25 doctor was phoning them from somewhere within the

Page 68

Van Woert

1  
2 hospital? Is that your understanding?
3    A    I would presume so, but I don't
4 know. I don't know where they were.
5    Q    Then the other document in this
6 group of documents is another document from
7 Children's Hospital. This one is entitled
8 "HIPAA/IRB Agreement for Use and Disclosure
9 (Sharing) in a Clinical Research Study," and the
10 title of the study is "Evaluation of Serum Iron
11 and Iron Storage Levels in Neonates undergoing
12 ECMO," correct?
13    A    Correct.
14    Q    This document, the HIPAA/IRB
15 agreement for use and disclosure (sharing) refers
16 back to the same consent to participate in a
17 clinical research study we were previously
18 discussing on evaluation of serum iron and iron
19 storage levels, correct?
20    A    That's correct.
21    Q    So those two documents are related?
22    A    They are related.
23    Q    And, again, you see that that
24 document was over on the second page signed by
25 Ms. Morring on September 13, 2005, correct?

Page 69

Van Woert

1  
2    A    It was signed on September 13th,
3 yes. The witness was September 11th.
4    Q    Well, on this document is there a
5 separate witness -- there is no separate witness
6 signature; is there?
7       MR. NEWMAN:  The same woman,
8    it looks like Lewis MD, page 49, the
9    front page, but then the second page
10    is this. He might not have had it
11    connected the same.
12       MR. McCONNELL:  That is part
13    of the first document.
14       MR. NEWMAN:  All right.
15       MR. McCONNELL:  That is a five
16    page -- that is page 5 of 5 of the
17    first document, right, Doctor?
18       MR. NEWMAN:  I just did it in
19    the order -- here it is, this one.
20    Q    Now, this is a two-page document,
21 HIPAA/IRB, do you agree?
22    A    Yes.
23    Q    She signed that on the 13th, true?
24    A    That's true.
25    Q    The next document in this series of

Page 70

Van Woert

1
2   documents is entitled "Consent to Participate In a
3   Clinical Research Study," and the title of this
4   study is "Monitoring Continuous Amplitude
5   Integrated EEG," et cetera, correct?
6       A    Correct.
7       Q    This, again, is a five-page
8   document, correct?
9       A    Correct.
10      Q    This document on the last page shows
11  that there was an informed consent discussion
12  between a Dr. Jordana Levik and Ms. Morring on
13  September 11, 2005, correct?  By telephone?
14      A    Well, it looked like to me like a
15  person containing consent is Jordana Fenik?
16      Q    I'm sorry.  Fenik.  You are correct.
17  F-e-n-i-k.  Fortunately she actually printed it
18  out so we can read.
19      A    Yes, that's on the 11th, and the
20  signature was on the 13th.
21      Q    And Ms. Morring then signed this
22  document on September 13, correct?
23      A    That's correct.
24      Q    Do you have any knowledge one way or
25  the other as to any further discussions that may

Page 71

Van Woert

1
2   have occurred between September 11 and
3   September 13 between Dr. Fenik or any of the other
4   healthcare providers at Children's National
5   Medical Center and Ms. Morring concerning the
6   status of her infant, the treatments that had been
7   instituted, the efficacy of those treatments, the
8   need to consider other forms of treatment, the
9   risks or benefits of the particular treatment then
10  underway as opposed to the risks or benefits of
11  proposed further treatment such as ECMO and
12  participation in either of these research studies?
13      Do you have any knowledge or
14  information one way or the other as to whether
15  there were a series of conversations over those
16  two -- over that two- to three-day period?
17          MR. NEWMAN:  I have to place
18      an objection.
19      Q    Concerning those issues.  Do you
20  have any information?
21          MR. NEWMAN:  My objection is
22      it's extremely complex and compound,
23      more importantly, you are asking if
24      the doctor who did the research
25      protocol did those other things?

Page 72

Van Woert

1
2           MR. McCONNELL:  Sure.
3   BY MR. McCONNELL:
4       Q    Do you have any knowledge one way or
5   the other whether there were discussions between
6   the healthcare providers on those issues between
7   September 11th and the time Ms. Morring signed
8   this document on September 13th?
9           MR. NEWMAN:  You are asking in
10      the normal course of business which
11      those things should be converted to
12      writing --
13          MR. McCONNELL:  That is way
14      out of order.
15          MR. NEWMAN:  We know you have
16      no evidence of those things happening,
17      but the fact is he would be looking
18      for evidence --
19          MR. McCONNELL:  This is way
20      beyond an objection.  Mr. Newman,
21      please.
22  BY MR. McCONNELL:
23      Q    Do you, as you sit here, have any
24  information one way or the other as to whether
25  there were such communications with this parent?

Page 73

Van Woert

1
2       A    I reviewed the medical charts that
3   were sent to me, and I found no reference to
4   conversations between the doctor and the mother.
5       Q    So you don't see anything anywhere
6   in the records reflecting any communications
7   between any of the healthcare providers and the
8   parent, the mother in particular of this child,
9   between September 11 and September 13th, and you
10  have done a very careful review and see no such
11  information; is that correct?
12      A    No, I have not seen it, no.
13      Q    Is it your understanding that when a
14  patient arrives at a pediatric hospital and is
15  placed in a NICU and is under consideration for
16  ECMO that the attending neonatologist generally
17  don't speak to the parents?  Is that your
18  experience or knowledge?
19      A    That they don't?
20      Q    That they don't.
21      A    I think they do.
22      Q    You told me before you haven't, but
23  I was wondering, do you have any idea as to how
24  intensive the involvement is of the care providers
25  for a patient that is undergoing ECMO?

19 (Pages 70 to 73)

Page 74

Van Woert

1
2     A    I believe so.
3     Q    Tell me about it.
4     A    They have to be supervised for 24
5  hours of the day.
6     Q    When you say "supervised," first,
7  who are on the healthcare team caring for a
8  patient?
9     A    I'm not an expert in this area.
10        What I can tell you is what was done
11  here, and they did have an attending, a
12  neonatologist, Dr. Bahrami was on the floor at
13  least during the day, and then they had a
14  technician who was monitoring the machine, and
15  there is a lot of information coming out of that
16  machine that they have to follow.  There are
17  nurses that are helping out on this.  So it is an
18  intensive procedure both manpower and, of course,
19  instrument and monitoring.
20     Q    When this patient was transferred
21  into -- do you know where the patient was born?
22     A    Where he was born?
23     Q    Yes.
24     A    No, I don't.
25     Q    Did you ever see the birth records?

Page 75

Van Woert

1
2     A    No, I did not.
3     Q    Did you see the pediatric records
4  for the neonatal admission of this record
5  following birth?
6     A    No, I didn't.
7     Q    Do you have any idea what was going
8  on at the birth hospital with this baby?
9     A    Only from the birth records that you
10  see here.
11     Q    Do you know how many days this baby
12  was at the birth hospital before he was
13  transferred to Children's?
14     A    I believe it was six days, is my
15  memory.
16     Q    Do you know based on those records
17  whether the physicians at the birth hospital had
18  reached the opinion that all conventional therapy
19  had failed and the child needed to be transferred
20  to Children's for consideration of ECMO?
21     A    Yes, I did not see those records of
22  the first hospital, so I know the usual procedure
23  is that if they feel ECMO is a possibility, they
24  would transfer them sooner rather than later.
25     Q    Why is that?

Page 76

Van Woert

1
2     A    Because it is possible that it would
3  be difficult to transfer them when they actually
4  do need the procedure.
5     Q    Is there any consideration in terms
6  of the determination as to the time at which an
7  infant should be placed on ECMO whether there is a
8  window in the patient's progress from birth to a
9  decision on ECMO where if the patient doesn't get
10  to ECMO, it becomes a futile therapy?  In other
11  words, one that would not work?
12     A    What you are describing is a very
13  complicated procedure to evaluate the patient, and
14  there are a number of factors, and, in general,
15  time is on their side because they are really
16  looking for healing of this cardiopulmonary
17  dysfunction.
18     Q    So you think in a patient like this
19  patient where a conventional therapy is not
20  adequately sustaining levels of perfusion, time
21  nonetheless remains on the side of the patient?
22        MR. NEWMAN:  Objection.  Those
23     are your words and your assumption.
24        MR. McCONNELL:  That is my
25     question to the doctor.

Page 77

Van Woert

1
2     A    No, I'm saying that if they can keep
3  the child in adequate cardiopulmonary function
4  without ECMO, that would be preferable, and I
5  think that is part of the issue here as to whether
6  there was an immediate need, no one knows the
7  future, put him on ECMO, but whether there was an
8  immediate need.  The child was transferred so that
9  could be evaluated and decided when or if ECMO
10  would be necessary.
11     Q    So even after -- based on your
12  review of the record, and while you are not an
13  expert in the field, you would agree that even
14  after this child arrived at Children's, the care
15  providers at Children's attempted for at least two
16  more days to sustain this child on conventional
17  forms of therapy, true?
18     A    They were for two days, yes.
19     Q    They didn't rush this kid
20  immediately from the transfer hospital into the
21  Children's National Medical Center and immediately
22  put this child on ECMO, did they?
23     A    Well, they got consent for it.
24  Consent for ECMO immediately when they came in
25  without evaluating how their conventional therapy

Page 78

Van Woert

1
2 would work.
3    Q   Can you think of a reason why that
4 would be the necessary way to proceed given the
5 particular circumstances in this case; that is,
6 why it would be necessary to obtain as a
7 precautionary measure telephone consent from
8 parents under these circumstances?  Do you know
9 what was happening?
10    A   Well, I think they hadn't evaluated
11 it, so I don't think they knew whether the child
12 needed ECMO or not during that hospitalization.
13    Q   Do you know whether under these
14 circumstances it was a likelihood that upon
15 arrival at Children's, this child in the judgement
16 of the attending physicians at the birth hospital
17 would need to be placed on ECMO promptly?  Do you
18 know one way or the other?
19       MR. NEWMAN:  You are asking if
20    he knew it was a likelihood in the
21    judgement of someone else's mind?
22    Q   Do you know what the physicians at
23 the transferring hospital were communicating to
24 the physicians at Children's about this child's
25 status?

Page 79

Van Woert

1
2    A   No.  I told you I did not see those
3 records but being transferred for ECMO does not
4 mean they have to go right on ECMO or within a
5 couple of days.
6       Now, I think the consent form, I had
7 a problem in that they were saying immediately
8 that this child was going on ECMO, and that is on
9 that -- if you want --
10    Q   Do you know --
11       MR. NEWMAN:  Let him finish.
12    A   I don't have the consent form in
13 front of me now.
14    Q   Any time you need a document, let me
15 know.
16       MR. NEWMAN:  You have them
17    sorted in your way, go ahead.
18    A   It says, this is on the consent to
19 participate in a clinical research study,
20 evaluation of serum iron -- what we referred to
21 before, and it says on the second page, "Your baby
22 is being asked to be in this study because he or
23 she is going to be placed on ECMO."
24       It's like they made the decision
25 just because the child is transferred to

Page 80

Van Woert

1
2 Children's Hospital, and they next say your baby
3 is about to go on ECMO in the NICU at Children's
4 Hospital.  To me this does not seem appropriate.
5       This suggests that maybe that's why
6 their child did go on ECMO after two days, is that
7 they had already made the decision.
8    Q   Do you believe that, Doctor?  Do you
9 believe that?
10       Is that your testimony here under
11 oath, that you think that the doctors at
12 Children's were irresponsible and reckless
13 concerning a determination on the 13th as to
14 whether the child really needed to be on ECMO
15 because they had already committed to ECMO on the
16 11th?  Is that your testimony?
17       MR. NEWMAN:  Objection to the
18    terminology.
19    A   I think the consent form is saying
20 that this child is going on ECMO.
21    Q   Do you know whether there are
22 circumstances given the particular presentation of
23 these infants, particularly if it involves a
24 transfer over distances -- let me ask you again:
25 Do you have any idea as you sit here today and

Page 81

Van Woert

1
2 make these judgments about the physicians at
3 Children's, how far away the parents were at the
4 time that this child landed at the neonatal
5 intensive care unit in Washington DC?
6    A   No, I do not.
7    Q   Do you know what their plans were in
8 terms of when they would first be able to arrive
9 in Washington DC?
10    A   No, I do not.
11    Q   Do you know whether given the
12 child's status during the time of transfer whether
13 it was reasonably foreseeable that this child's
14 condition would change or could change between
15 that period of time between his arrival at
16 Children's and between the time the parents could
17 arrive when it would be necessary to place this
18 child on ECMO?  Do you know?
19    A   I don't think anyone knows.
20       MR. NEWMAN:  Also, Counsel,
21    you did ask him to assume that the
22    mother was there at the time of the
23    9/11.  Now you are saying that the
24    mother wasn't there, which is a true
25    statement.

# EXHIBIT N

| DATE/ TIME | Education Plan:  Reviewed: ☐   Updated: ☐   Continue as planned: ☐   N/A: ☐ | INITIALS |
|---|---|---|
| .505 | RN Focus Note: | |
| 1930 | P3/P4 (Alt in Cardiac Function / Gas Exchange. | |
| | D: Recv'd this am orally intubated on mechanical vent | |
| | See RT flowsheet for settings. At 1230 pm infant had | |
| | prolonged desats & to 70's c̄ ↓ PO₂. Hand bagged for | |
| | prolonged times, placed on oscillator c̄ sats continuing | |
| | to be in 80's. Hand bagged ~ 15-20 min. Placed back on | |
| | mechanical ventilator. Infant unable to maintain sats > 90% | |
| | Infant became hypotensive c̄ MAPs in 40's. Albumin | |
| | fluid bolus given. Still unable to maintain sats > 90%. | |
| | A: Placed on V/A ECMO by surgical team | |
| | R: Up to 60% bypass. Incision site c̄ small amt of | |
| | sanguinous drainage. PO₂ 70 on initial ABG p̄ ECMO. | |
| | Pulses +2/+1. Remains pale. On minimal vent settings | |
| | weaning NO 116°. Infant tolerated procedure well. | |
| | Care ongoing. UAC placed by NNP! ——— RRCarter RN | |

CNMC 00380

CNMC458 back (9/03)

# EXHIBIT O

COPY

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
CIVIL ACTION NO. 06-2036 (RMC)

----

TERESA MORRING, et al.,              DEPOSITION UNDER
        Plaintiff,                   ORAL EXAMINATION
        VS.                                 OF
                                        PHILIP SAX

CHILDREN'S NATIONAL MEDICAL
CENTER, INC.,

        Defendants.

----


        REPORTED BY: SHOSHANA HIRSCH, CCR


        Transcript of the deposition of PHILIP

SAX, called for Oral Examination in the

above-captioned matter, said deposition taken

pursuant to Superior Court Rules of Practice and

Procedure by and before SHOSHANA HIRSCH, a Certified

Court Reporter and Notary Public for the State of

New Jersey, at the offices of SAIBER SCHLESINGER

SATZ & GOLDSTEIN, LLC, ONE GATEWAY CENTER, NEWARK,

NEW JERSEY 07102, on Monday, January 28, 2008,

commencing at 10:16 a.m.


                    DepoLink
        Court Reporting & Litigation Support Services
            Phone (973) 353-9880 Fax (973) 353-9445

2 (Pages 2 to 5)

|  | Page 2 |
|---|---|
| 1 | APPEARANCES: |
| 2 | NEWMAN, MCINTOSH & HENNESSEY, ESQS. |
|  | BY: ANTHONY NEWMAN, ESQ. |
| 3 | 7315 Wisconsin Avenue |
|  | Suite 700 E |
| 4 | Bethesda, Maryland 20814 |
|  | 301-654-3400 |
| 5 | anewman@nmhlaw.com |
|  | Counsel for the Plaintiff |
| 6 |  |
|  | JACKSON & CAMPBELL, P.C. |
| 7 | BY: NICHOLAS S. MCCONNELL, ESQ. |
|  | 1120 Twentieth Street N.W. |
| 8 | South Tower |
|  | Washington D.C. 20036 |
| 9 | 202-457-1600 |
|  | Counsel for the Defendants |
| 10 |  |
|  | SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC |
| 11 | BY: THEODORE D. ADEN, ESQ. |
|  | One Gateway Center |
| 12 | 13th Floor |
|  | Newark, New Jersey 07102 |
| 13 | 973-622-3333 |
|  | tda@saiber.com |
| 14 | Counsel for Maquet |
| 15 | SAIBER SCHLESINGER SATZ & GOLDSTEIN, LLC |
|  | BY: JEFFREY W. LORELL, ESQ. |
| 16 | One Gateway Center |
|  | 13th Floor |
| 17 | Newark, New Jersey 07102 |
|  | 973-622-3333 |
| 18 | jwl@saiber.com |
|  | Counsel for Maquet |
| 19 |  |
|  | ALSO PRESENT: |
| 20 | Jamie Yich, Maquet employee |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 4 |
|---|---|
| 1 | EXHIBITS CONT' |
| 2 | NO.    DESCRIPTION    PAGE |
| 3 | Maquet-15 Updated Instructions,    53 |
|  | Bates Stamp 147-153 |
| 4 |  |
|  | Maquet-16 Roller Pump Safety Harness    53 |
| 5 |  |
|  | Maquet-17 Brochure from Maquet    54 |
| 6 |  |
| 7 |  |
| 8 |  |
| 9 |  |
| 10 |  |
| 11 |  |
| 12 |  |
| 13 |  |
| 14 |  |
| 15 |  |
| 16 |  |
| 17 |  |
| 18 |  |
| 19 |  |
| 20 |  |
| 21 |  |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

|  | Page 3 |
|---|---|
| 1 | INDEX |
| 2 | Testimony of: PHILIP SAX |
| 3 | Direct   Cross   Redirect   Recross |
| 4 | By Mr. Newman |
| 5 | By Mr. McConnell |
| 6 |  |
| 7 |  |
| 8 | EXHIBITS |
| 9 | NO.   DESCRIPTION    PAGE |
| 10 | Maquet-1  Confidentiality Agreement    5 |
| 11 | Maquet-2  Amended Notice of Deposition    5 |
| 12 | Maquet-3  Mr. Sax's Curriculum Vitae,    7 |
|  | Bates Stamp 01 |
| 13 |  |
|  | Maquet-4  Bates Stamp 162    7 |
| 14 |  |
|  | Maquet-5  Questions to the FDA,    12 |
| 15 | Bates Stamp 160-161 |
| 16 | Maquet-6  Users Manual, Bates Stamp 03-161    13 |
| 17 | Maquet-7  Maquet Users Manual (2)    53 |
| 18 | Maquet-8  Excel Spreadsheet of MDR,    19 |
|  | Bates Stamp 157-159 |
| 19 |  |
|  | Maquet-9  Letter to the FDA,    26 |
| 20 | Bates Stamp 124 through 133 |
| 21 | Maquet-10 Safety Alert Letter, Bates Stamp 122   26 |
| 22 | Maquet-11 Safety Alert Letter, Bates Stamp 123   27 |
| 23 | Maquet-12 Two Page Document, Bates Stamp 120-121 27 |
| 24 | Maquet-13 Enforcement Report    27 |
| 25 | Maquet-14 Twelve Page Document about Pinched    31 |

|  | Page 5 |
|---|---|
| 1 | PHILIP SAX, 1140 RT. 22 East, Suite 202, |
| 2 | Bridgewater, New Jersey 08807, called as a witness, |
| 3 | having been duly sworn, was examined and testifies |
| 4 | as follows: |
| 5 | (Confidentiality Agreement marked Maquet-1 |
| 6 | for identification.) |
| 7 | (Amended Notice of Deposition marked |
| 8 | Maquet-2 for identification.) |
| 9 | MR. ADEN:  I just have a couple of |
| 10 | preliminary matters, if I might.  First of all, we |
| 11 | marked as Maquet-1 a stipulation and protective |
| 12 | order which the parties to this matter, and counsel |
| 13 | for Maquet, Inc. have signed.  And, even though the |
| 14 | court has not yet entered this order, do we all |
| 15 | agree that the parties at Maquet, Inc. can be bound |
| 16 | by this protective order in connection with the |
| 17 | documents that Maquet, Inc. has produced today? |
| 18 | MR. NEWMAN:  Yes. |
| 19 | MR. MCCONNELL:  Yes.  And I agree on |
| 20 | behalf of the defendant of Children's. |
| 21 | MR. ADEN:  Second of all, we marked as |
| 22 | Maquet-2 the amended notice of deposition.  This is |
| 23 | a 30(b)(6) deposition which has been noticed by |
| 24 | plaintiffs in this matter of Morring versus |
| 25 | Children's National Medical Center and I just wanted |

Page 6

1  to reiterate the obvious, that Mr. Sax is here
2  speaking on behalf, and testifying on behalf of,
3  Maquet, Inc. in response to this amendment notice of
4  deposition marked Maquet-2 and we expect that the
5  interrogation will be limited to the categories
6  which have been set forth in this notice. Thank
7  you.
8  DIRECT EXAMINATION BY MR. NEWMAN
9      Q   With that, can you state your full name
10 for the record.
11     A   My name is Philip E. Sax, S-A-X.
12     Q   Mr. Sax, I was provided a two page
13 document which appears to be your curriculum vitae.
14 Is that correct?
15     A   Yes.
16     Q   What I'll do, I'll mark it as exhibit
17 three just so I'm clear.
18         When did you first begin being involved
19 with Maquet?
20     A   I joined Maquet on October 29, 2007.
21     Q   Now, I've also been provided a -- just to
22 identify the documents so we can deal with them --
23 what appears to be the December 19, 1994 510(k).
24 Are you aware of that?
25     A   I've seen that.

Page 7

1      Q   Okay. I'll just mark that as exhibit
2  four.
3          Am I correct that you had nothing to do,
4  obviously, in 1994 with the 510(k)?
5      A   No, I did not.
6      (Mr. Sax's Curriculum Vitae, Bates Stamp
7  01, marked Maquet-3 for identification.)
8      (510(k), Bates Stamp 162, marked Maquet-4
9  for identification.)
10     Q   Exhibit five, which is Bates Stamp 160,
11 can you tell me what that is?
12     A   This appears to be a letter from the FDA
13 related to the 510(k) summation originally.
14     Q   Do you know, with regard to what's now
15 going to be marked as exhibit five, if that, in
16 fact, was generated around the time of the 510(k)?
17 Do you have any knowledge one way or another, which
18 would have been December of '94?
19     A   It's not dated. I can make an assumption;
20 but it's not dated.
21     Q   Let me ask you this: Did you draw a
22 conclusion based on the way it's set out with, if
23 you will, deficiencies that it was related to the
24 510(k)?
25     A   It looks like it was a request for

Page 8

1  additional information related to the 510(k).
2          MR. ADEN: There are two pages in this
3  exhibit, so make sure you refer to the Bates Stamp
4  number and which page.
5      A   I'm looking at the page -- is that the
6  page number -- Maquet, and it's just 160.
7      Q   And is the next -- I don't know the page
8  the next one is -- is it 161, what's that?
9      A   This looks like, again, it's from revision
10 to the 510(k) and explaining the indication for use
11 of the device, and this would also be from the U.S.
12 FDA, and that's 161.
13     Q   All right. Within the -- counsel, I have
14 a copy for you -- within exhibit five, the statement
15 and deficiency 4c, I'm going to ask -- it appears to
16 read as follows -- and I'm not reading the entire
17 paragraph, simply the section of the paragraph
18 halfway through which begins, "Indication for use."
19         It says, "Indication for use and duration
20 longer than six hours is currently considered
21 investigational and would require the submission of
22 an investigation of the device exemption (IDE
23 application.)
24         First of all, I gather I read that
25 correctly. And the next question: Do you know

Page 9

1  anything, since the time you become involved with
2  Maquet, if, in fact, there has been any submissions,
3  to your knowledge, with the use of the device for an
4  IDE for that particular purpose, greater than six
5  hours?
6      A   Not to my knowledge, no.
7      Q   Am I also correct in assuming that there
8  have been no up-to-the-date, today, an attempt by
9  Maquet to change in any manner the indications with
10 regard to the usage of the machine?
11     A   No.
12     Q   So it still remains a machine that is
13 intended for use, and that was involved in the
14 510(k), for six hours or less?
15     A   Correct.
16     Q   If there is an IDE application made, who
17 can be the sponsor of that?
18     A   If there were to be an IDE, which would
19 translate into clinical studies, that would come
20 from the factory in Sweden.
21     Q   If a practitioner or organization or
22 health care organization were to attempt to get an
23 IDE, is there a modification to Maquet to get done?
24     A   The way a process works, it's the owner of
25 the equipment, or the 510(k), that would apply for

Page 10

1    that. A practitioner or hospital can't do that.
2        Q    In regard to that deficiency comment,
3    there's a response which, if I'm correct, that's the
4    response from Maquet to the questions of the FDA?
5        A    That was from, at the time, Jostra, who
6    owned the 510(k) who developed the product. It was
7    not Maquet at that time.
8        Q    Therefore "It was Jostra's response to the
9    FDA that: The Jostra HL-20 is indicated for use as
10   an extracorporal circulation device for profusion
11   lasting not more than six hours. This is
12   sufficient. However, the labeling for the HL-20
13   should also include warnings informing the user that
14   the device has been qualified only for durations
15   appropriate to CPB procedures and has not been
16   qualified, through in vitro, in vivio, or clinical
17   studies for long term use as a bridge to transplant,
18   pending recovery of the natural heart, or ECMO
19   procedures."
20       A    That's correct.
21       Q    To your knowledge, is that continued to be
22   the warnings with regard to the device?
23       A    Yes.
24       Q    Do you have knowledge as to why those
25   warnings are still in place?

Page 11

1        A    That was a clearance that the FDA granted.
2        Q    And there has been no attempt by Jostra,
3    or later Maquet, to, in anyway, expand those
4    limitations?
5        A    No, there has been not been, to the best
6    of my knowledge.
7        Q    Still no vitro or in vivio studies?
8        A    No.
9        Q    Do you have any knowledge, one way or
10   another, as to why there was such an inquiry by the
11   FDA as to specifying the duration of the pump?
12       A    I don't know what their thought process
13   was, but that's the standard in the industry.
14       Q    Can you explain what that means?
15       A    In the process of submitting a 510(k), you
16   provide information of your substantial equivalence
17   to a product already in the marketplace. The FDA
18   reviews that. They make their suggestions and
19   recommendations to make sure it is substantially
20   equivalent to products already cleared for
21   marketing, and that was their addition to it, the
22   six hour limitation.
23       Q    So, with regard to the 510(k), it was
24   comparing itself specifically of products that were
25   also for six hours or less?

Page 12

1        A    Yes.
2            MR. NEWMAN: That's exhibit five.
3            MR. MCCONNELL: Off the record.
4            (Off the record discussion.)
5            (Questions to the FDA, Bates Stamp 160 and
6    161, marked Maquet-5 for identification.)
7        A    The second page of this document I'm
8    looking at, Maquet 161 -- that's 160 and 161. The
9    second page of that looks like it was from the
10   Jostra Operating Manual that's provided to
11   customers, not something from the client's or the
12   FDA's response.
13       Q    So it appears that 160 is what you would
14   expect from the FDA --
15       A    -- FDA. 161 looks like it's part of the
16   owner/user operator's manual.
17       Q    All right. Since we're on that subject,
18   I've been provided today with what's been Bates
19   Stamped as Maquet-3 through 119, which appears to be
20   the users manual.
21       A    Right.
22       Q    All I can say at the end of 119 it's -- it
23   says copyright, among other things, "Maquet Critical
24   Care, AB 2004?"
25       A    Yeah.

Page 13

1        Q    Is that the date of the issue of this
2    manual?
3        A    That would be the date that the manual was
4    put together with the Maquet label on it and
5    copyrighted.
6            MR. NEWMAN: I'm going to mark that as
7    exhibit six.
8            (Users Manual, Bates Stamp 031-19, marked
9    Maquet-6 for identification.)
10       Q    In the litigation involving this matter,
11   there was a manual produced, and you may have no
12   knowledge of it one way or another, but at least
13   with regard to the copyright that dates the same.
14   But let me turn to the last page of the document
15   which had been marked before -- we'll do it this
16   way, it will now be exhibit seven just to keep it
17   straight -- on the last page it says, "Jostra HL-20
18   User's Manual." And then it has an order number of
19   938731. Let me just let you look at what I'm
20   talking about; it's the last page.
21           MR. ADEN: This is exhibit seven or
22   exhibit eight?
23           MR. NEWMAN: Exhibit seven.
24           MR. ADEN: It has a different -- is that
25   from a different deposition?

# EXHIBIT P



*Consent Form Revised January 12, 2005*

# CHILDREN'S NATIONAL MEDICAL CENTER
### Department of Neonatology
### 111 Michigan Avenue, NW
### Washington, DC 20010
### (202) 884-5000

## CONSENT TO PARTICIPATE
## IN A CLINICAL RESEARCH STUDY AND AUTHORIZATION TO
## USE PROTECTED HEALTH INFORMATION

| | |
|---|---|
| **TITLE OF STUDY:** | Evaluation of Serum Iron And Iron Storage Levels in Neonates Undergoing Extracorporeal Membrane Oxygenation (ECMO) |
| **PRINCIPAL INVESTIGATOR:** | K. Rais-Bahrami, MD, Department of Neonatology |

### *"You" refers to "You" or "Your Child" throughout this document*

**INTRODUCTION:** We would like to invite you to be part of a research study at Children's National Medical Center. Before you decide if you would like to participate, we want you to know why we are doing the study. We also want you to know about any risks (anything unexpected that might happen) and what you will be expected to do in the study.

This form gives you information about the study. Your doctor will talk to you about the study and answer any questions you have. We encourage you to discuss this study with your family and anyone else you trust before making your decision. We will ask you to sign this form to show that you understand the study. If your child is seven years old or older, we may talk to your child about the study and ask your child to sign a form like this one but shorter. We will give you a copy of this form to keep. It is important that you know:

- You do not have to join the study;
- You may change your mind and stop being in the study any time you want. In some cases however, stopping the study medication early may cause harm to you. Your doctor will discuss this with you.

**IRB APPROVAL DATE:**          **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 1 of 9
Reviewed by IRB _____

**CNMC 02826**



*Consent Form Revised January 12, 2005*

- If we make any important change to the study we will tell you about it and make sure you still want to be in the study.

## A. PURPOSE OF STUDY

We want to study the iron levels in the blood of babies that require ECMO support. We know that during ECMO a lot of blood is broken down. A lot of iron is therefore being released in the patient's blood stream. We want to measure the level of iron in the bloodstream before we start ECMO and after ECMO, to see how high the levels of iron go. We also want to measure the iron levels before your baby is discharged from the CNMC NICU, as well as when you come back with your baby for follow-up, until your baby is one year old. We would like to see how long it takes for the iron levels to drop after ECMO. If babies' iron levels stay high for a long time, we will recommend that babies drink a low-iron formula and do not take a vitamin which contains iron after discharge from the NICU.

Your baby is being asked to be in this study because he or she is going to be placed on ECMO.

## B. PROCEDURE

Your baby is about to go on ECMO in the NICU at Children's Hospital. You have met or will meet a team of people involved in the care of your baby (doctors, ECMO specialists, nurses and respiratory therapists). If you agree that your baby can take part in this study, we will draw 2 cc of blood (less than half a teaspoon) from your baby as are starting ECMO. We will send that sample to the lab for them to do iron studies. During ECMO a lot of blood will be drawn for other tests. This blood will be taken from the catheter already in place, we will not stick your baby somewhere else. If ECMO is stopped in less than 7 days, we will draw another 2 cc of blood, again from the catheter already there, and send it for iron tests. If your baby is on ECMO for longer than 7 days, we will make the same measurements after 7 days since ECMO is started, and then every 7 days until your baby is off ECMO. Then we will measure them again on the last day of ECMO.

We will subsequently draw 2 cc of blood and run the same tests before your baby is discharged from the CNMC NICU, and subsequently when your baby comes back for follow-up in the Children's Hospital Developmental Clinic (at 4 months after discharge, 8 months after discharge and 12 months after discharge), this time drawing blood from a



IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 2 of 9
Reviewed by IRB _____

**CNMC 02827**



*Consent Form Revised January 12, 2005*

vein or through a heel stick.   We will not ask you to come back for a separate visit just for our study.  If your baby needs to have other blood tests, we will try to do all blood draws at the same time.

If you would like, we will let you know what the results of our tests are, as they become available from the lab.

## C. POTENTIAL RISKS/DISCOMFORT

Once your baby is on ECMO, there will be frequent blood sampling from the catheter or tube that will be placed for ECMO.  Drawing off the additional blood for our tests will add no additional risk or discomfort.

Prior to your baby's discharge, and when your baby comes back for follow-up at 4, 8 and 12 months after discharge from the NICU, we will have to draw blood at each visit either through the vein or by a heel stick.  The risks of blood drawing include bruising, swelling and possible infection.  However, the person that will draw your baby's blood is a professional phlebotomist (person that draws blood for a living) who will take extra care to clean the area well to avoid the risk of infection.  The phlebotomist will try to minimize the discomfort of drawing blood by using a very small needle.

## D. VOLUNTARY PARTICIPATION

There will be no penalty or loss of benefits to which you are otherwise entitled if you decide to withdraw from the study.

## E. POTENTIAL BENEFITS

The babies who are part of this study will help us find out whether babies have very high iron levels after ECMO.  If that is the case, we will change the diet recommendations, possibly to recommend low iron formula and no extra iron-containing vitamins after discharge from the NICU.

**IRB APPROVAL DATE:**     **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 3 of 9
Reviewed by IRB _____

**CNMC 02828**



*Consent Form Revised January 12, 2005*

## F. ALTERNATIVES TO PARTICIPATION

We do not currently know what the levels of iron are in the babies that have been treated with ECMO. You may choose not to participate in this study.

## G. QUESTIONS – WHO TO CALL

We want you to ask questions about any part of this study or consent form either now or at any time in the future. If you have research or medical questions about this study, call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you believe you have been injured as a result of being in this study, you should call the Principal Investigator, K. Rais Bahrami, M.D., at (202) 884-5448. If you have any questions or concerns about your rights in this research study at any time, please call Children's Hospital's Manager of Customer Relations, at (202) 884-5000 or call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000.

## H. CONFIDENTIALITY

We will keep the records of this study confidential. Only the people working on the study will know your name. They will keep this information in case we have to find you later to let you know of any new information that may affect your health. The federal government can review the study records and medical records to make sure we are following the law and protecting the children in the study. Your medical record is confidential, but just like any medical record; there are some exceptions under state and federal law.

## HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY

In 1996 the government passed a law known as The Health Insurance Portability and Accountability Act (HIPAA). This privacy law protects your individually identifiable health information (Protected Health Information or PHI). The privacy law requires you to sign an agreement so researchers can use or share your PHI for research purposes. This describes to you how information about you may be used or shared if you are in a research study. It is important that you read this carefully and ask a member of the research team to explain anything you do not understand.

I authorize Dr. K. Rais-Bahrami and his research staff to create, access, use, and disclose my PHI for the purposes described below.

**IRB APPROVAL DATE:**     **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 4 of 9
Reviewed by IRB _____

**CNMC 02829**



*Consent Form Revised January 12, 2005*

**Protected Health Information that may be used and shared includes:**

☒ Information that identifies you such as name, address, telephone number, date of birth, Social Security number, and other details about you

☒ Information that relates to your health or medical condition from your medical records

☒ Information obtained from the study procedures outlined in this consent form, for example: things done to see if you can join the study such as physical exams, blood and urine tests, x-rays and other tests, and any other medical information we learn from you about your health history and family history

☒ Laboratory results obtained on specimens collected from you (blood, urine, tissue)

☐ Questionnaires or surveys you complete

☐ Interviews conducted with you by members of the research team

☐ Audio/ video recordings

☐ Other *[please specify]:

*Example: *list any additional information that may be obtained from participants that is listed above such as information about financial and social circumstances, or educational level.*

**The Researchers may use and share my Protected Health Information with:**

♦ The Principal Investigator, other Investigators, Study Coordinators, and all administrative staff in charge of doing work for the study;

♦ Government agencies that have the right to see or review your PHI, including but not limited to the Office of Human Research Protections and the Food and Drug Administration;

♦ Children's National Medical Center Institutional Review Board;

♦ Audit Committee of the Children's National Medical Center Institutional Review Board;

♦ Quality Improvement Program Coordinator and other staff in the Office for the Protection of Human Subjects at Children's National Medical Center.

**In addition to the above people and organizations, the Researchers may also use and share my Protected Health Information with:**

☐ Doctors and staff at other places that are participating in the study. The name(s) of the other place(s) that are participating in this study are

☒ Laboratories and other people or organizations that look at your health information in

*IRB APPROVAL DATE:*          *IRB EXPIRATION DATE:*





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 5 of 9
Reviewed by IRB _____

**CNMC 02830**



*Consent Form Revised January 12, 2005*

connection with this study. The name(s) of the laboratory(ies) being used in this study is (are) the Children's National Medical Center Laboratory.

☐ The Sponsor of the study and people that the Sponsor may contract with for the study. The name of the Sponsor is

☐ The Contract Research Organization (an organization that helps the Sponsor run the study). The name of the Contract Research Organization is

☒ The Data Safety Monitoring Board (a group of people who examine the medical information during the study)

☒ The Medical Monitor for the Study (a person who reviews medical information during the study)

☒ The Patient Advocate or Research Ombudsman (person who watches out for your best interest)

☐ Any other outside entity who will receive health information
  Please list:

Also, your primary physician will be contacted if during the course of the study the researcher learns of a medical condition that needs immediate attention.

Should your health information be disclosed to anyone outside of the study, your information may no longer be protected by HIPAA and this Authorization. However, the use of your health information will still be regulated by applicable federal and state laws.

If you agree to participate in this research study, the research team, the research sponsor (when applicable) and the sponsor's representatives, may use Personally Unidentified Study Data. The Personally Unidentified Study Data does not include your name, address, telephone, or social security number. Instead, the researcher assigns a code to the Personally Unidentified Study Data. Personally Unidentified Study Data may include your date of birth, initials, and dates you received medical care. Personally Unidentified Study Data may also include the health information used, created, or collected in the research study. The research team or the research sponsor may share the Personally Unidentified Study Data with others to perform additional research, place it into research databases, share it with researchers in the U.S. or other countries, or use it to improve the design of future studies. They may also publish it in scientific journals, or share it with business partners of the sponsor and to file applications with U.S. or foreign government agencies to get approval for new drugs or health care products.

**IRB APPROVAL DATE:**     **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 6 of 9
Reviewed by IRB _____

**CNMC 02831**



*Consent Form Revised January 12, 2005*

**You do not have to sign this Consent/Authorization.** If you decide not to sign the Authorization, you will not be allowed to participate in the research study.

**After signing the Consent/Authorization, you can change your mind and:**

♦ Revoke this Authorization. If you revoke the Authorization, you will send a written letter to: K. Rais-Bahrami to inform him/her of your decision.
♦ If you revoke this Authorization, researchers may only use and disclose the PHI that was collected for this research study before you revoked the Authorization.
♦ If you revoke this Authorization your PHI may still be used and disclosed if you should have an adverse event (unexpected side effect).
♦ If you change your mind and withdraw the Authorization, you will not be allowed to participate in the study.

You will be allowed to review the information collected for this research study until after the study is completed. If you are not allowed to review your information during participation in the study, when the study is over you will have the right to access the information. This Authorization does not have an expiration date .

**If you have not already received a Notice of Privacy Practices from Children's National Medical Center, you may request a copy and will be given one. If you have any questions or concerns about your privacy rights, you may contact the Children's Hospital Privacy Officer at 202-884-4550.**

## I. COMPENSATION

Children's National Medical Center cannot promise that the risks we have told you about or other unknown problems will not happen. If you think that something unexpected happened because you were in the study, please call the Chief Academic Officer of the Children's National Medical Center at (202) 884-5000. We will give your child any emergency treatment needed.

**IRB APPROVAL DATE:**          **IRB EXPIRATION DATE:**





IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 7 of 9
Reviewed by IRB _____

**CNMC 02832**



Consent Form Revised January 12, 2005

## J. ADDITIONAL ELEMENTS

You or your health insurance will not be charged for the lab tests we do for this study. You will still have to pay for any medical care that is not part of the study. There will be no consequences to you or your child for withdrawing from this study.

### Research Subject Advocate:

The National Institutes of Health supports a Research Subject Advocate or RSA for the research study that you are being asked to join. The RSA, Dr. Tomas Silber, is here to answer your questions or concerns about taking part in this research. Dr. Silber does not work for the doctors who are doing this research and they do not pay him. He is here only to help and protect you during any research.

You may contact Dr. Silber at any time. This can be done before you decide to take part in the research, during the study, or even after you finish the study. You can call Dr. Silber at 202-884-3066 or reach him by e-mail at tsilber@cnmc.org.

### CONSENT / AUTHORIZATION:

I am the participant or I am authorized to act on behalf of the participant. I have read this information and will receive a copy of this form after it is signed.

By signing this form, you agree that you have talked to your doctor about the study and understand it, and you want to be in the study. You agree that we have talked to you about the risks and benefits of the study, and about other choices. You may decide to stop being in this study at any time and no one will mind and nothing will change about your medical care other than not being in the study. Copies of this form will be:

(1)    Kept in the study file by the Principal Investigator;
(2)    Put in your medical record; and
(3)    Given to you to keep.

Please call the Principal Investigator, K. Rais-Bahrami, M.D. at (202) 884-5448 if you have any questions.

**IRB APPROVAL DATE:**     **IRB EXPIRATION DATE:**

| IRB Approved |
| --- |
| AUG 1 7 2005 |
| Children's Hospital |

| EXPIRATION |
| --- |
| SEP – 1 2006 |
| Children's Hospital |

IRB Protocol No.: 3424
Date: JULY 6, 2005
Page 8 of 9
Reviewed by IRB _____

CNMC 02833



*Consent Form Revised January 12, 2005*

Printed Name of Participant: _____

Medical Record Number: _____

Printed Name of Parent(s)/Guardian(s): _____

Signature of Participant: _____ Date:_____
*(Participant must be 18 years of age or older)*

Signature of Parent(s)/Guardian(s): _____ Date:_____

Witness (to signatures): _____ Date:_____
    (may be investigator)

Translator's Signature (if, applicable): _____

    Language: _____

**AFFIDAVIT OF PERSON OBTAINING CONSENT:** I certify that I have explained to the above individual(s) the nature and purpose of the study, potential benefits, and possible risks associated with participation in this study. I have answered any questions that have been raised.

Printed Name of Individual Obtaining Consent: _____

Title: _____ Signature: _____ Date: _____

**IRB APPROVAL DATE:**     **IRB EXPIRATION DATE:**

IRB Approved

AUG 1 7 2005

Children's Hospital

EXPIRATION

SEP - 1 2006

...dren's Hospital

IRB Protocol No.: 3424
Date: JULY 6, 2005
    Page 9 of 9
Reviewed by IRB _____

**CNMC 02834**

# EXHIBIT Q

VIDEOTAPED DEPOSITION OF ROBERT F. CULLEN, JR., M.D.
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

1 (Pages 1 to 4)

---

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
 2
     - - - - - - - - - - - - - - -
 3
     TERESA A. MORRING and,      :
 4   DESHAUNIA Q. SNOWDEN,       :
     as Parents and Next Friends :
 5   of                         :
                                :
 6        Plaintiffs,            :
                                :
 7   vs.                        :
                                :
 8   CHILDREN'S NATIONAL MEDICAL :
     CENTER,                     :
 9                              :
          Defendant.            :
10   _____/
11
12
13        VIDEOTAPED DEPOSITION OF
          ROBERT F. CULLEN, JR., M.D.
14
          Taken on Behalf of the Defendant
15
     DATE TAKEN:  February 25, 2008
16   TIME:        6:14 PM - 9:23 PM
     PLACE:       3200 South West 60 Court
17                Miami, Florida 33155
18
19
20
21
22   Reported By:
     Michele Anzivino, RPR
23   Notary Public, State of Florida
     Network Reporting
24   305.358.8188
25
```

**Page 2**

```
 1   APPEARANCES:
 2   On Behalf of the Plaintiffs:
     NEWMAN, MCINTOSH & HENNESSEY, LLP
 3   BY: ANTHONY G. NEWMAN, ESQUIRE
     The Air Rights Building, East Tower
 4   7315 Wisconsin Avenue Suite 700
     Bethesda, Maryland 20814
 5   301.654.3400
 6
     CHAIKIN, SHERMAN, CAMMARATA, SIEGEL, P.C.
 7   BY: IRA SHERMAN, ESQUIRE
     1232 17th Street, Northwest
 8   The Law Building
     Washington, D.C. 20036
 9
10   On Behalf of the Defendant:
     JACKSON & CAMPBELL
11   BY: NICHOLAS S. MCCONNELL, ESQUIRE
     1120 20th Street, Northwest Suite 300
12   Washington, D.C. 20036
     202.457.1600
13
14
15           I N D E X
16   WITNESS:   DIRECT CROSS REDIRECT RECROSS
17   ROBERT F. CULLEN, JR., M.D.
18   By Mr. Mcconnell   3   --   --   --
19
20           - - -
21       E X H I B I T S
22   NUMBER    DESCRIPTION         PAGE
23   1      retained             3
24   2      retained             3
25
```

**Page 3**

```
 1        (The documents referred to were thereupon
 2   marked as Deposition Exhibits 1 and 2 for
 3   identification.)
 4        THE VIDEOGRAPHER:  Here begins videotape
 5   number one in the deposition of Robert Cullen,
 6   Jr., M.D. in the matter of Morring et al versus
 7   Children's National Medical Center, Case Number
 8   06-CV02036.  Today's date is February 25, 2008.
 9   The time on the video monitor is 6:14 p.m.  The
10   video operator today is Matt Taylor.  This video
11   deposition is taking place at 3200 Southwest 60th
12   Court, Suite 302, Miami, Florida.
13        Would counsel please identify yourselves and
14   state who you represent.
15        MR. NEWMAN:  Anthony Newman and Ira Sherman
16   on behalf of the plaintiff.
17        MR. MCCONNELL:  And Mike McConnell for
18   Children's National Medical Center.
19        THE VIDEOGRAPHER:  The court reporter today
20   is Michele Anzivino of LegalLink.  Would you
21   please swear in the witness?
22   Thereupon:
23        ROBERT F CULLEN, JR., M.D.,
24   having been first duly sworn or affirmed, was
25   examined, and testified as follows:
```

**Page 4**

```
 1        THE WITNESS:  I do.
 2   DIRECT EXAMINATION BY MR. MCCONNELL:
 3        Q.   Doctor, would you tell us your full name,
 4   please.
 5        A.   Robert Frances Cullen, Jr., M.D.
 6        Q.   And you're a licensed physician licensed to
 7   practice medicine in the State of Florida?
 8        A.   That's correct.
 9        Q.   And presently focusing your practice on
10   pediatric neurology?
11        A.   That's correct.
12        Q.   And your practice is based at Miami
13   Children's Hospital?
14        A.   Yes.
15        Q.   Where you've been in practice for how many
16   years?
17        A.   I've been here since 1974.
18        Q.   And based on materials that have been
19   provided to me by counsel for the plaintiff, it's my
20   understanding that you have been retained to testify
21   in this case as an expert witness for the plaintiffs?
22        A.   Yes.
23        Q.   And have agreed to do so?
24        A.   Yes.
25        Q.   And they've made arrangements with you,
```

VIDEOTAPED DEPOSITION OF ROBERT F. CULLEN, JR., M.D.
CONDUCTED ON MONDAY, FEBRUARY 25, 2008

**41**

1     When you see those patients, have you ever
2 been involved in their care in determining whether or
3 not to place the patient on ECMO?
4     MR. NEWMAN: Objection.
5     THE WITNESS: No.
6 BY MR. MCCONNELL:
7     Q. Do you know at Children's Miami what
8 parameters are used to determine whether an infant
9 should be placed on ECMO?
10     A. No, I don't.
11     Q. Do you know whether either here at
12 Children's Miami or among physicians who do ECMO
13 regularly and pediatric pulmonologists, there are ways
14 of ascertaining blood oxygen levels that are the
15 functional equivalent of PAO2s less than 50 without
16 using a PAO2 measurement? Do you know if there are
17 other ways of determining that?
18     A. Such as?
19     Q. I'm asking you. Do you know.
20     A. I'm not sure what you're referring to.
21     Q. You just have know idea how that might
22 occur, correct?
23     A. I don't know of any that are reasonably
24 consistent, no.
25     Q. Do you have an opinion one way or the other

**42**

1 whether this child had any cardiovascular instability
2 during the mid afternoon to late afternoon hours on
3 September 13, 2005?
4     A. Well, I think in the afternoon of the -- of
5 the 13th we started to see some prolong VSATs, yes.
6     Q. Was that a signal of cardiovascular
7 instability?
8     A. It would reflect difficulties with profusion
9 and oxygenation, yes.
10     Q. And do you see in the records that the
11 health care providers were attempting to stabilize the
12 infant at that point with various interventions?
13     A. They were.
14     Q. And what were those interventions?
15     A. Well, they've used high frequency
16 oscillatory ventilation, they'd used nitric oxide --
17 nitrous oxide.
18     Q. With those interventions had they been able
19 to maintain satisfy PO2s?
20     A. The PO2s up until late that afternoon had
21 been reasonable.
22     Q. All right. But with those interventions,
23 were they able to maintain those satisfactory levels?
24     A. I don't think they were happy with what they
25 had, no.

**43**

1     Q. Well, it's not so much being happy with what
2 they had, but was this child being adequately pursued
3 -- profused with the interventions that included high
4 frequency oscillation or ventilation and nitric oxide?
5     A. Well, the oxygen sats and the PO2s had been
6 reasonable until they started to change in the
7 afternoon.
8     Q. And then in the afternoon, what happened to
9 the O2 sats?
10     A. They started to decrease into the 70s.
11     Q. Is that adequate level of profusion for this
12 infant?
13     A. No, it's low.
14     Q. And if the -- looking at the record, they
15 had used high frequency oscillation or ventilation,
16 they had attempted nitric oxide. At that point was
17 there anything else left by way of conventional
18 therapy if you know?
19     A. I don't recall seeing if surfactant had been
20 used.
21     Q. You think surfactant, surfactant,
22 S-U-R-F-A-C-T-A-N-T, is an appropriate modality for
23 this infant at this time?
24     A. I've seen it used for severe respiratory
25 distress like this, yes.

**44**

1     Q. Do you have any way of knowing whether if
2 surfactant had been used it would have had any effect
3 in improving the child's O2 sats?
4     A. I don't, no. But if surfactant were used,
5 it would have been anticipated to be used earlier.
6     Q. Do you know if surfactant had been used
7 earlier?
8     A. I don't recall seeing an order for it, no.
9     Q. Do you know if surfactant had been used
10 initially during the infant's admission at CHKD?
11     A. I don't know because I don't have all those
12 order sheets.
13     Q. But you would agree that the O2 sats in the
14 70s would not have reflected a patient who was
15 cardiovascularly stable and adequately profused,
16 correct?
17     A. It would not reflect stability, no.
18     Q. If a child is unable to attain and maintain
19 adequate levels of oxygen saturations, what effect
20 does that have on a child?
21     MR. NEWMAN: Objection. With what duration?
22 BY MR. MCCONNELL:
23     Q. Let's be specific. Well, go ahead. Answer
24 the question as I put it.
25     A. It would depend upon what other support